**EINBINDER & DUNN, LLP**
Michael Einbinder, Esq. *Pro Hac Vice Admission Pending*
Mackenzie L. Dimitri, Esq. *Pro Hac Vice Admission Pending*
Kenneth L. Leiby, Jr., Esq.
159 Millburn Ave.
Millburn, NJ 07041-1849
973-921-2000
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES INC., | DOCKET NO. |
| Plaintiff, | CIVIL ACTION |
| v. | |
| LEHIGH GAS WHOLESALE SERVICES, INC.,<br>LEHIGH GAS WHOLESALE LLC, and<br>LGP REALTY HOLDINGS LP | |
| Defendants.<br>_____/ | **COMPLAINT**<br>**AND JURY DEMAND** |

Plaintiff, Universal Property Services Inc. ("UPS"), by its attorneys, Einbinder & Dunn, LLP, for its complaint in the above-entitled action, alleges as follows:

<u>**The Parties**</u>

1.      UPS is a New Jersey corporation, with a principal place of business located at 6 Lenn Road, Allentown, New Jersey 08501.

2.      Lehigh Gas Wholesale Services, Inc. ("Lehigh Landlord") is a Delaware corporation. Upon information and belief, its principal place of business is 600 Hamilton Street, Allentown, Pennsylvania, 18101.

3.      Lehigh Gas Wholesale LLC ("Lehigh Supplier") is a Delaware limited liability corporation. Upon information and belief, its principal place of business is 600 Hamilton

Street, Allentown, Pennsylvania, 18101. Upon information and belief, its members are entities that are citizens of (or whose members and/or partners are citizens of) states other than New Jersey.

4.     LGP Realty Holdings LP ("LGP") is a Delaware limited partnership. Upon information and belief, its principal place of business is 600 Hamilton Street, Allentown, Pennsylvania, 18101. Upon information and belief, its partners are entities that are citizens of (or whose members and/or partners are citizens of) states other than New Jersey.

5.     Lehigh Landlord and Lehigh Supplier (together, the "Lehigh Parties") and LGP are affiliates with common ownership and interests.

## Jurisdiction and Venue

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as more fully detailed below.

7.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, as UPS is a citizen only of the State of New Jersey and none of the defendants is a citizen of New Jersey as more fully detailed below.

8.     The value of the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.     Venue is proper in this district as to Defendants pursuant to 28 U.S.C. § 1391 (b)(1) and 28 U.S.C. §1391(c)(2), because Defendants are entities which are subject to personal jurisdiction in this district.

## The Nature of the Action

10.     This case arises out of the Petroleum Marketing Practices Act, 15 U.S.C.A. § 2801 *et seq.* ("PMPA"), a statute designed to protect retail service station franchisees from wrongful and arbitration termination of their franchises. UPS is a party to several agreements with

Defendants for the operation of 17 retail service station franchises. Defendants wrongfully terminated all 17 franchises. The termination violated the PMPA because (1) Defendants have no grounds for termination, which grounds are specifically prescribed by the PMPA; and (2) because Defendants did not provide sufficient notice as required by the PMPA. The termination was also wrongful because it violated state laws.

11.     As set forth more fully below, Defendants are responsible for processing credit card payments made at UPS' 17 businesses, and are then required to deposit those payments into UPS' 17 operating accounts. Defendants wrongfully withheld more than $1 million in credit card proceeds from UPS, starting in or about September 2019. UPS demanded Defendants release the improperly withheld funds, which Defendants ignored. UPS advised Defendants that without the wrongfully withheld funds in their operating accounts, UPS could not pay its bills via withdrawal from its operating account. In other words, Defendants would not be able to deduct amounts due under any of the agreements from UPS' operating accounts, because Defendants were withholding all of UPS' funds that were supposed to be deposited into those operating accounts. UPS had several conversations with Defendants and understood that Defendants would apply the improperly withheld funds to UPS' November 2019 rent and return the remainder of the improperly withheld funds. Instead, however, Defendants continued to improperly withhold UPS' funds in subsequent months. Defendants never advised UPS that it was in breach of any of the agreements or provided UPS with a time to cure, as required under the agreements, so UPS understood that Defendants had applied the improperly withheld funds to amounts due under the agreements. UPS continued to request that Defendants return the improperly withheld funds, however, as the amounts Defendants improperly withheld far exceeded any amounts Defendants were owed, at any time, under the agreements. Defendants refused to turn over the improperly

withheld funds, failed to apply those funds to amounts due under the agreements without advising UPS, and then, incredibly, terminated all of the agreements alleging nonpayment by UPS. Now, UPS faces the loss of 17 businesses, the loss of employment for nearly 100 employees, and a substantial hardship as a result of this improper termination. The terminations violated state laws and federal regulations and, accordingly, this action asks the Court to find the termination improper.

