**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES INC. and SYED KAZMI, | |
| Plaintiffs, | Civil Action No. 20-3315 (FLW) |
| v. | **OPINION** |
| LEHIGH GAS WHOLESALE SERVICES, INC., LEHIGH GAS WHOLESALE LLC, LGP REALTY HOLDINGS LP, CIRCLE K STORES INC. and TMC FRANCHISE CORP., | |
| Defendants. | |

**WOLFSON, Chief Judge:**

Plaintiffs, Universal Property Services Inc. ("UPS") and Syed Kazmi ("Syed") (collectively, "Plaintiffs"), brought this contract-related action against Defendants Lehigh Gas Wholesale Services, Inc. ("Lehigh Gas Inc."), Lehigh Gas Wholesale LLC ("Lehigh Gas LLC"), LGP Realty Holdings LP ("LGP Realty") (together with Lehigh Gas Inc. and Lehigh Gas LLC, the "Lehigh Defendants"), Circle K Stores Inc. ("Circle K"), and TMC Franchise Corp. ("TMC") (collectively, "Defendants"). Plaintiffs allege, among other things, that Circle K and TMC supplied Plaintiffs with inaccurate and fraudulent sales information and historical financial data, which Plaintiffs relied upon in deciding to acquire seventeen franchised gas stations and convenience stores in Florida. Plaintiffs also allege that the Lehigh Defendants breached their contract and violated the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA"), in connection with Plaintiffs' operation of the Florida properties.

Presently before the Court are three separate motions to dismiss Plaintiffs' First Amended Complaint ("FAC") filed, respectively, by the Lehigh Defendants, Circle K, and TMC.  The Lehigh Defendants move to dismiss the FAC for lack of personal jurisdiction, improper venue, lack of subject matter jurisdiction, and failure to state a claim under Fed. R. Civ. P. 12(b)(6); Circle K moves to dismiss Counts I through V of the FAC based on choice of law and the parol evidence rule; and TMC moves to dismiss Counts I through V of the FAC also based on choice of law and Plaintiffs' failure to plead fraud with particularity in accordance with Fed. R. Civ. P. 9(b).[1]

For the reasons that follow, the Lehigh Defendants' Motion to Dismiss is **DENIED** without prejudice, because Plaintiffs' request for jurisdictional discovery is granted.  The parties will be given thirty days to conduct limited jurisdictional discovery as to the relationship between the Lehigh Defendants and Circle K and/or TMC, specifically the relationship, if any, between Marcello Ciminelli and the Lehigh Defendants.  The parties are directed to communicate with the magistrate judge regarding the process and procedure for this limited discovery.

As to Circle K's Motion to Dismiss, I reserve decision.  Plaintiffs and Circle K are directed to provide supplemental briefing within two weeks from the date of this Opinion and accompanying Order, analyzing whether Pennsylvania or New Jersey should govern Plaintiffs' claims pursuant to the Leases and Supply Agreements executed by the parties.

---

[1]    In Counts I through V of the FAC, Plaintiffs assert the following causes of action against Circle K and TMC: (1) violation of the Florida's Deceptive and Unfair Trade Practices Act (Count I), (2) violation of the Florida Franchise Act (Count II), (3) fraudulent misrepresentation (Count III), (4) fraudulent concealment (Count IV), and (5) negligent misrepresentation (Count V). Counts VI through XII of the FAC assert causes of action against only the Lehigh Defendants.  In addition, Count XIII of the FAC asserts a cause of action for attorneys' fees against all Defendants. For purposes of this motion, the Court will treat Count XIII as a prayer for relief and not as a separate cause of action.

TMC's Motion to Dismiss is **GRANTED**, and therefore, Plaintiffs' claims, in Counts I through V, against TMC are dismissed without prejudice based on choice of law principles. Plaintiffs are given leave to amend their FAC consistent with this Opinion and the accompanying Order.  Plaintiffs will also be given leave to amend once the Court resolves the jurisdictional questions related to the Lehigh Defendants and determines whether Pennsylvania or New Jersey law applies to Plaintiffs' claims against Circle K.

## I.   <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

### A.   **Factual Background**

For the purposes of these motions, the Court takes as true all allegations of the FAC.  UPS is a New Jersey corporation, with a principal place of business in New Jersey, and Syed is citizen of New Jersey.  (FAC at ¶¶ 1-2.)  The Lehigh Defendants are Delaware entities, with their principal places of business in Pennsylvania.  (*Id.* at ¶¶ 5-7.)  Circle K is a Texas corporation, with its principal place of business in Arizona.  (*Id.* at ¶ 3.)  TMC is an Arizona corporation, with its principal place of business in Arizona.  (*Id.* at ¶ 4.)

In September 2018, Plaintiffs began exploring the possibility of operating Circle K and Kangaroo Express gas stations and convenience stores in Florida.  (*Id.* at ¶ 24.) Circle K is a franchisor that sells the rights to franchisees to operate motor fuel businesses for the sale of Circle K-sourced motor fuel and convenience stores.  (*Id.* at ¶ 22.)   TMC licenses the Circle K trademarks to franchised business owners.  (*Id.* at ¶ 23.)  TMC and Circle K are allegedly affiliates with common ownership and interests.  (*Id.* at ¶ 8.)[2]

---

[2]     The Court notes that TMC disputes its involvement in the negotiations of the Leases and Supply Agreements, including its purported transmission of fraudulent or inaccurate historical sales data.

Plaintiffs allege that during negotiations with Circle K, Marcello Ciminelli ("Ciminelli"), a Senior Director for Circle K, advised UPS representative, Shamikh Kazmi ("Shamikh"), that UPS would be required to submit business plans in connection with their bids to operate at the proposed sites.  (*Id.* at ¶ 26.)  Plaintiffs further allege that Circle K and TMC offered to provide UPS with a memorandum of sales and other data for each location, which could then be used to generate the business plans.  (*Id.* at ¶ 27.)  Indeed, Circle K and TMC purportedly provided UPS with written and oral historical and projected sales information related to a number of the proposed sites in Florida.  (*Id.* at ¶¶ 27, 30.)  Specifically, on or about October 9, 2018, and October 31, 2018, Circle K and TMC sent two memorandums which provided certain "trailing 12 month data for the period through April 2018 for each of the 22 locations that UPS was considering acquiring," including: "(1) total gallons of fuel sold; (2) gross sales data for sales in the convenience store; (3) net lottery commissions; (4) net ATM commissions; (5) other sales; and (6) real estate tax."  (*Id.* at ¶ 29.)

