**McCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.**
Asaad K. Siddiqi
James Harry Oliverio
210 Park Avenue, Third Floor
Florham Park, NJ 07932
(973) 635-6300
asiddiqi@marc.law
jholiverio@marc.law

and

**ZARCO EINHORN SALKOWSKI & BRITO, P.A.**
Robert Zarco (*pro hac vice*)
Alejandro Brito (*pro hac vice*)
Robert F. Salkowski (NJ Bar No. 049591992)
One Biscayne Tower
2 South Biscayne Boulevard, 34th Floor
Miami, FL 33131
(305) 374-5418
rzarco@zarcolaw.com
abrito@zarcolaw.com
rsalkowski@zarcolaw.com

*Attorneys for Plaintiffs*
*Universal Property Services Inc. and Syed Kazmi*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES INC., and SYED KAZMI, <br><br> Plaintiffs, <br><br> vs. <br><br> LEHIGH GAS WHOLESALE SERVICES, INC, LEHIGH GAS WHOLESALE LLC, LGP REALTY HOLDINGS LP, CIRCLE K STORES INC and TMC FRANCHISE CORP., <br><br> Defendants. | Civil Action No. 3:20-cv-03315-FLW-TJB <br><br> **PLAINTIFFS' SECOND AMENDED COMPLAINT** <br> **(Jury Trial Demanded)** |

1

Plaintiffs, Universal Property Services Inc. ("UPS") and Syed Kazmi, by and through their undersigned counsel, and in accordance with this Court's April 30, 2021 Memorandum and Order, hereby file their Second Amended Complaint in the above-entitled action, and allege as follows:

## The Parties

1.        UPS is a New Jersey corporation, with a principal place of business located at 6 Lenn Road, Allentown, New Jersey, 08501. UPS is a citizen only of the state of New Jersey.

2.        Syed Kazmi is an individual and citizen of the state of New Jersey, whose residence is 6 Lenn Road, Allentown, New Jersey, 08501.

3.        Circle K Stores Inc. ("Circle K") is a Texas corporation. Its principal place of business is 1300 West Warner Road, Tempe, Arizona 85284. Circle K is a citizen only of the state of Texas and is not a citizen of New Jersey.

4.        TMC Franchise Corporation ("TMC") is an Arizona corporation. Its principal place of business is 1300 West Warner Road, Tempe, Arizona 85284. TMC is a citizen only of the state of Arizona and is not a citizen of New Jersey.

5.        Lehigh Gas Wholesale Services, Inc. ("Lehigh Landlord") is a Delaware corporation. Upon information and belief, its principal place of business is 600 Hamilton Street, Allentown, Pennsylvania 18101. Lehigh Landlord is a citizen of only the states of Delaware and Pennsylvania and is not a citizen of New Jersey.

6.        Lehigh Gas Wholesale LLC ("Lehigh Supplier") is a Delaware limited liability corporation. Upon information and belief, its principal place of business is 600 Hamilton Street, Allentown, Pennsylvania 18101. Upon information and belief, its members are entities that are citizens of (or whose members and/or partners are citizens of) states other than New Jersey. Lehigh Supplier is a citizen only of states other than the state of New Jersey and is not a citizen of New

2

Jersey.

7.      LGP Realty Holdings LP ("LGP") is a Delaware limited partnership. Upon information and belief, its principal place of business is 600 Hamilton Street, Allentown, Pennsylvania 18101. Upon information and belief, its partners are entities that are citizens of (or whose members and/or partners are citizens of) states other than New Jersey. LGP is a citizen only of states other than the state of New Jersey and is not a citizen of New Jersey.

8.      At all times hereinafter mentioned, Lehigh Landlord and Lehigh Supplier (together, the "Lehigh Parties") and LGP were affiliates with common ownership and interests. At all times hereinafter mentioned, TMC and Circle K were affiliates with common ownership and interests.

9.      Circle K is the parent of TMC, which owns all of TMC's stock, and is the owner of the Circle K trademarks.

10.      Circle K is wholly owned by Circle K Delaware Inc., which is wholly-owned by The Circle K Corporation, which is wholly-owned by Couche-Tard U.S. Inc. ("Couche-Tard").

11.      The Lehigh Parties and LGP are, upon information and belief, wholly-owned subsidiaries of CrossAmerica Partners LP, which itself was a subsidiary of Couche-Tard until approximately December 2019.

12.      Accordingly, all of the defendants are or were owned directly or indirectly by the same parent company.

## Jurisdiction and Venue

13.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331, as more fully detailed below.

14.      This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, as Plaintiffs are citizens only of the state of New Jersey and none of the defendants is a

3

citizen of New Jersey, and as more fully detailed below.

15.     The value of the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

16.     This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. §1367, as all of the claims are based upon the same facts and contracts, are interrelated, and form part of the same case and controversy.

17.     Venue is proper in this district as to Defendants pursuant to 28 U.S.C. § 1391 (b)(1) and 28 U.S.C. §1391(c)(2), because Defendants are entities which are subject to personal jurisdiction in this district.

## The Nature of the Action

18.     This case arises out of the wrongful sale of 17 franchised gas stations and convenience stores to UPS by certain defendants, and subsequent concerted efforts by all defendants to completely divest UPS of its entire business investment. In connection with the acquisitions of the gas stations and convenience stores, UPS entered into an Inventory Agreement, Supply Agreements, Leases, and Franchise Agreements with various defendants.

19.     First, as fully set forth below, Circle K and TMC made misrepresentations regarding the sales at the 17 gas stations and convenience stores UPS purchased, and further, omitted critical facts related to sales and profitability of the gas stations and convenience stores. Circle K, on behalf of itself and TMC, also provided UPS with information concerning profit margins and expected sales growth in order to create financial projections for the gas stations and convenience stores, then reviewed and approved those financial projections. The conduct of Circle K and TMC violated federal regulations governing franchising, 16 C.F.R. § 436.1, *et seq.* (the "FTC Rule"), and applicable state laws.

4

20.     Secondly, all of the Defendants, in a concerted effort, worked to undermine UPS' business investment and, by their breaches and wrongful acts, divested UPS of its businesses, starting with Circle K's breaches of the Inventory Agreement, when Circle K wrongfully invoiced UPS for amounts that UPS did not owe to Circle K and then, compounding its mistake, made a call on a letter of credit for that amount and wrongfully withheld more than $100,000 of UPS' funds.

21.     Third, and simultaneously with the wrongdoing by Circle K set forth above, the Lehigh Parties wrongfully withheld more than $1 million in credit card proceeds processed at the gas stations and convenience stores, which emptied UPS' operating accounts, causing myriad operational issues for UPS with its vendors.

22.     Fourth, after wrongfully withholding UPS' funds, the Lehigh Parties attempted to default UPS for "nonpayment," sending termination notices relating to the Leases and Supply Agreements, all of which violated the Petroleum Marketing Practices Act, 15 U.S.C.A. § 2801 *et seq.* ("PMPA"), a statute designed to protect retail service station franchisees from wrongful and arbitrary termination of their franchises. The termination violated the PMPA because (1) the Defendants have no grounds for termination, which grounds are specifically prescribed by the PMPA and (2) because the Defendants did not provide sufficient notice as required by the PMPA. The termination was also wrongful because it violated state laws.

23.     Fifth, Lehigh Supplier then refused to sell fuel to UPS, which crippled the businesses.

24.     Sixth, TMC terminated the franchise agreements it had entered into with UPS, alleging that the lack of fuel and operational issues caused by the Lehigh Parties were defaults of those agreements.

25.     UPS has, to date, invested and lost more than $10 million, and seeks rescission and damages, among other remedies. UPS is no longer in possession of the Premises, and no longer owns or operates the gas stations or convenience stores it purchased.

## FACTUAL BACKGROUND

26.     Circle K is a franchisor that sells the rights to franchisees to operate motor fuel businesses for the sale of Circle K-sourced motor fuel and convenience stores using Circle K's trademarks and system.

27.     According to TMC's Franchise Disclosure Document ("FDD"), Circle K licenses TMC the right to use its trademarks in TMC's franchise program.

### I.     Circle K and TMC's Misrepresentations and Omissions

28.     In or about September 2018, UPS representative Shamikh Kazmi ("Shamikh") and Marcello Ciminelli, Circle K's Senior Director, first discussed the possibility of entering into a business relationship for the lease of several premises in Florida and operation of several gas stations and convenience stores at those premises.

29.     At all relevant times alleged in this pleading, Ciminelli, Kenneth Frye, Director of Fuels for Circle K, Joseph Alfier, Circle K's wholesale territory manager, and George Wilkins, acted not only on behalf of Circle K, but as representatives or agents of TMC, with express, implied or apparent authority to act on its behalf.

