# EXHIBIT 1



# CIRCLE K® FRANCHISE AGREEMENT

Issuance Date:  June 4, 2019

## BY AND BETWEEN

**TMC FRANCHISE CORPORATION**
**1130 West Warner Road**
**Tempe, Arizona 85284**

**602-728-8000**

**AND**

**Universal Property Services Inc**

## FRANCHISED LOCATION:

205 S. Lawrence Blvd
Keystone Heights, FL 32656

# TABLE OF CONTENTS

**ARTICLE**                                                                                          **PAGE**

ARTICLE 1 DEFINITIONS ...................................................................................................1

ARTICLE 2 GRANT OF LICENSE ......................................................................................1

   2.1     Non-Exclusive License; Franchised Location; Store Opening ..................... 1
   2.2     Franchisor's Reservation of Rights ................................................................ 2
   2.3     Use of Franchised Location; No Subfranchising ......................................... 2
   2.4     Store Relocation ........................................................................................... 3

ARTICLE 3 TERM; FRANCHISEE'S OPTION TO RENEW .............................................3

   3.1     Term ............................................................................................................... 3
   3.2     Conditions to Renew ..................................................................................... 3
   3.3     Renewal Obligations ..................................................................................... 4
   3.4     Early Renewal ............................................................................................... 4

ARTICLE 4 MARKS, BUSINESS SYSTEM, AND TECHNIQUES ...................................5

   4.1     Ownership ...................................................................................................... 5
   4.2     Franchisee's Business Name ......................................................................... 5
   4.3     Substitution of Marks ................................................................................... 5
   4.4     Adverse Third-Party Claims to Marks ........................................................ 6
   4.5     Defense or Enforcement of Right to Marks ................................................. 6
   4.6     Tender of Defense ......................................................................................... 6

ARTICLE 5 INITIAL FRANCHISE FEE; ROYALTY FEE; AND PAYMENTS .....................7

   5.1     Initial Franchise Fee ..................................................................................... 7
   5.2     Royalty Fees .................................................................................................. 7
   5.3     Additional Business ...................................................................................... 8
   5.4     Optional Program Fees ................................................................................. 8
   5.5     Method of Payment ....................................................................................... 8
   5.6     Interest on Unpaid Fees; Default Royalty Fee Rate ..................................... 8
   5.7     Franchisee's Absolute Obligation to Pay ..................................................... 8
   5.8     Franchisor's Set-Off Right ........................................................................... 9

ARTICLE 6 ADVERTISING AND PROMOTIONS .............................................................9

   6.1     Promotional Fees .......................................................................................... 9
   6.2     Grand Opening ............................................................................................ 10
   6.3     Advertising Programs.................................................................................. 10
   6.4     Franchisee's Advertising ............................................................................ 11
   6.5     Advertising Council and Advertising Cooperative Programs..................... 11
   6.6     Advertising Programs and Vendor Promotions.......................................... 11

ARTICLE 7 BUILDING DESIGN AND SPECIFICATIONS; FRANCHISEE'S
         LEASE ........................................................................................................12

   7.1     Store Improvements, Fixtures, and Equipment; Compliance with Franchisor's
            Standards .................................................................................................. 12
   7.2     Changes in Plans and Specifications; Inspections...................................... 13
   7.3     Remodeling ................................................................................................. 13

7.4   Maintenance and Repair ............................................................................ 14
7.5   Signs ......................................................................................................... 14
7.6   Equipment/Construction and Other Funding ........................................... 14
7.7   Franchised Location; Franchisor's Approval of the Lease ........................ 15
7.8   Lease Termination .................................................................................... 15

ARTICLE 8 QUALITY CONTROL, UNIFORMITY, AND STANDARDS
        REQUIRED OF FRANCHISEE ....................................................................16

8.1   Authorized Services and Products ............................................................ 16
8.2   Purchases .................................................................................................. 17
8.3   Inventory of Products ............................................................................... 17
8.4   Operational Requirements ........................................................................ 18
8.5   Suppliers ................................................................................................... 20
8.6   Franchisee's Participation in Operations .................................................. 20
8.7   Store Manager .......................................................................................... 20
8.8   Uniforms .................................................................................................. 20
8.9   Payment of Expenses ............................................................................... 20
8.10  Compliance with Laws ............................................................................. 21
8.11  Payment of Taxes ..................................................................................... 21
8.12  Corporation, Partnership, or Limited Liability Company as Franchisee .... 21
8.13  Guaranties ................................................................................................ 22
8.14  Initial Training ......................................................................................... 22
8.15  Expenses ................................................................................................... 23
8.16  Opening Assistance .................................................................................. 23
8.17  Changes in Store Manager ....................................................................... 23
8.18  Additional Training .................................................................................. 23
8.19  Employee Training .................................................................................... 23
8.20  Annual Convention ................................................................................... 23

ARTICLE 9 CONFIDENTIAL BUSINESS SYSTEMS MANUALS AND OTHER
        INFORMATION ..........................................................................................23

9.1   Compliance with Business Systems Manuals ............................................ 23
9.2   Revisions to Business Systems Manuals ................................................... 24
9.3   Confidentiality .......................................................................................... 24
9.4   Inspection Rights ...................................................................................... 24
9.5   Key Individual .......................................................................................... 25

ARTICLE 10 NON-COMPETITION AND NON-SOLICITATION .............................25

10.1  Covenant Not to Compete ........................................................................ 25

ARTICLE 11 ELECTRONIC POINT OF SALE SYSTEM; REPORTS,
        INSPECTIONS AND FINANCIAL STATEMENTS .....................................25

11.1  EPOS System, Computer Systems and Internet Access.............................. 25
11.2  Participation in Website or Other Online Communication Systems ............ 26
11.3  Franchisor Access to Data; Reports; Financial Statements ........................ 26
11.4  Franchisor's Audit Rights ......................................................................... 27
11.5  Tax Returns .............................................................................................. 27
11.6  Accounting Forms .................................................................................... 27
11.7  Delinquent Reports ................................................................................... 27

ARTICLE 12 SERVICES PROVIDED BY FRANCHISOR ..........................................................28

12.1    Franchisor's Services ............................................ 28
12.2    Third-Party Management Firm ................................ 28

ARTICLE 13 INSURANCE .................................................................................................29

13.1    General Liability..................................................... 29
13.2    Business Automobile.............................................. 29
13.3    Umbrella or Excess ................................................ 29
13.4    Commercial Property .............................................. 29
13.5    Liquor Liability ...................................................... 29
13.6    Insurance Required By Law .................................... 29
13.7    Other Insurance ...................................................... 29
13.8    Minimum Requirements ......................................... 30
13.9    Additional Insured ................................................. 30
13.10   Certificate of Insurance .......................................... 30
13.11   Subcontractors ....................................................... 30
13.12   Waiver of Subrogation ........................................... 31
13.13   Cross Liability ....................................................... 31
13.14   Primary Coverage ................................................... 31
13.15   Policy Cancellation ................................................ 31
13.16   Policy Rating .......................................................... 31
13.17   Financial Responsibility ......................................... 31
13.18   Obligations ............................................................ 31

ARTICLE 14 DEFAULT; TERMINATION RIGHTS ...........................................................31

14.1    Franchisor's Immediate Termination Right Without Notice ..................................... 31
14.2    Franchisor's Immediate Termination Rights With Notice ......................................... 32
14.3    Other Conditions of Breach ................................... 33
14.4    Notice of Breach; Cure Period ............................... 34
14.5    Extended Cure Period............................................. 34
14.6    Cross-Default with Related Agreements .................. 35
14.7    Rights and Obligations upon Expiration or Termination .......................................... 35
14.8    Interim Period......................................................... 37

ARTICLE 15 TRANSFER ..................................................................................................38

15.1    Transfer by Franchisor ........................................... 38
15.2    Transfer by Franchisee ........................................... 38
15.3    Change of Ownership ............................................. 40
15.4    Death or Incapacity ............................................... 40
15.5    Divorce/Dissolution ............................................... 41

ARTICLE 16 FRANCHISOR'S OPTION TO PURCHASE ASSETS ....................................41

16.1    Franchisor's Right to Purchase Business Assets ...... 41
16.2    Transfer of Majority Interest in Franchisee ............. 41
16.3    Notice of Purchase................................................. 42
16.4    Offsets .................................................................. 42

ARTICLE 17 INDEMNIFICATION ....................................................................................43

| 17.1 | Indemnification | 43 |
|---|---|---|
| 17.2 | Risk Allocation | 43 |
| 17.3 | Defense of Claims | 43 |
| 17.4 | Survival of Indemnity | 43 |
| 17.5 | Notification of Possible Indemnity Events | 44 |

**ARTICLE 18 DISPUTE RESOLUTION** ..................................................44

| 18.1 | Negotiation; Mediation | 44 |
|---|---|---|
| 18.2 | Arbitration | 44 |
| 18.3 | Exception to Arbitration | 45 |
| 18.4 | Injunctive Relief | 45 |
| 18.5 | Cumulative Rights | 45 |
| 18.6 | Venue and Jurisdiction | 45 |

**ARTICLE 19 NOTICES** .................................................................46

**ARTICLE 20 MISCELLANEOUS** .....................................................46

| 20.1 | Relationship of Parties; Independent Contractor | 46 |
|---|---|---|
| 20.2 | Conduct of Business | 46 |
| 20.3 | Approval | 47 |
| 20.4 | Successors | 47 |
| 20.5 | Governing Law | 47 |
| 20.6 | Franchisor's Right of Self-Help | 47 |
| 20.7 | Counterparts | 47 |
| 20.8 | Variances | 47 |
| 20.9 | Severability | 48 |
| 20.10 | Waiver | 48 |
| 20.11 | Entire Agreement | 48 |
| 20.12 | Joint and Several Obligations | 48 |
| 20.13 | No Oral Modifications | 49 |
| 20.14 | Headings; Terms | 49 |
| 20.15 | Interpretation of Rights and Obligations | 49 |
| 20.16 | Force Majeure | 49 |
| 20.17 | Anti-Terrorism Provision | 50 |

**ARTICLE 21 ACKNOWLEDGMENTS BY FRANCHISEE** ............................50

| 21.1 | Business Risk; No Financial Projections | 50 |
|---|---|---|
| 21.2 | Recommendation to Obtain Legal Counsel | 50 |
| 21.3 | Other Franchisees | 51 |
| 21.4 | Disclaimer by Franchisor | 51 |
| 21.5 | No Income or Refund Warranties | 51 |
| 21.6 | Receipt of Franchise Disclosure Document and Franchise Agreement | 51 |
| 21.7 | No Other Representations | 51 |

## SCHEDULES AND EXHIBITS

Schedule 1     Definitions
Exhibit 1      Data Sheet ................................................................................. 1-1
Exhibit 2      Electronic Point of Sale and Software Agreement ............................ 2-1
Exhibit 3      Electronic Funds Transfer Authorization........................................... 3-1
Exhibit 4      Equipment/Construction Funding Agreement ................................... 4-1
Exhibit 5      Personal Guaranty ...................................................................... 5-1

## CIRCLE K® FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "**Agreement**") is made and entered into as of the Effective Date (as set forth on the signature page hereto), by and between TMC Franchise Corporation, an Arizona corporation, 1130 West Warner Road, Tempe, Arizona 85284 ("**Franchisor**"), and Universal Property Services Inc ("**Franchisee**").

## RECITALS:

A.      Franchisor has received from its affiliate the right to license to those individuals and entities who meet the qualifications established from time to time by Franchisor the right to use of the name "Circle K®" (and certain other Marks) and the Business System (each capitalized term as defined below) in connection with the operation of retail convenience stores under the name "Circle K®".

B.      Franchisee desires to acquire from Franchisor the right to use the Marks and the Business System to operate a Circle K Store (as defined below) at the location specified in this Agreement in conformity with the Business System and the uniformity requirements and quality standards as established from time to time by Franchisor, subject to the terms and conditions of this Agreement.

C.      Franchisee understands that Franchisor would neither grant to Franchisee the right to use the Marks and the Business System nor provide Franchisee with any information or know-how about Circle K Stores and the Business System unless Franchisee has agreed to comply with the terms and conditions of this Agreement, including the obligation to pay the Initial Franchise Fee, the Royalty Fee, the Promotional Fee, and the other fees and payments specified herein.

In consideration of the covenants and promises contained herein, the sufficiency and receipt of which are hereby acknowledged by the parties, Franchisor and Franchisee hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

In addition to terms defined elsewhere in this Agreement, the capitalized terms used in this Agreement shall have the definitions set forth in Schedule 1 attached hereto.

## ARTICLE 2
## GRANT OF LICENSE

2.1      Non-Exclusive License; Franchised Location; Store Opening.  Subject to the terms and conditions herein, Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, a non-exclusive license to establish and operate, during the Term, a Circle K Store, in conformity with the Business System, using the Marks (the "**License**"), at the location described in the Data Sheet attached hereto as Exhibit 1 (the "**Franchised Location**").  Franchisee agrees that the Store shall be constructed in accordance with the requirements of this Agreement and should be ready to open within: (i) 180 days of the Effective Date, if the Store is a Conversion Store; (ii) 365 days

of the Effective Date, if the Store is a New Store; or (iii) 240 days of the Effective Date, for all other types of construction projects. A failure to open a Conversion Store within one year or a New Store within two years will entitle Franchisor to immediately terminate this Agreement without Franchisor incurring any liability for such termination. If this Agreement is so terminated, Franchisee must comply with all post-termination obligations set forth herein, including but not limited to the payment of Liquidated Damages.

2.2    <u>Franchisor's Reservation of Rights</u>. Except for the limited License granted to Franchisee hereunder, all other rights related to the Business System and the Marks not specifically granted to Franchisee hereunder are expressly reserved by Franchisor and its Affiliates. Franchisee acknowledges that the License granted hereby relates solely to the Franchised Location, affords Franchisee no rights regarding other licenses or locations, and does not give Franchisee any exclusive right to market or sell to any prospective customers or any exclusive right to any territory. Without limiting the generality of the foregoing, Franchisee acknowledges and agrees that Franchisor and its Affiliates have expressly reserved certain rights to the use of the Marks, the Business Systems, the Methods, and Confidential Information in connection with their own convenience store and retailing operations, in connection with licensing the same or similar products or services utilizing the same or similar Marks, or any other trademarks, service marks or names, in connection with the manufacture and sale of products at wholesale and at retail, and in connection with granting such rights to others pursuant to a franchise agreement, some or all of which activities may compete, directly or indirectly, with Franchisee's operation of the Store. Franchisee agrees that it will not in any way interfere with the business operations of Franchisor, its Affiliates or other franchisees. Franchisor has the right to make such changes to the Business System as it deems appropriate, including without limitation, changes to the building appearance and "image" requirements. Because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor has the right to vary the standards for any license owner based upon the peculiarities of a particular site or circumstance, density of population, business potential, population or trade area, existing business practices, governmental requirements, local ordinances, or any other condition that Franchisor deems to be potentially significant to the successful operation of a Circle K Store. A grant by Franchisor of one or more variances to one or more other franchisees will not entitle Franchisee to the same or a different variation.

2.3    <u>Use of Franchised Location; No Subfranchising</u>. Franchisee agrees to operate the Store under the Business System using the Marks in strict compliance with the terms and conditions of this Agreement. Franchisee will operate the Store under the name "Circle K" (the "**Franchised Name**"), and will not change the Franchised Name or use any other marks or names in the Franchised Name, or in any other manner, except with Franchisor's prior written approval. Franchisee may not operate any other business at the Franchised Location without prior written approval from Franchisor. Franchisee may not use or attempt to use the Store or the Franchised Location for any purpose other than as permitted hereunder, or separately approved in writing by Franchisor, nor may Franchisee sublease, subfranchise, or transfer (other than in compliance with the terms of this Agreement) to any other person or entity the Store or the Franchised Location's leasehold interest or other rights relating in whole or in part to the Franchised Location.

2.4    <u>Store Relocation</u>. Franchisee may not change the Franchised Location without the prior written approval of Franchisor. Franchisee shall request such approval in writing which sets

DocuSign Envelope ID: 2F8B55A34FEA-4873-95AB-238B24B12D0B

forth the proposed new location and the reason(s) for the relocation request.  Franchisor will use commercially reasonable efforts to approve or deny the relocation of the Store within sixty (60) days from the date the request is received.  If Franchisor approves such relocation, Franchisee may relocate the Store to the approved new location, at Franchisee's sole cost and expense, and must pay to Franchisor a relocation fee equal to fifty percent (50%) of Franchisor's then-current initial franchise fee.  In connection with Franchisor's approval of the relocation, Franchisor reserves the right to require Franchisee to execute Franchisor's then-current form of franchise agreement.

ARTICLE 3
TERM; FRANCHISEE'S OPTION TO RENEW

3.1     <u>Term</u>.  The term of this Agreement (the "**Term**") begins on the Effective Date and will expire on the tenth (10th) anniversary of the Open Date (the "**Expiration Date**"), unless earlier terminated in accordance with Article 13.  Once established by Franchisor, the Open Date and the Expiration Date will be noted on the Data Sheet.

3.2     <u>Conditions to Renew</u>.  Upon expiration of the Term, Franchisee will have an option to receive an offer of a new license for the Franchised Location for one renewal term equal to the initial term of the then-current form of franchise agreement of Franchisor; <u>provided</u> that:  (1) Franchisor has not determined, before the end of the Term, in good faith and in the normal course of business either (i) that renewal of the franchise relationship is likely to be not economical for Franchisor, or (ii) to withdraw from the relevant geographic market in which the Store is located; and (2) Franchisee is in Good Standing and has agreed to and has complied with all of the following conditions:

(A)     Franchisee has given Franchisor written notice of its desire to seek such a new license at least six (6) months prior to the expiration of the Term.  (Franchisee's failure to timely provide such notice will be deemed a waiver of the option to renew.)

(B)     Throughout the Term, Franchisee has complied in good faith with all material terms and conditions of this Agreement and has operated the Store in compliance with the material operating and quality standards and procedures of the Business System, and Franchisee is not in default under this Agreement or any other agreement with Franchisor or its Affiliates.

(C)     The average amount of Gross Sales at Franchisee's Store for the previous 12 months has exceeded $50,000 per month.

(D)     Franchisor has not received numerous bona fide customer complaints concerning Franchisee's operation of the Store or any single bona fide complaint evidencing egregious or unconscionable conduct on part of the Franchisee or Franchisee's employees in dealing with customers.

(E)     If requested by Franchisor, Franchisee will upgrade and renovate the Franchised Location to conform to the current standards and image required of then-new franchisees, including, without limitation, upgrading of signs, equipment, furnishings, fixtures, and decor.

(F)     Franchisee and Guarantors will execute a general release (a "**Release**") in a form satisfactory to Franchisor, of any and all claims each may have against Franchisor, its Affiliates and their officers, directors, shareholders, employees, consultants, and agents, in their corporate and individual capacities, including without limitation, all claims arising under this Agreement and under any federal, state, or local law, rule, or ordinance.  If applicable law prohibits the giving of a general release as a condition for the offer of a new license, then this Section 3.2(F) will not be a condition for the offer of a new license, unless a release of some, but not all, claims is permitted, in which instance Franchisee and Franchisor will execute a release to the extent permitted by law.

(G)     All monetary obligations owed by Franchisee to Franchisor or any Affiliates have been paid in full, or resolved to Franchisor's satisfaction, prior to the end of the Term, and have been timely paid throughout the Term.

(H)     Franchisee and Franchisee's Store Manager will complete any new, refresher, or additional training and educational programs that Franchisor may require.

