**FOX ROTHSCHILD LLP**
Peter C. Buckley, Esquire
Barry J. Muller, Esquire
212 Carnegie Center
Suite 400
Princeton, NJ, 08540
Tel: 609-895-3600
Fax: 609-896-1469
Email: PBuckley@FoxRothschild.com
BMuller@FoxRothschild.com

*Attorneys for Defendants / Counterclaim PlaintiffsLehigh Gas Wholesale Services, Inc., Lehigh Gas Wholesale LLC, and LGP Realty Holdings LP*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES, INC., and SYED KAZMI,<br><br>*Plaintiffs / Counterclaim Defendants*,<br><br>vs.<br><br>LEHIGH GAS WHOLESALE SERVICES, INC., LEHIGH GAS WHOLESALE LLC, LGP REALTY HOLDINGS LP, CIRCLE K STORES, INC. and TMC FRANCHISE CORP.,<br><br>*Defendants / Counterclaim Plaintiffs*. | Civil Action No. 3:20-cv-03315<br><br>Return Date: August 4, 2025. |

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**
**IN SUPPORT OF LEHIGH'S MOTION FOR SUMMARY JUDGMENT**

Defendants / Counterclaim Plaintiffs Lehigh Gas Wholesale Services, Inc., Lehigh Gas Wholesale LLC, and LGP Realty Holdings LP (collectively, "Lehigh") submit this *Statement of Material Facts Not in Dispute* pursuant to Local Civil Rule 56.1(a) in support of their motion for summary judgment filed herewith.

1. Between April and July 2019, UPS and Circle K entered into 17 leases ("Leases") and 17 fuel supply agreements ("Supply Agreements" and with the Leases, "Agreements") for 17 gas stations in Florida; the Agreements were identical but for their addresses and rent amounts. *See Plaintiffs' Second Amended Complaint*, ECF 70 ("SAC") ¶¶ 26, 46, 48; *see also* Lease, Ex. 1;[1] Supply Agreement, Ex. 2.[2]

2. In August 2019, Circle K sold and assigned the stations and Agreements to Lehigh. *See* SAC ¶ 81.

3. Under the Leases, UPS agreed to pay rent "without setoff" on the first of the month. Lease § 3(a); Opinion, ECF 116 ("Opinion") at 10 ("without setoff") (emphasis added by the Court).

4. The Supply Agreements required payment "at or before the time of delivery." Supply Agreement § 4(a).

[1] Lehigh introduced the Lease as Exhibit 6 at the deposition of UPS's corporate representative on February 23, 2024. This Lease is representative of all the leases.

[2] Lehigh introduced the Supply Agreement as Exhibit 5 at the deposition of UPS's corporate representative on February 23, 2024. This Supply Agreement is representative of all the fuel supply agreements.

5. To "secure timely payment of rent and other sums due" to Lehigh, UPS agreed Lehigh could require security "acceptable to [Lehigh]"—including via a letter of credit. Lease § 3(b); Supply Agreement § 7(f).

6. Lehigh required $487,500 in security for the gas stations. *See* Lehigh 30(b)(6) Deposition – Thomas Caverly ("Lehigh (Caverly) Dep."), Ex. 3 at 71:9-12.

7. If UPS fell behind, UPS agreed Lehigh could withhold credit card proceeds from the stations as security. Lease § 3(b); Supply Agreement § 7(f); Opinion at 12 ("Applying the plain meaning of the contractual language, I agree.").

8. Syed signed guaranties ("Guaranties") requiring him to pay UPS's debt if UPS did not. *See* SAC ¶ 54; *see also* Guaranty, Ex. 4 (a copy of which is also attached to the *Declaration of David Hrinak* filed in support of Lehigh's motion for summary judgment).

9. On November 4, 2019, Lehigh tried to draw UPS's rent but, three days later, that rent bounced:

| | | | | |
|---|---|---|---|---|
| 11/4/2019 | | -7,331.77 | 20.00 | Pre-Authorized Payment NSFed by ctrl# 95501 NSF |
| 11/7/2019 | … | 7,331.77 | 7,351.77 | NSF receipt Ctrl# 94449 NSF |

*See* Receivable Detail, Ex. 5 p. 1;[3] *See* Lehigh (Caverly) Dep. at 16:1-8 ("A. I believe November of 2019 rent returned. We drafted it and then returned. I believe that was

[3] Plaintiffs introduced the Receivable Detail as Exhibit 6 at the 30(b)(6) deposition of Lehigh while Thomas Caverly, Lehigh's Director of Accounting, testified.

the start of it.").