## Facts

12.     Circle K Stores Inc. ("Circle K") is a franchisor which sells the rights to franchisees to operate motor fuel businesses for the sale of Circle K-sourced motor fuel and convenience stores using Circle K's trademarks and system.

13.     On or about April 30, 2019, UPS and Circle K entered into 11 supply agreements and leases for premises located at (1) 1140 County Road 309, Crescent City Florida, 32112; (2) 901 State Road 20, Interlachen, Florida 32148; (3) 9750 Old St. Augustine Road, Jacksonville, Florida 32257; (4) 1005 S. Edgewood Ave., Jacksonville, Florida 32205; (5) 205 S. Lawrence Blvd., Keystone Heights, Florida 32656; (6) 5420 W State Road 235, La Crosse, Florida 32615; (7) 17025 SE County Road 234, Micanopy, Florida, 32667; (8) 3232 W. Silver Springs Blvd., Ocala, Florida, 34475; (9) 239 N. Center Street, Pierson, Florida, 32180; (10) 2158 N. Temple Ave., Starke, Florida 32091; and (11) 861 E. State Road 44, Wildwood, Florida 34785, the terms of which were all identical, except as to location and the specific rental due under each lease, and pursuant to which UPS acquired the right to operate a motor fuel business using Circle K sourced motor fuel at the above-referenced locations. UPS and Circle K also entered into 11 security agreements for each of the above-referenced premises, the terms of which were identical except as to location.

4

14.     On or about July 10, 2019, UPS and Circle K entered into six additional supply agreements and leases for premises located at: (1) 808 S. Park Ave., Apopka, Florida 32703; (2) 2413 US 301 N., Ellenton, Florida 34222; (3) 10800 Metro Parkway, Fort Myers, Florida 85284; (4) 5055 S. Orange Blossom Trail, Kissimmee, Florida 34758; (5) 5051 Gateway Ave., Orlando, Florida 32821; and (6) 13075 Spring Hill Drive, Spring Hill, Florida, 34609, the terms of which were all identical, and which were also identical, except as to location and the specific rental due under each lease, to the terms of the supply agreements and leases entered into on April 30, 2019, and pursuant to which UPS acquired the right to operate a motor fuel business using Circle K sourced motor fuel at the above-referenced locations. UPS and Circle K also entered into six additional security agreements for each of the above-referenced premises, the terms of which were identical except as to location. (Hereafter, all of the 17 above-referenced locations are referred to collectively as the "Premises" and all of the 17 above-referenced supply agreements, lease agreements and security agreements governing the Premises are collectively referred to as the "Supply Agreements," the "Leases" and the "Security Agreements.")

15.     UPS began operating the Premises, pursuant to the Supply Agreements and Leases, between July 15, 2019 and August 15, 2019.

16.     In or about September 2019, Circle K assigned its rights and obligations under the Supply Agreements to Lehigh Supplier and its rights and obligations under the Leases to Lehigh Landlord. Circle K assigned its rights under "all agreements" entered into with UPS to the Lehigh Parties and LGP, and further stated that any guaranties or security, including the Security Agreements, would apply to the benefit of the Lehigh Parties and LGP.

I.      **The Lehigh Parties Improperly Withhold UPS' Credit Card Proceeds**

17.     The Lehigh Parties process all of UPS' credit card transactions. Lehigh Supplier is authorized, pursuant to the Supply Agreements, to withhold UPS' credit card proceeds only from the sales of motor fuel. All other credit card proceeds, including credit card proceeds from the sale of goods sold at the stores at the Premises, are UPS' property, and may not be withheld by the Lehigh Parties for any reason. Those proceeds must be turned over to the UPS Parties within a "commercially reasonable time."

18.     Regarding which specific funds Lehigh Supplier may withhold, the Supply Agreements, Section 4, provide that UPS "hereby assigns to [Lehigh Supplier] all of [UPS]'s right, title and interest in the proceeds from the sale of goods delivered by [Lehigh Supplier] that are effectuated through credit card transactions … and otherwise."