In addition to this data, Plaintiffs allege that Circle K and TMC employees made other representations to UPS, including those made in a telephone call on or about November 5, 2018. (*Id.* at ¶ 30.)  During that telephone call, Plaintiffs allege that Ciminelli provided Shamikh with other historical financial data, such as profit margins for convenience stores and fuel sales at the locations UPS was interested in leasing.  (*Id.*)  Plaintiffs also maintain that during that phone call, Ciminelli informed Shamikh that UPS could expect significant sales increases and higher margins upon commencement of UPS's operation of the convenience stores and gas stations, based on projections of increased sales and margins at approximately fifty similar convenience stores and gas stations operated by Circle K and TMC.  (*Id.*)  According to Plaintiffs, UPS used this

information to create its comprehensive business plan, which included sales projections for twenty-two locations in Florida, seventeen of which UPS ultimately acquired.  (*Id.* at ¶ 30.)

On November 15, 2018, UPS submitted its business plan.  (*Id.* at ¶ 32.)  Later that same month, Ciminelli allegedly called Shamikh to advise that Circle K and TMC were "impressed with the Business Plan," and invited UPS to "Circle K/TMC's office in Allentown, Pennsylvania." (*Id.* at ¶ 33.)  Shortly thereafter, on December 4, 2018, Shamikh met with Ciminelli and other purported representatives of Circle K and TMC in Pennsylvania to review the business plan.  At the meeting, Circle K and TMC allegedly "verbally approved" the business plan, commenting that "it was one of 'the best business plans they had ever read.'"  (*Id.* at ¶¶ 31-32.)

According to Plaintiffs, however, the historical sales data that Circle K and TMC provided, which was ultimately relied upon for UPS's business plan, was fraudulent and inaccurate.  (*Id.* at ¶ 36.)  Specifically, Plaintiffs allege that sales at each of the locations declined before UPS took over and that Circle K and TMC knew of this decline, but they failed to disclose it.  (*Id.* at ¶ 37.)  Plaintiffs further submit that Circle K and TMC told UPS, at the December 4, 2018 meeting, that the growth projections in UPS's business plan were accurate when both knew they were not.  (*Id.* at ¶ 38.)  In short, Plaintiffs claim that Circle K and TMC knew that the profit margins and growth projections in UPS's business plan, which were based on representations made by Ciminelli to Shamikh, were inaccurate and had no basis in any historical data.  (*Id.* at ¶ 38.)  Neither Circle K, nor TMC, however, advised UPS to revise the business plan to reflect lower profit margins, growth projections, or sales.  (*Id.*)

In April 2019 and July 2019, without having knowledge that the historical information and sales data was allegedly inaccurate, Plaintiffs entered into a total of seventeen separate Leases and Supply Agreements with Circle K for properties located in Florida.  (*Id.* at ¶¶ 41, 43.)  The terms

of the Leases and Supply Agreements were identical, except as to location and the specific rental due under each lease.  (*Id.* at ¶¶ 41.)  In relevant part, the Leases and Supply Agreements each contain a Pennsylvania choice of law provision, which states: "This Contract shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania and controlling U.S. federal law, except for any rule of court or law of said state which would make the law of any other jurisdiction applicable."  (*Id.* at ¶ 131; *see also* Declaration of Keenan D. Lynch, Esq. in Support of the Lehigh Defendants' Motion to Dismiss ("Lynch Decl."), Ex. 2 at ¶ 41 and Ex. 3 at ¶ 38.)

Thereafter, Plaintiffs also entered into seventeen separate Franchise Agreements with TMC for the operation of Circle K or Kangaroo Express convenience stores at each location.  (*Id.* at ¶¶ 46-48.)  In relevant part, each Franchise Agreement between Plaintiffs and TMC contains an identical Arizona choice of law clause.  (Decl. of Daniel Seeck, Esq. in Support of TMC's Motion to Dismiss ("Seeck Decl."), Exs. 1-2 at ¶ 20.5.) Specifically, the Franchise Agreements state: "Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. § 1051 *et seq.*), and the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) this Agreement and the relationship between Franchisor and Franchisee will be governed by the laws of the State of Arizona, without regarding to any conflicts of laws principles." (*Id.*)

Between July and August 2019, UPS began operating at the Florida properties pursuant to the Leases and Supply Agreements.  (*Id.* at ¶ 73.)  Plaintiffs allege that shortly thereafter, UPS contacted Circle K and TMC to advise that sales at each location were lower than expected.  (*Id.* at ¶ 74.)

In September 2019, Circle K assigned its rights under the Leases and Supply Agreements to the Lehigh Defendants, and the Lehigh Defendants assumed some of Circle K's obligations.

(*Id.* at ¶ 76.)[3]  According to Plaintiffs, "Circle K assigned its rights under 'all agreements' entered into with UPS to the Lehigh [Defendants], and further stated that any guaranties or security, including the Security Agreements, would apply to the benefit of the Lehigh [Defendants]." (*Id.*; *see also* Lynch Decl., Ex. 1.)[4]

On February 6, 2020, the Lehigh Defendants sent a Notice of Termination to UPS, which stated that the Supply Agreements and Leases would terminate on February 27, 2020.  (*Id.* at ¶ 128.)  The Notice of Termination claimed that UPS failed to pay monthly amounts due under the Leases, including rent, in an amount totaling $721,085.78, and six unpaid returned fuel drafts totaling $54,446.88, in violation of the Supply Agreements.  (*Id.* at ¶ 103.)  On March 5, 2020, the Lehigh Defendants sent UPS a notice of default.  (*Id.* at ¶¶ 100-36.)

### B.    Procedural History

On March 26, 2020, Plaintiffs filed their Complaint in this Court, and an Amended Complaint ("FAC") on April 10, 2020.  (ECF Nos. 1 and 6.)  The FAC adds Circle K and TMC as defendants.  The FAC asserts thirteen causes of action, including claims for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), the Florida Franchise Act ("FFA"), and

---

[3]     Circle K also assigned two letters of credit to the Lehigh Defendants which were provided by UPS at the time it entered into the Supply Agreements.   (FAC at ¶¶ 121-22.)