30.     Among other things that evidence the right of Ciminelli, Frye, Alfier and Wilkins to act on behalf of Circle K and TMC, during the negotiations between UPS, Circle K and TMC before the various agreements were signed: (i) Ciminelli sent Shamikh an e-mail dated January 3, 2019, discussing franchise opportunities for Circle K internationally that referred to Matt McCure as "*our* VP of Franchise & International Development"; Mr. McCure, who was copied on that e-mail and whose own e-mail uses the domain @circlek.com, is identified by TMC in its Franchise

6

Disclosure Document as its Vice President, Worldwide Franchising and International Development; (ii) TMC authorized Alfier to send a Letter of Intent to UPS on June 14, 2019; this Letter of Intent thanked UPS "for discussing the leasing and supplying opportunity for Universal Property Services Inc. and its affiliates…related to six (6) new locations in the Circle K Stores Inc. portfolio" that would include, "pursuant to a Franchise Agreement signed by [UPS] and TMC Franchise Corporation, an affiliate of Circle K Stores Inc., … a license to utilize the Circle K®, Kangaroo Express®, or Corner Store® trademarks and business system in connection with the backcourt of the Locations."; (ii) TMC further authorized Alfier to include in the June 14, 2019 Letter of Intent, "the terms of the Franchise Agreement [that] will be for 10 years," and that would include the right of the "FRANCHISEE [to] terminate early with no consequences at the end of any lease term if DEALER does not renew the Lease Agreement and ceases operation at the Location," an "Initial Franchise Fee of $5,000," "a Royalty Fee of 3.0% and Promotional Fee of 1.5% or 1.0%" and a requirement that "[a]ll partners/owners of the franchise entity will be required to sign a Personal Guaranty"; and (iii) at the direction of Ciminella, Shamikh sent an e-mail on May 3, 2019, regarding the conversion of a Circle K branded store to a Kangaroo store; according to Ciminella, "he will handle it" on behalf of TMC. Accordingly, UPS and Shamikh reasonably understood that all representations made by Ciminelli, Frye, Alfier and Wilkins and others at Circle K were being made on behalf of Circle K and TMC, with the express, implied, or apparent authority of TMC. In all respects, Circle K was acting on behalf of itself and an authorized agent of TMC during these negotiations.

31.     Ciminelli advised Shamikh that to be considered as a Circle K/TMC franchisee, UPS would be required to submit business plans for the proposed sites on which UPS wanted to lease and operate gas stations and convenience stores. At that time, there were four "districts"

available, each with several different locations.

32.     Ciminelli advised Shamikh that Circle K and TMC would provide UPS with a memorandum with sales and other data from each location that UPS could use to create the business plans.

33.     Ciminelli also provided Shamikh with a template for the business plan, and instructed Shamikh how to fill out the business plan, using the confidential information Circle K and TMC would provide.

34.     On October 9, 2018, and October 31, 2018, Frye, on behalf of Circle K and TMC, e-mailed Shamikh two memorandums that provided trailing 12-month financial data for the period through April 2018 for each of the 22 locations that UPS was considering acquiring that included: (1) total gallons of fuel sold; (2) gross sales data for sales in the convenience stores; (3) net lottery commissions realized from the sale of lottery tickets from the convenience stores; (4) net ATM commissions from ATM machines located in the convenience stores; (5) other sales; and (6) real estate taxes. Specifically, among other things, the two memoranda provided by Frye disclosed, for the gas stations and convenience stores ultimately purchased by UPS, the following:

| Address | City | Represented Gallons | Represented Store Sales | Represented Profit per gallons | Represented Store sales profit percentage |
|---|---|---|---|---|---|
| 2413 Us Highway 301 | Ellenton | 1,327,250 | 1,041,893 | 0.15 | 0.33 |
| 10800 Metro Parkway | Fort Myers | 587,213 | 960,173 | 0.15 | 0.33 |
| 5055 S Orange blossom Trail | Kissimmee | 1,259,322 | 739,364 | 0.15 | 0.33 |
| 808 S Park Ave | Apopka | 414,334 | 983,234 | 0.16 | 0.33 |
| 13075 Spring Hill Dr | Spring Hill | 764,699 | 1,413,389 | 0.15 | 0.33 |
| 5051 Gateway Ave. | Orlando | 1,235,304 | 1,173,153 | 0.15 | 0.33 |
| 2158 N Temple ave | Starke | 547,690 | 756,465 | 0.15 | 0.33 |
| 9750 Old St Augustine rd | Jacksonville | 348,772 | 1,176,224 | 0.15 | 0.33 |
| 1005 S edgewood ave | Jacksonville | 773,024 | 1,293,161 | 0.15 | 0.33 |
| 205 S lawrence blvd | Keystone Heights | 1,464,765 | 1,695,711 | 0.15 | 0.33 |
| 5420 W State Road 235 | La Crosse | 535,493 | 910,019 | 0.15 | 0.34 |
| 3232 W Silver Springs Blvd | Ocala | 448,408 | 820,692 | 0.15 | 0.33 |
| 239 N Center St | Pierson | 723,394 | 744,533 | 0.17 | 0.33 |
| 1140 County Road 309 | Cresent City | 689,147 | 1,388,147 | 0.15 | 0.33 |
| 901 State road 20 | Interlachen | 754,480 | 976,586 | 0.15 | 0.33 |
| 17025 SE County Road 234 | Micanopy | 1,136,604 | 749,748 | 0.15 | 0.33 |
| 861 E State Road 44 | Wildwood | 820,468 | 413,934 | 0.15 | 0.33 |

35.     In addition to the data in the memorandums described above, Circle K, on behalf

of itself and TMC, made additional representations to UPS that were false and materially misleading. Among other things, during a telephone call on November 5, 2018, Ciminelli provided Shamikh with other financial information, including historical financial data such as profit margins for convenience store and fuel sales for each of the locations that UPS was interested in leasing. Ciminelli also informed Shamikh that UPS could expect significant sales increases (and related higher margins) upon commencement of UPS' operation of the convenience stores and gas stations. Ciminelli stated that these projections were based on increased sales and margins at approximately 50 other convenience stores and gas stations that Circle K and TMC had operated as "company owned stores" and then sold or transferred to new operators, like UPS. At Ciminelli's direction, and with his knowledge, UPS used all of this information to complete its Business Plan.

36.     Based on the data provided by Circle K and TMC and the additional representations by Ciminelli and others, including those described herein, UPS created a business plan (the "Business Plan"), that included an analysis of and projections on future performance for 22 locations in Florida, 17 of which UPS ultimately acquired.

37.     UPS submitted the Business Plan to Circle K and TMC on or about November 15, 2018. The Business Plan included, among other things, the following projections and representations:

a.     5051 Gateway Ave., Orlando Florida location (the "Orlando" location) would earn $493,150 in net sales and $45,970 in net profit in Year 1; $546,090 in net sales and $75,855 in net profit in Year 2; and $590,970 in net sales and $66,607 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month. (The Business Plan used the term "total income" to refer to the "net sales" figures referenced herein, and used the term "gross profits" to refer to the "net profits" referenced herein. These terms are used throughout the document, but UPS' understanding was that it was projecting net sales and net profits.)

b.     808 South Park Ave., Apopka, Florida location (the "Apopka" location) would earn $502,335 in net sales and $98,722 in net profit in Year 1;

$557,685 in net sales and $107,186 in net profit in Year 2; and $606,350 in net sales and $108,744 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

c.      10800 Metro Parkway, Fort Myers, Florida location (the "Fort Myers" location) would earn $508,557 in net sales and $101,482 in net profit in Year 1; $567,765 in net sales and $113,768 in net profit in Year 2; and $617,350 in net sales and $116,255 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

d.      2413 US Highway 301 North, Ellenton, Florida location (the "Ellenton" location) would earn $613,649 in net sales and $165,597 in net profit in Year 1; $643,478 in net sales and $190,048 in net profit in Year 2; and $671,075 in net sales and $198,173 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

e.      5055 South Orange Blossom Trail, Kissimmee, Florida location (the "Kissmmee" location) would earn $509,926 in net sales and $62,771 in net profit in Year 1; $552,627 in net sales and $99,941 in net profit in Year 2; and $585,923 in net sales and $113,729 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

f.      13705 Spring Hill Drive, Springhill, Florida location (the "Springhill" location) would earn $652,835 in net sales and $153,721 in net profit in Year 1; $692,295 in net sales and $160.242 in net profit in Year 2; and $724,871 in net sales and $173,338 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

g.      239 N. Central Street, Pierson, Florida location (the "Pierson" location) would earn $461,901 in net sales and $59,062 in net profit in Year 1; $534,680 in net sales and $98,142 in net profit in Year 2; and $578,635 in net sales and $108,210 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

h.      1140 County Road 309, Crescent City, Florida location (the "Crescent City" location) would earn $676,110 in net sales and $173,871 in net profit in Year 1; $754,620 in net sales and $206,217 in net profit in Year 2; and $797,615 in net sales and $220,913 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

i.      901 State Road 20, Interlachen, Florida location (the "Interlachen" location) would earn $522,786 in net sales and $94,013 in net profit in Year 1; $588,900 in net sales and $126,483 in net profit in Year 2; and $630,095 in net sales and $133,865 in net profit in Year 3. The Business Plan projected that this location

would increase its net sales and profits every single month.