3.3     Renewal Obligations. If Franchisee meets the conditions in Section 3.2 above, then Franchisee will be required to execute Franchisor's then-current form of franchise agreement (the "**Renewal Franchise Agreement**") and pay Franchisor's then-current renewal fee as set forth in Franchisor's then-current franchise disclosure document.  Franchisee will be required to pay the Royalty Fees and Promotional Fees at the rates specified in the Renewal Franchise Agreement plus any additional fees that may be required under such Renewal Franchise Agreement (even if such fees are not required hereunder). Franchisee acknowledges that the terms, conditions, and economics of the Renewal Franchise Agreement may vary in substance and form from the terms, conditions, and economics of this Agreement.  Franchisee acknowledges and agrees that the option to renew is for one renewal term only, unless Franchisor and Franchisee specifically agree in writing otherwise. If this Agreement is signed in connection with a renewal, Sections 3.2 and 3.3 shall not apply unless the parties agree in writing otherwise.

The Renewal Franchise Agreement will take effect on the day following the expiration of this Agreement.  If Franchisee accepts Construction/Equipment Funding from Franchisor, Franchisor will use commercially reasonable efforts to upgrade the Franchised Location using the funds from the Construction/Equipment Funding within six to twelve months.  The timing of completion of any such upgrades will in no way affect the commencement of the term of the Renewal Franchise Agreement, including but not limited to, the payment of applicable royalty or promotion fees.

3.4     Early Renewal.  Franchisee may request a renewal, and Franchisor may approve, in Franchisor's sole discretion, such a renewal request effective prior to the expiration of the Term; provided that upon such early renewal, Franchisee is in full compliance with this Agreement and in Good Standing.  In such event, the term of the applicable Renewal Franchise Agreement will consist of the remaining term of this Agreement plus the applicable renewal term.  Franchisee would be required to sign a Release and a termination agreement terminating this Agreement at the time such Renewal Franchise Agreement would be signed by the parties.

ARTICLE 4
MARKS, BUSINESS SYSTEM, AND TECHNIQUES

4.1 <u>Ownership</u>. Franchisor represents and warrants that it has the right to license the Marks and the Business System to Franchisee hereunder. All information regarding the Marks and the Business System provided or revealed to Franchisee, together with the goodwill associated therewith, is, and will remain, the sole and exclusive property of Franchisor (or its Affiliates). Any and all improvements made by Franchisee (or any of its employees, agents, contractors or representatives) relating to the Marks or the Business System will be the sole and exclusive property of Franchisor or its Affiliates, who have the right to register and otherwise protect their rights in all such improvements in accordance with any applicable law. Franchisee agrees not to assert any rights in or to the Marks or the Business System other than as specifically granted in this Agreement. Franchisee will not use any names, trademarks, trade names, service marks, logo types, trade styles, designs, signs, symbols, or slogans other than the Marks in connection with the Store. Without limiting the foregoing, Franchisee acknowledges that all of the Techniques (including, without limitation, the Business Systems Manuals) are owned by Franchisor (or its Affiliates), whether or not published, registered, or copyrighted, or suitable for registration or copyright protection, have been revealed to Franchisee in trust and confidence and constitute trade secrets and/or proprietary property of Franchisor and its Affiliates. Franchisor will not be required to divulge any trade secrets to Franchisee except as may be expressly provided for herein. Any unauthorized use of the Marks or the Business System by Franchisee will constitute an infringement of Franchisor's (or its Affiliates') rights and will constitute a material default under this Agreement.

4.2 <u>Franchisee's Business Name</u>. Franchisee will not use any of the Marks or anything similar thereto, in or as part of its corporate, sole proprietorship, partnership or other legal entity name. Franchisee will at all times hold itself out to the public as an independent contractor operating the Store pursuant to a license from Franchisor. Whenever practical, Franchisee will clearly indicate on its business checks, stationery, purchase orders, business cards, invoices, receipts, advertising and promotional materials, and other written materials that Franchisee is a "Circle K®" franchisee. Franchisee will display signs at the Franchised Location that are clearly visible to the general public indicating that the Store is independently owned and operated as a franchised Circle K Store.

4.3 <u>Substitution of Marks</u>. Franchisor has the right to modify, or discontinue the use of, any Marks or to substitute different trade names, service marks, trademarks, logos, designs, and commercial symbols as the Marks used to identify the Store or in connection with the operation of the Store. Subject to Section 4.4, upon Franchisor's written instructions, Franchisee will, at its expense, and within the time period specified by Franchisor, make all modifications to the Marks displayed or otherwise used at the Franchised Location as required by Franchisor, and if so directed by Franchisor, Franchisee will cease using all discontinued Marks and commence using the "new" Marks.

4.4 <u>Adverse Third-Party Claims to Marks</u>. If Franchisor requires Franchisee to change the Marks in response to a third party's claim, or in response to a determination by a court of competent jurisdiction that a third party's rights to use the Marks are superior to Franchisor's (or its Affiliate's) rights, then upon written instructions from Franchisor, Franchisee will, at Franchisee's expense: (A) immediately make such changes and amendments to the Marks as may be required by Franchisor; and/or (B) at the Franchised Location and in connection with all advertising, marketing and promotion of the Store, immediately cease using the Marks at issue and

DocuSign Envelope ID: 2F8B5501-34EEA-4873-95AB-238B24B12D0B

will, as soon as reasonably practicable, commence using the new or modified trademarks, trade names, service marks, designs, trade symbols, logos, or commercial symbols designated by Franchisor in writing.  In this limited circumstance only, Franchisor agrees to reimburse Franchisee for the cost of any new signage that Franchisor determines is necessary pursuant to this Section 4.4; provided Franchisee has cooperated with any action Franchisor undertakes with regard to the third party claim.  Franchisee will not make any changes or amendments whatsoever to the Marks or the Business System unless directed so by Franchisor in writing.

      4.5    <u>Defense or Enforcement of Right to Marks</u>.  Franchisee will have no right to and will not defend or enforce any rights associated with the Marks or the Business System in any court or other proceedings for or against imitation, infringement, any claim of prior use, or for any other claim or allegation.  Franchisee will give Franchisor prompt and timely written notice of any and all claims or complaints made against or associated with the Marks or the Business System, and Franchisee will, at its expense, cooperate in all respects with Franchisor and its Affiliates in any lawsuit or other proceedings involving the Marks or the Business System.  Franchisor or its Affiliates have the right to determine whether they will commence any action or defend any litigation involving the Marks and/or the Business System, and the cost and expense of all litigation incurred by Franchisor or its Affiliates, including attorneys' fees, specifically relating to the Marks or the Business System will be paid by Franchisor or its Affiliates.  Franchisee may, at its expense, retain an attorney of its own choosing to represent it individually in all litigation and court proceedings involving the Marks or the Business System, and will do so with respect to claims and matters involving only Franchisee (i.e., not involving Franchisor, its Affiliates, or their interests); however, Franchisor or its Affiliates and its legal counsel will have the absolute right to control and conduct any litigation or other proceeding involving the Marks and the Business System.  Except as provided for herein, neither Franchisor nor its Affiliates will have any liability to Franchisee for any costs that Franchisee incurs in any such litigation involving the Marks or the Business System and Franchisee will pay for all costs, including attorneys' fees, that it may incur in any such litigation or proceeding arising as a result of matters referred to under this Article, unless Franchisee tenders the defense of any claim related to the Marks or the Business System to Franchisor in a timely manner as provided for herein.

      4.6    <u>Tender of Defense</u>.  If Franchisee is named as a defendant or party in any action involving the Marks or the Business System, and if Franchisee is named as a defendant or party solely because the plaintiff or claimant is alleging that Franchisee does not have the right to use the Marks or the Business System at the Franchised Location as permitted under this Agreement, then Franchisee will have the right to tender the defense of the action to Franchisor, and Franchisor will, at its expense, defend Franchisee in the action provided that Franchisee has tendered the action to Franchisor within seven (7) days after receiving service of the pleadings or the Summons and Complaint involving the action.  Franchisor will indemnify and hold Franchisee harmless from any damages assessed against Franchisee in any actions resulting solely from Franchisee's authorized use of the Marks and the Business System at the Franchised Location if Franchisee has timely tendered the defense of the actions to Franchisor consistent with the requirements of this Section 4.6.

ARTICLE 5
INITIAL FRANCHISE FEE; ROYALTY FEE; AND PAYMENTS

5.1     Initial Franchise Fee.  In consideration of the License granted herein, on the date Franchisee executes this Agreement, Franchisee will pay, in full, to Franchisor a fee in the amount set forth in the Data Sheet (the "**Initial Franchise Fee**") via cashier's check or money order.   If Franchisee or its Affiliate has signed a Multiple Site Operator Agreement and has already paid the Initial Franchise Fee for this Store under such Multiple Site Operator Agreement, the Data Sheet shall reflect that.  The Initial Franchise Fee is deemed fully earned by Franchisor upon receipt and is non-refundable except if Franchisee is unable to secure the necessary permits for the construction of the Store, despite Franchisee's good faith efforts and due diligence, in which case the Initial Franchise Fee, reduced by all reasonable expenses incurred by Franchisor to date, will be refunded to Franchisee.

5.2     Royalty Fees.   As set forth in Section 7.8, Franchisor may offer Equipment/Construction Funding.  The rate of Franchisee's monthly Royalty Fee that Franchisee is required to pay to Franchisor hereunder (the "**Royalty Fee**") will be determined based on: (i) the amount of Equipment/Construction Funding Franchisee accepts (if any) and (ii) whether the Store is located in a city, municipality, or state that prohibits the collection of royalty fees on the sale of alcoholic beverages, as follows:

| Amount of Equipment/Construction Funding that Franchisee accepts | Royalty Fee rate (as a percentage of Gross Sales) if no prohibition on collection of royalty fees on sale of alcoholic beverages | Royalty Fee rate (as a percentage of Gross Sales) if state or local law prohibits collection of royalty fees on sale of alcoholic beverages |
|---|---|---|
| No funding | 3.0% | 4.0% |
| Level 1* funding | 4.0 % | 5.0% |
| Level 2* funding | 4.5% | 5.5% |
| Level 3* funding | 5.5% | 6.5% |
| Level 4* funding | 6.5% | 7.5% |
| Level 5* funding | 7.5% | 8.5% |

*Each term as defined in Schedule A to the Equipment/Construction Funding Agreement.

Once determined, the Royalty Fee rate that Franchisee will be required to pay during the Term will be noted on the Data Sheet.  The monthly Royalty Fee payment that Franchisee will be required to pay hereunder will be the greater of: (a) $1,000 or (b) the amount calculated as the applicable percentage of Gross Sales, as noted above and on the Data Sheet.

5.3     Additional Business.  Franchisee must obtain Franchisor's written approval prior to operating, or permitting others to operate, a separate business (*e.g.*, a coffee/pastry offering) (the "**Additional Business**") at the Store or the Franchised Location.  Franchisor may condition its approval on Franchisee agreeing to pay to Franchisor a royalty fee of 1% of Franchisee's Gross Sales from the Additional Business (the "**Co-Branded Royalty Fee**").  If a third party operator of an Additional Business has met the criteria from time to time established by Franchisor, and has been approved in writing by Franchisor, Franchisee agrees to pay Franchisor a monthly fee of $500, in lieu of the Co-Branded Royalty Fee, for the right to operate such Additional Business from the Store or the Franchised Location (such flat fee, together with the Co-Branded Royalty Fee, the "**Co-Branded Fee**").

5.4     Optional Program Fees.  Franchisee may, but is not required to, participate in certain optional programs that Franchisor may from time to time offer to Franchisee (each, an "**Optional Program**").  In connection with participating in an Optional Program, Franchisee will share a portion of the Optional Program revenue with Franchisor, and may be required to enter into a separate agreement with Franchisor and/or a third-party vendor approved by Franchisor.

5.5     Method of Payment.  Except as otherwise stated in this Agreement, all recurring payments required to be paid to Franchisor under this Agreement will be paid by electronic funds transfer via the Automated Clearing House ("**ACH**") or wire transfer (at Franchisor's election) to Franchisor or its Affiliates by the 25th day of each month for the preceding calendar month's business activity.  If the payment due date is a Saturday, Sunday, or a legal holiday, the payment will be made on the immediately following business day.  Franchisee hereby agrees to make arrangements with its bank to allow Franchisor or its Affiliates to draw on Franchisee's bank account on a continuing basis by ACH or wire transfer for the amount of all fees and payments due Franchisor as provided herein and agrees to execute the Electronic Funds Transfer Authorization set forth in Exhibit 3.

5.6     Interest on Unpaid Fees; Default Royalty Fee Rate.  If Franchisee fails to remit the fees required to be paid under this Agreement when due (including if insufficient funds are available in Franchisee's account to fully pay the amount owed when due), the applicable payment will be considered late, Franchisee will be in default hereunder and any unpaid and past due fees will bear interest at the rate of one and one-half percent (1½%) per month or the legal rate allowed by applicable law, whichever is lower.

5.7     Franchisee's Absolute Obligation to Pay.  Franchisee's obligation to pay Franchisor the fees required hereunder will be absolute and unconditional.  Franchisee will not, for any reason, withhold payment of any Royalty Fees, Promotional Fees or any other fees or payments due Franchisor under this Agreement or any other agreement.  Franchisee will not have the right to "offset" any liquidated or unliquidated amounts allegedly due to Franchisee from Franchisor against the Royalty Fees, Promotional Fees or any other payments due to Franchisor under this Agreement or any other agreement. Franchisee must pay timely and in full all fees due under this Agreement regardless of any claims that Franchisee may allege against Franchisor.  Except as noted above with respect to the Initial Franchise Fee, no fees paid by Franchisee hereunder are refundable under any circumstances.

5.8     Franchisor's Set-Off Right.  Franchisor, in its sole discretion, may withhold, set-off or recoup any amount it owes to Franchisee under this Agreement (including without limitation any discounts, rebates and allowances under Section 6.6) from or against any amount owed by Franchisee to Franchisor (including without limitation pursuant to any indemnification obligation of Franchisee) or held by Franchisor on Franchisee's behalf.

ARTICLE 6
ADVERTISING AND PROMOTIONS

6.1     Promotional Fees.  In addition to the fees payable under Article 5, Franchisee will pay to Franchisor a monthly promotional fee (the "**Promotional Fee**") consisting of the following components:

(A)   General Promotional Fee.   Franchisee must pay Franchisor 0.25% of Franchisee's monthly Gross Sales (on Gross Sales of up to $125,000) to cover general costs associated with promoting Circle K Stores, including, but not limited to, the cost of image/customer service inspections, incentive programs for franchisees, administrative costs associated with the Promotional Fund, and work done by outside advertising agencies.

(B)   Local and Regional Promotional Fee.   In addition, Franchisee must pay Franchisor up to 1.25% of Franchisee's monthly Gross Sales (on Gross Sales of up to $125,000) ("**Local and Regional Promotional Fee**") to cover the costs associated with local and regional promotions of, and equipment upgrades for, Circle K Stores located in a particular area (the "**Designated Marketing Area**" or "**DMA**").   The exact rate of the Local and Regional Promotional Fee may vary based on the particular DMA in which the Store is located.   All franchisees in a given DMA may not pay the same Local and Regional Promotional Fee rate.   At Franchisor's option, if there are surplus Local and Regional Promotional Fees in any given year, Franchisor may elect to direct such surplus to be used to fund local store marketing programs ("**LSM**"), which will give Franchisee the ability to use a portion of such funds to implement Franchisor-approved Store-level marketing and promotional programs.   Franchisee acknowledges that LSM funds may not be available to Franchisee in every (or any) year during the Term.

(C)   National Promotional Fee.   The parties acknowledge that no national promotional fee is in effect as of the Effective Date; however, during the Term, Franchisor may require payment of such a fee.   In such an event, Franchisor will provide Franchisee at least 60 days' advance written notice, at which time Franchisee will be required to pay Franchisor up to 0.25% of Franchisee's monthly Gross Sales (on Gross Sales of up to $125,000) to cover national promotional costs associated with promoting Circle K Stores.

Franchisor has the final decision-making authority over all matters relating to the Promotional Fees collected.  The Promotional Fees will be used by Franchisor for payment of costs of category development and to establish and develop marketing, sales promotions, image, customer service, franchisee incentive and advertising programs designed to promote and enhance the Marks and the Business System and to increase sales, to cover Franchisor's costs incurred in the administration of the Promotional Fees, and for any taxes incurred on the Promotional Fees.  Franchisor's or Franchisor's Affiliate's marketing department is responsible for category development, as well as the development of the promotional programs, which includes the production, research, and administration of advertising, marketing calendars, production of television, radio, newspaper, direct mail, and point of purchase advertising, grand opening activities for new Circle K Store openings and all collateral materials.  Upon written request, Franchisor will provide Franchisee with an annual unaudited statement showing the financial status of any fund created by Franchisor with respect to the Promotional Fees, and the manner in which the Promotional Fees were spent by Franchisor during Franchisor's previous fiscal year; provided, however, that Franchisor will not be required to provide any such annual statement to Franchisee earlier than ninety (90) days after the end of Franchisor's fiscal year.  Franchisor is not obligated to spend Promotional Fees in any particular market or geographic area or in proportion to the payments made by franchisees in a market.  Franchisor does not guaranty that Franchisee's Store will benefit directly or pro rata from the Promotional Fees, and allocations from the Promotional Fees may benefit other franchise Stores or Franchisor's Affiliate's company-owned Stores disproportionately to Franchisee's Store.  Further, Franchisor is not obligated to spend all of the Promotional Fees collected in any fiscal

year. If Franchisor's costs for a fiscal year for the advertising and promotions described above exceed or fall short of the Promotional Fees collected for a fiscal year, Franchisor may, at its option, carry the excess or shortfall over to the next fiscal year. The monthly Promotional Fees are payable by Franchisee hereunder in the same manner and at the same time as Royalty Fees as set forth in Article 5. Franchisor will have no fiduciary duty to Franchisee with respect to the collection or expenditure of the Promotional Fees, and any advertising fund created by Franchisor will not be a trust or escrow account held for the benefit or account of Franchisee.

6.2    <u>Grand Opening</u>. Unless exempted by Franchisor, Franchisee will conduct a grand opening advertising and promotional campaign in connection with the opening of the Store within one hundred (100) days of the date that Franchisee begins conducting business at the Store hereunder. Franchisor will reasonably assist Franchisee with developing and carrying out such grand opening campaign and will furnish Franchisee with a grand opening materials package. All grand opening activities and related publicity and promotional materials must receive Franchisor's prior written approval. All publicity and promotional costs including the full cost of any price reductions and other customer inducements incurred in such grand opening advertising campaign will be at the sole expense of Franchisee, which expense will be in addition to Franchisee's obligation to pay the Promotional Fees as set forth above; provided, however, that Franchisor will reimburse Franchisee (from the Local and Regional Promotional Fees) any pre-approved expenditures in the amount of $.50 for each $1.00 Franchisee spends, up to a maximum reimbursement of $4,000.

6.3    <u>Advertising Programs</u>. Franchisor may, from time to time, initiate sales and marketing programs intended to promote and enhance the business of all Circle K Stores, and Franchisee will participate fully therein according to the terms of the programs as established by Franchisor, unless Franchisee's participation is otherwise excused in writing by Franchisor. Such programs may include, by way of illustration and not of limitation, gift certificates, coupons, catalog and other direct mail, telemarketing, interchange programs, combination selling programs, or advertising in the yellow pages with other franchisees. The initiation of any such program will not obligate Franchisor to continue the program for any specific time period. In addition, Franchisor may, from time to time, develop advertisements or promotions for the use in radio or television media. Franchisor may make such advertisements or promotions available to Franchisee upon Franchisee's request; provided, that Franchisee will be solely responsible to place the advertisement or promotion and pay for media costs and the costs of voice-over, footage or other costs to identify the location of the Store.