10. Around this time, Lehigh kept sweeping credit card proceeds to UPS—sweeping $314,044.89 to UPS on November 8—the day after UPS's November 2019 rent bounced:

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120131 | ND-77113-110719 | 17,719.28 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120133 | ND-77113-110719 | 7,435.42 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120134 | ND-77113-110719 | 11,392.52 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120135 | ND-77113-110719 | 14,725.91 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120136 | ND-77113-110719 | 27,809.57 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120137 | ND-77113-110719 | 31,324.58 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120138 | ND-77113-110719 | 992.93 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120139 | ND-77113-110719 | 34,500.01 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120141 | ND-77113-110719 | 4,776.38 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120142 | ND-77113-110719 | 5,571.11 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120143 | ND-77113-110719 | 23,433.33 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120145 | ND-77113-110719 | 22,914.30 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120146 | ND-77113-110719 | 2,902.67 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120147 | ND-77113-110719 | 39,278.45 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120152 | ND-77113-110719 | 38,778.71 | 0.00 |
| 11/8/2019 | ND-77113-110719 | 11/10/2019 | 120153 | ND-77113-110719 | 30,489.72 | 0.00 |

*See* AR Transaction Report, Ex. 6 at, *e.g.*, p. 83 ("ND-77113-110719," etc.);[4] *see also* Lehigh (Caverly) Dep. at 25:13-17 ("Q. … So if I were to go through this document in total every time it said ND that would mean a sweep to UPS? A. That's

[4] Plaintiffs introduced the AR Transaction Report as Exhibit 4 at the Lehigh (Caverly) Dep.

correct.”).

11. Lehigh swept $105,795.99 to UPS on November 6, 2019—the day before UPS’s November 2019 rent bounced. AR Transaction Report pp. 79-80.

12. After November 8, 2019, Lehigh did not sweep credit card proceeds to UPS, instead holding those proceeds as security in view of UPS’s bounced rent and its concerns about the sufficiency of UPS’s letter of credit. *See* AR Transaction Report pp. 84-244 (no further “ND-” entries); *see also* Lehigh (Caverly) Dep. at 32:22-33:1 (testifying Lehigh withheld credit card proceeds because UPS “returned November’s rent draft and at that point, we also were pretty sure that Soleil Bank letter of credit that was provided was not – was not actually secured.”).

13. Lehigh communicated its intentions to UPS and asked UPS to supply replacement security; however, UPS never provided any replacement security. *See* Lehigh 30(b)(6) Deposition – Joseph Alfier (“Lehigh (Alfier) Dep.”), Ex. 7 at 44:2-45:12 (discussing Lehigh’s request for a new letter of credit) & 53:18-23 (testifying Lehigh never received a new letter of credit).

14. From November 2019 through February 2020, UPS accrued over $700,000 in missed rent and fuel payments. *See* February 6, 2020 Termination Notice, Ex. 8 (“Termination Notice”);[5] *see also* Lehigh/UPS AR Balances Chart,

[5] Lehigh introduced the Termination Notice as Exhibit 9 during UPS’s 30(b)(6) deposition on February 23, 2024.

Ex. 9 ("725,219.41" owed in rent as of February 29, 2020).[6]

15. Throughout that time, the credit card proceeds withheld by Lehigh trailed UPS's obligations, as illustrated by the following chart produced by Lehigh during discovery:

**Lehigh/UPS**
**AR Balances**

| *As of* | *LGW AR Balance (Fuel)* | *Yardi RE Balance (Rent)* | *Original Security* | *Net Due to Lehigh* |
|---|---|---|---|---|
| 9/30/2019 | (279,794.48) | - | 487,500.00 | 207,705.52 |
| 10/31/2019 | (333,485.13) | 4,447.16 | 487,500.00 | 158,462.03 |
| 11/30/2019 | (335,398.69) | 197,726.94 | 487,500.00 | 349,828.25 |
| 12/31/2019 | (435,373.56) | 362,564.76 | 487,500.00 | 414,691.20 |
| 1/31/2020 | (712,158.12) | 542,220.27 | 487,500.00 | 317,562.15 |
| 2/29/2020 | (996,366.59) | 725,219.41 | 487,500.00 | 216,352.82 |
| 3/31/2020 | (996,522.46) | 921,863.43 | 487,500.00 | 412,840.97 |
| 4/30/2020 | (991,743.17) | 1,100,728.94 | 487,500.00 | 596,485.77 |
| 5/31/2020 | - | 300,209.76 | 487,500.00 | 787,709.76 |

*See* Lehigh/UPS AR Balances Chart.