19.     The only good delivered by Lehigh Supplier to UPS is motor fuel, so the Supply Agreements only allow Lehigh Supplier to withhold credit card proceeds from fuel sales. Lehigh Supplier is not authorized to withhold credit card proceeds from any other transactions.

20.     The Leases do not authorize Lehigh Landlord to withhold credit card proceeds from any transactions at all.

21.     Notwithstanding the foregoing, the Lehigh Parties improperly withheld credit card proceeds from the sales of goods at the stores at the Premises, beginning in or about September and October 2019, shortly after the assignment of the Supply Agreements, Leases and Security Agreements from Circle K.

22.     Up to and including October 2019, UPS performed all of its obligations under the Leases, including paying all amounts due when owed.

23.     UPS maintains 17 separate operating accounts – one for each of the locations it operates. All sales at each of the locations go into that location's operating account.

Credit card sales are processed by the Lehigh Parties and then, as set forth above, are supposed to be deposited into the corresponding operating account within a commercially reasonable time, with the exception of fuel sales paid by credit card, which Lehigh Supplier may withhold and apply to amounts due for fuel sales from Lehigh Supplier to UPS pursuant to the Supply Agreement.

24.     In September 2019 and October 2019, Lehigh Landlord had withdrawn rent for each location directly from UPS' 17 operating accounts.

25.     In or about September and October 2019, the Lehigh Parties improperly withheld UPS' credit card proceeds from the sales of goods at the stores at the Premises without authorization to do so, and did not deposit those amounts into UPS' various operating accounts.

26.     As a result of this improper withdrawal, in October 2019, UPS contacted Lehigh Landlord to advise that it did not have funds in its operating accounts, and so Lehigh Landlord would not be able to withdraw its November 2019 rent payment from UPS' operating accounts. UPS demanded the return of the improperly-withheld funds, and also advised Lehigh Landlord that the amount of improperly withheld funds far exceeded (by hundreds of thousands of dollars) the rent UPS owed to Lehigh Landlord for November 2019.

27.     During several discussions regarding this issue, Lehigh Landlord verbally agreed that it would not withdraw UPS' rent from UPS' operating accounts in November 2019, based on its improper withholding of the credit card proceeds. Lehigh Landlord advised UPS that it would apply the improperly-withheld funds to the amounts due for November 2019 rent. UPS demanded that Lehigh Landlord return the improperly-withheld funds and simply withdraw the rent from UPS' operating accounts.

28.     Lehigh Landlord failed to return the improperly withheld funds before the November 2019 rent was due. Accordingly, thereafter, UPS demanded Lehigh Landlord return the improperly-withheld funds, less any amounts owed by UPS for November 2019 rent payments.

29.     Instead, thereafter, without any authority to do so, the Lehigh Parties have continued to improperly withhold UPS' credit card proceeds from sales of goods at the stores on the Premises.

30.     To date, the Lehigh Parties have improperly retained over $1 million in UPS' credit card proceeds, which far exceeds UPS' rent, or any amounts due under the Leases.

31.     UPS has repeatedly demanded the Lehigh Parties return the improperly withheld funds and deposit them into UPS' operating accounts. When the Lehigh Parties ignored these requests, UPS then demanded the Lehigh Parties take any amounts due from UPS to the Lehigh Parties under the Leases and/or Supply Agreements from the improperly withheld funds, and then return the balance to UPS' operating accounts.

32.     The Lehigh Parties have refused or ignored all of UPS' demands to return the improperly withheld credit card proceeds, including any amounts in excess of what UPS owed to the Lehigh Parties under the Leases and/or Supply Agreements. Since December 2019, Lehigh Landlord has not attempted to withdraw rent from UPS' operating accounts, and the Lehigh Parties never contacted UPS about any alleged failure to pay rent or any amounts due under the Leases or the Supply Agreements until February 6, 2020, when they abruptly sent a notice of termination, as set forth more fully below.

## II.    The February 6, 2020 Notice

33.     On February 6, 2020, the Lehigh Parties sent UPS a Notice of Termination, which stated the Supply Agreements and Leases would terminate on February 27, 2020.

34.     The February 6, 2020 Notice was based on two alleged failures to pay amounts due to the Lehigh Parties and UPS' alleged failure to provide a letter of credit. None of the allegations on which the Notice is based have any merit. (The February 6, 2020 Notice also alleged cross-defaults of the Supply Agreements and Leases, but because none of the claims underlying the alleged defaults have any merit, there is no cross-default, here.)