[4]     "Generally, a court considering a motion to dismiss under Rule 12(b)(6) may consider only the allegations contained in the pleading to determine its sufficiency." *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014), *cert. denied*, 575 U.S. 963, 135 S. Ct. 1860 (2015).  However, a court may also consider the following without converting the motion to dismiss into one for summary judgment: (1) "documents which are attached to or submitted with the complaint," (2) "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading," and (3) "[d]ocuments that the defendant attaches to the motion to dismiss ... if they are referred to in the plaintiff's complaint and are central to the claim." *Id.* at 290-91 (citations and internal quotation marks omitted); *see also Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, the I will consider the Supply Agreements and Leases and the Franchise Agreements because they are central to the claims and their contents are repeatedly referred to in the FAC.

various common law fraud claims against Circle K and TMC; claims for violation of the PMPA, breach of contract, and declaratory judgment are asserted against the Lehigh Defendants. Importantly, in Counts I through V of the FAC, Plaintiffs assert Florida common law and statutory claims against Circle K and TMC.

On June 22, 2020, the Lehigh Defendants filed their Motion to Dismiss, and Circle K and TMC each filed separate Motions to Dismiss on June 29, 2020.  (ECF Nos. 28, 32, 33.)

## II.   **LEGAL STANDARD**

Collectively, Defendants move to dismiss the FAC for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and failure to plead fraud with particularity pursuant to Fed. R. Civ. P. 9(b).  The following legal standards apply.

### A.   **Federal Rule of Civil Procedure 12(b)(2)**

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing Fed. R. Civ. P. 4(e)).  "[T]he New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (citations omitted).  Thus, the central inquiry is whether Defendant has "certain minimum contacts with...[New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations and citations omitted).  In analyzing personal jurisdiction, the Court must determine whether it has general or specific jurisdiction over Defendant.

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller*

*Yacht Sales, Inc.*, 384 F.3d at 97; *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).  Still, plaintiff "'bears the burden to prove, by a preponderance of the evidence,' that personal jurisdiction is proper." *Cerciello v. Canale*, 563 F. App'x 924, 925 n.1 (3d Cir. 2014) (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992)).  In the context of assessing personal jurisdiction, "[w]hile disputed issues are construed in favor of the plaintiff, allegations may be contradicted by the defendant through opposing affidavits or other evidence, at which point the plaintiff must respond with 'actual proofs, not mere allegations.'" *Am. Bd. of Internal Med. v. Rushford*, No. 14-6428, 2015 WL 5164791, at *2 (D.N.J. Sept. 2, 2015) (quoting *Patterson v. FBI*, 893 F.2d 595, 603 (3d Cir. 1990)).

### B.  Federal Rule of Civil Procedure 12(b)(6)

Courts undertake a three-part analysis when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)) (alteration in original).  Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotation omitted).  In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "[M]ere restatements of the elements of [a] claim[ ] ... are not entitled to the assumption of truth." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (alterations in original) (quotation omitted).  Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556

U.S. at 679).   "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

"Rule 12 prohibits the court from considering matters outside the pleadings in ruling on a motion to dismiss for failure to state a claim ... and a court's consideration of matters outside the pleadings converts the motion to a motion for summary judgment."  *Kimbugwe v. United States*, No. 12-7940, 2014 WL 6667959, at *3 (D.N.J. Nov. 24, 2014).   "[A]n exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (internal quotation marks omitted).   Notwithstanding these principles, courts may not consider allegations raised for the first time in a plaintiff's opposition to a motion to dismiss.  *See Pennsylvania ex rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

## C.       Federal Rule of Civil Procedure 9(b)

Fraud based claims are subject to a heightened pleading standard, requiring a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). For a fraud-based claim, a court may grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 9(b) if the plaintiff fails to plead with the required particularity.  *See Frederico v. Home Depot*, 507 F.3d 188, 200-02 (3d Cir. 2007).  The level of particularity required is sufficient details to put the defendant on notice of the "precise misconduct with which [it is] charged."  *Id.* at 200 (citation omitted).   At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who,

what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (citation omitted).

The heightened pleading standard set forth in Rule 9(b) applies to Plaintiffs' statutory and common law fraud claims against Circle K and TMC in Counts I through V.

## III.   <u>DISCUSSION</u>

As stated above, Defendants each filed separate motions to dismiss.  The Lehigh Defendants move to dismiss the FAC for lack of personal jurisdiction, improper venue, lack of subject matter jurisdiction, and failure to state a claim under Fed. R. Civ. P. 12(b)(6); Circle K moves to dismiss Counts I through V of the FAC based on choice of law and the parol evidence rule; and TMC also moves to dismiss Counts I through V of the FAC based on choice of law and Plaintiffs' failure to plead fraud with particularity in accordance with Fed. R. Civ. P. 9(b).  I will address each Defendant's motion, in turn.

### A.   **Lack of Personal Jurisdiction Over the Lehigh Defendants**

The Lehigh Defendants move to dismiss the FAC on a variety of grounds, including lack of personal jurisdiction.  Because I find that there are issues of fact as to jurisdiction, I do not consider, on this motion, the Lehigh Defendants' remaining arguments, and permit limited jurisdictional discovery.

"There are two distinct theories under which personal jurisdiction can arise: general and specific." *Allaham v. Naddaf*, 635 Fed. Appx. 32, 37-38 (3d Cir. 2015) (citing *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559 (3d Cir. 1994)).  Here, I note that the FAC does not identify under which theory Plaintiffs are asserting jurisdiction; however, based on their opposition brief, it appears that Plaintiffs make arguments for both general and specific jurisdiction over the Lehigh

Defendants.   Regardless which theory Plaintiffs pursue, they have failed to satisfy either jurisdictional ground.