j.      17025 SE County Road 234, Micanopy, Florida location (the "Micanopy" location) would earn $491,497 in net sales and $63,847 in net profit in Year 1; $551,820 in net sales and $90,609 in net profit in Year 2; and $589,115 in net sales and $107,849 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

k.      3232 West Silver Springs Boulevard, Ocala Florida location (the "Ocala" location) would earn $444,116 in net sales and $69,328 in net profit in Year 1; $507,300 in net sales and $98,880 in net profit in Year 2; and $547,115 in net sales and $104,873 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

l.      861 East State Road 44, Wildwood, Florida location (the "Wildwood" location) would earn $334,424 in net sales and $42,184 in net profit in Year 1; $394,931 in net sales and $91,043 in net profit in Year 2; and $427,235 in net sales and $111,545 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

m.      2158 North Temple Avenue, Starke, Florida location (the "Starke" location) would earn $423,870 in net sales and $97,556 in net profit in Year 1; $485,351 in net sales and $144,879 in net profit in Year 2; and $524,375 in net sales and $162,627 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

n.      1005 South Edgewood Avenue, Jacksonville, Florida location (the "1005 Jacksonville" location) would earn $634,266 in net sales and $173,170 in net profit in Year 1; $695,891 in net sales and $186,284 in net profit in Year 2; and $724,434 in net sales and $196,727 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

o.      205 South Lawrence Boulevard, Keystone Heights, Florida location (the "Keystone" location) would earn $792,366 in net sales and $239,829 in net profit in Year 1; $852,143 in net sales and $251,113 in net profit in Year 2; and $883,787 in net sales and $275,270 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

p.      5420 West State Road, La Crosse, Florida location (the "La Crosse" location) would earn $469,854 in net sales and $57561 in net profit in Year 1; $639,911 in net sales and $136,207 in net profit in Year 2; and $673,098 in net sales and $151,241 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

q.      9750 Old St. Augustine Road, Jacksonville, Florida location (the "9750 Jacksonville" location) would earn $548,073 in net sales and $102,313 in net profit in Year 1; $601,055 in net sales and $120,600 in net profit in Year 2; and $629,53 in net sales and $124,234 in net profit in Year 3. The Business Plan projected that this location would increase its net sales and profits every single month.

38.      In late November 2018, Ciminelli advised Shamikh by telephone that Circle K and TMC were impressed with the Business Plan and would like Shamikh to come to Allentown, Pennsylvania to review the Business Plan.

39.      Shamikh, on behalf of UPS, met with Ciminelli, Frye, and Alfier on December 4, 2018, and reviewed the Business Plan during a meeting that lasted over two hours, including the projections of sales, profit margins and growth stated therein. Ciminelli, Frye, and Alfier each verbally approved the Business Plan, and Ciminelli and Frye stated that it was one of "the best business plans they had ever read." Ciminelli, Frye, and Alfier advised Shamikh that this would be a "very successful transaction" for UPS.

40.      Thereafter, in or about March 2019, Circle K and TMC advised UPS that it wanted to move forward and lease 11 gas station and convenience store locations to UPS.

41.      Upon information and belief, the financial information sent by Frye on October 1, 2018 and October 31, 2018 were false and materially misleading, and that sales during the trailing 12 months to April 2018 and profit margins for that same period were actually lower than what was represented to Shamikh.

42.      Additionally, although sales at the locations being considered for purchase by UPS substantially declined after April 2018, Circle K and TMC failed to inform UPS of this critical material fact.

43.      Circle K and TMC knew that the profit margins and growth projections contained in the Business Plan, including those set forth above that were based on representations made by

12

Ciminelli, were inaccurate and had no basis in any historical data. Circle K and TMC also failed to advise UPS to revise the Business Plan to reflect lower profit margins or growth projections, sales, or to make any other changes to the Business Plan. Instead, during the December 4, 2018 meeting, Ciminelli, Frye, and Alfier indicated on behalf of Circle K and TMC that the same were accurate.

44.     It is industry standard for a petroleum franchisor, such as Circle K, to review a Business Plan and advise the franchisee immediately if the projected profit margins are inaccurate and/or do not reflect historical sales data.

45.     Hereafter, the foregoing actions and/or inactions are referred to as "Misrepresentations" and "Omissions."

## II.     <u>UPS Enters into 17 Security Agreements, Supply Agreements, and Leases with Circle K</u>

46.     On or about April 30, 2019, relying on all the Misrepresentations and Omissions and the projections in the Business Plan, UPS entered into 11 supply agreements and leases with Circle K for premises at (1) Crescent City; (2) Interlachen; (3) 9750 Jacksonville; (4) 1005 Jacksonville; (5) Keystone; (6) La Crosse; (7) Micanopy; (8) Ocala; (9) Pierson; (10) Starke; and (11) Wildwood locations, the terms of which were all identical, except as to location and the specific rental due under each lease, and pursuant to which UPS acquired the right to operate a motor fuel business using Circle K sourced motor fuel at the above-referenced locations. UPS and Circle K also entered into 11 security agreements for each of the above- referenced premises, the terms of which were identical except as to location.

47.     On or about April 1, 2019, Ciminelli called Shamikh and, in a telephone conversation, advised Shamikh that Circle K and TMC were "very impressed" with UPS and stated that Circle K and TMC would like UPS to enter into six leases for six additional locations. UPS

had provided financial projections for these six new locations as part of its Business Plan, and Circle K and TMC had provided sales data in the confidential memorandums related to these six additional locations. During the April 1, 2019 telephone call, Ciminelli also advised Shamikh that the six additional locations had increased their monthly sales and profits dramatically since April 2018. (Hereafter, references to the "Misrepresentations and Omissions" shall include this statement.). This statement was false when made, as the monthly sales and profits at these additional locations had no increased.

48.     Accordingly, relying on all of the Misrepresentations and Omissions and the projections in the Business Plan, UPS and Circle K entered into six additional supply agreements and leases on July 10, 2019,  for premises at the (1) Apopka; (2) Ellenton; (3) Fort Myers; (4) Kissimmee; (5) Orlando; and (6) Springhill locations, the terms of which were all identical, except as to location and the specific rental due under each lease, to the terms of the supply agreements and leases entered into on April 30, 2019. UPS and Circle K also entered into six additional security agreements for each of the above-referenced premises, the terms of which were identical except as to location. (Hereafter, all of the 17 above-referenced locations are referred to collectively as the "Premises" and all of the 17 above-referenced supply agreements, lease agreements and security agreements governing the Premises are collectively referred to as the "Supply Agreements," the "Leases" and the "Security Agreements.")

49.     If Circle K and TMC, through their authorized representatives, had not made the Misrepresentations or Omissions, UPS would not have entered into the Supply Agreements, Leases, and/or Security Agreements.

**UPS Enters into the Franchise Agreements**

50.     In or about March 2019, Jessica Rezendes, Circle K's franchise development

manager, provided UPS with two franchise disclosure documents (the "FDDs") on behalf of TMC, pursuant to which TMC offered UPS the opportunity to purchase several Kangaroo Express franchises and several Circle K franchises. Pursuant to the June 14, 2019 Letter of Intent, UPS was obligated to enter into this franchise relationship with TMC.

51.      Thereafter, on June 27, 2019, UPS, relying on the Misrepresentations and Omissions and the projections from the Business Plan that were approved by Circle K and TMC, as well as the FDDs, entered into five franchise agreements with TMC to operate Circle K convenience stores at the (1) Crescent City; (2) 9750 Jacksonville; (3) 1005 Jacksonville; (4) Keystone; and (5) La Crosse locations, and entered into six franchise agreements with TMC to operate Kangaroo Express franchises at the (1) Interlachen; (2) Micanopy; (3) Ocala; (4) Pierson; (5) Starke; and (6) Wildwood locations.

52.      On August 5, 2020, Circle K and TMC provided UPS with two additional FDDs, which were substantively identical to the first two FDDs, pursuant to which UPS was offered the opportunity to purchase additional Kangaroo Express franchises and Circle K franchises. Thereafter, on or about October 4, 2020, UPS, relying on all of the Misrepresentations and Omissions and the projections from the Business Plan, as well as the FDDs, entered into one franchise agreement with TMC to operate a Circle K convenience store at the Fort Myers location, and entered into five franchise agreements with TMC to operate Kangaroo Express franchises at the (1) Apopka; (2) Ellenton; (3) Kissimmee; (4) Orlando; and (5) Springhill locations.

53.      Accordingly, by October 4, 2019, UPS, in reliance on the Misrepresentations and Omissions and the projections in the Business Plan (which were based on representations made by Circle K and TMC), and the FDDs, entered into the Franchise Agreements, each of which provided for the operation of a Kangaroo Express or Circle K convenience store at each of the 17 locations

(sometimes referred to herein as the "C-Stores").

54.     In connection with each of the Franchise Agreements, Syed Kazmi ("Syed") entered into a Personal Guaranty (the "Personal Guaranties"), pursuant to which he became personally liable for the financial obligations of UPS under the Franchise Agreements, which he entered into relying on the Misrepresentations and Omissions and the projections in the Business Plan, and the FDDs.

55.     UPS would not have then entered into any of the Franchise Agreements with TMC and Syed would not have entered into the Personal Guaranties if Circle K and TMC had not made the Misrepresentations and Omissions, had not approved the Business Plan, and had not provided FDDs that were fraudulent.