6.4    <u>Franchisee's Advertising</u>. All advertising, regardless of the form of media used for advertising, including electronic media, social media, press releases, and the internet, done by Franchisee will be subject to Franchisor's prior written approval with respect to form and content, to be obtained in the following manner: copy of the proposed advertising or press release (specifying the anticipated publication date and the medium) will be submitted to Franchisor at least thirty (30) days prior to the anticipated publication date. Franchisor will have thirty (30) days after receiving such copy to approve or disapprove it. A disapproved copy may be re-submitted with corrections, and Franchisor will have ten (10) additional business days to approve or disapprove any such re-submitted copy. Franchisor's failure to respond within the designated period will be deemed an approval; provided, however, that Franchisor's approval of specified advertising (affirmatively or by failure to object) will not preclude Franchisor from subsequently

DocuSign Envelope ID: 2E58B550134FEA4873-05AB-938B24B12D0B

disapproving the same or similar copy. Franchisee's use of any unauthorized signs, notices, advertising, or publications shall be a material breach hereunder giving Franchisor grounds for terminating this Agreement. Without waiving its right to declare Franchisee in breach of this Agreement, Franchisor may enter the Franchised Location and unilaterally seize or remove any unauthorized advertising materials from such Store.

6.5     Advertising Council and Advertising Cooperative Programs. Franchisor reserves the right to form an advertising council composed of an elected group of franchisees, and, if such a council is formed and Franchisee is elected to the council, Franchisee agrees to abide by all rules and regulations promulgated by such council, and to regularly participate in the periodic meetings of such council. In addition, Franchisor reserves the right, from time to time, to establish advertising cooperative associations comprised of franchisees in a specific geographic territory, which associations would conduct and administer advertising and promotions in the applicable geographic region. If such an advertising cooperative association is formed in the geographic region in which the Store is located, Franchisee agrees to participate in such an association. All advertising and promotions conducted by the cooperative must be pre-approved in writing by Franchisor. All Circle K Stores owned by Franchisor or its Affiliates within such geographic area will also join such association on the same terms and conditions as Franchisee.

6.6     Advertising Programs and Vendor Promotions.

(A)     By executing this Agreement, Franchisee assigns to Franchisor its right to receive marketing, advertising, promotional, volume, retail display, and placement discounts, rebates and allowances offered by any manufacturers, distributors, or suppliers of products and services to the Store, excluding standard counter pack allowances offered by tobacco companies and excluding volume discounts reflected on the invoice by any manufacturer or supplier. For avoidance of doubt, Franchisee acknowledges that access to such manufacturers, distributors and suppliers is not guaranteed, and it is possible that such third parties will be unable or unwilling to deliver products to Franchisee's Store. Franchisor may, in its sole discretion, (i) keep these discounts, rebates and allowances, (ii) retain a portion of these discounts, rebates, and allowances to off-set the costs associated with administering any vendor discount/rebate programs, (iii) use these discounts, rebates and allowances to supplement the Promotional Fees, or (iv) distribute such discounts, rebates and allowances to franchisees in such amounts and using such allocation methods as Franchisor deems appropriate. In all instances Franchisee agrees to cooperate and participate fully in all advertising and promotional programs or ventures designated by Franchisor, unless otherwise agreed in writing by Franchisor. Franchisor may withhold or offset any amount of marketing allowances and rebates it owes Franchisee under this Agreement from or against any amount owed by Franchisee to Franchisor (including pursuant to any indemnification obligation of Franchisee).

(B)     If Franchisor agrees (in its sole discretion) to process any discounts, rebates or allowances on Franchisee's behalf, the following terms shall apply: Franchisor will credit such discounts, rebates and allowances to Franchisee's account, less an administrative fee retained by Franchisor (in an amount from time to time determined by Franchisor), after Franchisor receives payment from the applicable vendor. Franchisor will determine, in its sole discretion, which vendors it will process discounts, rebates or allowances for on behalf of its franchisees. Franchisee acknowledges that the time between the date of the applicable purchase from the vendor and the

date Franchisee receives the rebate can vary from 4 to 12 months or longer, depending on the vendor's processing time.

(C)     Franchisee acknowledges that it does not have any ownership right or claim to any discounts, rebates, or allowances. Notwithstanding the foregoing, it is Franchisor's current policy to handle discounts, rebates, and allowances in the following manner, and such policy is subject to change at any time in Franchisor's sole discretion, without notice to Franchisee: upon expiration of this Agreement, Franchisor will continue to credit Franchisee's account for all applicable vendor discounts, rebates and allowances received, less any amounts Franchisee owes to Franchisor, for a period of 6 months after the expiration of this Agreement; following a Transfer of Franchisee's rights hereunder in accordance with <u>Article 15</u> of this Agreement, Franchisor will continue to credit all vendor discounts, rebates and allowances Franchisor receives through the end of the month in which the transfer occurred, less any amounts Franchisee owes to Franchisor, to Franchisee's account, irrespective of which party operated the Store when the discount, rebate or allowance was earned. Starting on the first day of the month subsequent to the transfer, all rebates Franchisor receives will begin to be credited to the new franchisee-transferee. For example, if a transfer takes place on June 15th, rebates Franchisor collects beginning July 1st would be credited to the transferee. If this Agreement is terminated for any reason other than expiration or a Transfer, Franchisor will cease crediting Franchisee's account with any vendor discounts, rebates, or allowances as of the effective date of such termination.

ARTICLE 7
BUILDING DESIGN AND SPECIFICATIONS; FRANCHISEE'S LEASE

7.1     <u>Store Improvements, Fixtures, and Equipment; Compliance with Franchisor's Standards</u>. Franchisor must approve any proposed site for the Franchised Location, which site must meet Franchisor's then-current site selection criteria. The Store building and premises must conform to the approved building plans and specifications, exterior and interior decorating designs, required equipment and color schemes for Circle K Stores. Franchisor will provide Franchisee with a typical Circle K Store floor plan layout and Franchisor's standard construction and equipment specifications, and Franchisee will take all actions necessary to bring the Store into compliance with the then-current layout and equipment specifications prior to the Open Date. If the Store is a Conversion Store, Franchisor, in its sole discretion, may require that the Store either close or remain open for business during the conversion process. Any general contractor or architect that will be making any improvements to the Franchised Location must be pre-approved by Franchisor. Franchisee will effect building improvements and will install such fixtures and equipment at the Store as required by Franchisor's current specifications as set forth in the mandatory provisions of the Business Systems Manuals, and Franchisee will provide Franchisor with an architectural schedule prior to making any renovations to the Store. All plans and specifications must be approved by Franchisor prior to the commencement of construction. All architectural, engineering, construction, and design services for the Store will be at Franchisee's sole cost and responsibility, although Franchisor will consult with Franchisee regarding the design and layout of the Store upon the request of Franchisee. Failure to construct and furnish the Store in accordance with the plans and specifications may result in termination of this Agreement. Franchisee will not make any architectural, structural, design or decorating changes to the interior or exterior of the building or the premises, including any signs bearing the Marks, without Franchisor's prior written approval (unless such change is specifically required under applicable

law).  The furniture, fixtures, and equipment used in Franchisee's Store will be acquired from approved suppliers, installed and located in accordance with the floor plans and specifications approved by Franchisor for the Store, and will conform to the quality standards and uniformity requirements established from time to time by Franchisor.  Franchisor will not be liable for any claims of loss, damage, or expenses arising from the design or plan of the Store by reason of its approval of plans and specifications or of changes thereto, including, but not limited to, environmental claims, suitability of site, design or plan thereof, and Franchisee will indemnify Franchisor for any such liability should any such claim arise.

7.2    Changes in Plans and Specifications; Inspections.  Franchisor must pre-approve in writing any and all changes to the Store plans or specifications.  Franchisor may make periodic inspections of the site and may conduct a final inspection of the Store and may require corrections and modifications as it deems necessary to bring the Store into compliance with the plans and specifications previously approved by Franchisor.  If Franchisee fails to correct any unauthorized variance within thirty (30) days of receipt of notice of such default, Franchisor will be entitled to immediately terminate this Agreement.  Franchisee will reimburse Franchisor for all expenses incurred in connection with any changes to plans or specifications and any inspections to verify corrections of any defaults.

7.3    Remodeling.  Franchisee will make the reasonable capital expenditures necessary to remodel, modernize, redecorate, and renovate the Franchised Location and Franchisee's Store, and to replace and modernize the furniture, fixtures, supplies, and equipment so that the Franchised Location and the Store will reflect the then-current image intended to be portrayed by Franchisor (collectively, such efforts, "**Remodeling**").  All Remodeling must be done in accordance with the standards and specifications prescribed by Franchisor and any applicable laws, ordinances, and regulations.  Franchisee will commence Remodeling within three (3) months from the date Franchisee receives written notice from Franchisor specifying the required Remodeling, and will diligently complete such Remodeling within a reasonable time thereafter.  Franchisee will not be required to conduct any extensive Remodeling more than once every five (5) years during the Term (each such five year period, the "**Remodel Period**"); provided, however, that (i) if Franchisor determines in good faith that an item or items of furniture, fixtures, or equipment (such as countertops, displays, and fascia) have become so worn in the ordinary course of business prior to the expiration of the applicable Remodel Period and repairs cannot be reasonably made so as to conform the Franchised Location with Franchisor's then-current image standards, such item(s) shall be replaced by Franchisee upon Franchisor's request prior to the expiration of the Remodel Period; or (ii) at such time as Franchisor revises the Circle K Store general floor plan layout, Franchisee agrees to reconfigure the Store's floor plan layout to bring the floor plan into conformance with Franchisor's then-current specifications within three (3) months.

7.4    Maintenance and Repair.    As between Franchisee and Franchisor, Store maintenance and repair will be the sole responsibility of Franchisee.  Franchisee will at all times maintain the interior and exterior of the Store and all fixtures, furnishings, signs, and equipment located at the Store and surrounding area used in connection with such business in the highest degree of cleanliness, orderliness, safety, and sanitation as set forth in the mandatory provisions of the Business Systems Manuals.  Franchisee will make such additions, alterations, repairs, and replacements as necessary to conform to Franchisor's requirements. All replacements of furniture,

fixtures, and equipment must conform to the quality standards for Circle K Stores, any applicable laws, ordinances, and regulations, and must be approved by Franchisor in writing.

7.5    <u>Signs</u>.    Franchisee will display at the Franchised Location signs, advertising, slogans, and symbols as Franchisor may prescribe from time to time, subject to any Lease and local zoning restrictions.  Franchisee will pay for permitting and exterior signage at the Franchised Location and will be responsible for the installation and maintenance of all signs.  Any signage including any of the Marks will be sole property of Franchisor, may not be used except as permitted hereunder and may not be altered or removed by Franchisee except with Franchisor's prior written consent or upon termination of this Agreement.

7.6    <u>Equipment/Construction and Other Funding</u>.  Franchisor may offer to Franchisee funding for acquisition of certain Store equipment and/or construction of the Store ("<u>Equipment/Construction Funding</u>") if Franchisee qualifies for same.  If Franchisee accepts the Equipment/Construction Funding, Franchisee must sign the Equipment/Construction Funding Agreement in the form attached hereto as <u>Exhibit 4</u> (the "<u>Equipment/Construction Funding Agreement</u>") and Personal Guaranty (in the form attached hereto as <u>Exhibit 5</u>).  Franchisor will use the Equipment/Construction Funding funds to off-set the acquisition cost of Store equipment and the construction cost of the Store, and pay related invoices on Franchisee's behalf.  The Equipment/Construction Funding will be amortized over the Term.    Schedule A to the Equipment/Construction Funding Agreement sets forth the options available to Franchisee with respect to Equipment/Construction Funding.  The amount of Equipment/Construction Funding, if any, that Franchisee selects will be noted on the Data Sheet.

In addition to the Equipment/Construction Funding, Franchisee may qualify for an additional up to $10,000 in funding from Franchisor if it qualifies for and maintains a Krispy Krunchy Chicken food offering in the Store.  If such funding is accepted by Franchisee, the amount will be noted on the Data Sheet and Franchisee may be required to enter into a separate funding agreement with Franchisor (in the form provided by Franchisor).  If, for any reason, the Krispy Krunchy Chicken food offering is removed from the Store during the Term, Franchisee will be required to repay the funding amount, less 1/120 for each month that Krispy Krunchy Chicken food offering was in full operation in the Store provided that the offering was in full operation for at least three years.  If the Krispy Krunchy Chicken food offering was not in full operation for at least three years, Franchisee agrees to repay to Franchisor the full amount of Krispy Krunchy Chicken funding.

7.7    <u>Franchised Location; Franchisor's Approval of the Lease</u>.  Franchisor must approve any lease or other agreement granting Franchisee the right to occupy the Franchised Location as contemplated hereunder (the "**Lease**"), and such approval will not be unreasonably withheld if the landlord ("**Lessor**") agrees in the Lease as follows:

(A)    The initial term, or initial term with renewal terms, must be for at least 10 years, or the term of the Franchise Agreement, whichever is longer.

(B)    The Lessor consents to Franchisee's use of the Marks and to the operation of a convenience store on the leased premises as required hereunder.

DocuSign Envelope ID: 2F8B550134EFE4-4873-95AB-238B21B12D0B

(C)     Franchisee may not (i) sublease or assign all or any part of its rights under the Lease or (ii) extend or renew the Lease, in each case without Franchisor's prior written consent.

(D)     The Lessor must agree to provide Franchisor with copies of all notices of default or similar communications given to Franchisee under the Lease.

(E)     Franchisor has the right to enter the leased premises to make necessary modifications to protect the Marks and the Business System or to cure any default under this Agreement or the Lease.

(F)     Upon default, expiration or termination of this Agreement, and upon notice to the Lessor, Franchisor (or its designee) may assume Franchisee's rights under the Lease, including the right to assign or sublease the Lease.  In connection with such assumption, Franchisor will not be obligated to pay the Lessor any past-due rent, common area maintenance fees, or other charges attributable to a period longer than one month.  Upon termination of Franchisee's rights under the Lease, the Lessor will give Franchisor thirty (30) days to exercise its assumption option.

Franchisee must furnish Franchisor with a copy of the signed Lease within 10 days after it is signed.

7.8     Lease Termination.  If the Lease is terminated due to a default by Franchisee, such Lease termination will constitute a breach of this Agreement and all other related agreements by Franchisee.  If Franchisor assumes control of the Franchised Location and the operation of the business conducted therein, the future operation of that business by Franchisor will not be as an agent of Franchisee, and Franchisor will not be required to account to Franchisee on account thereof.

## ARTICLE 8
## QUALITY CONTROL, UNIFORMITY, AND STANDARDS REQUIRED OF FRANCHISEE

Franchisee acknowledges and agrees that Franchisor, its Affiliates and predecessors have expended large sums of money to popularize the Marks and the Business System so that the same represents very valuable goodwill distinctive of Franchisor, its Affiliates and their respective business reputations.  Franchisee further acknowledges and agrees that Franchisor will from time to time develop, establish, modify, implement, and enforce uniform standards of quality and service regarding the business operations of the Store.  Accordingly, to ensure that all franchisees will maintain the uniformity requirements and quality standards for the foods, products, merchandise, and services associated with Franchisor, Circle K Stores, the Marks and the Business System, Franchisee agrees to maintain the uniformity and quality standards established by Franchisor for all foods, products, merchandise, and services associated with the Marks and the Business System, and agrees to follow Franchisor's standards to assure that all Circle K Stores will be uniform in nature and will provide quality foods, products, merchandise, and services to the public.

Any required standards exist to protect Franchisor's interests in the Business System and the Marks and not for the purpose of establishing any control or duty to take control over those matters that are reserved to Franchisee.  The required standards generally will be set forth in the Business Systems Manuals or other written materials.  The Business Systems Manuals also will

include guidelines or recommendations in addition to required standards.  In some instances, the required standards will include recommendations or guidelines to meet the required standards.  Franchisee may follow the recommendations or guidelines or some other suitable alternative, provided that Franchisee meets and complies with the required standards.  In other instances, no suitable alternative may exist.  In order to protect Franchisor's interests in the Business System and Marks, Franchisor reserves the right to determine if Franchisee is meeting a required standard and whether an alternative is suitable to any recommendations or guidelines.

      8.1   <u>Authorized Services and Products</u>.  Franchisee will diligently and continuously use and offer for sale only those products, merchandise, and services (including product mix) as specified by Franchisor from time to time or as specified in the mandatory provisions of the Business Systems Manuals, which will generally consist of those products and services offered or used by Franchisor and its Affiliates at their Circle K Stores.  Franchisee may not use, sell, or offer for sale any other products, merchandise, or services at its Franchised Location unless specifically authorized in writing by Franchisor or as set forth in the mandatory provisions of the Business Systems Manuals.  Without the prior written consent of Franchisor, Franchisee may not sell any products, merchandise, or services under the Marks or purchased through Circle K's negotiated purchasing arrangements with suppliers at any location other than the Franchised Location.  Franchisor will not be liable for any claim on the part of Franchisee in the event of loss or interruption in the supply of any or all such products or merchandise.

      Franchisee acknowledges and agrees that certain approved supplies may only be available from one source, and Franchisor or Franchisor's Affiliate may be that source.  Franchisee agrees to pay the then-current price in effect for all products, supplies, and services that Franchisee purchases from Franchisor or Franchisor's Affiliate.  All inventory, products, services, materials and other items and supplies used in the operation or construction of the Store that have not been approved by Franchisor must conform to the specifications and standards Franchisor establishes from time to time.  ALTHOUGH APPROVED OR DESIGNATED BY FRANCHISOR, FRANCHISOR AND ITS AFFILIATES MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO SERVICES, PRODUCTS, EQUIPMENT (INCLUDING, WITHOUT LIMITATION, ANY REQUIRED COMPUTER SYSTEMS), SUPPLIES, FIXTURES, FURNISHINGS OR OTHER APPROVED ITEMS.  IN ADDITION, FRANCHISOR DISCLAIMS ANY LIABILITY ARISING OUT OF OR IN CONNECTION WITH THE SERVICES RENDERED OR PRODUCTS FURNISHED BY ANY SUPPLIER APPROVED OR DESIGNATED BY FRANCHISOR.  FRANCHISOR'S APPROVAL OR CONSENT TO ANY SERVICES, GOODS, SUPPLIERS, OR ANY OTHER INDIVIDUAL, ENTITY OR ANY ITEM SHALL NOT CREATE ANY LIABILITY TO FRANCHISOR.

      Franchisee must obtain Franchisor's prior written consent to offer motor fuel for sale from the premises where the Store is located.  Franchisor's execution of this Agreement shall be deemed as such written consent solely for the brand of fuel offered by Franchisee at the time of the execution of this Agreement.  Franchisee may not subsequently offer a different brand or unbranded motor fuel for sale without obtaining Franchisor's separate prior written consent.

DocuSign Envelope ID: 2F8B550134EEA-4873-95AB-038B24B12D08

8.2    <u>Purchases</u>.  To preserve the uniformity of the Business System and the goods sold under the Marks, Franchisor may from time to time require that Franchisee purchase from Franchisor, or its Affiliates, or from a sole source vendor or service provider, certain proprietary items, including, but not limited to, food products, merchandise, accounting and software programs used in the operation of the Store; provided, that Franchisee will not be required to purchase from Franchisor, its Affiliates, any sole source vendor or service provider, any items not generally used or offered for sale by Franchisor or its Affiliates in their Circle K Stores.

8.3    <u>Inventory of Products</u>.  Franchisee will maintain at all times sufficient minimum inventories of products and merchandise in the Store as set forth in the mandatory provisions of the Business Systems Manuals or as otherwise specified by Franchisor.  If the Store is purchased from Franchisor, then Franchisee will pay to Franchisor an amount equal to the value of the entire inventory in the Store as of the Transfer Date.  The inventory will be calculated using the retail inventory accounting method then in use by Franchisor.  Franchisee will not be required to purchase damaged or unsaleable merchandise from Franchisor, but may do so by mutual agreement.  As soon as practicable, Franchisor will provide Franchisee with an estimate of the value of the inventory expected to be in the Store as of the Transfer Date, and Franchisee will pay such amount on the date Franchisee receives the estimate, or on such other date that is on or prior to the Transfer Date as Franchisee and Franchisor may mutually agree upon.  On the Transfer Date, the parties will then confirm the actual value of the inventory as of the Transfer Date, and within 30 days of the Transfer Date, if the amount paid by Franchisee for the estimated inventory is greater than the actual value of inventory confirmed on the Transfer Date, Franchisee will receive a refund of such difference, and if the amount paid by Franchisee for the estimated inventory is less than the actual value on the Transfer Date, Franchisee will make a corresponding additional payment to Franchisor.