16. On February 5, 2020, seeking payment for UPS's debt, Lehigh sent a letter drawing on a purported letter of credit from Soleil Chartered Bank ("Soleil"), which is incorporated in the island of Comoros (in the Indian Ocean). *See* June 23, 2022 Soleil 30(b)(6) Deposition ("June Soleil Dep."), Ex. 10 at 118:20-119:22 (Govind Srivastava ("Srivastava"), Soleil's Nominated Managing Director, testifying he recognized a Lehigh letter drawing on a letter of credit issued by Soleil).

[6] Plaintiffs introduced the Lehigh/UPS AR Balances Chart as Exhibit 9 at the Lehigh (Caverly) Dep.

17. On February 14, 2020, Soleil rejected Lehigh's draw. *See* February 14, 2020 Soleil Rejection Letter, Ex. 11.[7]

18. This was not the first time Soleil rejected a draw on one of UPS's letters of credit. *See* July 8, 2022 Soleil 30(b)(6) Deposition ("July Soleil Dep."), Ex. 12 at 65:14-22 (Srivastava acknowledging a letter draw attempt from Circle K).

19. On October 24, 2019, Circle K, through counsel, sent a claim letter to Soleil, demanding immediate payment of approximately $600,000. *See* October 24, 2019 Stradley Ronon Letter, Ex. 13.[8]

20. Soleil never paid on Circle K's draw. *See* July Soleil Dep. at 75:4-11 ("Q. Okay. I just want to be perfectly clear. [Soleil] never paid out any monies to Circle K in response to this call on the letter of credit in response to this letter; is that right? A. There was no money paid to Circle K from Soleil.").

21. That denial caused Lehigh to question UPS's compliance with the security obligations under the Agreements and, after UPS bounced its November 2019 rent, Lehigh began to withhold credit card proceeds to provide alternative security. *See* Lehigh (Caverly) Dep. at 21:8-13 (discussing Circle K's failed draw)

---

[7] Lehigh introduced the February 14, 2020 Soleil Rejection Letter as Exhibit 15 during Soleil's 30(b)(6) deposition on June 23, 2022.

[8] Circle K introduced the October 24, 2019 Stradley Ronon Letter during Soleil's 30(b)(6) deposition on July 8, 2022.

& 32:22-33:1 (Lehigh withheld credit card proceeds because UPS "returned November's rent draft and at that point, we also were pretty sure that Soleil Bank letter of credit that was provided was not – was not actually secured.").

22. UPS provided four letters of credit (collectively, the "Soleil Letters of Credit") to allegedly secure its obligations under the Agreements. *See* Soleil Letters of Credit, Exs. 14-17.[9]

23. UPS had Indemnity Agreements with Soleil (collectively, "Indemnity Agreements") UPS never told Circle K or Lehigh about and—pursuant to those Indemnity Agreements—Soleil would not pay on the Soleil Letters of Credit unless UPS paid Soleil first. *See* Indemnity Agreements, Exs. 18-21.[10]

24. Soleil would not pay unless UPS paid Soleil first. *See* July Soleil Dep. at 77:13-25 (testifying to the same).

25. When Soleil rejected Lehigh's draw on February 14, 2020, Soleil wrote: "Please note, due to non-completion of credit terms by applicant to us we are unable to settle this non-compliant claim. We hereby reject your draft drawn under

---

[9] Soleil produced the Soleil Letters of Credit pursuant to Lehigh's subpoena. Lehigh introduced the April 23, May 9, and June 26, 2019 letters of credit during Soleil's 30(b)(6) deposition on June 23, 2022. Circle K introduced the July 3, 2019 letter of credit during Soleil's 30(b)(6) deposition on July 8, 2022.

[10] Soleil produced the Indemnity Agreements pursuant to Lehigh's subpoena. Lehigh introduced the Indemnity Agreements during Soleil's 30(b)(6) deposition on June 23, 2022.

Standby Letter of Credit No. SCB1904694CHS as we are not liable for any payment due to non-compliance of the claim with the terms governing the issuance of this Standby Letter of Credit." February 14, 2020 Soleil Rejection Letter.