35.     The termination of each of the Supply Agreements and Leases constitutes a termination of a franchise governed by the PMPA. The February 6, 2020 Notice advises that it is being sent in accordance with the requirements of the PMPA.

36.     The February 6, 2020 Notice alleged UPS failed to pay (1) monthly amounts due under the Leases, including rent, in an amount totaling $721,085.78; and (2) six unpaid returned fuel drafts totaling $54,446.88, in violation of the Supply Agreements. Neither claim has merit.

37.     The February 6, 2020 Notice also stated that the Lehigh Parties reserved their rights under the Security Agreements.

a.   **The Lehigh Parties' allegations of unpaid rent and fees pursuant to the Lease.**

38.     As set forth above, the Lehigh Parties have improperly withheld more than $1 million from UPS' credit card proceeds, which is far in excess of any amounts UPS owes to the Lehigh Parties, including amounts due under the Leases. UPS has demanded the return of these funds and, when those demands were ignored, UPS demanded the Lehigh Parties deduct any payments due pursuant to the Leases and/or Supply Agreements from the improperly withheld funds (and then further demanded the Lehigh Parties return the substantial balance to UPS' operating accounts).

39.     During several conversations with the Lehigh Parties in October 2019, the Lehigh Parties advised they would deduct payments owed to them from the wrongfully withheld funds. After December 2019, the Lehigh Parties did not attempt to withdraw rent and other payments from UPS' operating accounts.

40.     Accordingly, UPS has not defaulted by failing to pay rent – rather, instead of Lehigh Landlord receiving a rent payment by withdrawing rent from UPS' operating accounts, the Lehigh Parties withheld the credit card proceeds and agreed to apply those funds to the rent and other amounts due under the Leases and Supply Agreements. In fact, the Lehigh Parties have been overpaid and owe UPS hundreds of thousands of dollars.

41.     Additionally, the balance claimed by Lehigh Landlord in unpaid rent is inaccurate and includes amounts due from third parties to Lehigh Landlord, in addition to other inexplicable charges that are not UPS' responsibility.

42.     Additionally, the Security Agreements provide that, in the event of a default, which includes any nonpayment under the Leases, the Lehigh Parties are required to provide written notice to UPS of the default, and provide UPS with 10 days to cure the default. The Lehigh Parties never provided this required written notice and did not provide UPS with an opportunity to cure as required under the Security Agreements.

43.     Based on UPS' discussions with the Lehigh Parties in October 2019 described above, the Lehigh Parties had more than 60 days' notice of all of the facts underlying its claims for default for failure to pay rent before they sent the February 6, 2020 Notice.

b.  **The Allegedly Unpaid Fuel Drafts**

44.     Lehigh Supplier's contention that UPS failed to pay for fuel drafts is also false.

45. As set forth above, UPS maintains 17 operating accounts - one for each of its locations. All sales at each of the locations go into that location's operating account. Credit card sales are processed by the Lehigh Parties and then are required to be deposited into the corresponding operating account, with the exception of fuel sales paid by credit card, which Lehigh Supplier may withhold and apply to amounts due for fuel sales.

46. As set forth above, the Supply Agreements provide that Lehigh Supplier may withhold credit card proceeds from fuel sales, only. The Supply Agreements, Section 4, also provide that if the credit card proceeds from fuel sales "are insufficient to pay for [motor fuel delivered to UPS] as of the Purchase Date, [Lehigh Supplier] may at its option demand that [UPS] pay for such goods via electronic funds transfer, cash, certified or cashier's check, money order, Automated Direct Debit System, or other means approved by [Lehigh Supplier]…"

47. Accordingly, in the event that the credit card sales for fuel at any of the locations did not cover the costs of fuel delivered by Lehigh Supplier to UPS for that location, then Lehigh Supplier could demand payment by any means.

48. The February 6, 2020 Notice alleges that Lehigh Supplier attempted to withdraw funds from UPS' operating accounts in order to pay $54,446.88 in fuel costs that were not covered by credit card proceeds from fuel sales.

49. However, as set forth above, the Lehigh Parties have been improperly withholding UPS' credit card proceeds since September or October 2019, and currently have improperly withheld more than $1 million. Moreover, UPS demanded that the Lehigh Parties apply the improperly withheld credit card proceeds to any amounts due under the Leases and Supply Agreements, and the Lehigh Parties agreed to do so.