> i.   *General Jurisdiction*

General jurisdiction exists when the defendant's affiliations with the forum state are "so continuous and systematic as to render [it] essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal citations and quotations omitted).  General jurisdiction allows a court to assert personal jurisdiction over an out-of-court defendant when "that party can be called to answer any claim against her, regardless of whether the subject matter of the cause of action has any connection to the forum."  *Mellon Bank P.S.F.S. v. Farino*, 960 F.2d 1217, 1221 (3d Cir.1992).  "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] ... bases for general jurisdiction.'" *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citation omitted).  Indeed, when the forum is not the place of incorporation or principal place of business, "exceptional" circumstances are needed to establish general jurisdiction.  *See id.* at 139.

Here, Plaintiffs do not allege that the Lehigh Defendants are incorporated or have principal place of business in New Jersey.  Rather, in their FAC, Plaintiffs explicitly allege that New Jersey is not the state of incorporation for any of the Lehigh Defendants, nor is it their principal place of business.  (FAC at ¶¶ 5-7.)  Plaintiffs also have not alleged any facts sufficient to find that this is "an 'exceptional' case such that the place of incorporation/principal place of business rule should be disregarded."  *Barth v. Walt Disney Parks & Resorts U.S., Inc.*, 697 Fed.Appx. 119, 120 (3d Cir. 2017).  Rather, Plaintiffs have only provided evidence that LGP Realty owns three properties in New Jersey, while the remaining Lehigh Defendants possess mortgagor/mortgagee, lessor/lessee, or security interests in other New Jersey properties.  (Declaration of Alejandro Brito,

Esq. in Opp. to the Lehigh Defendants' Motion to Dismiss, dated Aug. 17, 2020, ¶ 5.)  That single fact, standing alone, falls far short of the "continuous and systematic" affiliations with New Jersey required to find that the Lehigh Defendants are subject to general jurisdiction in New Jersey.[5] Indeed, Plaintiffs fail to provide any case law where a court found general jurisdiction based only on a corporation's ownership of property within the forum.  *See JWQ Cabinetry, Inc. v. Granada Wood & Cabinets, Inc.*, No. 13-4110, 2014 WL 2050267, at \*3 (D.N.J. May 19, 2014) (finding that general jurisdiction was lacking, where the plaintiff "only offered evidence that shows that [the defendant] conducted some business in New Jersey ...."); *see also McCourt v. A.O. Smith Water Prod. Co.*, No. 14-221, 2015 WL 4997403, at \*3 (D.N.J. Aug. 20, 2015) (finding no general jurisdiction over corporation that leased two offices and employed thirty-one individuals in New Jersey).

Furthermore, the Lehigh Defendants' lack of "continuous and systematic" affiliations with New Jersey is supported by the Lehigh Defendants' Declaration from Keenan D. Lynch, Esq., the General Counsel and Corporate Secretary for each of the Lehigh Defendants.  The Lehigh Defendants do not regularly conduct or transact business in New Jersey, nor do they have any employees or offices in New Jersey.  (Lynch Decl. at ¶ 5-6.)  The Lehigh Defendants also are not registered to do business in New Jersey, do not advertise in New Jersey, and have not underwritten insurance covering any person, property, or risk in New Jersey.  (*Id.* at ¶¶ 7-9.)  As such, general jurisdiction is clearly lacking.

---

[5]    Plaintiffs only argue that the Lehigh Defendants' interests in these properties is sufficient to confer general jurisdiction, not specific jurisdiction.  Even if the Court were to consider the Lehigh Defendants' interest in the New Jersey properties as it relates to specific jurisdiction, however, these contacts would be insufficient because the litigation, which concerns gas stations and convenience stores located entirely in Florida, clearly does not arise out of, or relate to, the New Jersey properties.

ii.   *Specific Jurisdiction*

Specific jurisdiction exists over a non-resident defendant where the plaintiff's claim "'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler*, 571 U.S. at 127 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 1414 n.8 (1984)); *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) ("In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'") (quoting *Goodyear*, 564 U.S. at 919).  Courts apply a three part test to determine whether specific jurisdiction over a non-resident defendant exists: "First, the defendant must have purposefully directed [its] activities at the forum.  Second, the litigation must arise out of or relate to at least one of those activities.  And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comport[s] with fair play and substantial justice." *Petrucelli v. Rusin*, 642 Fed. Appx. 108, 110 (3d Cir. 2016) (internal citations and quotations marks omitted).  In establishing specific jurisdiction, it is not necessary that the defendant be physically located in the forum state while committing the alleged act. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Even a single act may satisfy the "purposeful availment" requirement if it creates a "substantial connection" with the forum. *Id.* at 476.

Plaintiffs argue that specific jurisdiction has been established because representatives of the Lehigh Defendants directed activities at New Jersey following Circle K's assignment of its obligations under the Leases and Supply Agreements in August 2019.  (Pl. Opp. to Lehigh Def. Motion at 10-11.)  According to Plaintiffs, they understood that by virtue of the Notice of Assignment, any communications that UPS had after August 20, 2019, with its gasoline distributor

or landlord for the Florida properties, were with the Lehigh Defendants.  (*Id.* at 12; Declaration of Shamikh Kazmi ("Shamikh Decl.") in Opposition to Lehigh Defendants' Motion to Dismiss, dated Aug. 17, 2020, ¶ 10.)   Therefore, Plaintiffs claim that Syed and Shamikh had repeated conversations by telephone, text message, and email with "multiple" representatives of the Lehigh Defendants, including Brent Boehm ("Boehm"), the purported Director of Operations or Area Manager for the Lehigh Defendants, David Hrinak ("Hrinak"), the alleged Vice President of the entity that owns or controls the Lehigh Defendants, and Joe Alfier ("Alfier") and Ciminelli. (Shamikh Decl. at ¶¶ 19, 25-27.)   During each of these conversations, in which the parties discussed gasoline distribution and tenancy issues, Plaintiffs maintain that Syed and Shamikh were located in New Jersey.  (*Id.*)  In further support of specific jurisdiction, Plaintiffs provide a text message exchange between Shamikh and Ciminelli from December 2019, where Ciminelli and Shamikh coordinated Ciminelli's visit to Jersey City, New Jersey.  (*Id.* at Ex. 2)   According to Plaintiffs, these communications, combined with Ciminelli's solitary meeting in New Jersey, are sufficient to confer specific jurisdiction over the Lehigh Defendants.