### III.  **The FTC Rule**

56.     The Federal Trade Commission regulates the sale of franchises pursuant to the FTC Rule.

57.     Pursuant to the FTC Rule, a commercial business arrangement is a "franchise" if it satisfies three definitional elements: (1) the franchisor grants to franchisee the right to operate a business that is identified or associated with the franchisor's trademark; (2) the franchisor will exert or has authority to exert significant control or provide significant assistance in the operation of the business; and (3) as a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

58.     The Franchise Agreements are each a commercial arrangement that meet the definition of a "franchise."

59.     The Franchise Agreements provide UPS with a license to use TMC's trademarks,

16

whether Circle K or Kangaroo Express.

60.     The Franchise Agreements provide TMC with the right to exert significant control over the operation of the C-Stores, which TMC did, including by requiring UPS to: operate the C-Stores in strict compliance with TMC's specifications and standards; build out/construct/renovate the C-Stores in strict compliance with TMC's specification sand standards; purchase all inventory and food from approved vendors; complete TMC's training; comply with regular audits by Franchise Business Consultants employed by TMC who supervises the C-Stores at all times; and install point of sale and other computer and accounting systems, which TMC can access, in accordance with TMC's specifications, among other things.

61.     Both the 2018 Kangaroo Express FDD and the 2018 Circle K FDD state that TMC is a franchisor.

62.     UPS paid franchise fees and a monthly royalty fee, among other things, to TMC, all of which constitute a "payment" under the FTC Rule.

63.     Pursuant to the FTC Rule, any disclosures of material fact must be accurate.

64.     The FTC Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or corporate owned outlets only if there is a reasonable basis for the information and if the information is included in the FDD. If the franchisor is selling corporate-owned stores, then it may provide historical financial information to the franchisee-purchaser, which information must be accurate and cannot be misleading, but does not have to be disclosed in the FDD.

65.     Pursuant to the FTC Rule, if a franchisor provides "supplemental" financial performance representations ("FPRs") that are not included in the FDD, such supplemental FPRs must:

      a.     be in writing;
      b.     explain the difference between the supplemental FPR and the

representations in the FDD;

      c.    include a statement of whether the supplemental FPR is a historic FPR about the franchise system's existing outlets, or a subset of those outlets, or is a forecast of the prospective franchisee's future financial performance;

      d.    if the FPR relates to past performance of existing outlets, state the material bases for the representation, including:

      i.        whether it relates to all of the existing outlets or a subset of existing outlets that share a particular set of characteristics and what those characteristics are;

      ii.       the dates of such financial performance;

      iii.     the total number of outlets that existed during the relevant period and the total number of outlets with the described characteristics;

      iv.     the number of outlets whose actual financial performance data were used in arriving at the representation;

      v.      of those outlets described in the preceding subparagraph iv., how many attained or surpassed the stated results; and

      vi.     characteristics of the included outlets that may differ materially from the outlet offered to a prospective franchisee;

      e.    if the FPR is a forecast of future financial performance, state the material bases and assumptions on which the projection is based; and

      f.    contain a clear and conspicuous admonition that a new franchisee's individual financial results may differ than the result stated in the supplemental financial performance representation.

66.     The FTC Rule further provides that it is an unfair or deceptive act in violation of the Section 5 of the Federal Trade Commission Act for any franchisor to make any claims that contradict the information it is required to disclose (including the information in the FDD), or to disseminate any FPRs to prospective franchisees unless the franchisor has a reasonable basis and written substantiation for the FPR at the time it is made and the FPR is included in Item 19 of the FDD, or otherwise fail to comply with the FTC Rule.

67.     It is also a violation of the FTC Rule to omit material information related to any disclosures made in the FDD.

68.     All of the Misrepresentations and Omissions, its FDD, and the approval by Circle K and TMC of the projections made in the Business Plan, violate the FTC Rule in that they were made outside the FDD, and do not conform with the representations contained in Item 19.

## IV. __The Letters of Credit and Inventory Agreement__

69.     On or about July 1, 2019, Circle K and UPS entered into 17 Inventory Purchase Agreements (one agreement for each location UPS was to take over pursuant to the Supply Agreements and Leases) and, thereafter, 17 Amendments to the Inventory Purchase Agreements (hereafter, the "Amended Inventory Agreements"). The Amended Inventory Agreements provided that, on the date UPS assumed possession of each location pursuant to the Leases, Circle K and UPS would conduct a "Physical Inventory" of fuel, supplies, food service and merchandise inventory at each location and, upon completion of the Physical Inventory, Circle K and UPS would execute documents confirming the Final Inventory Price. Thereafter, UPS would be required to pay the Final Inventory Price in three separate installments.

70.     Pursuant to the Amended Inventory Agreements, Circle K and TMC agreed that UPS could provide a $2 million letter of credit, as security for the Final Inventory Price, which UPS did.

71.     Accordingly, on the date UPS assumed possession of each of the Premises, Circle K conducted a Physical Inventory and the parties agreed on and executed documents confirming the Final Inventory Price.

72.     The total Final Inventory Price for all of the Amended Inventory Agreements was $1,165,683.05, which amount was to be paid in three installments: the first payment would be for $258,736; the second payment would be for $406,947; and the final payment would be for $500,000.05.

73.     UPS received an invoice for, and promptly paid, the first two installment payments in the amounts sent forth above.

74.     UPS received the third invoice, however, for $531,462.76, which was approximately $30,000 higher than the amount agreed upon and documented.

75.     UPS sent the documentation of the Final Inventory Price to Circle K and TMC, disputing the amount of the third invoice.

76.     In response, Circle K called on the third letter of credit for, inexplicably $644,612.93, even though UPS only owed $500,000.05.

77.     As a result, Circle K wrongfully received and has retained approximately $144,000 of funds. When UPS advised Circle K again that this was in error, Circle K refused to release the funds back to UPS' bank unless UPS agreed to sign a release of any claim that UPS might have against Circle K, which UPS refused to do.

**V.   UPS' Operations; Circle K's and TMC's Additional Misrepresentations**

78.     As stated above, UPS began operating the Premises, pursuant to the Supply Agreements and Leases, between July 15, 2019 and August 15, 2019.

79.     Within a few days of takeover, UPS contacted Circle K and TMC to advise that sales at each of the locations were much lower than what had been represented by Circle K and TMC.

80.     Shamikh contacted Alfier by telephone on or about July 30, 2019, and Alfier stated that the sales would rebound and that by the end of the first month, the sales would reach the levels that Circle K and TMC represented the C-Stores and gas stations were earning prior to April 2018, and, in fact, would exceed those numbers. They never did.

**VI.   Circle K Assigns the Supply Agreements, Leases, and Security Agreements**

81.     In or about September 2019, Circle K assigned its rights under the Supply Agreements to Lehigh Supplier and its rights under the Leases to Lehigh Landlord, and Lehigh

Supplier and Lehigh Landlord assumed Circle K's obligations. Circle K assigned its rights under "all agreements" entered into with UPS to the Lehigh Parties and LGP, and further stated that any guaranties or security, including the Security Agreements, would apply to the benefit of the Lehigh Parties and LGP.

**VII.     The Lehigh Parties' Breaches and Wrongful Acts**

     **a.  The Lehigh Parties Improperly Withhold UPS' Credit Card Proceeds**

82.     The Lehigh Parties process all of UPS' credit card transactions. The Lehigh Parties' required UPS to agree to this arrangement. Lehigh Supplier is authorized, pursuant to the Supply Agreements, to withhold UPS' credit card proceeds from the sales of motor fuel only. All other credit card proceeds, including credit card proceeds from the sale of goods sold at the stores at the Premises, are UPS' property, and may not be withheld by the Lehigh Parties for any reason. Those proceeds must be turned over to UPS within a "commercially reasonable time."

83.     Regarding which specific funds Lehigh Supplier may withhold, the Supply Agreements, Section 4, provide that UPS "hereby assigns to [Lehigh Supplier] all of [UPS]'s right, title and interest in the proceeds from the sale of goods delivered by [Lehigh Supplier] that are effectuated through credit card transactions … and otherwise."

84.     The only goods delivered by Lehigh Supplier to UPS was motor fuel, so the Supply Agreements only allow Lehigh Supplier to withhold credit card proceeds from fuel sales only. Lehigh Supplier is not authorized to withhold credit card proceeds from any other transactions.

85.     The Leases do not authorize Lehigh Landlord to withhold credit card proceeds from any transactions.

86.     Notwithstanding the foregoing, the Lehigh Parties improperly withheld credit card proceeds from the sales of goods at the stores at the Premises, beginning in or about September

and October 2019, shortly after the assignment of the Supply Agreements, Leases and Security Agreements from Circle K.

87.     The Lehigh Parties advised UPS that they were withholding these funds because UPS allegedly owed Circle K payment of the third invoice pursuant to the inventory audit. The Lehigh Parties had no right whatsoever to demand payment by UPS to Circle K but, because the Defendants are or were related entities, the Lehigh Parties exercised self-help in an effort to strong-arm UPS into making the contested payment to the Lehigh Parties' affiliate, Circle K.