8.4    <u>Operational Requirements</u>.  Franchisee will operate the Store in strict conformity with such uniform methods, standards, and specifications as Franchisor may from time to time prescribe (including without limitation, such methods, standards, and specifications set forth in the mandatory provisions of the Business Systems Manuals) to ensure that the highest degree of quality and service is uniformly maintained.  During the Term, Franchisee agrees to:

(A)    use the Franchised Location solely for the operation of the Store and to refrain from using or permitting the use of the Franchised Location for any other purpose or activity without the prior written consent of Franchisor; and

(B)    keep the Store open for business and in normal operation (doors open and fully illuminated) twenty-four (24) hours a day, seven (7) days a week (including all holidays), unless otherwise agreed to in writing by Franchisor, or unless prohibited by local laws or ordinances.  The utilization of a pass-through window or bullet-resistant glass does not constitute being open for business in normal operation and requires Franchisor's prior written approval to install at the Store.  If Franchisee operates the Store for less than twenty-four (24) hours any day during a month in a locality where applicable laws do not prohibit operating twenty-four (24) hours a day, or if Franchisee operates the Store for twenty-four (24) hours a day, seven (7) days a week, but utilizes a pass-through window or bullet-resistant glass surrounding the sales counter for any such time, Franchisor may, in its sole discretion, increase Franchisee's monthly Royalty Fee rate for the Store by up to one percent (1%).  If the Store is closed for 24 consecutive hours or more

without Franchisor's prior written approval, the Franchisee's average daily Gross Sales for the month prior to the Store closing will be used as Franchisee's daily Gross Sales for each day the Store is closed in order to calculate the Royalty Fees and Promotional Fees due for such days; and

(C)     comply with the procedures and systems instituted by Franchisor both now and in the future, including, without limitation, those relating to sales, good business practices, advertising, and other obligations and restrictions set forth herein; and

(D)     maintain sufficient supplies of (as Franchisor may prescribe in the mandatory provisions of the Business Systems Manuals or otherwise in writing), and use at all times, only such approved merchandise, equipment, materials, advertising methods, formats, and supplies as conform with Franchisor's standards and specifications; and

(E)     secure and maintain in full force and effect in Franchisee's name all required licenses, permits, and certificates relating to and necessary for the operation of the Store, including, but not limited to, registration of names, fictitious names, tax permits, and lottery, liquor and tobacco licenses, if required and to deliver copies of any of the foregoing to Franchisor within five (5) days of Franchisor's request.  If Franchisee has its alcohol, tobacco, or lottery license suspended or revoked, Franchisee's average daily Gross Sales for the month prior to the suspension or revocation will be used as Franchisee's daily Gross Sales for each day the license is suspended in order to calculate the applicable Royalty Fees and Promotional Fees due; and

(F)     notify Franchisor in writing within five (5) days of each of the following events: the threat of, or the actual commencement of, any action, suit, or proceeding, or the issuance of any order, writ, injunction, award, notice, or decree of any court, agency, or other governmental entity, which, in any of the above instances, may adversely affect the operation, financial condition, or goodwill of Franchisee, Franchisor, or the Business System; and

(G)     handle all customer complaints and requests for adjustments consistent with any procedure required in the mandatory provisions of the Operations Manual(s), and always in a manner that will not detract from the name and goodwill enjoyed by Franchisor; and

(H)     maintain a competent, conscientious staff and employ such minimum number of employees as are necessary to service the anticipated volume of business at the Store. Franchisee will be solely responsible for the terms of employment, compensation, and proper training of all of its employees; and

(I)     honor credit cards and maintain relationships with such credit and debit card issuers or sponsors, check verification services, financial center services, and electronic funds transfer systems as Franchisor may designate or provide from time to time so that Franchisee may accept customers' credit and debit cards and other methods of payment.  Franchisee agrees that all sales at the Premises made using credit cards, credit identifications, fleet cards, debit cards, pre-paid cards or other similar transaction authorization cards will be made pursuant to a point of sale ("POS") system for processing such cards as designated by Franchisor.  Franchisor reserves the right to add or remove credit card payment systems, relationships, or services, and other methods of payment at any time; and

(J)      maintain adequate security on the Franchised Location, and not permit illegal activities to take place in the Store or on the premises of the Franchised Location; and

(K)      timely pay all utility bills and other obligations and liabilities affecting the Store or the Franchised Location; and

(L)      timely pay all vendors, suppliers, and providers of inventory to ensure that the required levels of inventory are maintained at the Store; and

(M)      apply to participate in the Supplemental Nutrition Assistance Program (SNAP), or other comparable program designated by Franchisor, and accept SNAP benefits as a form of payment; and

(N)      comply with all youth access laws prohibiting the sale of tobacco and alcohol to minors and ensure that no minor is allowed to purchase tobacco or alcohol on the premises.

(O)      refrain from engaging in conduct which would tend to discredit, dishonor, reflect adversely upon or in any manner injure the reputation of Franchisor, the Circle K brand, and/or the Marks.

(P)      maintain a functioning automated teller machine (ATM) at the Franchised Location unless this requirement is waived by Franchisor; and

(Q)      comply with all other requirements which may be prescribed herein.

8.5      <u>Suppliers</u>.  Franchisee will purchase all merchandise, supplies, equipment, and materials required for the operation of the Store from suppliers approved by Franchisor who demonstrate, to the satisfaction of Franchisor, the ability to meet Franchisor's standards and specifications for such items; who possess adequate capacity and facilities to supply Franchisee's needs in the quantities, at the times, and with the reliability requisite to an efficient operation; and who have been pre-approved by Franchisor.  Franchisor has the right to appoint a single approved primary source of supply for many merchandise items, and Franchisee may be required to purchase these items from this primary source under Franchisor's negotiated contract.  Franchisee will not purchase any distressed or salvaged products for resale or use in the Store.  Franchisor and/or its Affiliates may from time to time make available to Franchisee goods, products, and/or services for use in the Store on the sale of which Franchisor and/or its Affiliates may make a profit, and Franchisor and/or its Affiliates may from time to time receive consideration from suppliers, distributors, and/or manufacturers in consideration of services rendered or rights franchised to such persons.  Franchisee acknowledges that Franchisor and/or its Affiliates will be entitled to such profits and/or consideration, as provided in Section 6.6.

Franchisee agrees to work with the third party management firm designated by Franchisor in connection with the construction and development of Franchisee's Store.  A list of the third party management firms currently used by Franchisor is included in the Business Systems Manuals and may be revised by Franchisor from time to time.  Franchisee must obtain Franchisor's prior written approval if it wishes to use a third party management firm that Franchisor has not designated.

8.6     Franchisee's Participation in Operations.  Unless excused in writing by Franchisor, Franchisee will be actively involved in the day-to-day operations of the Store and will spend adequate management time required to maintain the standards required hereunder.  If Franchisee is acquiring the rights to operate more than one Circle K Store, Franchisee will be actively involved in the supervision of management of all of the Circle K Stores owned by Franchisee and will spend adequate management time to ensure Franchisor's standards are maintained at all Stores.

8.7     Store Manager.  If Franchisee will not be solely responsible for the direct management and daily activities of the Store, Franchisee will hire a Store Manager who will be solely responsible for the direct management and daily activities of the Store.  The Store Manager must successfully complete Franchisor's training program prior to the opening of the Store. Franchisee agrees that no person who has been convicted of a felony, has otherwise committed any act involving fraud, or has engaged in any acts that could adversely affect or be detrimental to the goodwill of the Marks and the Business System will be permitted to be employed as a Store Manager.

8.8     Uniforms.  Franchisee will require its employees to wear the standard attire or uniforms approved by Franchisor and will comply with Franchisor's uniform requirements to promote the Circle K Store image and to protect and further the goodwill associated with the Marks and the Business System.

8.9     Payment of Expenses.  Franchisee will be solely responsible for, and will timely pay (unless contested in good faith) all operating expenses, taxes, and levies in connection with the operation of the Store, including, without limitation, all costs related to obtaining, purchasing, leasing, maintaining, repairing, or replacing inventory, equipment, and other supplies needed to operate the Store and all salaries and wages and other benefits of employees.

8.10    Compliance with Laws.  Franchisee will, at all times and at its expense, conduct and operate the Store in strict compliance with all applicable federal, state, and local laws, ordinances, and regulations pertaining to the purchase, construction, remodeling and operation of the Store, including, without limitation, the Americans With Disabilities Act.  Without limiting the foregoing, Franchisee acknowledges and agrees that, as between Franchisor and Franchisee, Franchisee is solely responsible for ensuring that all third party products and services used in connection with the construction and/or operation of the Store, whether or not approved or recommended by Franchisor, comply with all applicable laws and regulations.  Additionally, Franchisee will, at its expense, be solely responsible for determining the licenses and permits required by law for the operation of the Store, for obtaining and qualifying for all construction or operation licenses and permits required by law, and for complying with all applicable federal, state, and local laws.

8.11    Payment of Taxes.  Franchisee will be solely responsible for and will timely pay all federal, state, city, and local taxes and assessments including, but not limited to, individual and corporate income taxes, sales and use taxes, excise taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, unemployment taxes, personal property taxes (including related to signage containing the Marks), real estate taxes, gasoline or motor fuel taxes, and all others taxes payable in connection with the operation of the Store and sale of merchandise and services. Without limiting the foregoing, Franchisee also will pay all state and local taxes,

including, without limitation, taxes denominated as income or franchise taxes that may be imposed on Franchisor as a result of its receipt or accrual of the Initial Franchise Fee, Royalty Fees, Promotional Fees, or other fees due hereunder, whether assessed against Franchisee through withholding or other means or whether paid by Franchisor directly. In either case, Franchisee shall pay Franchisor (and to the appropriate governmental authority) such additional amounts as are necessary to provide Franchisor, after taking such taxes into account (including any additional taxes imposed on such additional amounts), with the same amounts that Franchisor would have received or accrued hereunder had such withholding or other payment, whether by Franchisor or Franchisee, not been required.

       8.12   <u>Corporation, Partnership, or Limited Liability Company as Franchisee</u>. If Franchisee is a corporation, then Franchisee will provide Franchisor with a list of all shareholders (showing the number of shares owned), officers and directors of the corporation, and will keep such information current at all times. All stock certificates of a corporate Franchisee will bear a legend as specified by Franchisor stating that transfer of the stock is restricted and subject to the terms of this Agreement. Upon Franchisor's request, each shareholder will execute an acknowledgment of restriction on the right to transfer stock of the corporation. If Franchisee is a partnership, limited liability company or other entity, then Franchisee will provide Franchisor with such ownership and governance information as Franchisor may reasonably require, including without limitation, the identity of the Principal Equity Holders in Franchisee, the percentage of ownership interest held by each Principal Equity Holder, and Franchisee's governing documents.

       8.13   <u>Guaranties</u>. If Franchisee is a corporation, a limited partnership whose general partner is a corporation, or a limited liability company or other entity, all Principal Equity Holders of such corporation, limited partnership, limited liability company or other entity will: (i) approve this Agreement in writing; (ii) furnish any personal financial information reasonably requested by Franchisor; and (iii) execute a personal guaranty of Franchisee's payments and performance obligations under this Agreement, any related agreement entered into between Franchisee and Franchisor, or any Affiliate, and any agreement executed upon renewal, in substantially the same form as the Personal Guaranty attached to this Agreement as <u>Exhibit 5</u> (the "**Guaranty**"). Persons or entities that subsequently become Principal Equity Holders will execute the Guaranty within thirty (30) days after becoming a Principal Equity Holder.

       8.14   <u>Initial Training</u>. Prior to commencing business operations at the Store, Franchisee or Franchisee's operations manager and Franchisee's Store Manager must successfully complete the initial training program provided by Franchisor (the "**Training Program**"). Franchisee or Franchisee's operations manager and the Store Manager must demonstrate competence in, and a thorough understanding of, each individual training segment before progressing to the next training segment. The classroom component of the Training Program will consist of two (2) weeks of training as determined by Franchisor, and will be conducted at Franchisor's training facilities, currently located in Tempe, Arizona, and at such other locations as specified by Franchisor, and will cover the basic operating procedures of the Business System as described in the mandatory provisions of the Business Systems Manuals. Additionally, Franchisee may be required to complete in-store training of up to two weeks at various Circle K Stores or similar convenience stores, based on Franchisor's evaluation of Franchisee's experience. Franchisee must complete the Training Program no earlier than one hundred eighty (180) days prior to the opening of the Store. If the Training Program is completed more than one hundred eighty (180) days prior to the

opening of the Store, Franchisee will need to be recertified by Franchisor before Franchisor will approve the opening of the Store.

If Franchisee is an existing convenience store franchisee of Franchisor, Franchisee may be required to attend a modified training program (the "**Modified Training Program**"), which will be shorter in duration than the Training Program. If required, Franchisee must complete the Modified Training Program no earlier than one hundred eighty (180) days prior to the opening of the Store. If the Modified Training Program is completed more than one hundred eighty (180) days prior to the opening of the Store, Franchisee will need to be recertified by Franchisor before Franchisor will approve the opening of the Store. Regardless of whether Franchisee attends the Training Program or Modified Training Program, Franchisee must complete all pre-classroom assignments and pass the same final exam required of all Circle K franchisees.

Any training provided by Franchisor to any of Franchisee's employees will be limited to training or guiding the employees regarding the provision of approved products and services to customers in a manner that reflects the customer service standards of the Circle K System. Franchisee is, and will remain, the sole employer of its employees at all times, including during all training programs, and Franchisee is solely responsible for all employment decisions and actions related to its employees. Franchisee is solely responsible for ensuring that its employees receive adequate training.

8.15    Expenses.    Franchisor will provide the Training Program to Franchisee or Franchisee's operations manager and one (1) Store Manager at no cost to Franchisee. However, during the Training Program, Franchisee is responsible for all salaries, fringe benefits, payroll taxes, travel costs, lodging, food, and other personal expenses incurred by those attending the Training Program on Franchisee's behalf.

8.16    Opening Assistance.    After Franchisee and Franchisee's Store Manager have successfully completed the Training Program, Franchisor will furnish a representative to the Store who will provide opening assistance and training to Franchisee and its employees as deemed necessary and appropriate by Franchisor, including, but not limited to, assistance with training employees, implementing the Business System, and evaluating initial business operations. Franchisee may not open the Store until Franchisor has given Franchisee written approval to open the Store.

8.17    Changes in Store Manager.    If Franchisee hires a new or additional Store Manager, Franchisee is responsible to ensure that such new or additional Store Manager is adequately trained, which includes a complete review of the Business Systems Manuals and which may include successfully completing Franchisor's Training Program, at Franchisee's cost. Franchisee is also responsible for all travel, lodging, food, and other personal expenses incurred by all new or additional Store Managers attending the Training Program. All Franchisee Store Managers, including new or additional Store Managers, are required to be certified under the then-current Circle K training requirements by Franchisor within the first 90 days of employment by Franchisee, regardless of the method that Franchisee selects to conduct training.

8.18    Additional Training.    Franchisor has the right to hold refresher and/or additional training programs for Franchisee and/or its Store Manager at a location or locations selected by

DocuSign Envelope ID: 2E58B55A134EEA-4873-05AB-238B21B12D0B

Franchisor.  Attendance at such additional training shall be mandatory for Franchisee so long as there is no tuition charged by Franchisor for such programs.  Franchisee will be responsible for travel, lodging, food, and other personal expenses of those who attend on Franchisee's behalf.  Notwithstanding the above, if Franchisee receives a written notice of default that relates, in whole or in part, to Franchisee's failure to meet any operational standards, Franchisor may require, as a condition of curing the default, that Franchisee and/or Franchisee's manager(s) re-attend and successfully complete the training program, at Franchisee's expense.

8.19   <u>Employee Training</u>.  Notwithstanding any other provision of this Agreement, Franchisee, at its sole cost and expense, will be responsible for training its employees.

8.20   <u>Annual Convention</u>.   Franchisor reserves the right to arrange for an annual convention sponsored and conducted by Franchisor for the benefit of all franchisees.  If Franchisee and/or Franchisee's Store Manager attends any such convention, such attendance will be at Franchisee's sole cost and expense.

## ARTICLE 9
## CONFIDENTIAL BUSINESS SYSTEMS MANUALS AND OTHER INFORMATION

9.1   <u>Compliance with Business Systems Manuals</u>.  Franchisor will provide Franchisee with one copy of Franchisor's business systems manuals, including but not limited to the Store Guides and Operations and Reference Manuals (collectively, the "**Business Systems Manuals**"), either electronically, on the Circle K franchise extranet or in hard copy format, which must be available at all times at the Store, and, if in hard copy format, returned by Franchisee to Franchisor upon expiration or termination of this Agreement.   To protect the reputation and goodwill of Franchisor, and to maintain uniform operating standards under the Business System, Franchisee will at all times during the Term conduct business at the Store in accordance with the mandatory provisions of the Business Systems Manuals.

9.2   <u>Revisions to Business Systems Manuals</u>.  The Business Systems Manuals will, at all times during the Term and thereafter, remain the sole and absolute property of Franchisor.  Franchisor reserves the right to revise, combine or eliminate any part of the Business Systems Manuals at any time during the Term and Franchisee agrees to operate the Store in accordance with all such revisions.  Franchisee will at all times keep the Business Systems Manuals current and up-to-date, and in the event of any dispute regarding the Business Systems Manuals, the terms of the master copy of the Business Systems Manuals maintained by Franchisor will be controlling in all respects.

9.3   <u>Confidentiality</u>.  Franchisee will use all reasonable means to keep all Confidential Information secret and confidential.  Franchisee will not copy any Confidential Information, or any portion thereof, except as approved by Franchisor in writing, and will only use Confidential Information as permitted under this Agreement. Franchisee will not, during the Term or thereafter, communicate, divulge or use for the benefit of any other person or entity any Confidential Information, except that Franchisee may divulge Confidential Information to those (and only those) of its employees who must have access to it in order to operate the Store and who have agreed in writing to maintain confidentiality of such information as required hereunder.

9.4     Inspection Rights.  Franchisor or its designee will have the right at all reasonable times to access the premises of the Franchised Location electronically or in person (without being guilty of trespassing) in order to inspect the premises and observe Franchisee's operations to ensure Franchisee's full and faithful compliance with the terms of this Agreement and the mandatory provisions of the Business Systems Manuals.  Franchisee may be required to bear the costs of such inspections if the inspections are conducted by a third-party designee of Franchisor.  Franchisor will have the absolute right to take photographs and videotapes of the interior and exterior of the Franchised Location and the Store premises (including, without limitation, employees, equipment, floors, ceilings, freezers, refrigerators, and other goods, fixtures, and equipment at the Store) at all reasonable times, to examine and photograph representative samples of foods, food items, goods and paper products sold or used at the Store, and to examine and evaluate the quality of the services provided by Franchisee to customers.  Franchisor will have the right to use all photographs and videotapes of the Store for such purposes as Franchisor deems appropriate, including, but not limited to, use in training, advertising, marketing, promotional materials, public relations, and/or litigation.  Franchisee will not be entitled to, and hereby expressly waives, any right that it may have to be compensated by Franchisor, its advertising agencies, or other Circle K franchisees for using photographs or videotapes in the manner described herein.

9.5     Key Individual.  If Franchisee is a corporation or other entity, Franchisee shall designate a Key Individual to assist Franchisee in fulfilling its obligations under this Agreement.  If Franchisee and Franchisor are also parties to a motor fuel agreement governing the sale of fuel at the Franchised Location (a "Motor Fuel Agreement"), the Key Individual identified in this Agreement shall be the same individual identified as the "Key Individual" under the Motor Fuel Agreement.  The Key Individual must be identified in the signature page of this Agreement.  FRANCHISOR'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISEE.  NOTHING IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY OWNER OF A CORPORATE/ENTITY FRANCHISEE.