26. Srivastava confirmed the "non-completion of credit terms" was UPS's failure to pay. *See* June Soleil Dep. at 144:3-7 (Q. So what would have needed to happen for Soleil to pay on this draw that Lehigh is asking for? A. UPS should have paid and then we would have paid you").

27. While UPS sent the Soleil Letters of Credit to Circle K for approval as to the terms, UPS never told Circle K or Lehigh about the Indemnity Agreements. *See* Syed Kazmi Dep. ("Syed Dep."), Ex. 22 at 30:9-15 ("I didn't have any interaction with Soleil or Circle K or Lehigh"); *see also* UPS 30(b)(6) Dep. ("UPS Dep."), Ex. 23 at 137:11-138:7 (UPS did not provide an Indemnity Agreement to Circle K or Lehigh because they "never requested" it).

28. Srivastava testified he did not think Soleil had ever written a check in response to a letter of credit claim. *See* July Soleil Dep. at 74:16-19.

29. While UPS accrued debt, it and Lehigh discussed rent relief conditioned upon "a new letter of credit from UPS" which Lehigh requested. SAC ¶ 122.

30. Due to concerns about the Soleil Letters of Credit and Soleil's refusal to pay on the draw to Circle K, Lehigh required a letter of credit from a known bank. *See* Lehigh (Alfier) Dep. at 44:18-21, 47:7-16 (discussing genesis of Lehigh's

request for a valid letter of credit); *see also* UPS Dep. at 188:11-20 (acknowledging Lehigh asked for another "SBLC"—*i.e.*, standby letter of credit).

31. UPS sent a draft letter of credit allegedly from Barclays Bank. *See* UPS Dep. at 71:21-72:7; *see also* Alleged Barclays Letter, Ex. 24 (an email from UPS attaching an alleged draft letter of credit from Barclays).

32. However, Barclays has no record of ever being contacted by UPS or its broker to request a letter of credit. *Compare* Lehigh's Subpoena to Barclays, ECF 93-1 at 1-5 (attached to Plaintiffs' *Motion to Quash Subpoenas to Non-Parties Barclays Bank PLC, Worldwide Business Finance, Inc., and Soleil Chartered Bank*), *with* Barclays' January 5, 2022 letter in response to the subpoena, Ex. 25.

33. Shamikh Kazmi, UPS's day-to-day manager, gave unrebutted testimony that he never asked Barclays to issue UPS a letter of credit. UPS Dep. at 188:4-7 ("Q. Did Barclays ever issue you, University Property Services, a Letter of Credit? A. I never asked them to.").

34. Afterwards, the negotiations fell apart and "[t]he parties did not, thereafter, discuss rent reductions or a letter of credit." SAC ¶ 122; *see also* Lehigh (Alfier) Dep. at 47:12-16 (settlement discussions broke down because "everything was contingent on getting a letter of credit and feeling secure with the businesses that we offered to them").

35. UPS paid One Ten Retail Services Corp II Inc ("<u>One Ten</u>") $620,000

on November 4, 2019—the exact same day Lehigh tried to draw November 2019 rent that bounced three days later. *Compare* UPS Dep. at 218:3-17 (Shamikh failing to recall what the payment was for), *with* Receivable Detail at 1.

36. Syed confirmed he was the president of One Ten and that his and Shamik's father owned One Ten. *See* Syed Dep. at 22:7-12.

37. Syed also gave unrebutted testimony that he was the president of and that his father owned Aqri, Inc. ("Aqri") and Diwan Petrol ("Diwan"). *See id.* at 18:10-13 (Aqri) & 21:11-14 (Diwan).

38. Aqri and Diwan were other vendors UPS paid. *See* UPS Dep. at 216:7-15 ($20,000 to Aqri on July 23, 2019) & 213:3-21 (testifying that Aqri, Diwan, and One Ten would have been paid when UPS was purchasing inventory from them).

39. Lehigh learned about these payments to family members' companies thanks to a bank statement UPS produced for one of its "central accounts"—an account it would use to move money to and from separate accounts UPS had set up for each of the 17 gas stations. *See* UPS Bank Statement for Account ending in #4590 (the "Statement"), Ex. 26;[11] *see also* UPS Dep. at 211:8-12 (confirming the account ending in #4590 belonged to UPS) & 212:13-20 ("If an account needed funds from one account to another account they were transferred between accounts.").