50.     Accordingly, Lehigh Supplier collected the payments owed pursuant to the Supply Agreements *via* its improper withholding of credit card proceeds, and no amounts remain unpaid. In fact, the Lehigh Parties have improperly withheld credit card proceeds far in excess of any amounts they are owed under the Leases and Supply Agreements.

51.     Additionally, The Lehigh Parties did not provide UPS with written notice or an opportunity to cure as required under the Security Agreements.

52.     Based on UPS' discussions with the Lehigh Parties in October 2019 described above, the Lehigh Parties had more than 60 days' notice of all of the facts underlying its claims for any failure to pay before they sent the February 6, 2020 Notice. The Lehigh Parties knew, in October 2019, that UPS could not pay the Lehigh Parties via deductions from their operating accounts, at that time or any time thereafter, because hundreds of thousands of dollars (and, in fact, to date, more than $1 million) in operating funds were being wrongfully withheld by the Lehigh Parties. Since October 2019, the Lehigh Parties were aware that UPS had demanded that the Lehigh Parties return the improperly withheld funds, and when that was ignored, UPS demanded the Lehigh Parties deduct amounts due under the Supply Agreements and Leases from the improperly withheld funds and then return the substantial balance to UPS' operating accounts.

**c.   The February 6, 2020 Notice's Allegations Regarding UPS' Letter of Credit**

53.     The Supply Agreement, Section 7, provides that "...[Lehigh Supplier] reserves the right to require from [UPS] from time to time a … letter of credit … to secure [UPS]' obligations under [the Supply Agreement]…"

54.     As stated above, UPS initially entered into the Supply Agreement with Circle K. At the time UPS entered into the Supply Agreement, it provided two letters of credit, in accordance with Circle K's requests at the time.

12

55.    In or about September 2019, Circle K assigned all of its agreements and the letters of credit to the Lehigh Parties and LGP. Accordingly, Lehigh Supplier has two letters of credit from UPS.

56.    In or about October 2019, when the Lehigh Parties and UPS first discussed the Lehigh Parties' wrongful withholding of credit card proceeds and UPS' resultant inability to pay rent via withdrawals from its operating accounts, the parties also discussed whether Lehigh Landlord would provide $200,000 in rent credits to UPS, based on amounts UPS had been overcharged during the time period when it took over the Premises, and a rent reduction for November 2019, December 2019, and January 2020 rents. The Lehigh Parties advised UPS that, in the event the rent was reduced and rent credits were provided, the Lehigh Parties would require a new letter of credit from UPS. At that time, UPS advised the Lehigh Parties that it had already provided two letters of credit, and that a further letter of credit was unwarranted. The parties did not, thereafter, discuss rent reductions or a letter of credit.

57.    Lehigh Supplier has not, on any other occasion, prior to the February 6, 2020 Notice, requested UPS provide an additional letter of credit. Accordingly, there is no basis to allege a default, here.

58.    Moreover, the Lehigh Parties, again, had more than 60 days' notice of the facts underlying this claim for default.

59.    Additionally, the Lehigh Parties did not provide UPS with written notice or an opportunity to cure this alleged default as required under the Security Agreements.

60.    UPS advised the Lehigh Parties that all of the alleged claims were meritless and that UPS had not defaulted under the Leases or Supply Agreements.

61.     Notwithstanding, on February 26, 2020, the Lehigh Parties sent UPS a letter stating that, pursuant to the February 6, 2020 Notice, the Supply Agreements and Leases were terminated as of 12:01 AM on February 27, 2020. The February 27, 2020 Notice states it is sent pursuant to the PMPA.

**III.     The Three Day Notices**

62.     Thereafter, on March 5, 2020, Lehigh Landlord sent, via overnight mail, 17 notices of default under the Leases to UPS, alleging that UPS owed rent under each Lease, and demanding payment of the rent or that UPS turn over possession of the Premises within three business days, by March 10, 2020 (hereafter, the "Three Day Notices"). (Lehigh Landlord also sent copies of the Three Day Notices to an individual, not UPS, by e-mail on March 5, 2020, however, neither the notice provisions of the Leases, Pennsylvania law, nor Florida law recognize or permit notice by e-mail and, accordingly, such notice was legally and practically ineffective.)

63.     Presumably, the Three Day Notices were an attempt to comply with §83.20, Fla. Stat., which requires such notices as a condition precedent to the institution of an eviction action.

64.     Among other things, however, the Leases provide that Pennsylvania law applies.

65.     Pursuant to Article V, Section 501(b) of Pennsylvania's Landlord Tenant Act, a landlord may seek recovery of possession of a premises in the event of a failure to pay rent after the expiration of ten days' notice to pay or quit. Section 501(f) provides that the notice must be served personally upon the tenant or by leaving same at the premises.