In response, the Lehigh Defendants argue that Plaintiffs have failed to address whether the Lehigh Defendants are "the alter egos of any co-Defendant parent or affiliate entity, and therefore the contacts of those parents or affiliate entities cannot be imputed to the Lehigh Defendants." (Lehigh Def. Moving Reply Br. at 2.)  Instead, the Lehigh Defendants claim that the Plaintiffs only argue that "the individuals with whom they communicated were employees or agents of Circle K/TMC, not the Lehigh Defendants."  (*Id.*)

Plaintiffs' position on this motion appears inconsistent with the allegations of the FAC. While Plaintiffs suggest that Ciminelli and Alfier were representatives of the Lehigh Defendants, the FAC alleges that Plaintiffs only communicated with Ciminelli in his capacity as "Senior

Director for Circle K" and that Joe Alfier was a "Circle K/TMC representative." (FAC at ¶¶ 24, 34.) Indeed, the FAC does not contain any allegations that Ciminelli or Alfier were employed by the Lehigh Defendants. Rather, significant portions of the FAC are dedicated to Ciminelli's alleged transmission of fraudulent or inaccurate historical financial data to Plaintiffs on behalf of Circle K—conduct that occurred well before the August 2019 assignment. (*Id.* at ¶¶ 24-40.) That said, however, the alleged text message exchange between Shamikh and Ciminelli in December 2019 is equally confounding. That exchange clearly occurred several months after Circle K assigned its rights and obligations to the Lehigh Defendants, and what is more, Ciminelli's contact information is identified as "Marcello Cross Americ[a]" in Shamikh's phone. To that end, the FAC alleges upon information and belief that the Lehigh Defendants are wholly-owned subsidiaries of CrossAmerica Partners LP. (*Id.* at ¶ 80.)[6] Because the Lehigh Defendants' reply does not shed any further light on the relationship, if any, between Ciminelli and the Lehigh Defendants, the circumstances surrounding jurisdiction remain unclear.

Accordingly, on the pleadings and the current record before the Court, I simply cannot determine whether Plaintiffs have established the requisite "purposeful availment" necessary for a finding of specific jurisdiction. *Walburn v. Rovema Packaging Machines, L.P.*, No. 07-3692, 2008 WL 852443, at *6 (D.N.J. Mar. 28, 2008) ("Under the purposeful availment inquiry, the act itself must deliberately target the forum state and establish such a relationship between the defendant and the forum such that it is reasonable to require the defendant to answer for such acts in that state."). But, Plaintiffs have introduced discrepancies and presented questions that are crucial to personal jurisdictional, such as the relationship between Ciminelli and the Lehigh Defendants,

---

[6]     As noted by the Lehigh Defendants, Plaintiffs do not argue that Circle K or TMC's jurisdictional contacts with New Jersey should be imputed in any way to the Lehigh Defendants, nor do Plaintiffs argue that the Lehigh Defendants are the alter egos of Circle K or TMC.

which may be resolved through limited jurisdictional discovery.  *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (finding that a plaintiff is entitled to jurisdictional discovery where it "presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [defendant] and the forum state.").  Put simply, the Court cannot rule on jurisdiction until it has the complete picture.  The parties will be given thirty days from the date of this Opinion and accompanying Order to conduct this discovery.

### B.    Enforceability of Contractual Choice of Law Provisions

Circle K and TMC move separately to dismiss Plaintiffs' claims under the FUDTPA and FFA on choice of law grounds.  The parties' Leases and Supply Agreements and the Franchise Agreements both contain choice of law provisions.  The Leases and Supply Agreements provide: "This Contract shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania and controlling U.S. federal law, except for any rule of court or law of said state which would make the law of any other jurisdiction applicable."  (FAC at ¶ 131; *see also* Lynch Decl., Ex. 2 at ¶ 41 and Ex. 3 at ¶ 38.)  Likewise, the Franchise Agreements state: "Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. § 1051 *et seq.*), and the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) this Agreement and the relationship between Franchisor and Franchisee will be governed by the laws of the State of Arizona, without regarding to any conflicts of laws principles."  (Seeck Decl., Exs. 1-2 at ¶ 20.5.)  Accordingly, Circle K and TMC maintain that the FDUTPA and FFA claims should be dismissed, because the parties contractually agreed that Pennsylvania and Arizona law, not Florida law, would govern their respective contractual relationships.  I will address the scope, enforceability, and applicability of the choice of law provisions in the Leases and Supply Agreements and Franchise Agreements, separately.

17

i.     *The Leases and Supply Agreements' Choice of Law Provision*

Initially, Circle K and Plaintiffs dispute the scope of the choice of law provision in the Leases and Supply Agreements, and whether it extends to non-contractual causes of action, such as the FDUTPA, FFA, and Plaintiffs' remaining common law fraud claims.  Circle K argues that courts routinely find that choice of law provisions, like the one here, which include the language "governed by and construed in accordance with," cover tort claims closely tied to the contract. (Circle K Reply Br. at 3) (citing *Pro v. Hertz Equip. Rental Corp.*, 2008 WL 5218267, at *5 (D.N.J. Dec. 11, 2008) and *Sullivan v. Sovereign Bancorp, Inc.*, 2001 WL 34883989 (D.N.J. Jan. 19, 2001)).[7]

In response, Plaintiffs maintain that the choice of law provision is narrow in scope, and therefore, is inapplicable to the non-contractual claims asserted against Circle K.  Relying on several cases from this Court, including *Fagan v. Fischer*, 2019 WL 5587286, *7 (D.N.J. Oct. 30, 2019) and *Portillo v. National Freight, Inc.*, 323 F. Supp. 3d 646 (D.N.J. 2018), and the Third Circuit's decision in *Black Box Corp. v. Markham*, 127 F. App'x 22, 25-26 (3d Cir. 2005), Plaintiffs argue that because these non-contractual claims relate to material misrepresentations made prior to UPS entering into the pertinent contractual agreements, Florida law applies.

As a federal court sitting in diversity, when assessing the applicability of a choice of law provision, I must apply the choice of law rules of New Jersey to determine the controlling law. *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941); *see also Thabault v. Chait*,

---

[7]     TMC also addresses the scope of the Franchise Agreements' choice of law provision, arguing that because the provision expressly and unambiguously states that Arizona law applies to "the relationship" between TMC and UPS, Arizona law governs Plaintiffs' non-contractual claims. (TMC Moving Br. at 9-10.)  Notably, Plaintiffs do not contest the scope of the choice of law provision in the Franchise Agreements.