88.     Up to and including October 2019, UPS performed all of its obligations under the Leases, including paying all amounts that were properly due when owed. In several instances, the Lehigh Parties had submitted multiple false invoices to UPS, which UPS paid.

89.     UPS maintained 17 separate operating accounts – one for each of the locations it operated. All sales at each of the locations went into that location's operating account. Credit card sales were processed by the Lehigh Parties and then, as set forth above, were required to be deposited into the corresponding operating account within a commercially reasonable time, with the exception of fuel sales paid by credit card, which Lehigh Supplier was entitled to withhold and apply to amounts due for fuel sales from Lehigh Supplier to UPS pursuant to the Supply Agreement.

90.     In September 2019 and October 2019, Lehigh Landlord had improperly withdrawn rent for each location directly from UPS' 17 operating accounts.

91.     In or about September and October 2019, the Lehigh Parties improperly withheld UPS' credit card proceeds from the sales of goods at the stores at the Premises without authorization to do so, and did not deposit those amounts into UPS' various operating accounts, as required.

92.     As a result of this improper withholding, in October 2019, UPS contacted Lehigh Landlord to advise that it did not have funds in its operating accounts, and so Lehigh Landlord would not be able to withdraw its November 2019 rent payment from UPS' operating accounts. UPS demanded the return of the improperly-withheld funds, and also advised Lehigh Landlord that the amount of improperly withheld funds far exceeded (by hundreds of thousands of dollars) the rent UPS owed to Lehigh Landlord for November 2019.

93.     During several discussions regarding this issue, Lehigh Landlord verbally agreed that it would not withdraw UPS' rent from UPS' operating accounts in November 2019, based on its improper withholding of the credit card proceeds. Lehigh Landlord advised UPS that it would apply the improperly-withheld funds to the amounts due for November 2019 rent. UPS demanded that Lehigh Landlord return the improperly-withheld funds and simply withdraw the rent from UPS' operating accounts.

94.     Lehigh Landlord failed to return the improperly-withheld funds before the November 2019 rent was due. Accordingly, thereafter, UPS demanded Lehigh Landlord return the improperly-withheld funds, less any amounts owed by UPS for November 2019 rent payments.

95.     Instead, without any authority to do so, the Lehigh Parties have continued to improperly withhold UPS' credit card proceeds from sales of goods at the stores on the Premises.

96.     To date, the Lehigh Parties have improperly retained over $1 million in UPS' credit card proceeds, which far exceeds UPS' rent, or any amounts that were due under the Leases (and/or any other agreements, including the Supply Agreements).

97.     UPS has repeatedly demanded the Lehigh Parties return the improperly withheld funds and deposit them into UPS' operating accounts. When the Lehigh Parties ignored these requests, UPS then demanded the Lehigh Parties take any amounts due from UPS to the Lehigh

Parties under the Leases and/or Supply Agreements from the improperly withheld funds, and then return the balance of the improperly-withheld funds to UPS' operating accounts.

98.     The Lehigh Parties have refused or ignored all of UPS' demands to return the improperly withheld credit card proceeds, including any amounts in excess of what UPS owed to the Lehigh Parties under the Leases and/or Supply Agreements. Since December 2019, Lehigh Landlord has not attempted to withdraw rent from UPS' operating accounts, and the Lehigh Parties never contacted UPS about any alleged failure to pay rent or any amounts due under the Leases or the Supply Agreements until February 6, 2020, when they abruptly sent a notice of termination, as set forth more fully below.

       **b.**     **The Lehigh Parties' February 6, 2020 Notice**

99.     On February 6, 2020, the Lehigh Parties sent UPS a Notice of Termination, which stated the Supply Agreements and Leases would terminate on February 27, 2020.

100.     The February 6, 2020 Notice was based on two alleged failures to pay amounts due to the Lehigh Parties and UPS' alleged failure to provide a letter of credit. None of the allegations on which the Notice is based have any merit. (The February 6, 2020 Notice also alleged cross-defaults of the Supply Agreements and Leases, but because none of the claims underlying the alleged defaults have any merit, there is no cross-default, here.)

101.     The termination of the Supply Agreements and Leases constitutes a termination of a franchise governed by the PMPA. The February 6, 2020 Notice stated that that it was being sent in accordance with the requirements of the PMPA.

102.     The February 6, 2020 Notice alleged UPS failed to pay (1) monthly amounts due under the Leases, including rent, in an amount totaling $721,085.78; and (2) six unpaid returned fuel drafts totaling $54,446.88, in violation of the Supply Agreements. Neither claim has merit.

103.     The February 6, 2020 Notice also stated that the Lehigh Parties reserved their rights under the Security Agreements.

    **i.**          **The Lehigh Parties' allegations of unpaid rent.**

104.     As set forth above, the Lehigh Parties have improperly withheld more than $1 million from UPS' credit card proceeds, which amount far exceeds any amounts UPS may owe to the Lehigh Parties, including amounts due under the Leases. UPS has demanded the return of these funds and, when those demands were ignored, UPS demanded the Lehigh Parties deduct any payments due pursuant to the Leases and/or Supply Agreements from the improperly withheld funds, and then further demanded the Lehigh Parties return the substantial remaining balance to UPS' operating accounts.

105.     During several conversations with the Lehigh Parties in October 2019, the Lehigh Parties advised they would deduct payments owed to them from the improperly-withheld funds. After December 2019, the Lehigh Parties did not attempt to withdraw rent and other payments from UPS' operating accounts.

106.     Accordingly, UPS has not defaulted by failing to pay rent – rather, instead of Lehigh Landlord receiving a rent payment by withdrawing rent from UPS' operating accounts, the Lehigh Parties withheld the credit card proceeds and agreed to apply those funds to the rent and other amounts due under the Leases and Supply Agreements. In fact, the Lehigh Parties have been overpaid and owe UPS hundreds of thousands of dollars.

107.     Additionally, the balance claimed by Lehigh Landlord in unpaid rent is inaccurate and includes amounts due from third parties to Lehigh Landlord, in addition to other inexplicable charges that are not UPS' responsibility.

108.     Additionally, the Security Agreements provide that, in the event of a default,

which includes any non-payment under the Leases, the Lehigh Parties are required to provide written notice to UPS of the default, and provide UPS with 10 days to cure the default. The Lehigh Parties never provided this required written notice and did not provide UPS with an opportunity to cure as required under the Security Agreements.

109.     Based on UPS' discussions with the Lehigh Parties in October 2019 described above, the Lehigh Parties had more than 60 days' notice of all of the facts underlying its claims for default for failure to pay rent before they sent the February 6, 2020 Notice.

### ii.   The Allegedly Unpaid Fuel Drafts

110.     Lehigh Supplier's contention that UPS failed to pay for fuel drafts is also false.

111.     As set forth above, UPS maintained 17 operating accounts - one for each of its locations. All sales at each of the locations went into that location's operating account. Credit card sales were processed by the Lehigh Parties and then were required to be deposited into the corresponding operating account, with the exception of fuel sales paid by credit card, which Lehigh Supplier was entitled to withhold and apply to amounts due for fuel sales only.

112.     The Supply Agreements, Section 4, also provided that if the credit card proceeds from fuel sales "are insufficient to pay for [motor fuel delivered to UPS] as of the Purchase Date, [Lehigh Supplier] may at its option demand that [UPS] pay for such goods via electronic funds transfer, cash, certified or cashier's check, money order, Automated Direct Debit System, or other means approved by [Lehigh Supplier]…"

113.     Accordingly, in the event that the credit card sales for fuel at any of the locations did not cover the costs of fuel delivered by Lehigh Supplier to UPS for that location, then Lehigh Supplier could demand payment by any means.

114.     The February 6, 2020 Notice alleges that Lehigh Supplier attempted to withdraw

funds from UPS' operating accounts in order to pay $54,446.88 in fuel costs that were not covered by credit card proceeds from fuel sales.

115.    However, as set forth above, the Lehigh Parties have been improperly withholding UPS' credit card proceeds since September or October 2019, and currently have improperly withheld more than $1 million. Moreover, UPS demanded that the Lehigh Parties apply the improperly withheld credit card proceeds to any amounts due under the Leases and Supply Agreements, and the Lehigh Parties agreed to do so.

116.    Accordingly, Lehigh Supplier collected the payments owed pursuant to the Supply Agreements *via* its improper withholding of credit card proceeds, and no amounts remain unpaid. In fact, the Lehigh Parties have improperly withheld credit card proceeds far in excess of any amounts they are owed under the Leases and Supply Agreements.

117.    Additionally, the Lehigh Parties did not provide UPS with written notice or an opportunity to cure as required under the Security Agreements.

118.    Based on UPS' discussions with the Lehigh Parties in October 2019 described above, the Lehigh Parties had more than 60 days' notice of all of the facts underlying their claims for any failure to pay before they sent the February 6, 2020 Notice. The Lehigh Parties knew, in October 2019, that UPS could not pay the Lehigh Parties via deductions from the operating accounts, at that time or any time thereafter, because hundreds of thousands of dollars (and, in fact, to date, more than $1 million) in operating funds were being wrongfully withheld by the Lehigh Parties. Since October 2019, the Lehigh Parties were aware that UPS had demanded that the Lehigh Parties return the improperly-withheld funds, and when that was ignored, UPS demanded the Lehigh Parties deduct amounts due under the Supply Agreements and Leases from the improperly withheld funds and then return the substantial balance to UPS' operating accounts.