ARTICLE 10
NON-COMPETITION AND NON-SOLICITATION

10.1     Covenant Not to Compete.  Franchisee, on behalf of itself, its owners and Affiliates, and the Guarantors: (A) acknowledges that, pursuant to this Agreement, Franchisee's owners, principals or officers, and employees will receive specialized training from Franchisor and access to Franchisor's research and development, trade secrets and other Confidential Information pertaining to the Business System and the operation of Circle K Stores; and (B) agree that they will not, during the Term of this Agreement, on their own account or as an employee, agent, consultant, partner, manager, officer, director, owner or other representative of any other person, firm, partnership,  corporation or other entity, own, operate, lease, franchise, conduct, engage in, advise, be connected with, have any interest in, or assist any person or entity engaged in, any other convenience retail business, or other related business that is in any way competitive with or similar to Circle K Stores, that is located within two (2) miles of any Circle K Store, except with the prior written consent of Franchisor.

## ARTICLE 11
## ELECTRONIC POINT OF SALE SYSTEM; REPORTS, INSPECTIONS AND FINANCIAL STATEMENTS

11.1     <u>EPOS System, Computer Systems and Internet Access</u>.  Franchisee shall purchase, install and maintain, at Franchisee's expense, an electronic point-of-sale cash register system, designated by Franchisor that meets standards and specifications established by Franchisor, as modified by Franchisor from time to time in response to business, operations and marketing conditions (the "**EPOS System**").  In addition to the EPOS System, Franchisee must purchase, install and maintain, at its expense, a back office computer system, including without limitation both hardware and software, or other existing or future communication or data storage systems, designated by Franchisor which meet standards and specifications established by Franchisor, as modified by Franchisor from time to time in response to business, operations and marketing conditions (collectively "**Computer Systems**").  Franchisee must purchase the EPOS System and any required Computer Systems from a source or sources designated by Franchisor. Franchisor has the right to designate a single source from whom Franchisee must purchase the EPOS System or any required Computer Systems, any components thereof or associated service.  Franchisee agrees that Franchisor will have full, including electronic, access to Franchisee's EPOS System and any required Computer Systems and the Store-related data and information these systems collect and store at all times, in order for Franchisor to have the ability to monitor Franchisee's daily sales and business activity.  Franchisee also agrees to purchase, install and maintain one or more additional DSL or high speed lines or other future required communication access device designated exclusively for the EPOS System and any required Computer Systems.  Franchisor has the right to designate the specifications of any future required communication access device. Franchisee agrees to transmit daily item level sales data through the Franchisor approved Back Office System on a daily basis via the DSL or high speed internet line, or other future required communication access device, in accordance with Franchisor's transmission protocol.  In addition, Franchisee agrees that at all times Franchisee shall have high speed internet access through an established service provider, maintain an active e-mail account on the internet, and keep Franchisor informed of the e-mail address for such account.  Franchisor's proprietary software will be licensed to Franchisee pursuant to the Electronic Point of Sale and Software Agreement attached hereto as <u>Exhibit 2</u> (the "**Software Agreement**"), which Franchisee is required to execute, and Franchisee will be required to pay a monthly fee set forth in the Software Agreement.  Franchisee will be solely responsible for performing all recordkeeping duties and all such records will be maintained according to the mandatory provisions of the Business Systems Manuals. Franchisor reserves the right to require Franchisee to enter into a separate agreement with a third party designated by Franchisor covering the use and maintenance of the systems required for the Store, including the EPOS System and/or any other Computer Systems or communication software Franchisor deems necessary to operate the Store or to collect data from the Store.  Franchisee acknowledges and agrees that it will not be excused from performing any of its obligations hereunder as a result of the failure or malfunction of either the EPOS System or the Computer Systems.  It is Franchisee's responsibility to make sure that it is in compliance with all laws that are applicable to the EPOS System or other technology used in the operation of Franchisee's Store, including all data protection or security laws as well as payment card industry (PCI) and Europay, MasterCard and Visa (EMV) compliance.

11.2    <u>Participation in Website or Other Online Communication Systems</u>.  Franchisor has the right to require Franchisee, at Franchisee's expense, to participate in a "Circle K" extranet website or other online communication systems.  Franchisor has the right to determine the content and use of any websites or other online communication systems and will establish the rules under which its franchisees (including Franchisee) will participate.  Franchisor will retain all rights relating to any website or other online communication systems and may alter or terminate the site or systems.  Franchisee's use of and general conduct on any website or other online communication systems, specifically its use of the Marks, domain names or any advertising on any website or online communication systems, is subject to the provisions of this Agreement.  Franchisee acknowledges that certain information obtained through its participation in the extranet website or other online communication systems may be considered confidential information, including access and identification codes.  Franchisee's right to participate in any website or other online communication systems or otherwise use the Marks or the Business System on the internet terminates when this Agreement expires or terminates.

11.3    <u>Franchisor Access to Data; Reports; Financial Statements</u>.  Franchisor will have direct and full access to, and ownership of, all Store-related data and related information by such means as Franchisor may from time to time require, including without limitation, via third party vendors, direct access telephone, data transmission lines, or modem.  Simultaneously with the payment of Royalty Fees hereunder, Franchisee will submit to Franchisor, electronically or otherwise in writing as required by Franchisor, Store sales reports that include an itemization by product/service category as required by Franchisor (e.g., merchandise sales, lottery sales, money order sales, etc.) for sales made during the previous month from the Store, which reports shall include calculation of Gross Sales and Royalty Fees, Co-Branded Fees and Promotional Fees, in such format and with such level of detail as required by Franchisor.  In addition, Franchisee is required to provide Franchisor with Franchisee's monthly profit and loss statements in a format prescribed by Franchisor.  Such profit and loss statements (which shall include both the relevant month and year-to-date periods) must be submitted to Franchisor within 45 days of each month-end.  Additionally, franchisee is required on a periodic basis to provide to Franchisor financial statements prepared in accordance with U.S. Generally Accepted Accounting Principles or in accordance with the federal income tax basis of accounting.  All reporting requirements are more fully set forth in the mandatory provisions of the Business Systems Manuals.

11.4    <u>Franchisor's Audit Rights</u>.  Within 48 hours after receiving notice from Franchisor, Franchisee will make all of its financial records, books, ledgers, work papers, accounts, bank statements, tax returns, sales tax returns, and other financial information pertaining to the Store ("**Books and Records**") available to Franchisor at all reasonable times for review and audit by Franchisor or its designee.  The Books and Records for each fiscal year will be kept in a secure place by Franchisee and will be available for audit by Franchisor for at least five (5) years from the termination, expiration, or Transfer of this Agreement.  If an audit by Franchisor determines that the actual Gross Sales were understated by Franchisee by more than two percent (2%), then Franchisee will immediately pay to Franchisor any identified deficiency in Royalty Fees, Promotional Fees, or other amounts owed to Franchisor hereunder (plus interest as provided in <u>Section 5.7</u>), and will reimburse Franchisor for all costs and expenses incurred by Franchisor in connection with the audit (including salaries of Franchisor's employees or designees, travel costs, room and board, and audit fees).

11.5   <u>Tax Returns</u>.  Upon Franchisor's request, Franchisee will provide Franchisor with a true and complete copy of all federal, state, and local sales and income tax returns relating to the Store, and Franchisee hereby waives any privilege pertaining thereto.

11.6   <u>Accounting Forms</u>.  Franchisee will, at its own expense, use such bookkeeping and recording forms, sales slips, invoices, purchase order forms, reprints, and other miscellaneous operating forms in the operation of the Store as Franchisor may require from time to time.

11.7   <u>Delinquent Reports</u>.  If Franchisee fails to provide to Franchisor when due any sales, financial statement, or other reports that Franchisee is obligated to provide to Franchisor, and such failure continues for a period of ten (10) days past the due date, Franchisee will pay to Franchisor a late fee with respect to each such report in the amount of Twenty-Five Dollars ($25.00) per day beginning with the eleventh (11) day after the date due.  The imposition of late reporting fees will be in addition to, and not in lieu of, any other remedy available to Franchisor for failure to report.

ARTICLE 12
SERVICES PROVIDED BY FRANCHISOR

12.1   <u>Franchisor's Services</u>. Consistent with Franchisor's uniformity requirements and quality standards, Franchisor or its authorized representative may, at its sole cost and expense:

(A)   provide Franchisee with a written schedule of all furniture, fixtures, supplies and equipment necessary and required for the operation of the Store, and, upon Franchisee's request, provide Franchisee with recommendations regarding obtaining products, securing vendors, and establishing purchasing, selling, and pricing strategies (Franchisor may, from time to time, make suggestions to Franchisee with regard to pricing policies.  Although Franchisee generally has the right to establish prices for the products and services it sells, Franchisor reserves the right to establish and enforce prices, both minimum and maximum, to the extent permitted by applicable law.);

(B)   inspect the Store, from time to time as Franchisor determines, at any time during hours that the Store is required to be open for the purpose of determining whether the Store is being operated in conformity with this Agreement and the mandatory provisions of the Business Systems Manuals.  Franchisor also reserves the right to hire independent professional shoppers to provide an evaluation of the Store operations.  Upon notice from Franchisor, Franchisee will immediately take such steps as may be necessary to correct deficiencies detected during any such inspections, including, without limitation, immediately desisting from the further use of any equipment, advertising materials, products, supplies, or methods and services that do not conform to Franchisor's then-current standards and specifications.  If Franchisee fails to operate the Store in conformity with this Agreement and the mandatory provisions of the Business Systems Manuals and fails to promptly remedy any non-compliance after being advised of the same by Franchisor, Franchisor will have the right to terminate this Agreement without providing any further right to cure such non-compliance.  In addition, Franchisee will reimburse Franchisor for any expenses incurred by Franchisor to fix, correct, or remedy any deficiencies found in Franchisee's operations;

(C)    upon Franchisee's request, assist Franchisee in preparing or otherwise developing Franchisee's own advertising programs;

(D)    render advisory services from time to time pertaining to the operation of the Store; and

(E)    provide Franchisee with access to the Business Systems Manuals, either electronically, on the Circle K franchise extranet or in hard copy format, as determined by Franchisor.

12.2    <u>Third-Party Management Firm</u>. Franchisor will select a third-party management firm to assist Franchisee with the development and construction of the Store. The services provided by this third-party management firm will vary depending on the construction and equipment needed to construct or convert the Store to the Business Systems' standards and requirements.

# ARTICLE 13
# INSURANCE

13.1    <u>General Liability</u>. Franchisee will procure and maintain in full force and effect, at its sole cost and expense, Commercial General Liability coverage insuring Franchisee from and against any and all loss, liability, claim or expense of any kind whatsoever associated with the operation, condition, use, business or occupancy of the Store. The Commercial General Liability policy will cover bodily injury, personal injury, property damage, contractual liability, products liability, premises liability, advertising liability and completed operations. This coverage will include the surrounding premises or area, the parking area, and the sidewalks of the Franchised Location. Minimum limits for these coverages will be One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate.

13.2    <u>Business Automobile</u>. Franchisee will procure and maintain in full force and effect, at its sole cost and expense, comprehensive automobile liability coverage insuring Franchisee from and against any and all loss, liability, claim or expense resulting from the use, operation or maintenance of any automobile or motor vehicle owned, non-owned or leased by Franchisee or used by Franchisee or any of its employees or agents in connection with the Franchised Business. Minimum limits for these coverages will be One Million Dollars ($1,000,000) for bodily injury and property damage, including personal injury, per occurrence.

13.3    <u>Umbrella or Excess</u>. Franchisee will procure and maintain in full force and effect, at its sole cost and expense, Umbrella or Excess Insurance of at least One Million Dollars ($1,000,000).

13.4    <u>Commercial Property</u>. Franchisee will, where appropriate, also maintain "all risk", full replacement cost coverage for buildings (if applicable), machinery and equipment, including boiler coverage (if applicable), fixtures, furnishings, inventory, including spoilage and contamination, signs, and property of others in the care, custody, and control of Franchisee. Business interruption insurance for a minimum of six (6) months and extra expense coverage must also be included.

13.5   Liquor Liability.   If Franchisee sells any alcoholic beverages, Franchisee will procure and maintain in full force and effect, at its sole cost and expense, Liquor Liability Insurance Coverage insuring Franchisee from and against any and all loss, liability, claim or expense of any kind whatsoever associated with the sale or distribution of any alcoholic beverages. The minimum limit for this coverage will be at least One Million Dollars ($1,000,000) per occurrence with an aggregate of Two Million Dollars ($2,000,000).

13.6   Insurance Required By Law.   Franchisee will, at its sole cost and expense, procure and pay for all other insurance required by state or federal law, including workers' compensation insurance (whether or not workers' compensation insurance is required by the state in which the Store is located) with Employers Liability limits of at least Five Hundred Thousand Dollars ($500,000).

13.7   Other Insurance.   Franchisee will, at its sole cost and expense, also procure and maintain all insurance required under the Lease and any mortgage, deed of trust, contract for deed or any other contract in connection with the Franchised Location or the Store.  Without in any way limiting the obligation of Franchisee to indemnify Franchisor as specified herein or to provide insurance with respect to operations performed pursuant to this Agreement, as further specified above, if the Franchised Location also stores and sells motor fuel, and if State funded and managed leaking Underground Storage Tank Funds for remediation expenses are not available to Franchisee or to Franchisor or its Affiliates, Franchisor may, at its option, upon sixty (60) days' notice to Franchisee, require Franchisee to obtain Environmental Pollution Liability Insurance and/or Environmental Impairment Liability Insurance which specifically covers, but is not limited to, leaks occurring from the underground tanks and piping system, whether they are sudden or gradual, with coverage extending to any and all expenses of clean-up or recovery including excavation of contaminated soil of not less than Five Hundred Thousand Dollars ($500,000) combined single limit of liability.

13.8   Minimum Requirements.   Franchisee acknowledges that the foregoing are minimum requested insurance requirements, and Franchisor in no way suggests or represents itself as a professional insurance advisor.

13.9   Additional Insured.   The insurance policies required above, except for Workers' Compensation and Employer's Liability Insurance, shall name Franchisor and its Affiliates, and their respective agents, assigns, employees, directors and officers as additional insureds.

Additional insured status shall include, without limitation, coverage for ongoing and completed operations.  The additional insured endorsement form shall be ISO CG 20-26 or any other form that provides comparable coverage and is approved in writing by Franchisor. Additional insured coverage shall not be limited to vicarious liability and shall extend to (and there shall be no endorsement limiting coverage for) the negligent acts, errors or omissions of Franchisor or other additional insureds.  Franchisee shall maintain such additional insured status for Franchisor and the other additional insureds on its insurance policies continuously during the Term.

13.10   Certificate of Insurance.  Franchisee shall provide a certificate of insurance prior to the Open Date and throughout the Term (upon Franchisor's request and upon each renewal of an

insurance policy) demonstrating compliance with the requirements of this Article 13. Franchisor's failure to demand delivery of a certificate shall not be a waiver by Franchisor of Franchisee's obligation to furnish either a complying certificate or the required insurance coverage. Franchisee shall forward Certificate(s) of Insurance to:

> TMC Franchise Corporation
> Contracts Administration, DC - 7
> 1130 West Warner Road
> Tempe, AZ 85284
> Fax: 602-307-3046

13.11   Subcontractors.  Franchisee shall ensure that all vendors hired to help Franchisee fulfill its obligations under this Agreement have adequate insurance. Franchisee shall be responsible for the actions or inactions of all vendors. The term "**vendors**" shall mean and include any individual or entity hired by Franchisee to assist Franchisee to perform any of Franchisee's duties under this Agreement.

13.12   Waiver of Subrogation. The Workers' Compensation and Employer's Liability insurance policy shall include a waiver of subrogation in favor of Franchisor.

13.13   Cross Liability. All insurance policies required shall include a cross-liability and severability of interest clauses applicable to Franchisor, providing coverage for claims by one insured against another insured and coverage to one insured regardless of the actions of the other insureds.

13.14   Primary Coverage.  All insurance policies shall include a clause expressly providing that such policies are primary insurance and not excess over or contributory with any other valid, existing or applicable insurance carried by Franchisor, its Affiliates, agents, employees, directors and officers.

13.15   Policy Cancellation.  Franchisee's insurance shall provide for thirty (30) days' written notice to all named and additional insureds of any cancellation or material change to the insurance contracts.

13.16   Policy Rating.  Franchisee shall obtain required insurance policies from insurers that are acceptable to Franchisor, which shall include only those insurers licensed (admitted) in the state or states within which this Agreement is to be performed, and with an A.M. Best Rating of A- VIII or better.

13.17   Financial Responsibility.  Franchisee shall be responsible for all deductibles under the required policies of insurance. Franchisor may permit self-insurance by prior written approval. Franchisor shall have the exclusive right to accept or deny Franchisee's request to self-insure.

13.18   Obligations. The insurance required by this Agreement shall not limit or restrict Franchisee's defense and indemnity obligations to Franchisor. Conversely, the insurance requirements of this Agreement shall not be limited or restricted by any legal limitation on the obligations of Franchisee to indemnify Franchisor. Franchisee's obligation to obtain and maintain

the foregoing policies in the amounts specified shall not be limited in any way by reason of any insurance that may be maintained by Franchisor.

## ARTICLE 14
## DEFAULT; TERMINATION RIGHTS

14.1    <u>Franchisor's Immediate Termination Right Without Notice</u>.  This Agreement will automatically terminate, without notice, and without Franchisee being afforded an opportunity to cure, if: (a) Franchisee, any Guarantor, or any of their Affiliates makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents or acquiesces in the appointment of a trustee or receiver for Franchisee, such Guarantor, Affiliate or the Store, (b) proceedings are commenced to have Franchisee or any such other person or entity adjudicated bankrupt or to seek a reorganization of any such person or entity under any state or federal bankruptcy or insolvency law and such proceedings are not dismissed within sixty (60) days, or (c) a trustee or receiver is appointed for Franchisee, or any such other person or entity, or the Store, without such person or entity's consent and the appointment is not vacated within sixty (60) days.

14.2    <u>Franchisor's Immediate Termination Rights With Notice</u>.  Franchisee will be in a material breach of this Agreement, and Franchisor may, at its option, terminate this Agreement and all rights granted to Franchisee hereunder at any time during the Term without prejudice to Franchisor's enforcement of any other legal right or remedy, immediately upon giving written notice of such termination and the reason(s) therefor, and without providing Franchisee an opportunity to cure, effective immediately upon Franchisee's receipt of the notice of termination, upon the occurrence of any of the following events:

(A)    <u>Franchisee's Failure to Meet Initial Qualifications</u>. If Franchisor determines that: (i) any financial, personal or other information provided by Franchisee to Franchisor is materially false, misleading, incomplete or inaccurate; or (ii) Franchisee lacks the requisite business experience or is otherwise determined to be incapable of properly managing the Store.

(B)    <u>Abandonment</u>.  Franchisee fails to keep the Franchised Location open for business during the hours set forth in <u>Section 8.3(B)</u> for a continuous period of three (3) or more consecutive days (or for any shorter period after which it is not unreasonable for Franchisor to conclude that Franchisee does not intend to continue the operation of the Franchised Location) unless the Franchised Location is closed by reason of an event beyond the control of Franchisee and not caused directly or indirectly by Franchisee's negligence, willful misconduct, or financial inability, or unless Franchisor has consented in writing to said closing.

(C)    <u>Misconduct</u>.  Franchisee makes any material misrepresentation in this Agreement or in any documents, interviews, or business discussions relating to Franchisee's acquisition of the Store, or Franchisee engages in conduct that reflects materially and unfavorably upon the reputation of the Business System.

(D)    <u>Operations</u>.  Franchisee materially defaults under this Agreement or commits breaches under this Agreement on three (3) or more occasions in any eighteen (18) month

period, regardless of whether such defaults or breaches are cured, or if Franchisee fails to materially operate the Store in accordance with the mandatory provisions of the Business Systems Manuals and fails to promptly conform to the standards specified therein.