---

[11] UPS produced the Statement; Lehigh introduced it as Exhibit 16 at the UPS Dep.

40. From this single "central account" alone, from November 2019 through February 2020, UPS paid family members' companies a total of $890,876—well above the rent and fuel debt UPS owed Lehigh:

| | **Total Payment Received from UPS's "Central Account" Ending in 4590 from November 2019 Through February 2020** |
|---|---|
| **One Ten** | $ 653,953.00 |
| **Aqri** | $ 153,806.00 |
| **Diwan** | $ 83,117.00 |
| **TOTAL** | **$ 890,876.00** |

*See generally* Statement, Ex. 26 (adding up each line item evidencing a payment to One Ten, Aqri, or Diwan).

41. The monthly fees UPS owed under the Lease as of the February 6, 2020 Termination Notice were $721,085.78 and the amount owed under the Supply Agreements was $54,446.88. *See* Termination Notice at 2.

42. Thus, UPS had more than enough money to pay Lehigh—it just chose to pay its own family members' companies instead. *Compare* Statement, *with* Termination Notice.

43. On February 6, 2020, Lehigh sent the Termination Notice to UPS, terminating UPS's franchise on February 27, 2020. *See* Termination Notice at 1.

44. The Court dismissed the notice aspect of Plaintiffs' Count V. Opinion at 17.

45. UPS did not leave the gas stations following termination. *See Declaration of Keenan Lynch, Esq.*, ECF 28-2 ¶ 12 (discussing eviction).

46. Lehigh commenced seventeen eviction cases in Florida state court in March 2020 before Plaintiffs agreed to settlements on May 7, 2020. *Id.* ¶¶ 12 & 13.

47. UPS vacated the gas stations on June 1, 2020. *Id.* ¶ 13.

48. During the time UPS remained on the premises after termination until the day UPS left, Lehigh charged UPS rent as a holdover tenant. Lease § 17(e) ("for each day or fraction thereof after termination . . . that [UPS] fails or refuses to vacate the Premises, [UPS] shall pay [Lehigh] upon demand as minimum damages (i) a sum equal to one hundred twenty five percent (125%) of the monthly installment rental . . . .").

49. Then, after UPS left, Lehigh applied all the credit card proceeds to satisfy a portion of UPS's debt. Supply Agreement §§ 7(e) & (c) ("[Lehigh] shall have the right but not the obligation to offset any indebtedness owed by [Lehigh] to [UPS] against any indebtedness owed by [UPS] to [Lehigh], whether arising from the sale of goods or product(s) under this [Supply Agreement], or from any other business transaction described in subparagraph (c) above"—"business transactions . . . including without limitation . . . (i) trade accounts, (ii) promissory notes, (iii) rentals or other amounts due under any other agreement or transactions").

50. That application of credit card proceeds satisfied UPS's outstanding debt for fuel but left a balance of $273,235.35 in unpaid rent. *See* Yardi Open AR Spreadsheet, Ex. 27 at 11 ("Grand Total" row).[12]

51. Lehigh terminated UPS's franchise after UPS did not pay rent, did not provide security for fuel and real estate, and paid its family members' companies instead of Lehigh. *See* Lehigh 30(b)(6) Deposition – David Hrinak ("Lehigh (Hrinak) Dep."), Ex. 28 at 13:9-17 ("the reason that we felt we needed to take that action [*i.e.*, terminate UPS's franchise] was that we were uncomfortable with the financial situation of the customer. They owed us a whole bunch of back rent that hadn't been paid. I believe they still had returned a bunch of fuel drafts as well that were outstanding. And, you know, after lots of back and forth as I recall, we were unable to get any acceptable security that was required under the contract.").

[12] Plaintiffs introduced the Yardi Open AR Spreadsheet as Exhibit 5 at the Lehigh (Caverly) Dep.

June 13, 2025

Respectfully submitted,

**FOX ROTHSCHILD LLP**

*/s/ Peter C. Buckley*

Peter C. Buckley, Esq.
Barry J. Muller, Esq.
212 Carnegie Center
Suite 400
Princeton, NJ 08540
pbuckley@foxrothschild.com
bmuller@foxrothschild.com
Tel: 609-895-3600
Fax: 609-896-1469

*Attorneys for Defendants / Counterclaim Plaintiffs Lehigh Gas Wholesale Services, Inc., Lehigh Gas Wholesale LLC and LGP Realty Holdings LP*