66.     Here, of course, ten days' notice was not provided and the notice was not personally served upon UPS. Accordingly, the Three Day Notices are invalid under Pennsylvania law.

67.     Moreover, even if Florida law applied here, which it does not because of the provisions of the Leases, the Three Day Notices are still deficient, because §83.20, Fla. Stat. requires three days' notice for commercial evictions. According to Florida's Rules of Judicial Administration, the three day time period begins the day after service, delivery, filing, or mailing and does not include weekends or holidays. Here, the Three Day Notices were sent via overnight mail on March 5, 2020, and thus, delivered on March 6, 2020. Three days from Friday, March 6, 2020, not including Saturday March 7, 2020 or Sunday March 8, 2020, was Wednesday, March 11, 2020, not March 10, 2020, the date on which Lehigh Landlord demanded payment of rent or turnover of the Premises in its Three Day Notices. Accordingly, even if Florida law applies (which, pursuant to the Leases, it does not), then the Three Day Notices were defective and invalid.

68.     Moreover, even to the extent Florida law applies, which, as set forth above, it does not pursuant to the Leases, the Three Day Notices are also invalid because they demand payment from UPS to Lehigh Landlord at an address in in Pennsylvania, without providing an additional five days mailing time for such payment which is required under Florida law because Lehigh Landlord is not based in Florida.

69.     Additionally, the Lehigh Parties did not provide UPS with written notice and 10 days to cure as required under the Security Agreements, and so the Three Day Notices are defective on that basis as well.

## COUNT I
## (PERMANENT INJUNCTION PURSUANT TO THE PETROLEUM MARKETING PRACTICES ACT)

70.     Plaintiff re-alleges the allegations herein.

71.     The Supply Agreements, Leases, and Security Agreements are governed by the PMPA. Pursuant to the PMPA, The Lehigh Parties are franchisors and UPS is a franchisee.

72.     Among other things, the PMPA provides that a franchisor may only terminate a franchise based upon a ground set forth in PMPA §2802(2).

73.     PMPA §2802 states a franchisor has a ground to terminate a franchise if the franchisee fails to comply with any provision of the franchise.

74.     Here, there is no failure to comply, as the PMPA § 2801 specifically states that the term "failure" does not include any failure for a cause beyond the reasonable control of the franchisee. UPS had no control over the fact that the Lehigh Parties' improperly withheld $1 million in operating funds and, likewise, had no control over the Lehigh Parties' inexplicable decision to not apply those improperly withheld funds to the amounts due under the Supply Agreements and/or Leases. Accordingly, there is no ground to terminate, here and so the terminations are improper on that basis.

75.     PMPA §2802 further states that there is a ground to terminate the franchise in the event of a failure to comply (which, as set forth above, does not apply here), but only if the franchisor first acquired knowledge of such failure **no more than 60 days prior to the date notice of termination is given**, if the franchisor provides less than 90 days' notice of termination, pursuant to PMPA §2804(b)(1). In other words, if the franchisor terminates on less than 90 days' notice, then the franchisor must move quickly – within 60 days of learning of the alleged basis for the termination.

76.     Here, both the February 6, 2020 Notice and the Three Day Notices provide less than 90 days' notice of termination and, accordingly, in order to have a "ground for

termination" the Lehigh Parties must have acquired knowledge of the claim underlying the termination less than 60 days before sending the notices.

77.    As set forth above, based on UPS' discussions with the Lehigh Parties in October 2019, the Lehigh Parties had more than 60 days' notice of all of the facts underlying its claims for any failure to pay and the facts underlying its claim for failure to provide a letter of credit before they sent the February 6, 2020 Notice or the Three Day Notices. The Lehigh Parties knew, in October 2019, that UPS could not pay the Lehigh Parties via deductions from their operating accounts, at that time or any time thereafter, because hundreds of thousands of dollars (and, in fact, to date, more than $1 million) in operating funds were being wrongfully withheld by the Lehigh Parties, and had been advised by the UPS parties that UPS had already provided two letters of credit and UPS did not believe any further letter of credit was warranted.

78.    Based on the foregoing, the Lehigh Parties knew of the facts underlying all of its claims underlying the alleged defaults and failed to act for more than 60 days and then provided less than 90 days' notice of termination and, accordingly, there is no "ground for termination," and the terminations are invalid on this basis as well.