541 F.3d 512, 535 (3d Cir. 2008).  In New Jersey, "effect [is given] to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy."  *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331 n.21 (3d Cir. 2001) (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992)).  Whether a choice of law provision also governs the parties' non-contractual claims, such as tort and fraud claims, turns on the breadth of the provision.  *See, e.g.*, *Sullivan v. Sovereign Bancorp Inc.*, 33 F. App'x 640, 642 (3d Cir. 2002) (explaining that where an agreement's choice of law provision is "broad and all-encompassing," the provision "encompasses all tort claims that may arise from the [agreement]").  Thus, the relevant starting point in resolving these inquiries is whether the choice of law provisions encompass Plaintiffs' non-contractual claims asserted in Counts I through V.

When interpreting the scope of a choice of law provision, courts look to the contractual language.  *See Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 653 (D.N.J. 2018) (applying New Jerseys' general rules of contract construction in order to interpret the scope of a contractual choice of law provision).  However, courts in this District are far from uniform in how they interpret "governed by and construed in" language in choice of law provisions such as the one before this Court.[8]  *See, e.g.*, *Carrow v. Fedex Ground Package Sys., Inc.*, No. 16-3026, 2017 WL

---

[8]     When interpreting the use of the phrase "governed by and construed in accordance with" some courts in this District have found that, under New Jersey law, the phrase is broad enough to govern non-contractual claims, whether tort or statutory, so long as they stem from the contractual relationship.  *See e.g.*, *Pro v. Hertz Equip. Rental Corp.*, No. 06–3830, 2008 WL 5218267, at *5 (D.N.J. Dec.11, 2008) ("Choice of law clauses that use the language 'governed and construed by' ... are considered to be broad capturing both contract and tort claims, particularly tort claims that relate to the contract"); *Sullivan v. Sovereign Bancorp, Inc.*, No. 99-5990, 2001 WL 34883989 at *8 (D.N.J. Jan. 19, 2001) (holding that choice of law provision which held that "[t]his Agreement shall be governed by and construed in accordance with the domestic internal law (including the law of conflicts of law) of the Commonwealth of Pennsylvania" was "sufficiently broad to encompass contract-related tort claims such as fraudulent inducement."), *aff'd. Sullivan v. Sovereign Bancorp., Inc.*, 33 F. App'x 640, 642 (3d Cir. 2002). However, other courts in this District, interpreting the same language, have concluded that under New Jersey law the phrase

1217119, at *6 (D.N.J. Mar. 30, 2017) (recognizing that "[c]ourts in this district have varied in their approach.   Some courts have found the phrase 'governed by and construed under' to be expansive .... Other courts have refrained from applying such provisions to tort claims." (internal citations omitted)).   In the most recent, albeit unpublished, Third Circuit case to address this issue, *Black Box Corp. v. Markham*, the Court examined a merger agreement between the parties that contained a choice of law provision, which stated that the agreement "will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania."  127 F. App'x. at 23 n.1.   The Court explained that the language utilized was "narrowly drafted to encompass only the underlying merger agreement itself, and not necessarily the entire relationship between [the parties]."  *Id.* at 25.

Here, like my recent decision in *Estate of Cotton v. Senior Planning Servs., LLC*, No. 19-8921, 2020 WL 7022740, at *11 (D.N.J. Nov. 30, 2020), I choose to apply the reasoning in *Markham* and the district court cases that have followed it.   *Portillo*, 323 F. Supp. 3d at 655 (finding, based on *Markham*, that choice of law provision which provided that agreement "shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey" was "not phrased sufficiently broadly to apply to the non-contractual claims asserted" by the plaintiffs); *Carrow*, No. 16-3026, 2017 WL 1217119, at *6 (finding, based on

---

should be narrowly construed and thus, does not extend to tort or statutory claims between the parties.  *See Portillo*, 323 F. Supp. 3d at 652-55 (holding that "New Jersey principles of statutory interpretation would counsel a narrow reading of the choice-of-law provision" which provided that "[t]his Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey, without regard to the choice-of-law rules of New Jersey or any other jurisdiction" and therefore the choice-of-law provision did not govern statutory claims, but rather applied "only to interpretation of the Agreement.); *Carrow*, No. 16-3026, 2017 WL 1217119, at *6 (D.N.J. Mar. 30, 2017) (declining to apply choice-of-law provision, which provided that contract was to be "governed by and construed" under Pennsylvania law, to misrepresentation claim because "the most recent Third Circuit decision held that the language in the [contract] does not suffice to encompass tort claims.") (internal citations and quotation marks omitted).

*Markham*, that choice of law provision which provided that agreement would be "governed by and construed under" Pennsylvania law should be construed narrowly and thus did not govern tort claims). In *Estate of Cotton*, I explained that:

> Plaintiffs' claims largely involve alleged fraud in the inducement and misrepresentations regarding the precise services SPS was contracted to provide. The nature of their fraud claims has little relevance to the contract language. Rather, like in *Markham*, the choice of law provision at issue in this case is narrowly drafted and provides that the Agreement shall be "governed by and construed in accordance with" New Jersey law. <u>Because Plaintiffs' NJCFA claims involve allegations of fraud based on, among other things, the purported representations that SPS could provide legal advice and services which it was not legally authorized to provide, the contractual choice-of law-provision does not control.</u>

No. 19-8921, 2020 WL 7022740, at *11 (emphasis added). Here, Plaintiffs' tort-related claims involve certain alleged misrepresentations and falsities with historical sales data and other figures that Plaintiffs claim induced their execution of the contracts. Similar to *Estate of Cotton*, these fraud claims have little relevance to the contract language, and therefore, I find that the choice of law provision in the Leases and Supply Agreements is limited solely to contract claims arising from the parties' contracts.