### iii.  The February 6, 2020 Notice's Allegations Regarding UPS' Letter of Credit

119.    The Supply Agreement, Section 7, provides that "...[Lehigh Supplier] reserves the right to require from [UPS] from time to time a … letter of credit … to secure [UPS]' obligations under [the Supply Agreement]…"

120.    As stated above, UPS initially entered into the Supply Agreement with Circle K. At the time UPS entered into the Supply Agreement, it provided two letters of credit, in accordance with Circle K's requests at the time. (It provided a third letter of credit related to the opening inventory which, upon information and belief, was not assigned.)

121.    In or about September 2019, Circle K assigned all of its agreements and the two letters of credit provided pursuant to the Supply Agreement to the Lehigh Parties and LGP. Accordingly, Lehigh Supplier had two letters of credit from UPS.

122.    In or about October 2019, when the Lehigh Parties and UPS first discussed the Lehigh Parties' wrongful withholding of credit card proceeds and UPS' resultant inability to pay rent via withdrawals from its operating accounts, the parties also discussed whether Lehigh Landlord would provide $200,000 in rent credits to UPS, based on amounts UPS had been overcharged during the time period when it took over the Premises, and a rent reduction for November 2019, December 2019, and January 2020 rents. The Lehigh Parties advised UPS that, in the event the rent was reduced and rent credits were provided, the Lehigh Parties would require a new letter of credit from UPS. At that time, UPS advised the Lehigh Parties that it had already provided two letters of credit, and that a further letter of credit was unwarranted. The parties did not, thereafter, discuss rent reductions or a letter of credit.

123.    Lehigh Supplier has not, on any other occasion, prior to the February 6, 2020

Notice, requested UPS provide an additional letter of credit. Accordingly, there is no basis to allege a default.

124.     Moreover, the Lehigh Parties, again, had more than 60 days' notice of the facts underlying their claim for default.

125.     Additionally, the Lehigh Parties did not provide UPS with written notice or an opportunity to cure this alleged default as required under the Security Agreements.

126.     UPS advised the Lehigh Parties that all of the alleged claims were meritless and that UPS had not defaulted under the Leases or Supply Agreements.

127.     Notwithstanding, on February 26, 2020, the Lehigh Parties sent UPS a letter stating that, pursuant to the February 6, 2020 Notice, the Supply Agreements and Leases were terminated as of 12:01 AM on February 27, 2020. The February 27, 2020 Notice states that it was sent pursuant to the PMPA.

### c.     The Three-Day Notices

128.     On March 5, 2020, Lehigh Landlord sent, via overnight mail, 17 notices of default under the Leases to UPS, alleging that UPS owed rent under each Lease, and demanding payment of the rent of the UPS turn over possession of the Premises within three business days, by March 10, 2020 (the "Three-Day Notices"). Prior to sending out the Three-Day Notices, on February 28, 2020, Lehigh Landlord exercised self-help with respect to the gas station and convenience store at the Fort Myers location in violation of applicable law.

129.     The Three-Day Notices were defective and improper because Lehigh Landlord failed to comply with the notice provisions of the Leases, did not provide UPS with the time required to cure the alleged defaults under the Leases and Security Agreements, and otherwise failed to comply with the applicable state law.

**d.      Lehigh Supplier's Breach of the Supply Agreements**

130.    The Supply Agreements require Lehigh Supplier to, among other things, sell all UPS' requirements for fuel in no less than the quantities shown on the Commodity Schedule annexed to each Supply Agreement.

131.    Notwithstanding the foregoing, on or about January 15, 2020, Lehigh Supplier stopped selling fuel to UPS.

132.    UPS demanded Lehigh Supplier continue to sell fuel pursuant to the Supply Agreements, but Lehigh Supplier refused.

**VIII.   UPS' Damages**

133.    As set forth above, after nearly a year of due diligence and communications with Circle K and TMC, including the review of the data provided by Circle K and TMC related to the 17 gas stations and convenience stores acquired by UPS, the preparation of detailed financial projections set forth in the Business Plan based on that data, and in reliance on the Misrepresentations and Omissions, UPS invested millions of dollars into the gas stations and convenience stores.

134.    As set forth above, almost immediately after the acquisition, UPS advised Circle K that the sales were far lower than what Circle K had represented and projected. Circle K advised UPS that the sales would stabilize.

135.    Unfortunately, the sales and profitability at the locations never rose to the levels Circle K and TMC represented they were performing at prior to April 2018. The sales and profitability at the locations never rose to the levels projected in the Business Plan.

136.    UPS' poor sales figures caused immediate losses in the operation of the

businesses. However, the wrongful acts by Circle K, the Lehigh Parties and TMC, who acted in a concerted effort to completely divest UPS of its businesses, exponentially compounded UPS' losses.

137.    As set forth above, the Lehigh Parties wrongfully withheld more than $1 million from UPS, and then wrongfully terminated UPS' Leases and Supply Agreements for non-payment of amounts substantially lower than what the Lehigh Parties had wrongfully withheld.

138.    While the Lehigh Parties were wrongfully withholding UPS' money, emptying UPS' operating funds, Circle K wrongfully "called on" a letter of credit for hundreds of thousands of dollars.

139.    While the Lehigh Parties and Circle K were all wrongfully withholding more than $1 million of UPS' money, Lehigh Supplier breached the Supply Agreements and refused to sell UPS fuel.

140.    Without funds in its operating accounts UPS was unable to pay critical vendors. Without fuel from Lehigh Supplier, it was unable to make any fuel sales.

141.    Critically, the sales that UPS was able to make were largely made through credit card transactions and, thus, continued to be wrongfully taken by the Lehigh Parties.

142.    The Lehigh Parties and Circle K effectively decimated UPS' business in a matter of months through their concerted efforts and breaches of all the agreements.

143.    In January 2020, TMC sent a notice of default of all of the Franchise Agreements, as described in more detail below, which provided vague assertions of default that were impossible for UPS to understand, let alone remedy. Thereafter, TMC improperly terminated the Franchise Agreements, alleging that the conditions caused by the Lehigh Parties and Circle K (among other things, a lack of operating funds, no fuel sales, and a lack of inventory at the C-Stores) were

attributable to UPS.

144.     Circle K, the Lehigh Parties, and TMC have now entirely divested UPS of its entire business investment. UPS has invested and lost approximately $10 million or more.

### IX.   TMC's Purported Termination of the Franchise Agreements

145.     On or about January 7, 2020, TMC sent UPS a notice of default regarding (apparently) all 17 of the Franchise Agreements. The January 7 Notice stated that there were a "large number of violations," including "the inventory levels of the Stores' merchandise." The Notice of Default also stated "many" of the Stores had gone "an extended period of time" without certain deliveries from vendors, resulting in "shortages" of "many items."

146.     The January 7 Notice did not specify which of the C-Stores had low inventory, or on what dates or time frames, or what items were out of stock or which C-Stores were experiencing shortages.

147.     There were no other defaults alleged in the January 7 Notice, although the January 7 Notice referred to unspecified "reports" of actions by UPS that "if true" would constitute a default, among other things. The January 7 Notice did not provide any detail about any specific default other than set forth above.

148.     The January 7 Notice did not advise UPS that it must cure any defaults within 30 days.

149.     On February 12, 2020, TMC followed up on its vague January 7 Notice, advising UPS that "since the various violations set forth in each of UPS' Franchise Agreements have not been cured and the 30-day cure period has now expired, we possess the right to immediately terminate [the Franchise Agreements…] Although we possess this right, we are not exercising it at this time."

150.     Instead, TMC advised UPS that it would grant UPS additional time to address and remedy the "various defaults" described in the January 7 Notice.

151.     The February Notice also alleged that UPS had failed to pay fees "for a number of its 17 stores." It demanded UPS pay $36,086.40 "as soon as possible and in no event later than five days" and, for amounts due to TMC that were, at the time of the February Notice, unknown or undefined, TMC demanded UPS submit affidavits of amounts due and payments by February 29, 2020.

152.     On April 6, 2020, TMC sent a notice of termination (the "April Termination Notice"). The April Termination Notice stated that the January 7 Notice "granted UPS a 30-day period in which to cure the violations…" which was, as set forth above, not true.

153.     The April Termination Notice stated that "most, if not all, of the violations had not been cured at the expiration of that period, [and so] TMC agreed to grant UPS an extension." Neither the April Termination Notice nor the January 7 Notice provide any insight into what potential defaults, at which C-Stores, or on which dates, UPS failed to cure.

154.     Moreover, as set forth above, the January 7 Notice did not advise UPS of a 30-day cure period, and instead merely "implored" UPS to take steps to remedy the vague defaults alluded to therein. Accordingly, there was no "extension" granted at any time.

155.     Instead, without providing any further information about the vague defaults described in the January 7 Notice, TMC sent the February Notice, which demanded UPS "cure" the vague defaults and pay monies allegedly owed to TMC.