(E)     Seizure.  The Store, the Franchised Location, this Agreement, or any assets relating to the Store are seized, taken over, or foreclosed by a government official in the exercise of his duties, or by a creditor, lien holder, or lessor, provided a final judgment against Franchisee remains unsatisfied for thirty (30) days (unless a bond has been filed), or if a levy of execution or other judicial seizure is made on any such property and is not discharged within five (5) days.

(F)     Criminal Acts.  If Franchisee or any Affiliate of Franchisee is convicted of or pleads nolo contendere to a felony, any crime involving moral turpitude, or other misconduct relevant to the operation of the Store or injurious to the reputation of the Business System.

(G)     Expiration or Termination of the Lease/Sublease.  If the Lease (or any underlying lease related to the Franchised Location) is cancelled, expires or is terminated and not renewed.

(H)     Violation of Law.  Franchisee permits a violation of any law, ordinance, rule, or regulation of a governmental agency to continue for more than ten (10) days, in the absence of a good faith dispute over its application or legality and without promptly resorting to an appropriate administrative or judicial forum for relief therefrom.

(I)     Misuse of Marks.  Franchisee misuses or makes any unauthorized use of the Marks or any other identifying characteristic of the Business System, or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein.

(J)     Understatement of Gross Sales; False Reports.  Franchisee intentionally understates Gross Sales by two percent (2%) or more in any sales report or if Franchisee falsely reports information required to be reported to Franchisor.

(K)     Unauthorized Transfer.  Franchisee purports to transfer any rights or obligations arising under this Agreement to any third party without Franchisor's prior written consent and in compliance with the terms hereof, including, but not limited to, any unapproved transfer by operation of law.

(L)     Construction/Opening.  Franchisee fails to construct and open the Store in accordance with Section 2.1 and Article 7.

(M)     Termination of Another Agreement with Franchisor or Its Affiliate. Another agreement between Franchisee (or its Affiliate) and Franchisor (or its Affiliate) is terminated due to Franchisee's (or its Affiliate's) default under such agreement.

14.3     Other Conditions of Breach.  In addition to the other rights of termination contained in this Agreement, Franchisee will be in material breach of this Agreement for any failure to comply substantially with any of the terms or conditions of this Agreement, or to carry out the terms and conditions of this Agreement in good faith.  Such material breaches will include, but are not limited to, the occurrence of any of the following events:

(A)    <u>Non-Payment of Fees</u>.  If Franchisee fails, refuses, or neglects to promptly pay when due any monies owing to Franchisor or any of its Affiliates, or if Franchisee fails to satisfy any third-party obligations with respect to the operation of the Store, Franchisee must remit such monies to Franchisor or satisfy such third-party obligations, as the case may be, within five (5) days after receiving notice from Franchisor of the same.

(B)    <u>Reports and Financial Statements</u>.  If Franchisee fails to submit any Store report or any financial statement required by Franchisor when due or upon a request therefor from Franchisor.

(C)    <u>Breach of Other Agreements</u>.  If Franchisee fails to comply with the terms of this Agreement or any other related agreement with Franchisor or any Affiliate for the Franchised Location, including without limitation, any financing agreements or the Software Agreement.

(D)    <u>Required Training</u>.  If Franchisee or Franchisee's Store Manager fails to successfully complete any required training programs to the satisfaction of Franchisor.

(E)    <u>Operations</u>.    If Franchisee fails to maintain or operate the Store in accordance with the specifications contained in the mandatory provisions of the Business Systems Manuals, or in a clean, orderly, and safe manner.

(F)    <u>Lapse of Insurance</u>.  Any required insurance coverage of the Store lapses for a period of more than five (5) days for any reason.  In any such case, Franchisor shall have the right to obtain the types and amounts of insurance coverage specified in <u>Article 13</u> hereof and charge the cost and expense for any such premiums to Franchisee's account.

(G)    <u>Failure to Obtain Permits or Licenses</u>.    Franchisee fails to obtain any necessary permits or licenses required for the operation of the Store, including but not limited to, the sale of liquor or tobacco, or such permits or licenses are suspended or canceled.

(H)    <u>Sale of Tobacco or Alcohol to Minors</u>.  The Store violates the youth access laws with respect to the sale of tobacco and/or alcohol to underage persons or Franchisee fails to notify Franchisor within five (5) days, in writing, of any notices of violation received from local, state, or federal authorities concerning the sale of tobacco and/or alcohol to minors.

(I)    <u>Operation of Additional Business without Approval</u>.  Franchisee opens and operates an Additional Business without Franchisor's prior approval in violation of Section 5.3.

14.4   <u>Notice of Breach; Cure Period</u>. Unless a different cure period is specifically provided in <u>Section 14.3</u>, Franchisor will not have the right to terminate this Agreement under <u>Section 14.3</u> *unless and until* Franchisee has failed to cure the alleged breach within thirty (30) days after receipt of a written notice of default from Franchisor (or during such other lesser period of time as Franchisor may require under the circumstances), subject to <u>Section 14.5</u>.  If any such default is not cured within the prescribed cure period, Franchisor will have the right to terminate this Agreement and all rights granted herein.

14.5    <u>Extended Cure Period</u>.  If Franchisee breaches any provision of this Agreement which permits a cure period, but the default by its nature cannot reasonably be cured within the time allotted for cure, Franchisee will be entitled to such additional time to cure the alleged breach as Franchisor deems reasonable.  Franchisee will not be entitled to an extension as provided in this <u>Section 14.5</u> if the default or delay is caused, directly or indirectly, by Franchisee's financial inability, negligence or willful misconduct.  In addition, if any law applicable to this Agreement requires additional notice or a longer notice period than specified herein, this Agreement will be deemed to be automatically amended to conform to the requirements of such law.

14.6    <u>Cross-Default with Related Agreements</u>.  At Franchisor's election, any default by Franchisee under this Agreement may simultaneously constitute a default by Franchisee of each and every other related agreement with Franchisor or any Affiliate for the Franchised Location, including, but not limited to any financing agreements, motor fuel agreement, branding agreement and the Software Agreement, regardless of whether such other agreements may in fact be properly and fully performed by Franchisee.  Further, at Franchisor's election, any default by Franchisee in any other agreement between Franchisee and Franchisor may simultaneously constitute a default by Franchisee under this Agreement notwithstanding that at such time Franchisee may be fully and promptly performing its obligations hereunder.

14.7    <u>Rights and Obligations upon Expiration or Termination</u>.  Upon expiration or termination of this Agreement for any reason, Franchisee will:

(A)    within five (5) days, pay all Royalty Fees, Promotional Fees, and any other amounts owed to Franchisor, suppliers, or vendors, including the outstanding principal amounts and accrued interest on any notes or evidences of indebtedness of Franchisee payable to Franchisor or any Affiliates.  The payment to Franchisor of all amounts owing will be accelerated on all debt obligations which had been the subject of payment schedules even if payment was then being made promptly according to the agreed schedule.  Franchisee hereby grants to Franchisor a lien and security interest against any and all personal property, equipment, and fixtures owned by Franchisee and used in connection with the Store as security for the payment of such obligations;

(B)    immediately pay, as fair and reasonable liquidated damages ("**Liquidated Damages**"), an amount equal to (i) the lesser of (x) 48 or (y) the remaining number of months under the Term, *multiplied by* (ii) the average monthly Royalty Fee payments (calculated in accordance with <u>Section 5.2</u>) payable by Franchisee hereunder for the 12 months preceding the termination (during which time the Franchisee was in Good Standing under this Agreement), or for a shorter period commencing with the Effective Date of this Agreement if this Agreement is terminated in the first 12 months of the Term.  If the Store has never been opened and therefore has no history of Royalty Fee payments, the Liquidated Damages will be calculated based on the average monthly Gross Sales of all Circle K franchisees located in the state where the Franchised Location is located for the 12 month period immediately preceding the termination.  If there are no Circle K franchisees located in such state, the calculation will be based on the average monthly Gross Sales of all Circle K franchisees located in the United States.  Franchisor and Franchisee acknowledge and agree that the termination of this Agreement will result in Franchisor incurring damages based on lost revenues from Royalty Fees and other amounts payable by Franchisee and the potential loss of goodwill if the Franchised Location is no longer a Circle K Store, and that it will be difficult to calculate with certainty the amount of damages Franchisor will incur.  The

provisions of this <u>Section 14.7(B)</u> do not apply if the Agreement expires at the end of its initial Term or is terminated due to (i) Franchisee's (or if Franchisee is an entity, Principal Equity Holder's) death; (ii) Franchisee's (or if Franchisee is an entity, Principal Equity Holder's) incapacity for at least 90 consecutive days, in either case which event results in Franchisee's (or if Franchisee is an entity, Principal Equity Holder's) inability to personally operate the Store; (iii) condemnation or other taking, in whole or in part, of the Franchised Location due to eminent domain; (iv) destruction of all or a substantial part of the Franchised Location through no fault of Franchisee; or (v) a determination made by Franchisor in good faith and in the normal course of business to withdraw from marketing in the geographical area in which the Store is located. Notwithstanding the foregoing, if a court determines that the payment under this <u>Section 14.7(B)</u> is unenforceable, then Franchisor may pursue all other available remedies, including consequential damages to the extent proved;

(C)     immediately discontinue all use of the Marks and the Business System. Franchisee will cease displaying and using, and will return to Franchisor, all copies of the Business Systems Manuals, other Confidential Information, all signs, stationery, letterheads, forms, printed matter, electronically stored data, advertising, and other materials required to be returned in accordance with this Agreement, and will cease using the Marks and any name, logo, slogans, or symbols or other designations that may mislead or confuse the public or suggest association between Franchisee and Franchisor or the Business System.  Franchisee will not thereafter operate, advertise, or do business under any name or in any manner in violation of this <u>Section 14.7</u>. Franchisee will promptly make reasonable modifications to the exterior and interior of the Franchised Location to eliminate Franchisee's former identification as a franchisee of Franchisor, including, but not limited to, removing all signs that contain the Marks; provided, however that Franchisor may waive (partially or entirely) this requirement if Franchisor is exercising its rights under <u>Section 14.7(D)</u>.  Subject to <u>Section 14.7(D)</u>, if Franchisee fails to debrand the interior or exterior of the Franchised Location to Franchisor's satisfaction, Franchisor may hire a third party to complete the debrand of the Franchised Location and Franchisor will charge Franchisee for all costs associated with the debranding process.  Franchisee will promptly execute and file an assignment of its fictitious business name and any other similar filings and take such additional actions as may be necessary to abandon use of any fictitious business name containing any of the Marks.  At Franchisor's request, Franchisee will assign to Franchisor or its nominee all telephone numbers and listings used in the Store.  Franchisee will, immediately upon Franchisor's request so that Franchisor may protect its interest in the Marks and the Confidential Information, permit Franchisor or its designees to access the Franchised Location to remove the signage owned by Franchisor and any other signage or materials containing the Marks and otherwise to secure Franchisee's compliance with this <u>Section 14.7</u>.  If Franchisee continues to operate a convenience store business at the Franchised Location after the termination of this Agreement, Franchisee will prominently display a notice to the public on the premises for a period of not less than six (6) months after termination indicating that it is no longer a Circle K franchisee or an authorized franchisee under the Business System;

(D)     if Franchisor exercises (in its sole discretion) its purchase right under <u>Section 16.1</u> or if Franchisor is the lessor under the Lease, then, upon request by Franchisor, peaceably surrender possession, occupancy, control and use of the Franchised Location to Franchisor or its designee.  Franchisee will, at the request of Franchisor, promptly execute assignments or other transfer documentation in the form requested by Franchisor to perfect the

transfer to Franchisor or its designee of Franchisee's interest in or to the right to use and occupy the Franchised Location.  The assumption of possession, occupancy and control of the Franchised Location by Franchisor (or its designee) will not relieve Franchisee of any outstanding unpaid obligations that may have accrued prior to the time of assumption of control by Franchisor (or its designee); all such obligations will remain the obligations of Franchisee.  If Franchisor elects not to assume possession and control of the Franchised Location, Franchisee will, at Franchisee's expense, make such modifications or alterations thereto immediately upon termination or expiration of this Agreement as Franchisor may demand to prevent the operation of any business therein being confused by the public with a business affiliated with Franchisor for any purpose and will otherwise comply with its obligations under this <u>Section 14.7</u>, including without limitation <u>Section 14.7(C)</u>.  If Franchisee owns or leases the Franchised Location from someone other than the Franchisor or its Affiliates, this provision does not apply;

      (E)    for a period of twelve months subsequent to expiration or termination of this Agreement, Franchisee will be subject to the provisions of <u>Article 10</u>;

      (F)    reimburse Franchisor (i) the entire amount of the Equipment/Construction Funding, if the termination occurs during the first thirty-six (36) months of the Term, or (ii) if the termination occurs after the first thirty-six (36) months of the Term, the entire amount of the Equipment/Construction Funding, less $1/120^{th}$ of such amount for each full month the Store was open and operating in full compliance with the terms of this Agreement, including, but not limited to the timely and full payment of all applicable Royalty Fees and Promotional Fees; and

      (G)    not remove from the Franchised Location any inventory, equipment or software that is the subject of the Software Agreement or any franchise or license agreement or security agreement with Franchisor or any other party for so long as there remain obligations of Franchisee to Franchisor. Franchisee will give Franchisor and its designated representatives full access to the Franchised Location and all of Franchisee's books and records at any time during customary business hours to conduct any inventory counts and determine the value of the assets. The inventory of good and saleable merchandise will be valued at cost in accordance with the retail inventory accounting method then used by Franchisor.  The value of any good and salable equipment owned by Franchisee will in no event exceed the lesser of (i) fair market value or (ii) book value of equipment on the date of expiration or termination of this Agreement.  No value will be assigned to unsaleable merchandise and equipment, and Franchisor may direct Franchisee to remove such items from the Franchised Location.  The value of such saleable inventory and equipment may, in Franchisor's sole discretion and to the extent that it does not infringe upon the security rights of others, be credited to any outstanding obligations of Franchisee to Franchisor and its ownership will be transferred to Franchisor if so credited.  If the value of the unencumbered saleable inventory and equipment exceeds the amount owed by Franchisee to Franchisor on the date of expiration or termination of this Agreement, Franchisor may select that inventory and equipment the value of which it wishes to apply to the outstanding debt of Franchisee to Franchisor and return the balance of unencumbered inventory and equipment to Franchisee and Franchisee may dispose of such inventory and equipment, subject to compliance with the other terms of this <u>Section 14.7</u>.

    14.8    <u>Interim Period</u>.  If this Agreement expires without Franchisee properly exercising its renewal right and Franchisee continues to accept the benefits of this Agreement thereafter, then,

at Franchisor's option, Franchisor may treat this Agreement either as: (i) expired as of the date of expiration, with Franchisee then illegally operating a franchise in violation of Franchisor's rights and this Agreement; or (ii) continued on a month-to-month basis (the "**Interim Period**") until both parties agree to enter into Franchisor's then-current form of franchise agreement for a renewal term or until one party provides the other with written notice of termination, in which case the Interim Period will terminate 30 days after receipt of the notice of termination.  In the latter case, all of Franchisee's obligations shall remain in full force and effect during the Interim Period as if this Agreement had not expired.  All obligations and restrictions imposed on Franchisee upon expiration of this Agreement shall take effect upon termination of the Interim Period.

ARTICLE 15
TRANSFER

15.1    Transfer by Franchisor.  Franchisor may transfer, assign, pledge, and/or delegate any or all of its interests, rights, and/or obligations under this Agreement, in whole or in part, directly or indirectly, by the transfer of the assets, stock, merger, acquisition, or otherwise, without notice to or the consent of Franchisee.

15.2    Transfer by Franchisee.  This Agreement is entered into by Franchisor in reliance upon and in consideration of the singular personal skills, qualifications, and representations of, and the trust and confidence reposed in, Franchisee, the Store Manager, and Franchisee's officers, directors, Principal Equity Holders, members, and partners, as the case may be.  Accordingly, except as otherwise provided in this Article 15, Franchisee may not pledge, sell, assign, trade, transfer, lease, sublease or otherwise dispose of (collectively, "**Transfer**") any part of, right to, or interest in (A) the Franchised Location; (B) the Store, the Store's land or building; (C) the furniture, fixtures, or equipment used in the Store (except for transactions involving the sale of merchandize in the ordinary course of business); (D) this Agreement; or (E) the Franchised Business (hereinafter clauses (A) through (E) either collectively or individually referred to as the "**Business Assets**") or any corporate, partnership, limited liability company or other ownership interest in Franchisee (collectively, "**Ownership Interest**" and together with the Business Assets, collectively or individually, a "**Franchisee Interest**") without, in each case, the prior written consent of Franchisor, whose consent will not be unreasonably withheld or delayed, and compliance with the terms of this Agreement.  Under no condition may Franchisee sublicense its rights hereunder.  Except as allowed herein, any purported Transfer in violation of this Agreement, whether by operation of law or otherwise, will be null and void and will constitute a material breach of this Agreement, for which breach Franchisor may immediately terminate this Agreement in accordance with Section 14.2(J). Consent to a Transfer upon specified terms and conditions will not be deemed consent to a Transfer upon any other terms or conditions, nor to any other or subsequent Transfer. Such consent will be conditioned upon Franchisee being in Good Standing and having complied with the following conditions:

(A)    Compliance with Law.  The Transfer will have been conducted in compliance with all applicable laws, and the proposed transferee will have secured all governmental permits and licenses required to operate the Store.

(B)    Qualified Assignee.  Franchisee and the proposed transferee will have demonstrated to Franchisor's reasonable satisfaction that the proposed transferee, and if

DocuSign Envelope ID: 2F8B550134EEA-4873-05AB-238B24B12D0B

applicable, the person designated to be the transferee's Store Manager, and the directors, officers, and principal shareholders and partners of the transferee, as the case may be, meet all of Franchisor's then-current qualifications for new franchisees, possess the requisite business experience, including, without limitation, management and sales abilities, and possess the financial resources to fulfill all obligations under the franchise agreement to be executed by the transferee and Franchisor with respect to the Store.

(C)     Execution of Franchise Agreement.  The proposed transferee will have executed Franchisor's then-current form of franchise agreement and all required related agreements and documentation, which may contain terms and conditions materially different from the terms and conditions hereof, including, without limitation, with respect to the Royalty Fee and Promotional Fee rates, territorial protection, and other material provisions.  If the proposed transferee elects not to execute Franchisor's then-current form of franchise agreement, Franchisor has the right to deny the consent of such Transfer.

(D)     Other Obligations.  The proposed transferee will have expressly assumed in writing all of the obligations of Franchisee and executed all agreements with Franchisor or its Affiliates as required of Franchisee, appointed a Store Manager, assumed all other agreements pertaining to the Store (and all third parties to such agreements will have consented in writing to such assumptions), complied with all applicable provisions of this Agreement, and will have executed the Guaranty attached hereto.

(E)     Training.   The proposed transferee and its Store Manager will have successfully completed the Training Program.

(F)     Transfer Fee.  Prior to the proposed transferee attending training, Franchisee or proposed transferee will have paid to Franchisor a nonrefundable transfer fee in an amount equal to the initial franchise fee payable under the then-current form of franchise agreement. A minimum transfer fee of $1,000 may apply to the following circumstances: (1) the Transfer is to the spouse or adult child of Franchisee (if Franchisee is an individual); (2) the Transfer is to a corporation (or other entity) in which Franchisee is the principal shareholder/owner retaining a majority ownership interest and Franchisee remains the officer or manager responsible for the full-time personal operation and supervision of the Store; (3) the Transfer is a transfer of any ownership interest of a partner, shareholder or other owner to another existing partner, shareholder or other owner; provided the majority partner, shareholder or other owner of Franchisee remains the same; or (4) only the name of Franchisee is changed (if Franchisee is a corporation or other entity).