79.    The PMPA also provides, among other things, that a franchisor may only terminate a franchise if the notification requirements of PMPA §2804 are met.

80.    PMPA §2804 requires a franchisor to provide 90 days' notice of any termination unless circumstances exist in which it would not be reasonable to furnish 90 days' notice, and further requires the notice must contain a statement that the franchisor intends to terminate the franchise and the reasons therefor, the date the termination will take place, and a summary statement prepared under PMPA §2804(d).

81.     Here, there is no reasonable basis to furnish less than 90 days' notice where the Lehigh Parties have retained more than $1 million in improperly withheld funds – a sum that greatly exceeds what the Lehigh Parties claim to be owed pursuant to the Supply Agreements and Leases (which amount, at any rate, is incorrect, as stated above). Accordingly, the February 6, 2020 Notice and the Three Day Notices are invalid on this basis as well. There is also no reasonable basis to furnish less than 90 days' notice where the only claim is nonpayment and where, as here, there are no aggravating circumstances.

82.     The Three Day Notices do not conform to any of the requirements of PMPA §2804(c) or (d). Accordingly, the Three Day Notices are improper and, thus, invalid on that basis as well.

83.     As set forth above, the February 6, 2020 Notice and the Three Day Notices were also deficient because UPS did not default on the Supply Agreements or Leases, paid all amounts when due, provided a letter of credit as required, and otherwise was in full compliance with the Supply Agreements and Leases in all respects. In other words, there is no merit to any of the claims underlying the alleged defaults and, thus, the February 6, 2020 Notice and the Three Day Notices are invalid on that basis as well.

84.     Additionally, the Lehigh Parties did not provide the written notice and 10 day opportunity to cure the alleged defaults as required by the Security Agreements, and so the terminations should be held to be invalid on that basis as well.

85.     UPS' franchises were terminated and there exist sufficiently serious questions going to the merits of such termination to make such questions a fair ground for litigation.

18

86.     UPS will suffer irreparable injury without the issuance of an injunction, and no other adequate remedy at law exists, and the injunction is appropriate to abate the harm caused by the wrongful terminations. Moreover, failing to issue the injunction will result in greater harm than issuing the injunction.

87.     An injunction enjoining the Lehigh Parties from terminating the Supply Agreements and Leases would preserve the status quo between the parties.

88.     Other interested parties will be harmed without the issuance of an injunction, including nearly 100 employees, several vendors, the Florida Department of Revenue, the Florida Lottery, and the Florida Department of State, among others.

89.     The public interest in the issuance of an injunction by this Court lies with UPS.

90.     The hardships imposed on Lehigh Inc. by the issuance of injunctive relief will be substantially less than the hardship imposed on UPS if UPS is forced to close all of the Premises.

91.     Based on the foregoing, the Court should enjoin the Lehigh Parties' from terminating the Supply Agreements and Leases and enjoin the Lehigh Parties and/or LGP from enforcing their rights under the Security Agreements.

## COUNT II
## (DECLARATORY JUDGMENT)

92.     Plaintiff repeats and re-alleges the allegations herein.

93.     An actual, bona fide controversy exists between UPS and the Lehigh Parties as to whether the Supply Agreements and Leases were properly terminated and, thus, that the terminations are invalid, and there is imminent and inevitable litigation on that issue, as well as a direct, substantial and present interest at issue.

94.    An actual bona fide controversy exists between UPS and the Lehigh Parties as to whether UPS breached the Supply Agreements and Leases, and there is imminent and inevitable litigation on that issue, as well as a direct, substantial and present interest at issue.

95.    Accordingly, this Court should determine that the Supply Agreements and Leases were not properly terminated and, thus, that the terminations are invalid.

96.    This Court should also determine that UPS did not breach the Supply Agreements and/or Leases, and thus, that the terminations are invalid on that basis as well.

97.    This Court should also determine that the Lehigh Parties and/or LGP did not provide notice as required under the Security Agreements, and, thus, cannot enforce any rights thereunder.

## COUNT III
## (ATTORNEYS' FEES)

98.    The Supply Agreements and Leases both provide for attorneys' fees to the prevailing party incurred in order to secure, defend, or protect the rights inuring to the prevailing party under the Supply Agreements and Leases, and/or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

99.    The PMPA provides that a prevailing franchisee is entitled to reasonable attorney and expert witness fees to be paid by the franchisor if a franchisor fails to comply with certain requirements of the PMPA, including those failures by the Lehigh Parties set forth above.