Finding that the choice of law provision does not apply, however, does not end the inquiry. In a tort case, New Jersey courts use the "most significant relationship" test to determine which state's law applies. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008). New Jersey's "most significant relationship" test consists of two prongs. First, a court must examine the substance of the potentially applicable laws in order to determine if an actual conflict exists. *Id.* (citing *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir.2006)). If there is no actual conflict, the analysis ends, and the court applies the law of the forum state. *See In re Ford Motor Co.*, 110 F.3d 954, 965 (3d Cir.1997); *Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615, 621 (2007). However, if a

conflict is found, the court must weigh the factors enumerated in the Restatement[9] to determine which jurisdiction has the most significant relationship to the claim.

Here, I find that even if a conflict existed, Florida does not have the most significant relationship to the claims. Section 148 contemplates two scenarios in which a plaintiff asserts a claim for fraud or misrepresentation. The first scenario involves misrepresentation claims in which the alleged harm suffered by a plaintiff and the action in reliance on any false representations occur in a single state. The second scenario contemplated under § 148 is where a plaintiff's action in reliance takes place in a state other than where the false representations were made. Restatement (Second) of Conflict of Laws, § 148 (1971). Because I find that Circle K's alleged fraudulent misrepresentations, which include two memorandums of allegedly inaccurate historical financial data and certain statements made during a telephone call between Ciminelli and Shamikh in November 2018, occurred in Pennsylvania, and that Plaintiffs' alleged receipt and reliance on those misrepresentations occurred in New Jersey, I find that the second scenario is applicable. Under that scenario, the Restatement provides as follows:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
>
> > (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> >
> > (b) the place where the plaintiff received the representations,

---

[9]     Because Plaintiffs' claims sound in fraud and misrepresentation, the Court looks to Section 148 of the Restatement. *See* Restatement (Second) of Conflict of Laws § 148 (1971); *see also Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 462 (D.N.J. 2009); *Nafar v. Hollywood Tanning Sys.*, 339 F. App'x. 216, 221 (3d Cir. 2009).

> (c) the place where the defendant made the representations,
>
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under the contract which he has been induced to enter by the false representations of the defendant.

*Id.* at § 148(2).

Here, an application of the factors demonstrates that Florida law does not apply. Indeed, only factors (e) and (f), which consider the place where the plaintiff acted in reliance upon the defendant's misrepresentations and the place where the plaintiff is to render performance under the contract, weigh in favor of applying Florida law. I find it significant that the FAC does not contain a single allegation that Circle K's alleged misrepresentations were made, received, or relied on in Florida. Rather, the remaining four factors, which include the place where the plaintiff acted in reliance upon the defendant's representations, the place where the plaintiff received the representations, the place where the defendant made the representations, and the place of incorporation or place of business of the parties, weigh in favor of applying either New Jersey or Pennsylvania law.[10] Plaintiffs allege that Circle K, an entity with a place of business in Pennsylvania, made certain fraudulent misrepresentations about the twenty-two properties that UPS was interested in acquiring. Plaintiffs allege that these misrepresentations primarily came in

---

[10] As it relates to § 148(2)(d), UPS is a New Jersey corporation, with a principal place of business in New Jersey, and Syed is citizen of New Jersey. (FAC at ¶¶ 1-2.) Circle K is a Texas corporation, with its principal place of business in Arizona; however, it appears to maintain an office in Allentown, Pennsylvania. (*Id.* at ¶ 33.)

two forms: (1) memoranda that included inaccurate historical sales data and other financial information, and (2) verbal misrepresentations about profit margins and recent fuel sales during a telephone call in November 2018.  Both categories were received and relied on by Plaintiffs in New Jersey, but presumably originated in Pennsylvania.  Moreover, Plaintiffs allege that UPS's business plan, which purportedly relied on the inaccurate financial data, was verbally approved at a meeting of the parties in Pennsylvania—the only physical meeting to occur prior to the execution of the agreements.  While the parties focus predominantly on Florida and Pennsylvania law, clearly some of these factors would weigh in favor of New Jersey law.  But, because neither Plaintiffs, nor Circle K provided adequate briefing on this issue, the Court would be engaging in guesswork to further analyze these factors.  As such, I will permit Plaintiffs and Circle K to submit supplemental letter briefs within two weeks analyzing whether Pennsylvania or New Jersey law should apply based on the factors set forth in § 148(2) of the Restatement.

## ii.   The Franchise Agreements' Choice of Law Provision

Applying that same framework and reasoning, I now turn to the Franchise Agreements. Although Plaintiffs do not oppose the scope of the choice of law provision here, I agree with TMC that the provision is conspicuously broader than the language found in the Leases and Supply Agreements.  Indeed, the Franchise Agreements provide that "Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. § 1051 *et seq.*), and the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) this Agreement <u>and the relationship between Franchisor and Franchisee</u> will be governed by the laws of the State of Arizona, without regarding to any conflicts of laws principles."  (Seeck Decl., Exs. 1-2 at ¶ 20.5) (emphasis added).

Simply finding that the choice of law provision encompasses Plaintiffs' non-contractual claims, does not end the analysis, however.  As stated above, New Jersey choice of law rules

provide that "[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice." *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 130 N.J. 324 (1992) (citing Restatement (Second) of Conflicts of Laws § 187 (Am. Law Inst. 1969) ("Restatement")). This rule honoring the parties' selected law serves the "[p]rime objectives of contract law ... to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." Restatement § 187 cmt. e. "A court should not depart from this rule and 'refrain from applying the [parties'] chosen law merely because this would lead to a different result than would be obtained under the ... law' of the forum state." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 184 (3d Cir. 2017) (quoting Restatement § 187 cmt. g.)

The parties' freedom to choose the law applicable to their agreements, however, is not without boundaries. New Jersey courts apply Restatement § 187 to determine under what circumstances a choice of law clause will be voided. *Instructional Sys.*, 614 A.2d at 133. Specifically, the Restatement provides that the parties' contractual choice will not govern if:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties.

I find that the choice of law provision in the Franchise Agreements is reasonable and does not offend the fundamental policy of the State of Florida. The first prong is clearly satisfied because Plaintiffs admit that TMC is incorporated in Arizona—the chosen state. (FAC at ¶ 4.) Indeed, the commentary to the Restatement makes clear that the standard of § 187 is a minimal standard:

> Requirement of reasonable basis for parties' choice.  The forum will not apply the chosen law to determine issues ... if the parties had no reasonable basis for choosing this law.  <u>The forum will not, for example, apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge.</u>  Situations of this sort do not arise in practice.  Contracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so.  When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice.  This will be the case, for example, when this state is that where performance by one of the parties is to take place <u>or where one of the parties is domiciled or has his principal place of business</u>.