156.     The April Termination Notice states that TMC granted UPS an extension "to cure other defaults related to the leases of the stores." However, TMC is not a party to the Leases.

157.     The April Termination Notice demonstrates the damage done to UPS' C-Stores

33

and the leased locations by the Lehigh Parties' wrongful withholding of credit card proceeds, and

Lehigh Supplier's refusal to sell UPS fuel in breach of the Supply Agreement. Among other things,

the April Termination Notice states that many of the C-Stores were forced to close and none of the

locations are able to sell fuel, damaging the goodwill of C-Stores and locations that UPS invested

millions of dollars to purchase, build out, and operate.

158.    The April Termination Notice advises that the Franchise Agreements are

terminated, effective immediately.

159.    All conditions precedent to the filing of this action have occurred or have been

waived.

**CAUSES OF ACTION**

**COUNT I**
**Against Circle K and TMC**
**(FRAUDULENT MISREPRESENTATION)**

160.    Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1

through 159, *supra*, as if fully set forth herein.

161.    Circle K/TMC made several false and material Misrepresentations to Plaintiffs,

as fully set forth in Paragraphs 28 through 49, *supra*, including but not limited to: (i) on October

9, 2018 and October 31, 2018, Frye, on behalf of Circle K and TMC, e-mailed Shamikh two

memorandums that provided trailing 12-month financial data for the period through April 2018

for each of the 22 locations that UPS was considering acquiring; (ii) during a November 5, 2018

phone call, Ciminelli provided Shamikh with historical financial data (i.e. profit margins, fuel

sales) for each of the locations that UPS was interested in leasing, Ciminelli informed Shamikh

that UPS could expect significant sales increases and related higher margins, and Ciminelli stated

that these projections were based on increased sales and margins at approximately 50 other

convenience stores and gas stations that Circle K and TMC had operated as "company owned

stores" and then sold or transferred to new operators, like UPS; and (iii) during a July 30, 2019 call, Alfier assured Shamikh that sales would rebound and that by the end of the first month, sales would reach the levels that Circle K and TMC represented the C-Stores and gas stations were earning prior to April 2018, and would exceed those numbers.

162.     Circle K/TMC knew or should have known the Misrepresentations were false.

163.     Circle K/TMC intended for Plaintiffs to rely upon such Misrepresentations and enter into the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties.

164.     Plaintiffs did not know and had no reason to know the Misrepresentations were false.

165.     Plaintiffs reasonably and justifiably relied on the Misrepresentations in entering into the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties.

166.     As a proximate and foreseeable result of the Misrepresentations, Plaintiffs have invested and lost in excess of $10 million.

**COUNT II**
**Against Circle K and TMC**
**(FRAUDULENT CONCEALMENT)**

167.     Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

168.     Circle K/TMC made several Omissions of material facts that in equity and good conscience should have been disclosed as fully set forth in Paragraphs 28 through 49, *supra*, including but not limited to: (i) on October 9, 2018 and October 31, 2018, Frye, on behalf of Circle K and TMC, e-mailed Shamikh two memorandums that provided trailing 12-month financial data

for the period through April 2018 for each of the 22 locations that UPS was considering acquiring; (ii) failing to inform UPS that sales at the locations being considered for purchase by UPS substantially declined after April 2018; (iii) knowledge that the profit margins and growth projections contained in the Business Plan, including those set forth in Paragraphs 36 and 37, *supra*, based on representations made by Ciminelli, were inaccurate and had no basis in any historical data; and (iv) failing to advise UPS to revise the Business Plan to reflect lower profit margins or growth projections, sales, or to make any other changes to the Business Plan and instead, during the December 4, 2018 meeting, Ciminelli, Frye, and Alfier indicated on behalf of Circle K and TMC that the same were accurate.

169.     It is industry standard for a petroleum franchisor, such as Circle K, to review a Business Plan and advise the franchisee immediately if the projected profit margins are inaccurate and/or do not reflect historical sales data.

170.     Circle K/TMC had a legal duty to disclose the Omissions to the Plaintiffs, based on the FTC Rule and federal regulations governing franchising. Circle K/TMC had a duty to disclose the Omissions to the Plaintiffs due to the trust and relationship between the parties, the inequality of condition or knowledge between the parties, and due to the fact that Circle K/TMC provided the projections in the Business Plan and made other representations and, thus, had a duty to disclose information that would make those representations and projections inaccurate or misleading.

171.     Circle K/TMC knew that the facts underlying the Omissions were being concealed.

172.     Plaintiffs did not know about the facts underlying the Omissions.

173.     Circle K/TMC intended for Plaintiffs to rely upon the Misrepresentations and

enter into the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties.

174.    Plaintiffs acted upon the Omissions and entered into the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties. If Circle K/TMC had disclosed the Omissions, the Plaintiffs would not have entered into the Supply Agreements, Leases, Security Agreements, Franchise Agreements, or Personal Guaranties.

175.    As a direct, proximate, and foreseeable result of the Omissions, Plaintiffs have invested and lost $10 million.

## COUNT III
### Against Circle K and TMC
### (NEGLIGENT MISREPRESENTATION)

176.    Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

177.    Circle K/TMC provided Plaintiffs with false and misleading information, as fully set forth in Paragraphs 28 through 49, *supra*, including but not limited to: (i) on October 9, 2018 and October 31, 2018, Frye, on behalf of Circle K and TMC, e-mailed Shamikh two memorandums that provided trailing 12-month financial data for the period through April 2018 for each of the 22 locations that UPS was considering acquiring; (ii) during a November 5, 2018 phone call, Ciminelli provided Shamikh with historical financial data (i.e. profit margins, fuel sales) for each of the locations that UPS was interested in leasing, Ciminelli informed Shamikh that UPS could expect significant sales increases and related higher margins, and Ciminelli stated that these projections were based on increased sales and margins at approximately 50 other convenience stores and gas stations that Circle K and TMC had operated as "company owned stores" and then sold or transferred to new operators, like UPS; and (iii) during a July 30, 2019 call, Alfier assured

Shamikh that sales would rebound and that by the end of the first month, sales would reach the levels that Circle K and TMC represented the C-Stores and gas stations were earning prior to April 2018, and would exceed those numbers.

178.    Circle K/TMC knew or should have known the Misrepresentations were false.

179.    Circle K/TMC intended for Plaintiffs to rely on the false information, and failed to exercise reasonable care in obtaining or communicating the false information.

180.    Plaintiffs justifiably relied on the false information and entered into the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties.

181.    As a direct, proximate, and foreseeable result of the Misrepresentations and Omissions, Plaintiffs have invested and lost $10 million.

**COUNT IV**
**Against Circle K**
**(BREACH OF THE INVENTORY AGREEMENT)**

182.    Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

183.    As set forth above, Circle K and UPS entered into the Amended Inventory Purchase Agreements.

184.    Pursuant to the Amended Inventory Agreements, on the date UPS assumed possession of each location pursuant to the Leases, Circle K and UPS would conduct a Physical Inventory and would execute documents confirming the Final Inventory Price. Thereafter, UPS would be required to pay the Final Inventory Price in three separate installments.

185.    Pursuant to the Amended Inventory Agreements, Circle K and TMC agreed that UPS could provide a $2 million letter of credit, as security for the Final Inventory Price, which UPS did.

186.     Thereafter, UPS paid the first two installments of the Final Inventory Price payments. However, UPS received an invoice for the third payment which was inaccurate, and immediately disputed the amount.

187.     Instead of correcting the amount owed, Circle K called on the third letter of credit for $644,612.93, in breach of the Amended Inventory Agreements.

188.     Circle K acknowledged its breach but refused to return the excess funds back to UPS unless UPS agreed to sign a release of any claims UPS may have against Circle K, which UPS refused to do.

189.     As a direct and result of Circle K's breach, UPS has lost approximately $144,000.

**COUNT V**
**Against the Lehigh Parties**
**(VIOLATION OF THE PMPA)**

190.     Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

191.     As set forth above, the Supply Agreements, Leases, and Security Agreements are governed by the PMPA. Pursuant to the PMPA, the Lehigh Parties are franchisors and UPS is a franchisee.

192.     Among other things, the PMPA provides that a franchisor may only terminate a franchise based upon a ground set forth in PMPA §2802(2).

193.     PMPA §2802 states a franchisor has a ground to terminate a franchise if the franchisee fails to comply with any provision of the franchise.

194.     Here, UPS did not fail to comply with any provision of the franchise, as the PMPA § 2801 specifically states that the term "failure" does not include any failure for a cause beyond

39

the reasonable control of the franchisee. UPS had no control over the fact that the Lehigh Parties improperly withheld $1 million in operating funds and, likewise, had no control over the Lehigh Parties' inexplicable decision to not apply the improperly withheld funds to the amounts due under the Supply Agreements and/or Leases. As such, the Lehigh Parties had no lawful right to terminate UPS' franchise, making the terminations improper on that basis.

195.    Furthermore, the PMPA §2804(b)(1) allows a franchisor to terminate a franchise with less than 90 days' notice if the franchisor first acquired knowledge of such failure no more than 60 days prior to the date notice of termination is given. In other words, if the franchisor terminates on less than 90 days' notice, then the franchisor must move quickly – within 60 days of learning of the alleged basis for the termination.