(G)     Right of First Refusal.  Franchisee will have first offered to sell the Franchisee Interest to Franchisor in accordance with Article 16 and Franchisor will have waived its right to purchase.

(H)     Upgrading.  Franchisee will have agreed to perform specified upgrading and/or renovation of the Franchised Location and the Store to conform to the current standards and image then required by Franchisor of its new franchisees.  All such upgrades and renovations shall be completed within 180 days of the Transfer.

(I)  <u>Releases and Subordination</u>.  Franchisee and Guarantors will have executed a release of all claims related to this Agreement, in a form acceptable to Franchisor, and Franchisee will have subordinated its rights to all payments from the transferee to all obligations of the transferee to Franchisor.

(J)  <u>Agreements</u>.  Upon Franchisor's request, Franchisee will have provided Franchisor with a complete copy of all agreements and related documentation between Franchisee and the transferee relating to the Transfer.

(K)  <u>Landlord Consent</u>.  The proposed transferee must have been accepted by the landlord in writing as a substitute tenant for the Franchised Location.  Franchisor may refuse to consent to a Transfer if the proposed transferee is not acceptable to the landlord.  If Franchisor is the landlord, or sublessor, for the Franchised Location, it has the right to withhold its consent as a landlord in its sole discretion.

(L)  <u>Payment of Outstanding Loans, Equipment/Construction Funding, and Fees</u>. Franchisee must have repaid the remaining balance on any loan or the unamortized portion of the Equipment/Construction Funding provided to Franchisee.  At the time of seeking Franchisor's consent to a Transfer hereunder, Franchisee must be current on all monthly fee payments due to Franchisor and its Affiliates.

15.3  <u>Change of Ownership</u>.  If Franchisee is a corporation, limited liability company, partnership or other entity, then during the Term, Franchisee must notify Franchisor of any Transfer of any Ownership Interest in Franchisee, including, without limitation, any assignment of the legal, beneficial, or voting rights therein, which notice shall include the terms and conditions of such proposed Transfer.  Any such Transfer which together with all prior Transfers of Ownership Interests constitutes an assignment of fifty percent (50%) or more of the Ownership Interests in Franchisee since the Effective Date, and any other action, either directly or indirectly, which results in a change in the effective control of Franchisee by those persons having effective voting control of Franchisee as of the Effective Date, will constitute a Transfer of Ownership Interest subject to the conditions of <u>Section 15.2</u> and subject to the provisions of <u>Section 16.2</u>.

15.4  <u>Death or Incapacity</u>.  In the event of the death or permanent incapacity of an individual Franchisee, or of any Principal Equity Holder owning a fifty percent (50%) or greater ownership interest in Franchisee, such person's executor, administrator, personal representative, successor, trustee, or heir (the "**Successor**") may seek Franchisor's approval to succeed to the Franchisee Interest owned by such deceased or incapacitated individual in accordance with the provisions of such person's will or any corporate or partnership buy-sell agreement controlling the issue of succession on death of an owner. If, within thirty (30) days of such death or incapacity, a Successor fails to obtain Franchisor's approval of the Transfer of such Franchisee Interest to such a Successor, the Successor must, within six (6) months from the date of notice of Franchisor's disapproval, Transfer such Franchisee Interest to a transferee acceptable to Franchisor, in compliance with the other provisions of this <u>Article 15</u>.  For avoidance of doubt, any such Transfer will constitute a Transfer subject to the conditions of <u>Section 15.2</u>.  If such a Transfer is not concluded within the required time period, Franchisor may terminate this Agreement for breach.

15.5 <u>Divorce/Dissolution</u>. If Franchisee is an individual, in the event of divorce or dissolution of marriage of Franchisee, any award by court decree or court-approved property settlement agreement of a Franchisee Interest to the ex-spouse of Franchisee will be considered a Transfer requiring compliance with the provisions of this <u>Article 15</u>, including, without limitation, compliance by Franchisee and the ex-spouse/transferee with <u>Section 15.2</u>, except that such ex-spouse/ transferee will not be required to pay a Transfer Fee. If, in Franchisor's judgment, such ex-spouse/ transferee is not qualified to operate the Store or otherwise assume the Franchisee Interest, such ex-spouse/ transferee will have a period of six (6) months within which to sell the Franchisee Interest to a transferee acceptable to Franchisor, subject to the requirements of this <u>Article 15</u>. If such a Transfer is not concluded within the required time period, Franchisor may terminate this Agreement for breach.

ARTICLE 16
FRANCHISOR'S OPTION TO PURCHASE ASSETS

16.1 <u>Franchisor's Right to Purchase Business Assets</u>. During the Term or upon expiration or termination of this Agreement, Franchisee will not Transfer any interest in or any part of the Business Assets to any party, including any Affiliates of Franchisee, without first offering the same to Franchisor in a written notice that contains all material terms and conditions of the proposed Transfer (hereinafter referred to as the "**Price and Terms**"). If the Business Assets are proposed to be Transferred in conjunction with other assets not related to the Business Assets, the written offer of the "Price and Terms" of the Business Assets must be separately identified to Franchisor. Subject to offset as provided in <u>Section 16.4</u> below, if Franchisor wishes to purchase any such Business Assets hereunder, the Business Assets will be sold to Franchisor free and clear of all liens or other encumbrances. The purchase price of any inventory will not be more than the value of such inventory based upon the retail inventory accounting method then used by Franchisor. This <u>Section 16.1</u> does not apply to the pledge of the Business Assets (with the exception of this Agreement) by Franchisee to a bank, other financial institution or other lender made in connection with the financing of the leasehold improvements, or acquisition of furniture, fixtures, supplies and equipment, and/or the real estate and building used in the Store.

16.2 <u>Transfer of Majority Interest in Franchisee</u>. Prior to any Transfer of Ownership Interests in Franchisee that would result in a change of ownership as described under <u>Section 15.3</u>, Franchisee will offer to Franchisor, in writing, each and all of the Business Assets; <u>provided</u>, <u>that</u>, unless otherwise agreed to in writing by Franchisor and Franchisee, the Price and Terms for the purchase of such Business Assets shall be established by a qualified appraiser selected by the parties. If the parties cannot agree upon an appraiser, an independent qualified appraiser shall be appointed by a Judge of the United States District Court for the District in which the Franchised Location is located upon petition of either party. For purposes of this provision, Franchisee's shareholders, members, partners or other owners must comply with all other applicable terms and conditions of this <u>Article 16</u> and <u>Article 15</u>. Further, nothing in this <u>Section 16.2</u> shall be construed as a limitation on Franchisee's obligations under <u>Article 15</u>, including <u>Section 15.3</u>.

Consistent with the terms of the preceding paragraph, all stock or other certificates of ownership issued by Franchisee evidencing ownership interest in Franchisee must bear the following legend:

"The ownership interests represented by this ownership certificate are subject to a written Franchise Agreement that grants TMC Franchise Corporation (the "Franchisor") a right of first refusal to purchase these ownership interests from the owner, and any person acquiring the ownership interests represented by this ownership certificate will be subject to the terms and conditions of the Franchise Agreement between the company named on the face of this certificate and Franchisor, which includes provisions containing covenants not to compete that apply to all owners."

16.3    <u>Notice of Purchase</u>.    The notice by Franchisee required under <u>Section 16.1</u>, specifying the Price and Terms of the proposed Transfer, shall also include all ancillary agreements for the Franchised Location and pertinent supplemental financial information necessary to evaluate the merits of the proposed Transfer, including, but not limited to, fuel volume, car wash sales and QSR sales.    Franchisor will notify Franchisee once Franchisor has received all of the required information.    Franchisor will have sixty (60) days from the date of such notice (or from the date of the notice required under <u>Section 15.3</u> in the case of a proposed Transfer of Ownership Interest) to either waive its right to purchase or express its interest in purchasing all or a portion of the Business Assets.    If Franchisor waives its right to purchase, then Franchisee may complete the Transfer of the relevant Business Assets, or Ownership Interests (as applicable), according to the Price and Terms set forth in the written notice to Franchisor (or the terms provided in the notice delivered under <u>Section 15.3</u>, as applicable); however, any such Transfer to a third party is expressly subject to the other terms and conditions set forth in <u>Article 15</u>.    If Franchisee does not consummate the Transfer of the Business Assets or Ownership Interests (as applicable) upon the Price and Terms, or in the case of Ownership Interests, on the terms provided in the notice delivered under <u>Section 15.3</u>, the offer must be made again to Franchisor as set forth in this <u>Article 16</u>.    Franchisee's obligations to comply with all of the terms and conditions of this Agreement, including, but not limited to, its obligations to pay the Royalty Fees and Promotional Fees, and to operate the business as a Circle K Store in compliance with the terms hereof, will in no way be affected or changed because of Franchisor's rejection of Franchisee's offer to purchase the Business Assets hereunder.

16.4    <u>Offsets</u>.    The purchase price payable by Franchisor to Franchisee under this <u>Article 16</u> will be reduced by (a) all amounts owed by Franchisee to Franchisor hereunder, (b) all amounts owed by Franchisee to Franchisor or any Affiliate of Franchisor under any other agreement, (c) Franchisee's unpaid balance of the purchase price with respect to any of the assets purchased by Franchisor hereunder, or if any such assets are subject to a lien, by the balance due on the underlying indebtedness, together with (d) any interest or other charges to be paid in order for Franchisor to acquire such assets free and clear of all liens.    If the amount due by Franchisee with respect to any asset exceeds its purchase price paid by Franchisor hereunder, Franchisee will remain solely liable for the difference.

ARTICLE 17
INDEMNIFICATION

17.1    <u>Indemnification</u>.    Except as otherwise expressly provided in this Agreement, and without limiting Franchisor's common law rights of indemnification, Franchisee assumes sole and

complete responsibility for and will, to the maximum extent permitted by law, defend, protect, indemnify, and hold harmless Franchisor, its Affiliates, and their respective directors, employees, officers, shareholders, managers, members, agents and successors and assigns (individually an "**Indemnified Party**" and collectively the "**Indemnified Parties**"), from and against any and all losses, costs, expenses, damages, and liability (including, without limitation, attorneys' fees and court costs) arising out of or relating to this Agreement, Franchisee's negligence, the operation or use of the Franchised Location or the Store, or the equipment or supplies used in connection therewith, and whether arising from bodily injury, personal injury, or property damage, or any other violation of the rights of others, or in any other manner, whether incurred for an Indemnified Party's primary defense or for enforcement of its indemnification rights hereunder, on account of any personal injury, disease, or death of any person(s), damage to or loss of any property, or money damages or specific performance owed to any third party (by contract or operation of law), and any fines, penalties, assessments, environmental response costs, or injunctive obligations imposed upon any of the Indemnified Parties caused by, arising out of, or in any way incidental to, or in connection with, Franchisee's performance hereunder, or the performance, acts, or omissions by any resale customer or consumer served by Franchisee (including employees, agents, contractors, and invitees of Franchisee and Franchisee's resale customers and consumers), or any other person.

17.2    <u>Risk Allocation</u>.  It is the intention of the parties hereto, in connection with an agreed allocation of risk between them, that the indemnity obligations of Franchisee are without regard to whether the negligence, fault, or strict liability of any of the Indemnified Parties is a concurrent or contributory factor, and such obligations are intended to protect the Indemnified Parties against the consequences of their own negligence, fault, or strict liability.  Only those matters which are determined by a final, nonappealable judgment to be a result of the sole negligence, intentional acts, or other legal fault of any of the Indemnified Parties or defects in Franchisor's products not caused or contributed to by the negligence or fault of Franchisee or Franchisee's employees, agents, contractors, invitees, customers, or consumers will be excluded from Franchisee's duty to indemnify the Indemnified Parties under such circumstances.  Such duty to defend and protect the Indemnified Parties will include, without limitation, investigation and costs of defense and settlement, including reasonable attorneys' fees up through final appeal of a trial court judgment or arbitration.

17.3    <u>Defense of Claims</u>.  Nothing herein will limit Franchisor's right to participate in its defense with counsel of its own choosing.  If Franchisor does so, Franchisee will instruct its counsel to cooperate fully with Franchisor and its counsel, including furnishing such information as Franchisor or its counsel may request.  Any costs incurred by Franchisor in defending any claims will be paid by Franchisee as provided in <u>Section 17.1</u>.

17.4    <u>Survival of Indemnity</u>.  Franchisee's indemnity obligations as provided in this <u>Article 17</u> will survive the expiration, termination, or nonrenewal of this Agreement and the License granted hereunder.

17.5    <u>Notification of Possible Indemnity Events</u>.  Franchisee will notify Franchisor of any event that is or may be subject to indemnity as provided herein, and which has resulted or may result in personal injury, death, disease, or destruction of property, by telephone within twenty-four (24) hours after such event and in writing within three (3) days after such event.

## ARTICLE 18
## DISPUTE RESOLUTION

18.1 <u>Negotiation; Mediation</u>. Except as expressly provided herein, the parties will attempt to settle disputes arising out of or relating to this Agreement, the parties' relationship or the Store or the Franchised Business by a meeting (either via phone conference, video conference, or in-person) of designated representatives of Franchisor and Franchisee within ten (10) days after a request by either party to the other party asking for the same. If the meeting is not held within the prescribed ten (10) day period, or such dispute is not fully resolved at this meeting, either party may initiate mediation of the dispute. The parties will designate a sole mediator, or if the parties are unable to agree upon a mediator within fourteen (14) days of initiating mediation, selection of the mediator will be governed by then-current CPR Mediation Rules under the Center for Public Resources Model Procedure for Mediation of Business Disputes. The mediation will take place within forty-five (45) days after a mediator is selected in Maricopa County, Arizona (or the county in which Franchisor's headquarters are located at the time mediation is demanded, if different). Each party will bear its own costs of mediation and share equally the mediator's fees.

18.2 <u>Arbitration</u>. If (a) not resolved by mediation within sixty (60) days of the selection of the mediator, or (b) at any time (including prior to initiating mediation or during mediation) a party believes that mediation would be futile (because of the other party's lack of cooperation), and except as qualified below, any dispute between Franchisor and Franchisee or their respective Affiliates arising under, out of, in connection with or in relation to this Agreement, the parties' relationship, the Store or the Franchised Business must be submitted to binding arbitration under the authority of the Federal Arbitration Act and in accordance with the Center for Public Resources Rules Non-Administered Arbitration of Business Disputes then in effect. Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claim or any other proceeding involving third parties. If a court determines that this limitation on joinder of or class action certification of claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The arbitration must take place in Maricopa County, Arizona (or the county in which Franchisor's headquarters are located at the time arbitration is demanded, if different). The arbitrator must follow the law and the terms of this Agreement. The arbitrator must have at least 5 years of significant experience in franchise law. A judgment may be entered upon the arbitration award by any state or federal court in the state where Franchisor maintains its headquarters or the state where the Store is located. The decision of the arbitrator will be final and binding on all parties to the dispute; however, the arbitrator may not under any circumstances: (1) stay the effectiveness of any pending termination of this Agreement; or (2) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance that Franchisor sets. All applicable statutes of limitations will be tolled while the procedures specified in this <u>Article 18</u> are pending. The parties will take such action, if any, as required to effectuate such tolling.

18.3 <u>Exception to Arbitration</u>. Notwithstanding <u>Section 18.2</u>, the parties agree that the following claims will <u>not</u> be subject to arbitration:

1. any action for declaratory or equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder.

2. any action in ejectment or for possession of any interest in real or personal property.

3. any action for the collection of moneys owed to Franchisor or its affiliates; and

4. any action related to the obligations of Franchisee upon termination or expiration of this Agreement, including, without limitation related to covenants not to compete and confidentiality obligations.

18.4   <u>Injunctive Relief</u>.  Franchisor will be entitled to seek the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to: (A) the Marks and the Business System; (B) the obligations of Franchisee upon termination or expiration of this Agreement; (C) the assignment of this Agreement, the Franchised Business, and ownership interests in Franchisee; (D) the covenants not to compete; (E) confidentiality; or (F) any act or omission by Franchisee, the Store or employees of the Store that (i) constitutes a violation of any applicable law, ordinance or regulation, (ii) is dishonest or misleading to customers or prospective customers of the Store or other Circle K Stores, (iii) constitutes a danger to employees or customers of the Store or to the public, or (iv) may impair the goodwill associated with the Marks and the Business System.  Franchisee will indemnify Franchisor for all costs that it incurs in any such proceedings including, without limitation, reasonable attorneys' fees, expert witness fees, costs of investigation, Court costs, accounting fees, travel and living expenses, and all other costs incurred by Franchisor.  Franchisor will be entitled to seek injunctive relief against Franchisee without the posting of any bond or security, unless required by applicable law.

18.5   <u>Cumulative Rights</u>.  The rights of Franchisor hereunder are cumulative and no exercise or enforcement by Franchisor of any right or remedy hereunder will preclude the exercise or enforcement by Franchisor of any other right or remedy hereunder or to which Franchisor is entitled by law to enforce.

18.6   <u>Venue and Jurisdiction</u>.  Unless otherwise prescribed by applicable law, and subject to the provisions of <u>Sections 18.1</u> and <u>18.2</u> regarding mediation and arbitration, all lawsuits, court hearings, proceedings or other actions initiated by either party against the other party will be venued in the county where Franchisor's headquarters are then located (currently, Maricopa County, Arizona).   Consequently, Franchisee, each of its officers, directors, members, shareholders or other owners do hereby agree to submit to personal jurisdiction in such county, for the purpose of any action or dispute arising out of this Agreement, the Franchised Location or the Store, and do hereby agree and stipulate that any such proceedings will be exclusively venued in such county.

ARTICLE 19
NOTICES

All notices required or permitted to be given under this Agreement to Franchisor will be in writing and will be made by overnight courier service, personal service upon an officer, or sent by prepaid registered or certified United States mail to any such officer of Franchisor, and will be deemed to have been duly given 24 hours after being sent by overnight courier service or five (5) days after being deposited in the United States mail for certified or registered delivery, addressed to Franchisor at 1130 West Warner Road, Tempe, Arizona 85284, Attention: Worldwide Franchising Group. All notices required or permitted to be given under this Agreement to Franchisee will be made by personal service upon Franchisee or, if applicable, an officer or director of Franchisee or sent by overnight courier service, personal service or prepaid registered or certified United States mail addressed to Franchisee at the Franchised Location, or such other address as Franchisee may designate in writing. Notice delivered by a delivery service that requires a written receipt signed by the addressee will be deemed to have been personally served under this Agreement. Franchisor may provide notice or other information to Franchisee by electronic or telephonic means including by facsimile or through the Internet or other online means.

## ARTICLE 20
## MISCELLANEOUS

20.1    <u>Relationship of Parties; Independent Contractor</u>.  Franchisee is an independent contractor.  Nothing in this Agreement will be deemed or construed to create the relationship of principal and agent, partnership, joint venture, employment, or a fiduciary relationship, and Franchisee will not hold itself out as an agent, legal representative, partner, subsidiary, joint venturer, servant or employee of Franchisor.  Neither Franchisor nor Franchisee has the right to bind or obligate the other to any obligations or debts.  It is expressly understood and agreed that neither Franchisee nor any employee or contractor of Franchisee whose compensation for services is paid by Franchisee may, in any way, directly or indirectly, expressly or by implication, be construed to be an employee of Franchisor for any purpose, most particularly with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state, or federal governmental agency.  There are no third party beneficiaries under this Agreement, except for any indemnified party (or other person entitled to be indemnified pursuant to this Agreement).

20.2    <u>Conduct of Business</u>.  It is acknowledged that Franchisee is the independent owner of its business, in full control thereof to conduct such business in accordance with Franchisee's own judgment and discretion, subject only to the provisions of this Agreement and such other agreements as may be entered into by the parties.  Franchisor will neither regulate nor be responsible for the hiring or firing of Franchisee's agents or employees or for Franchisee's contracts.  Franchisee will conspicuously identify itself, and the Store, and in all dealings with its clients, contractors, suppliers, public officials and others, as an independent franchisee of Franchisor, and will place such notice of independent ownership on all forms, business cards, stationery, advertising, signs and other materials and in such fashion as Franchisor may specify from time to time and as set forth in the mandatory provisions of the Business Systems Manuals or otherwise.