100.    Accordingly, UPS is entitled to recover attorneys' fees in order to protect its rights under and enforce the terms of the Supply Agreements and Leases, and pursuant to the PMPA.

**WHEREFORE,** UPS demands, as follows:

20

1. On its first count, an injunction prohibiting the Lehigh Parties from terminating the franchise and enjoining the Lehigh Parties and/or LGP from enforcing their rights under the Security Agreements;

2. On its second count, a judgment declaring the Supply Agreements and Leases were not properly terminated and, thus, that the terminations are invalid; that UPS did not breach the Supply Agreements and/or Leases, and thus, that the terminations are invalid on that basis as well; and that the Lehigh Parties and/or LGP did not provide notice as required under the Security Agreements, and, thus, cannot enforce any rights thereunder.

3. On its third count, judgment awarding to UPS attorneys' fees pursuant to the terms of the Supply Agreements and Leases and as provided for by the PMPA;

4. Judgment in favor of UPS and against Lehigh Parties and LGP, jointly and severally, for such other punitive damages, attorneys' fees, interest, costs, and relief as determined by this Court.

**Plaintiff demands a trial by jury of all claims.**

Dated:        March 26, 2020

Respectfully submitted,
**Einbinder & Dunn, LLP**
*Counsel for Plaintiff*

By:    /s/ Kenneth L. Leiby, Jr.
       Kenneth L. Leiby, Jr., Esq.

## CERTIFICATION PURSUANT TO L.CIV.R. 11.2

Kenneth L. Leiby, Jr., certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding except for the following landlord/tenant eviction proceedings in which Lehigh Wholesale Gas Services, Inc. is the plaintiff and Universal Property Services, Inc. is the defendant in each of the following Florida courts:

| COUNTY/COURT | ADDRESS | CASE NUMBER |
|---|---|---|
| **In the County Court in and for Alachua County Florida** | 17025 SE County Road Micanopy, FL 32667 | 2020 CC 001027 |
| | 5420 W. State Road 235 La Crosse, FL 32615 | 2020 CC 001028 |
| **In the County Court in and for Bradford County Florida** | 2158 N. Temple Avenue Starke, FL 32091 | 04-2020-CC-0127 |
| **In the County Court in and for Clay County Florida** | 205 S. Lawrence Blvd. Keystone Height, FL 32656 | 2020-CC-000362 |
| **In the County Court in and for Duval County Florida** | 9750 Old St. Augustine Road Jacksonville, FL 32257 | 2020-CC-003385 |
| | 1005 S. Edgewood Avenue Jacksonville, FL 32205 | 2020-CC-003386 |
| **In the County Court in and for Hernando County Florida** | 13075 Spring Hill Drive Spring Hill, FL 34609 | 2020-CC-000296 |
| **In the County Court in and for Lee County Florida** | 10800 Metro Pkwy Fort Myers, FL 33966 | 20-CC-001304 |
| **In the County Court in and for Manatee County Florida** | 2413 US Highway 301 N. Ellenton, FL 34222 | 2020-CC-001736 |
| **In the County Court in and for Marion County Florida** | 3232 W Silver Springs Blvd. Ocala, FL 34475 | 20-SC-001148AX |
| **In the County Court in and for Orange County Florida** | 808 S. Park Avenue Apoka, FL 32703 | 2020-CC-003631-0 |
| | 5051 Gateway Avenue Orlando, FL 32821 | 2020-CC-003670-O |
| **In the County Court in and for Osceola County** | 5055 S. Orange Blossom Trial Kissimmee, FL 34758 | 2020-CC-000836-EV |

| | | |
|---|---|---|
| **Florida** | | |
| **In the County Court in and for Putnam County Florida** | 901 State Road 20 Interlachen, FL 32148 | 2020-CC-000291 |
| | 1140 County Road 309 Crescent City, FL 32112 | 2020-CC-000290 |
| **In the County Court in and for Sumter County Florida** | 861 E. State Road 44 Wildwood, FL 34785 | 2020-CC-000208 |
| **In the County Court in and for Volusia County Florida** | 239 N. Center Street Pierson, FL 32180 | 2020-12479-CODL |

I certify under penalty of perjury pursuant to 28 USC 1746 that the foregoing is true and correct.

Executed on March 26, 2020.

   /s/ Kenneth L. Leiby, Jr.
Kenneth L. Leiby, Jr., Esq.