Restatement (Second) Conflicts of Laws § 187, cmt. F (emphasis added).

Second, the choice of law provision is not contrary to Florida public policy.  With respect to the FFA, I acknowledge that applying Arizona law may erode a franchisee's ability to recover because significant differences exist between the FFA and Arizona common law.  Specifically, for example, the FFA creates liability for a person who "intentionally misrepresents" the chances of a franchise's success when selling the franchise, without regard to whether the buyer relied on the misrepresentation.  Thus, the FFA is more protective than Arizona's doctrine of common law fraud.  Moreover, successful claimants under the FFA may receive reasonable costs, including attorneys' fees, whereas parties at common law generally bear their own costs.  Despite these discrepancies, however, district courts in Florida have found that an enforceable choice of law provision does not contravene a fundamental public policy of Florida.  *See*, *e.g.*, *Loehr v. Hot 'N Now, Inc.*, No. 95-6253, 1998 U.S. Dist. LEXIS 23649, at *6 (S.D.Fla. Feb. 11, 1998) (rejecting a Florida Franchise Act claim based on the parties' contractual agreement that Michigan law would apply); *Hardee's Food Sys., Inc. v. Bennett*, No. 89-8069, 1994 WL 1372628 (S.D.Fla. Mar. 23, 1994) (rejecting a Florida Franchise Act claim based on the parties' contractual agreement that North Carolina law would apply).  Courts have reasoned that the FFA contains no anti-waiver

provision, and therefore, parties operating under Florida law are free to contract away the protections of the statute.  Fla. Stat. § 817.416.  In short, "Florida's policy is to provide a franchisee with as much protection as he or she contracts to receive."  *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d at 550.

As for the FDUTPA, Plaintiffs provide little rebuttal to TMC's argument that application of Arizona law would not contravene a fundamental policy of Florida.  TMC submits that Florida has little interest in non-residents of Florida suing a non-resident defendant under the FDUTPA, and that the FDUTPA does not protect against allegedly deceptive acts that occurred outside of Florida.  In opposition, Plaintiffs submit only that there is no citizenship requirement to bring a claim under the FDUTPA.  (Pl. Opp. to TMC Motion at 6.)  (citing *Lady of Am. Franchise Corp. v. Arcese*, 05-61306, 2006 WL 8432331, at *7 (S.D. Fla. Feb. 13, 2006)).  Plaintiffs' argument is beside the point.  Rather, by signing the Franchise Agreements, Plaintiffs agreed to receive the protection afforded by Arizona law, and consequently waived the protections offered by Florida law.  Accordingly, Counts I and II against TMC, which assert causes of action under the FDUTPA and FFA, are dismissed.[11]

## C.   Common Law Fraud Claims (Counts III, IV, and V)

Finally, Circle K and TMC argue that Plaintiffs' claims of common law fraud, which include fraudulent misrepresentation (Count III), fraudulent concealment (Count IV), and negligent misrepresentation (Count V), should be dismissed for different reasons.  Circle K argues

---

[11]   To the extent that Plaintiffs argue the choice of law provision, if enforceable, does not apply to Syed, I disagree.  In addition to the choice of law provision, the Franchise Agreements also contained a personal guaranty provision, in which Syed agreed to be "personally bound by each and every condition and term contained in the Agreements[.]" (Seeck Decl., Ex. A and B.)  Therefore, Plaintiffs claim that the Franchise Agreements' choice of law provision does not apply to claims brought by Syed in his "individual capacity" lack merit.

that the Leases and Supply Agreements contain an integration clause, and therefore, the common law fraud claims are barred by the parol evidence rule. TMC contends that the common law fraud claims asserted against it should be dismissed pursuant to Fed. R. Civ. P. 9(b), because Plaintiffs fail to plead fraud with particularity.

I find that Plaintiffs' common law claims against Circle K and TMC are dismissed without prejudice based on the choice of law discussion above. Clearly, in drafting the FAC, Plaintiffs pled Counts III, IV, and V under Florida common law. As set forth above, the choice of law provision in the Franchise Agreements mandates that the common law fraud claims asserted against TMC should be pled under Arizona law, not Florida law. Similarly, whether the Court ultimately decides that Pennsylvania or New Jersey law applies to Plaintiffs' claims against Circle K, the common law claims must be re-pled. Indeed, these states may require different pleading elements as compared to Florida law. In addition, when amending the FAC, Plaintiffs should be mindful of Fed. R. Civ. P. 9(b), which requires that fraud claims be pled with particularity, as well as the parol evidence rule. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999) (explaining that fraud claims must identify the "who, what, where, when, and how"); *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) (same). Accordingly, Counts III, IV, and V are dismissed without prejudice.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the Lehigh Defendants' Motion to Dismiss is **DENIED** without prejudice, because Plaintiffs' request for jurisdictional discovery is granted. The parties will be given thirty days to conduct limited jurisdictional discovery as to the relationship between the Lehigh Defendants and Circle K and/or TMC, specifically the relationship, if any, between

Ciminelli and the Lehigh Defendants.  The parties are directed to communicate with the magistrate judge regarding the process and procedure for this limited discovery.

I reserve decision as to Circle K's Motion to Dismiss.  Plaintiffs and Circle K are directed to provide supplemental briefing within two weeks from the date of this Opinion, analyzing whether Pennsylvania or New Jersey should govern Plaintiffs' claims pursuant to the Leases and Supply Agreements executed by the parties.

TMC's Motion to Dismiss is **GRANTED**, and therefore, Plaintiffs' claims, in Counts I through V, against TMC are dismissed without prejudice based on choice of law principles. Plaintiffs are given leave to amend their FAC consistent with this Opinion and the accompanying Order.  Plaintiffs will also be given leave to amend once the Court resolves the jurisdictional questions related to the Lehigh Defendants and determines whether Pennsylvania or New Jersey law applies to Plaintiffs' claims against Circle K.

Dated: January 13, 2021                                         /s/ Freda L. Wolfson
                                                                            Freda L. Wolfson
                                                                            U.S. Chief District Judge