196.    The February 6, 2020, Notice and the Three-Day Notices of Default, each provided less than 90 days' notice of termination and, accordingly, in order to have a "ground for termination" the Lehigh Parties must have acquired knowledge of the claim underlying the termination less than 60 days before sending the notices.

197.    As set forth above, based on UPS' discussions with the Lehigh Parties in October 2019, the Lehigh Parties had more than 60 days' notice of all of the facts underlying their claims for any failure to pay and the facts underlying their claim for failure to provide a letter of credit before they sent the February 6, 2020 Notice or the Three-Day Notices. The Lehigh Parties knew, in October 2019, that UPS could not pay the Lehigh Parties via deductions from its operating accounts, at that time or any time thereafter, because hundreds of thousands of dollars (and, in fact, to date, more than $1 million) in operating funds were being wrongfully withheld by the Lehigh Parties, and had been advised by UPS that UPS had already provided two letters of credit and UPS did not believe any further letter of credit was warranted.

40

198.     Based on the foregoing, the Lehigh Parties knew of the facts underlying all of the claims and the alleged defaults and failed to act for more than 60 days, and then provided less than 90 days' notice of termination. Accordingly, there is no "ground for termination," and  the terminations are invalid on this basis as well.

199.     The PMPA also provides, among other things, that a franchisor may only terminate a franchise if the notification requirements of PMPA §2804 are met.

200.     PMPA §2804 requires a franchisor to provide 90 days' notice of any termination unless circumstances exist in which it would not be reasonable to furnish 90 days' notice, and further requires the notice must contain a statement that the franchisor intends to terminate the franchise and the reasons therefor, the date the termination takes place, and a summary statement prepared under PMPA §2804(d).

201.     Here, there is no reasonable basis to furnish less than 90 days' notice where the Lehigh Parties have retained more than $1 million in improperly withheld funds – a sum that greatly exceeds what the Lehigh Parties claim to be owed pursuant to the Supply Agreements and Leases (which amount, at any rate, is incorrect, as stated above). Accordingly, the February 6, 2020 Notice and the Three-Day Notices are invalid on this basis as well. There is also no reasonable basis to furnish less than 90 days' notice where the only claim is nonpayment and where, as here, there are no aggravating circumstances.

202.     The Three-Day Notices do not conform to any of the requirements of PMPA §2804(c) or (d). Accordingly, the Three-Day Notices are improper and, thus, invalid on that basis as well.

203.     As set forth above, the February 6, 2020 Notice and the Three-Day Notices were also deficient because UPS did not default on the Supply Agreements or Leases, paid all amounts

when due, provided a letter of credit as required, and otherwise was in full compliance with the Supply Agreements and Leases in all material respects. In other words, there is no merit to any of the claims  underlying the alleged defaults and, thus, the February 6, 2020 Notice and the Three-Day Notices are invalid on that basis as well.

204.     Additionally, the Lehigh Parties did not provide the written notice and 10-day opportunity to cure the alleged defaults as required by the Security Agreements, and so the terminations should be held to be invalid on that basis as well.

205.     The Lehigh Parties willfully disregarded the requirements of the PMPA by their wrongful conduct described herein. Indeed, even before sending any formal termination notices as required under the PMPA, UPS was advised via telephone on January 27, 2020 by Frye, Alfier, and one other Circle K representative, that UPS' franchise would be terminated effective immediately. UPS' fuel supply was cut off by the following day.

206.     The PMPA provides that a prevailing franchisee is entitled to actual damages, exemplary damages, attorneys' fees, and expert witness fees.

207.     UPS has been damaged by the Lehigh Parties' wrongful termination and improper exercise of self-help in an amount to be determined at trial but believed to be in excess of $10 million.

## COUNT VI
### Against Lehigh Supplier
### (BREACH OF THE SUPPLY AGREEMENT)

208.     Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

209.     The Supply Agreement requires, pursuant to Paragraph 3 and other provisions therein, for Lehigh Supplier to sell fuel to UPS at amounts set forth in the Supply Agreement.

210.     Notwithstanding the foregoing, Lehigh Supplier refused to sell UPS fuel, starting on January 27, 2020.

211.     UPS has been directly and proximately damaged by Lehigh Supplier's breach in an amount to be determined at trial, but believed3 to be in excess of $10 million.

## COUNT VII
### Against the Lehigh Parties
### (BREACH OF THE SUPPLY AGREEMENT AND LEASES)

212.     Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

213.     The Supply Agreement allows for Lehigh Supplier to withhold credit card proceeds for the sale of fuel, only.

214.     Lehigh Supplier is not authorized to withhold credit card proceeds from any other sales for any reason. Lehigh Landlord is not authorized for any reason to withhold credit card proceeds.

215.     Notwithstanding the foregoing, the Lehigh Parties improperly withheld more than $1 million in credit card proceeds from the sales of goods at the gas stations and convenience stores, in breach of the Supply Agreements and Leases.

216.     Lehigh Defendants also improperly retained for a period of time, monies that UPS paid in accordance with the terms of various invoices that were improperly submitted, amounting to hundreds of thousands of dollars.

217.     UPS has been directly and proximately damaged by the Lehigh Parties' breach in an amount to be determined at trial, but believed to be in excess of $10 million.

## COUNT VIII
### Against TMC
### (VIOLATION OF ARIZONA'S CONSUMER FRAUD ACT, A.R.S. § 44-1521 *et seq.*)

43

218.     Plaintiffs repeat and re-allege each and every allegation set forth in Paragraphs 1 through 159, *supra*, as if fully set forth herein.

219.     This is an action for violation of Arizona's Consumer Fraud Act ("ACFA"), A.R.S. § 44-1521, *et seq*.

220.     Pursuant to Section 44-1522 of the ACFA, "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

221.     Under the ACFA, "person" is defined as "any natural person or his legal representative, partnership, domestic or foreign corporation, any company, trust, business entity, or association, any agent, employee, salesman, partner, officer, director, member, stockholder, associate, or trustee." A.R.S. § 44-1521(6).

222.     Under the ACFA, "merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." A.R.S. § 44-1521(5).

223.     TMC is engaged in the sale of "merchandise" as defined under the ACDA, namely, a franchise opportunity.

224.     As reflected in Paragraphs 34 through 45, *supra*, TMC has engaged in unfair and deceptive acts and practices in connection with the sale of merchandise to Plaintiffs, in violation of the ACFA, with the intent that Plaintiffs rely on such unlawful conduct.

225.     As a direct, proximate and foreseeable result of TMC's violation of the ACFA, Plaintiffs have suffered and continue to suffer actual damages.

**WHEREFORE,** Plaintiffs demand judgment as follows:

1.          On their first count, against Circle K and TMC, damages, in an amount to be determined at trial but believed to be in excess of $10 million;

2.          On their first count, in the alternative, rescission of the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties;

3.          On their second count, against Circle K and TMC, damages, in an amount to be determined at trial but believed to be in excess of $10 million;

4.          On their second count, in the alternative, rescission of the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties;

5.          On their third count, against Circle K and TMC, damages, in an amount to be determined at trial but believed to be in excess of $10 million;

6.          On their third count, in the alternative, rescission of the Supply Agreements, Leases, Security Agreements, Franchise Agreements, and Personal Guaranties;

7.          On their fourth count, against Circle K, damages, in an amount to be determined at trial but believed to be in excess of $144,000;

8.          On their fifth count, actual damages, in an amount to be determined at trial but believed to be in excess of $10 million, exemplary damages, attorneys' fees, and expert witness fees;

9.          On their sixth count, a judgment against Lehigh Supplier, damages in

an amount to be determined at trial but believed to be in excess of $10 million, and attorneys' fees;

10.     On their seventh count, against the Lehigh Parties, damages in an amount to be determined at trial but believed to be in excess of $10 million, and attorneys' fees;

11.     On their eighth count, actual damages, in an amount to be determined at trial but believed to be in excess of $10 million, and punitive damages; and

12.     On those counts for which UPS is entitled, an award of compensatory, special, and punitive damages, as well as future lost profits.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable in this case.

**ZARCO EINHORN SALKOWSKI & BRITO, P.A.**
One Biscayne Tower
2 South Biscayne Boulevard, 34th Floor
Miami, FL 33131
Robert Zarco (*pro hac vice*)
Alejandro Brito (*pro hac vice*)
Robert F. Salkowski (NJ Bar No. 049591992)

and

**McCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.**
210 Park Avenue, Third Floor
Florham Park, NJ 07932

Attorneys for Plaintiffs
Universal Property Services Inc. and Syed Kazmi


By:   */s/Asaad K. Siddiqi*
           Asaad K. Siddiqi, Esq.
           James Harry Oliverio, Esq.

Dated:  May 21, 2021

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on May 21, 2021, he caused the foregoing document to be electronically filed with the U.S. District Court of the District of New Jersey, using the CM/ECF system, which will cause the foregoing document to be served upon all counsel of record.

By: */s/ Asaad K. Siddiqi*