20.3    <u>Approval</u>.  In all cases where Franchisor's prior approval is required and no other method or times for obtaining such approval is prescribed, Franchisee will request such approval

in writing, and Franchisor will notify Franchisee in writing of its decision within ten (10) business days after receiving Franchisee's written request and all supporting documentation. Franchisor's consent to or approval of any act or request by Franchisee will not be deemed to waive or render unnecessary consent or approval of any subsequent similar act or request.

20.4    <u>Successors</u>.  Subject to any restrictions regarding Transfer set forth herein, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective permitted successors, assigns, executors, administrators, heirs, and personal representatives.

20.5    <u>Governing Law</u>.  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §1051 et seq.), and the Federal Arbitration Act (9 U.S.C. § 1, et seq.) this Agreement and the relationship between Franchisor and Franchisee will be governed by the laws of the State of Arizona, without regarding to any conflicts of laws principles.

20.6    <u>Franchisor's Right of Self-Help</u>.  In addition to Franchisor's rights of self-help set forth elsewhere in this Agreement, if Franchisee at any time fails to perform any of its obligations under this Agreement in a manner reasonably satisfactory to Franchisor, Franchisor will have the right, but not the obligation, upon giving Franchisee at least ten (10) days' prior written notice of its election to do so (except that in the event of an emergency no prior written notice will be required), to perform such obligations on behalf of and for the account of Franchisee and to take all such action necessary to perform such obligations, including the right to enter the Store.  In such event, Franchisor's costs and expenses incurred therein will be reimbursed by Franchisee to Franchisor forthwith upon demand therefor plus interest thereon from the date Franchisor performs such work at the highest lawful rate pertaining to loans between businesses in the state whose law governs this Agreement, or in the absence of a maximum rate specified by state law, eighteen percent (18%) per annum.  The performance by Franchisor of any such obligation will not constitute a release therefrom or waiver thereof.

20.7    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which will constitute one agreement and will not be binding on Franchisor unless and until it has been accepted and signed by an authorized officer of Franchisor.

20.8    <u>Variances</u>.  Franchisor reserves the right to modify Franchisee's obligations hereunder to conform to applicable law and to modify Franchisee's obligations with the consent of Franchisee if such modification is deemed to be in the best interest of promoting the Business System, provided, however, that Franchisor will be under no obligation to grant such similar modification to other franchisees, and vice versa.

20.9    <u>Severability</u>.  All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable.  If any applicable law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder or the taking of some action not required hereunder, or if under any applicable and binding law of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice or other action required by such law or rule will be substituted for the notice requirements hereof, or such invalid or unenforceable

provision, specification, standard or operation procedure will be modified to the extent required to be valid and enforceable. Such modifications to this Agreement will be effective only in such jurisdiction and will be enforced as originally made and entered into in all other jurisdictions.

20.10   Waiver.   Franchisor or Franchisee may by written instrument signed by both Franchisor and Franchisee, waive any obligation of or restriction upon the other under this Agreement. Acceptance by Franchisor of any payment by Franchisee and the failure, refusal or neglect of Franchisor to exercise any right under this Agreement or to insist upon full compliance by Franchisee of its obligations hereunder including, without limitation, any mandatory specification, standard or operating procedure, will not constitute a waiver by Franchisor of any provision of this Agreement. Franchisor will have the right to waive obligations or restrictions for other franchisees under their license agreements without waiving those obligations or restrictions for Franchisee, and, except to the extent prohibited by law, Franchisor will have the right to negotiate terms and conditions, grant concessions, and waive obligations for other franchisees without granting those same rights to Franchisee and without incurring any liability to Franchisee whatsoever.

20.11   Entire Agreement.   This Agreement and all exhibits, addenda and appendices to this Agreement and the application form executed by Franchisee constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, understandings, representations and agreements. Nothing in this Agreement or in any related agreement, however, is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document that was furnished to Franchisee. Nothing in this Section 20.11, however, shall be construed as terminating or limiting Franchisee's duties or obligations under any agreement with Franchisor or its Affiliates, including, without limitation any financing agreements or the Software Agreement. Franchisee acknowledges that it is entering into this Agreement as a result of its own independent investigation of the Franchised Business and not as a result of any representations about Franchisor made by Franchisor's shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to or not included in the terms set forth in this Agreement or in any disclosure document, prospectus, or other similar document required or permitted to be given to Franchisee pursuant to applicable law.

20.12   Joint and Several Obligations.   If Franchisee consists of more than one individual, then the liability of all such individuals under this Agreement will be joint and several.

20.13   No Oral Modifications.   No modifications, changes, additions, rescissions, releases, amendments or waivers of this Agreement and no approval, consent or authorization required by any provision of this Agreement may be made except by a written agreement subscribed to by a duly authorized officer of Franchisee and the president or other duly authorized officer of Franchisor.

20.14   Headings; Terms.   The headings of the Articles and Sections used in this Agreement are for convenience only and do not define, limit or construe the contents of such Articles or Sections. The term "Franchisee" as used herein is applicable to one or more persons, a corporation, a partnership or other entity, as the case may be, and the singular usage includes the plural, the masculine usage includes the feminine and neuter, and vice versa. References to "Franchisee", "assignee", and "transferee" which are applicable to an individual or individuals will mean the

principal owner or owners of the equity or operating control of Franchisee or any such assignee or transferee if Franchisee or such assignee or transferee is a corporation, partnership or other entity.

20.15    Interpretation of Rights and Obligations.  The following provisions will apply to and govern the interpretation of this Agreement, the parties' rights under this Agreement, and the relationship between the parties:

(A)    Franchisor's Rights.  Whenever this Agreement provides that Franchisor has a certain right, that right is absolute and the parties intend that Franchisor's exercise of that right will not be subject to any limitation or review.  Franchisor has the right to operate, administrate, develop, and change the Business System in any manner that is not specifically precluded by the provisions of this Agreement.

(B)    Franchisor's Reasonable Business Judgment.  Whenever Franchisor reserves or is deemed to have reserved discretion in a particular area or where Franchisor agrees or is deemed to be required to exercise its rights reasonably or in good faith, Franchisor will satisfy its obligations whenever it exercises Reasonable Business Judgment in making its decision or exercising its rights.  A decision or action by Franchisor will be deemed to be the result of "Reasonable Business Judgment", even if other reasonable or even arguably preferable alternatives are available, if Franchisor's decision or action is intended, in whole or significant part, to promote or benefit the Business System generally even if the decision or action also promotes a financial or other individual interest of Franchisor.  Examples of items that will promote or benefit the Business System include, without limitation, enhancing the value of the Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization, and improving the competitive position of the Business System.

20.16    Force Majeure. Any failure or delay in performance of this Agreement (other than a payment obligation) according to its terms by Franchisor or Franchisee shall not be deemed a breach of the Agreement if the failure to perform arose from a cause beyond the control of, and without the negligence of, the non-performing party.  Except as may be specifically provided for elsewhere in this Agreement, such causes include, but are not limited to, strikes, wars, riots, civil commotion, acts of God, and acts of government.

20.17    Anti-Terrorism Provision.  Franchisee, on behalf of itself and each Principal Equity Holder, and each Guarantor represents and warrants to Franchisor that:  (a) neither Franchisee nor any Principal Equity Holder nor any Guarantor is named, either directly or by an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control currently located at www.treas.gov/offices/enforcement/ofac/; (b) Franchisee and each Principal Equity Holder will take no action that would constitute a violation of any applicable laws against corrupt business practices, against money laundering and against facilitating or supporting persons or entities who conspire to commit acts of terror against any person or entity, including as prohibited by the U.S. Patriot Act (currently located at http://www.epic.org/privacy/terrorism/hr3162.html), U.S. Executive Order 13244 (currently located at http://www.treas.gov/offices/enforcement/ofac/sanctions/terrorism.html) or any similar laws; and (c) Franchisee, each Guarantor and each Principal Equity Holder shall immediately notify Franchisor in writing of the occurrence of any event or the development of any circumstance

that might render any of the foregoing representations and warranties false, inaccurate or misleading and shall immediately take all actions required to remedy the situation and remove the violation.

## ARTICLE 21
## ACKNOWLEDGMENTS BY FRANCHISEE

21.1   <u>Business Risk; No Financial Projections</u>.   Franchisee acknowledges that it has conducted an independent investigation of the business contemplated by this Agreement and recognizes that an investment in a franchise involves business and economic risks, and that making a success of the venture is largely dependent upon Franchisee's own business abilities and efforts. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received nor relied upon, any representation, warranty, or guaranty, expressed or implied, as to the potential volume, income, earnings, expenses, profits, or financial or business success of the business venture contemplated by this Agreement except as may have been expressly set forth in the franchise disclosure document provided by Franchisor to Franchisee.   Without limiting the foregoing, Franchisee acknowledges and agrees that (i) Franchisor makes no representations, warranties or guaranties, and expressly disclaims all liability, with respect to any third party studies of the prospective Franchised Business location prepared at Franchisee's request and expense (including, without limitation any third party retail analytics studies) ("**Third Party Studies**"), including, without limitation any statements of potential volume, income, earnings, expenses, profits, or financial or business success of the Franchised Business that may be included in any such Third Party Studies, and (ii) any such Third Party Studies are not taken into account by Franchisor in evaluating and approving any proposed Franchised Location site.

21.2   <u>Recommendation to Obtain Legal Counsel</u>.   Franchisee acknowledges that Franchisor has strongly recommended that Franchisee retain legal counsel to review this Agreement and Franchisor's franchise disclosure document and to advise Franchisee as to the terms and conditions of this Agreement and the potential economic benefits and risks of loss relating to this Agreement and the Franchised Business. Franchisee acknowledges that it has had a full and adequate opportunity to  read and review this Agreement and Franchisor's franchise disclosure document and to be thoroughly advised of the terms and conditions of this Agreement by legal counsel or a personal advisor, and has had sufficient time to evaluate and investigate the Business System, the financial requirements, the economics of the convenience store business, and the business risks associated with owning and operating a Circle K Store.

21.3   <u>Other Franchisees</u>.  Franchisee acknowledges that other franchisees of Franchisor have or will be granted licenses at different times and in different situations, and the terms and conditions of such licenses may vary substantially in form and in substance from those contained in this Agreement.

21.4   <u>Disclaimer by Franchisor</u>.   Franchisor expressly disclaims the making of any express or implied representations or warranties regarding sales, earnings, income, profits, Gross Sales, business or financial success, or the value of Franchisee's Store that were not contained in Item 19 of the Franchisor's franchise disclosure document, or the viability of the business opportunity contemplated by this Agreement, including any warranty as to the goods or service

furnished by any supplier, particularly disclaiming all warranties of merchantability and of fitness for a particular purpose.

21.5   <u>No Income or Refund Warranties</u>.  Franchisee acknowledges that Franchisor does not warrant or guarantee that: (i) Franchisee will derive income or profits from the operation of the Store; or (ii) Franchisor will refund all or any part of the Initial Franchise Fee or the price paid for the Franchised Business or repurchase any of the furniture, fixtures, products, equipment, supplies, or chattels supplied by Franchisor or an approved vendor if Franchisee is unsatisfied with the Franchised Business.

21.6   <u>Receipt of Franchise Disclosure Document and Franchise Agreement</u>.  Franchisee acknowledges that it received from Franchisor a copy of this Agreement with all material blanks fully completed at least seven (7) calendar days prior to the date that this Agreement was executed by Franchisee.  Franchisee further acknowledges that it received a copy of Franchisor's franchise disclosure document, together with a copy of all proposed agreements relating to the sale of the franchise, at least fourteen (14) calendar days prior to the execution of this Agreement or at least fourteen (14) calendar days prior to the payment of Franchisee to Franchisor of any consideration in connection with the sale or proposed sale of the franchise granted hereby.

21.7   <u>No Other Representations</u>.  Franchisee hereby expressly warrants that it has no knowledge of any representation about the Store or the Franchised Business by Franchisor or its officers, directors, shareholders, employees, agents, or servants, that is contrary to the terms of this Agreement or the documents referred to herein.  Franchisee represents to Franchisor that Franchisee has made no misrepresentations in obtaining this Agreement.  No representation or statement has been made by Franchisor (or any employee, agent or salesperson thereof) and relied upon by Franchisee regarding Franchisee's ability to procure any required license or permit that may be necessary to the offering of one or more of the services or products contemplated to be offered by the franchise granted hereby.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date indicated below.

**FRANCHISOR:**

TMC FRANCHISE CORPORATION, an Arizona corporation

FRANCHISOR: TMC Franchise Corporation

*Mitch Filien*

By: ~~Mitch Filien~~, Asst. Secretary

Effective Date: 6-27-19

Franchisee: Universal Property Services Inc

Signature: *Syed M. kazmi*
C22514946A51484...

Title: President

Date: 6/8/2019 | 16:05 PDT

Franchisee designates the following person as the Key Individual:

Syed Kazmi

_____
Signature

### Schedule 1 to Convenience Store Franchise Agreement – Definitions

In addition to terms defined elsewhere in this Agreement, for purposes of this Agreement, the following terms will have the following meanings:

1.       "**Affiliate**" means, with respect to a party hereto, any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party.  The term "**control**" of an entity means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities, by contract or otherwise. For avoidance of doubt, an affiliate of Franchisor includes, without limitation, Circle K Stores Inc. and any of its subsidiaries, and Alimentation Couche-Tard and any of its subsidiaries, now existing or hereinafter formed or acquired.

2.       "**Agreement**" means this Franchise Agreement, and all amendments, addenda, modifications, Exhibits or extensions thereto that may be mutually agreed upon by Franchisor and Franchisee.

3.       "**Business System**" means the Methods, Techniques, and Marks.

4.       "**Circle K Store**" means a retail convenience store operating under the name "Circle K" and under the other Marks and the Business System, which is a full service convenience store with sufficient floor space, vehicle parking, and inventory levels to offer all of the merchandise and services of a traditional convenience store and that complies with the specifications of a Circle K Store as more fully described in the Business Systems Manuals.

5.       "**Confidential Information**" means all information and knowledge about the Business System and the services, standards, specifications, programs, procedures, and techniques prescribed by Franchisor which are not in the public domain or generally known in the convenience store industry including, but not limited to, the Business Systems Manuals, any other manuals created for or approved for use in the operation of the Store, and the information contained therein, trade secrets, information, data, software, technology, materials, know-how, ideas, techniques, procedures, marketing plans, strategic plans, research methods, methods of operation, improvements, and copyrighted materials (whether published, confidential, or suitable for registration or copyright), and the goodwill associated with them, information concerning the pricing structure, advertising, and promotional discounts relating to items offered at the Circle K Store, and any other information and material concerning the Business System or that Franchisor may designate as confidential or that a reasonable person would consider confidential (due to nature of the information and/or circumstances of disclosure).

6.       "**Conversion Store**" means an operating convenience store not currently operated under the Marks as of the Effective Date that is being converted to a Circle K Store pursuant to the terms and conditions contained herein.

7.       "**Effective Date**" means the date that this Agreement is executed by Franchisor.

8.       "**Electronic Point of Sale and Software Agreement**" means the agreement in the form set forth in Exhibit 2 attached hereto.

9.    **"Existing Store"** means an existing convenience store currently controlled, owned, or operated by Franchisor or its Affiliate, and operating under the Marks as of the Effective Date.

10.    **"Franchised Business"** means the operation of the Store at the Franchised Location subject to the terms of this Agreement.

11.    **"Good Standing"** means that all amounts of money due and owing to Franchisor or its Affiliates by Franchisee have been paid and that Franchisee is not otherwise in default hereunder or in violation of any of the material provisions set forth herein or in the Business Systems Manuals.

12.    **"Gross Sales"** means the total dollar revenue from the sale of all goods, wares, merchandise, and services sold, whether sold for cash, for payment by check, on credit, on barter or otherwise, without reserve or deduction for the inability or failure to collect from customers, and all other items of value received by Franchisee as payment in the course of such operations, excluding the following: (i) revenue from sales of motor fuel, car wash services, money orders, lottery, pay phones, ATMs, postage stamps, pre-paid phone cards and gift cards; (ii) revenue from sales from other approved royalty-based franchises that require separate point-of-sale equipment as part of their business system (excluding any approved Additional Business that is subject to the separate Co-Branded Fee as set forth in Section 5.5); (iii) the amount of any authorized cash or credit refunds made upon transactions that were previously included in Gross Sales, not exceeding the selling price of merchandise returned by the customer and accepted, which refunds may be deducted from Gross Sales in the month made; and (iv) the amount of any separated, collected, and stated city, county, state, or federal sales, luxury, or excise tax on such sales, which Franchisee pays directly to the governmental taxing authorities rather than to its suppliers; provided, however, that no franchise or capital-stock tax or any other similar tax based upon income, profits, or gross sales shall be deducted from Gross Sales.  Notwithstanding the foregoing, Franchisor may, in its sole discretion, from time to time approve in writing that with respect to certain products or services, Gross Sales shall be calculated on the basis of earnings as opposed to sales proceeds.  If applicable law prohibits collection of royalty fees on sale of alcoholic beverages from the Store, the definition of Gross Sales will not include any income from the sale of alcoholic beverages.

13.    **"Guarantor" or "Guarantors"** means all persons or entities that execute a Personal Guaranty in the form attached as Exhibit 5.

14.    **"Key Individual"** means (a) Franchisee, if Franchisee is an individual, or (b) an individual designated by Franchisee with the authority and responsibility for the operation and management of the Store and identified by name on the signature page of this Agreement, if Franchisee is a legal entity.  The Key Individual must be a person authorized to represent and bind Franchisee in all matters arising under this Agreement (including all related agreements) and all matters relating to the Store.

15.    **"Marks"** means the name "Circle K," and certain other distinctive trademarks, trade names, service marks, copyrights, interior and exterior building designs and specifications (including the unique motif, décor, and color combinations that comprise the trade dress of Circle K Stores), slogans, logos and commercial symbols together with all goodwill associated therewith, as identified in the Business Systems Manuals or otherwise by Franchisor in writing.

16.     **<u>Methods</u>** means the unique and distinguishing characteristics and methods for the operation of Circle K Stores, including without limitation, exterior and interior construction designs, equipment layout, operating methods, services, advertising and promotional materials, sales techniques, signs, personnel management and control systems, and bookkeeping and accounting systems, and systems for inventory control.

17.     **<u>New Store</u>** means a convenience store that is not a Conversion Store, but is to be constructed and operated under the Marks and the Business System pursuant to the terms of this Agreement.

18.     "<u>Open Date</u>" means the date on which the Franchisor deems the Store to have first opened for business, in accordance with the terms hereof.

19.     **<u>Principal Equity Holders</u>** means, if Franchisee is a corporation, the shareholders of such corporation owning directly or beneficially 10% or more of such corporation's stock upon the Effective Date or at any time thereafter, and, if Franchisee is a partnership, limited partnership, limited liability company or other entity, the holders that own, directly or indirectly, 10% or more of the equity interests in such entity, as of the Effective Date or at any time thereafter.

20.     **<u>Store</u>** means the Circle K Store located at the Franchised Location and operated by Franchisee under the Marks and the Business System, subject to the terms of this Agreement.

21.     **<u>Store Manager</u>** means an employee of Franchisee designated by Franchisee to work at, and have the responsibility for managing the day-to-day operations of, the Store.

22.     **<u>Techniques</u>** means the Methods, together with the Confidential Information, owned by Franchisor and its Affiliates and licensed by Franchisor to its franchisees for the operation of Circle K Stores.

23.     **<u>Transfer Date</u>** means (a) the date on which the Store is transferred to Franchisee hereunder, if the Store is an Existing Store, or (b) the date the Store is transferred to a new franchisee if the Store is being transferred or sold to a third party in accordance with the terms hereof.