**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**
Asaad K. Siddiqi
290 W Mount Pleasant Ave
Building 3, Suite 2350
Livingston, NJ 07039
asiddiqi@tisslaw.com

-and-

**ZARCO EINHORN SALKOWSKI, P.A.**
Robert Zarco (*pro hac vice*)
Robert F. Salkowski (NJ Bar No. 049591992)
Brenda Phang (*pro hac vice*)
One Biscayne Tower
2 South Biscayne Boulevard, 34th Floor
Miami, FL 33131
rzarco@zarcolaw.com
rsalkowski@zarcolaw.com
bphang@zarcolaw.com

*Attorneys for Plaintiffs/Counter-Defendants*
*Universal Property Services Inc. and Syed Kazmi*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES INC. and SYED KAZMI,<br><br>     Plaintiffs,<br>vs.<br><br>LEHIGH GAS WHOLESALE SERVICES, INC, LEHIGH GAS WHOLESALE LLC, LGP REALTY HOLDINGS LP, CIRCLE K STORES INC., and TMC FRANCHISE CORP.,<br><br>     Defendants. | Civil Action No. 3:20-cv-03315-FLW-TJB<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS LEHIGH GAS WHOLESALE SERVICES, INC., LEHIGH GAS WHOLESALE LLC, AND LGP REALTY HOLDINGS LP'S MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I.    FACTUAL BACKGROUND..............................................................................1

II.   LEGAL ARGUMENT.....................................................................................4

    A.    Applicable Standard Under the PMPA ...................................................4

    B.    Lehigh Defendants Failed to Establish That Their Decision to Withhold Nearly $1 Million in Credit Card Proceeds Belonging to UPS Was Reasonable Under the PMPA ............................................5

    C.    Lehigh Defendants Breached the Supply Agreements When They Withheld Credit Card Proceeds and Refused to Apply The Monies Towards UPS' Balance for Fuel Invoices.............................13

    D.    Lehigh Defendants' Notice of Termination Was Defective ...............15

        1.    Lehigh Defendants Never Requested that UPS Provide a New Letter of Credit Outside of Inadmissible Settlement Communications...............................15

        2.    Concerns about the Validity of the Soleil Letters of Credit Cannot Establish the Reasonableness of the Lehigh Defendants' Termination because They First Arose After the February 6, 2020 Termination Notice. ...........................................................................16

        3.    Lehigh Defendants Rejected Plaintiffs' Attempt to Provide a Replacement Letter of Credit. ................................19

        4.    Lehigh Defendants Improperly Rely on New Events That Were Only First Revealed During the Course of Discovery in This Litigation as a Basis for Their Notice of Termination............................................................21

    E.    Lehigh Defendants Are Not Entitled to Summary Judgment on Their Counterclaim...............................................................................23

III.  CONCLUSION...............................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Atlantis Petroleum, LLC v. Getty Petroleum Mktg., Inc.*,
2011 WL 4348285 (E.D. Pa. Sept. 16, 2011)..................................................9

*Joseph v. Sasafrasnet, LLC*,
689 F.3d 683 (7th Cir. 2012) .......................................................................20

*Commodity Futures Trading Com'n v. Rosenberg*,
85 F. Supp. 2d 424 (D.N.J. 2000)................................................................16

*Four Corners Serv. Station, Inc. v. Mobil Oil Corp.*,
51 F.3d 306 (1st Cir. 1995)............................................................................9

*Horsham Mobile Station Corp. v. Lukoil N. Am., LLC*,
2025 WL 1478403 (D.N.J. May 23, 2025).....................................................4

*Joseph v. Sasafrasnet, LLC*,
689 F.3d 683 (7th Cir. 2012) .........................................................................5

*Loomis v. Gulf Oil Corp.*,
567 F. Supp. 591 (M.D. Fla. 1983) ................................................................8

*Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC*,
559 U.S. 175 (2010).......................................................................................4

*Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*,
305 F.3d 498 (6th Cir. 2002) .........................................................................4

*O'Shea v. Amoco Oil Co.*,
886 F.2d 584 (3d Cir. 1989) ........................................................................22

*Sun Ref. & Mktg. Co. v. Rago*,
741 F.2d 670 (3d Cir. 1984) ..........................................................................5

## **Statutes**

15 U.S.C. § 2801 ................................................................................................20

15 U.S.C § 2804 .................................................................................................21

Plaintiffs, UNIVERSAL PROPERTY SERVICES, INC. ("UPS") and SYED KAZMI ("Kazmi") (collectively "Plaintiffs"), by and through undersigned counsel, file their Memorandum of Law in Opposition to Defendants, LEHIGH GAS WHOLESALE SERVICES, INC. ("Lehigh Landlord"), LEHIGH GAS WHOLESALE LLC ("Lehigh Supplier") and LGP REALTY HOLDINGS LP'S ("LGP") (collectively "Lehigh Defendants") Motion For Summary Judgment. Plaintiffs' Opposition is supported by their Counter-Statement of Undisputed Material Facts that is being filed simultaneously with this Opposition.

## I.    <u>FACTUAL BACKGROUND</u>

This action arises from a terminated franchise relationship stemming from the acquisition of franchised gas stations and convenience stores primarily located in Florida. In 2018, Plaintiffs became interested in acquiring certain franchised gas stations and convenience stores from Defendant Circle K Stores, Inc. ("Circle K"). SAC, ¶ 28 [DE 70]. During the time when UPS was considering the locations, Plaintiffs allege that Circle K supplied them with false and misleading historical financial data for those locations. Plaintiffs further allege that although Circle K knew or should have known that the historical data that it supplied to Plaintiffs was false and misleading, Circle K never addressed the falsity or incompleteness of the disclosed information and instead proceeded to enter into 17 Security Agreements, Supply Agreements and Leases (the "Agreements") with UPS. *Id.* at ¶¶ 18-20.

1

Based upon the false and materially misleading information provided by Circle K, UPS also entered into franchise agreements for each of the locations with Circle K's affiliate, TMC Franchise Corp. *Id.* at ¶¶ 50-55.  Sometime in November 2019, Lehigh Defendants acquired the Agreements from Circle K.

Plaintiffs asserted three separate and independent causes of action against Lehigh Defendants in their Second Amended Complaint. Following this Court's August 5, 2022 Opinion on Lehigh Defendants' Motion for Judgment on the Pleadings [DE 116] ("Order"), the only count remaining against Lehigh Defendants is Count V, which seeks damages for violation of the PMPA pertaining to the unlawful termination.

In the Order, this Court found that "[w]here a termination pursuant to section 2802(b)(2)(C) is based on franchisee misconduct, as is the case here, whether under an enumerated section 2802(c) event or not, courts must analyze the termination decision for reasonableness." (citations omitted). Because the parties did not address this issue in either their moving papers or in their opposition, the Court went on to state that "the factfinder will need to assess the reasonableness of that termination under the PMPA in light of the Lehigh Defendants' decision to withhold non-fuel credit card proceeds and not to use such proceeds to satisfy missed rent payments[.]" Order, p. 20. While the Court noted that "setoff did not violate the parties' contracts," the Court also recognized that "the Lease does not provide for setoffs," and

2

"presumably the $1 million in credit card proceeds allegedly withheld from UPS could have been sufficient to satisfy the missed rental payments." *Id.*

In their Brief filed in support of their Motion for Summary Judgment (the "Brief"), Lehigh Defendants argue that their decision to terminate the Agreements was "reasonable" based on three independent reasons: (i) Plaintiffs did not pay rent when due; (ii) Plaintiffs did not provide a letter of credit that was acceptable; and (iii) Plaintiffs transferred monies that were otherwise available to pay rents to companies owned or controlled by Plaintiff Syed Kazmi. *See generally*, Brief at pp. 1-3.

In this case, genuine issues of material fact continue to exist regarding the reasonableness of Lehigh Defendants' decision to terminate the Agreements. Furthermore, whether Lehigh Defendants' decision to terminate the Agreements was "reasonable" is generally a question of fact that is best left for the factfinder. Finally, Plaintiffs have established that the events leading up to Lehigh Defendants' termination of the Agreement were beyond their reasonable control, given the fact that Lehigh Defendants withheld nearly $1,000,000 in credit card proceeds belonging to UPS.

For these reasons and as fully set forth below, Plaintiffs submit that Lehigh Defendants' Motion for Summary Judgment should be denied in its entirety.

3

## II.   **LEGAL ARGUMENT**[1]

### A.   **Applicable Standard Under the PMPA**

"Prior to the PMPA, franchisors often leveraged their greater bargaining power to end franchise agreements for minor or technical breaches by the franchisee." *Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC,* 559 U.S. 175, 184 (2010). "In enacting the PMPA, the legislature acknowledged that if franchise agreements are unfairly or arbitrarily terminated or not renewed, franchisees could lose their livelihood and that franchisors tend to use 'their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes.' Accordingly, the PMPA was enacted to protect franchisees from exploitation by large petroleum companies." *Horsham Mobile Station Corp. v. Lukoil N. Am., LLC*, No. CV 25-2571 (KMW-AMD), 2025 WL 1478403, at *3 (D.N.J. May 23, 2025) (citations omitted).

"The '[m]ost important ... thing the [PMPA] is intended to prevent is the appropriation of hard-earned good will that occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern.'" *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.,* 305 F.3d 498, 506 (6th Cir. 2002) (citations omitted).

---

[1] Plaintiffs' shall refer to their Counter-Statement of Material Facts as "PSMF" followed by the corresponding paragraph number, which is being filed contemporaneously herewith.

"Courts must carefully scrutinize the reasonableness of terminations whether or not the terminating event is specifically enumerated in § 2802(c). [T]he grounds specified as justification for termination or nonrenewal of a franchise are intentionally broad enough to provide to franchisors the flexibility which may be needed to respond to changing market conditions ... [but] not so broad as to deny franchisees meaningful protections from ... discriminatory terminations ...." *Id.* at 508 (citations and quotations omitted).

With respect to issues surrounding payment and timeliness of payments by a franchisee under the PMPA, "evaluation of nonpayment or late payments in view of prevailing commercial or industry trade practices" is an appropriate inquiry to reach a determination on the reasonableness of a franchisor's actions. *Joseph v. Sasafrasnet, LLC*, 689 F.3d 683, 693 (7th Cir. 2012). Indeed, a franchisor's past practices may be considered and likewise serve as a basis to preclude a franchisor from demanding strict compliance with specified payment terms, absent any notice to the franchisee. *Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670, 674 (3d Cir. 1984).

### B. Lehigh Defendants Failed to Establish That Their Decision to Withhold Nearly $1 Million in Credit Card Proceeds Belonging to UPS Was Reasonable Under the PMPA

Lehigh Defendants contend that their decision to terminate the Agreements was proper and reasonable due to Plaintiffs' alleged failure to timely pay rent.

However, Lehigh Defendants fail to acknowledge and account for the fact that they began withholding credit card proceeds belonging to UPS in September 2019 - before rent payments ever became an issue, and continued to withhold monies belonging to UPS until they ultimately terminated the Agreements in February 2020. At the time Lehigh Defendants issued the February 6, 2020 Termination Notice to UPS, they had withheld nearly $1 million in UPS' credit card proceeds. PSMF, ¶¶ 12-15.

During all relevant times, Lehigh Defendants have attempted to justify their actions due to supposed concerns over Plaintiffs' ability to satisfy their financial obligations under the Agreements. However, Lehigh Defendants failed to identify any legitimate concerns with UPS' performance under the Agreements but rather, relied primarily on manufactured and pretextual reasons to serve as a basis to arbitrarily terminate the Agreements.

Lehigh Defendants' actions were not reasonable under the express terms of the Agreements or under the PMPA, which are addressed in turn. First, Lehigh Defendants' decision to withhold nearly $1 million in credit card proceeds as a form of security under the Agreements is not reasonable or authorized under the Agreements, which specify the forms of security and specified amounts of security that Lehigh Defendants are entitled to seek or require from UPS.

As reflected in the schedules below, the total amount of required security contemplated under the Leases for the 17 C-Stores totaled $487,500:

**Schedule A**

| Address | City | State | Monthly Rent | Contract Volume Yearly Commitment | Security Amount |
|---|---|---|---|---|---|
| 3232 W Silver Springs Blvd | Ocala | FL | $ 7,875 | 448,408 | $ 25,000 |
| 239 N Center St | Pierson | FL | $ 7,350 | 723,394 | $ 25,000 |
| 1140 County Road 309 | Crescent City | FL | $ 17,850 | 689,147 | $ 25,000 |
| 901 State Road 20 | Interlachen | FL | $ 7,350 | 754,480 | $ 25,000 |
| 17025 SE County Road 234 | Micanopy | FL | $ 13,650 | 1,136,604 | $ 37,500 |
| 861 E State Road 44 | Wildwood | FL | $ 2,625 | 820,468 | $ 25,000 |
| 2158 N Temple Ave | Starke | FL | $ 6,930 | 547,690 | $ 25,000 |
| 9750 Old St Augustine Rd | Jacksonville | FL | $ 6,930 | 348,772 | $ 25,000 |
| 1005 S Edgewood Ave | Jacksonville | FL | $ 10,500 | 773,024 | $ 25,000 |
| 205 S Lawrence Blvd | Keystone Heights | FL | $ 23,100 | 1,464,765 | $ 37,500 |
| 5420 W State Road 235 | La Crosse | FL | $ 9,450 | 535,493 | $ 25,000 |
| **TOTAL** | | | **$ 113,610** | **8,242,245** | **$ 300,000** |

**Schedule A**

| Address | City | State | Rent | Monthly Contract Volume | Security Amount |
|---|---|---|---|---|---|
| 2413 US Highway 301 N | Ellenton | FL | $ 6,825 | 110,604 | $ 37,500 |
| 10800 Metro Pkwy | Fort Myers | FL | $ 9,240 | 48,934 | $ 25,000 |
| 5055 S Orange Blossom Trail | Kissimmee | FL | $ 1,575 | 104,944 | $ 37,500 |
| 808 S Park Ave | Apopka | FL | $ 9,975 | 34,528 | $ 25,000 |
| 13075 Spring Hill Dr | Spring Hill | FL | $ 9,450 | 63,725 | $ 25,000 |
| 5051 Gateway Ave | Orlando | FL | $ 14,700 | 102,942 | $ 37,500 |
| **TOTAL** | | | **$ 51,765** | **465,677** | **$ 187,500** |

PSMF, ¶ 53.

During all relevant times, Lehigh Defendants withheld more than $487,500 in credit card proceeds belonging to UPS but nevertheless, improperly terminated the Agreements. Specifically, Lehigh Defendants acknowledged that by November 22,

7

2019, they had retained sufficient funds vis-à-vis UPS' credit card proceeds to satisfy the required $487,500 security deposit. Yet, Lehigh Defendants continued to withhold nearly $1,000,000 in credit card proceeds belonging to UPS, an amount far greater than the $487,500 security deposit required under the Leases. PSMF, ¶¶ 12, 15.

Not only did Lehigh Defendants' actions cripple UPS' cashflow and ability to operate its businesses, it also far exceeded the amounts specifically negotiated and agreed upon by the parties under the Agreements. Further Lehigh Defendants' actions were not aligned or consistent with the expectations of the parties or well-established industry standards.

Specifically, any credit card proceeds withheld by a supplier (*i.e.*, Lehigh Supplier) are to be applied as payment towards outstanding fuel invoices or other debts. *Loomis v. Gulf Oil Corp.*, 567 F. Supp. 591, 596 (M.D. Fla. 1983) (subtracting the credit balance in the franchisee's account with the supplier to determine the amounts owed to the supplier). This is consistent with Lehigh Defendants' general practices and more significantly, consistent with Lehigh Defendants prior dealings with UPS before it began withholding UPS' credit card proceeds.

Even assuming *arguendo* that Lehigh Defendants can establish that a factual basis for termination existed under Section 2802(c) of the PMPA, the inquiry does not end there. Tellingly, Lehigh Defendants failed to identify any binding legal

8

precedent to establish that their baseless and egregious actions were "reasonable" under the PMPA. To the contrary, Lehigh Defendants' strategic decision to withhold UPS credit card proceeds while simultaneously refusing to apply such proceeds to fuel invoices and rent only reveals Lehigh Defendants true motive and intent to terminate the Agreements. The PMPA was designed and enacted to prevent these exact types of improper terminations. *Four Corners Serv. Station, Inc. v. Mobil Oil Corp.,* 51 F.3d 306, 312 (1st Cir. 1995) ("Four Corners was left entirely to its own devices, in the awkward position of having to determine the most cost-effective remediation method . . . [i]n these circumstances, the district court reasonably could find that Four Corners acted in good faith, and that Mobil's reticence to assist was prompted by its desire to rid itself of the franchisee requesting its assistance.").

In their Brief, Lehigh Defendants rely on *Atlantis Petroleum, LLC v. Getty Petroleum Mktg., Inc.*, 2011 WL 4348285 (E.D. Pa. Sept. 16, 2011) to support their claim that withholding nearly $1,000,000 in credit card proceeds that rightfully belonged to UPS was "reasonable" for the purposes of determining the propriety of the termination.

However, the facts in *Atlantis Petroleum, LLC* are inapposite to the facts of this case and further support Plaintiffs' position that Lehigh Defendants acted unreasonably. Specifically, the dealer in *Atlantis Petroleum, LLC* had accumulated nearly a $10,500,000 balance with the franchisor at least *six months prior* to the time

9

that the franchisor raised the issue of termination. Even then, the franchisor offered to enter into a forbearance agreement in lieu of termination. Following such agreement, the franchisor extended additional lines of credit in an effort to provide financial relief and concessions to the dealer. Following the initial discussion regarding termination, more than two years had passed and only due to concerns regarding the dealer's plan to file bankruptcy did the franchisor ultimately terminate the distributor agreement and related sublease.

Here, however, instead of working with Plaintiffs, Lehigh Defendants took it upon themselves to improperly withhold Plaintiffs' credit card proceeds in an amount far exceeding the $487,500 security required under the Agreements over the course of just a few months spanning the parties' dispute. PSMF, ¶¶ 12-15.

Further, and despite the parties' ongoing dialogue to repair and continue the franchise relationship, which involved applying those proceeds towards UPS' rent balance, Lehigh Defendants elected to suddenly change course and deliver the Termination Notice to UPS, citing to the exact issues that parties had been discussing as part of a resolution (*i.e.*, November and December 2019 rent payments) and new events that Lehigh Defendants had never formally requested from UPS (*i.e.*, the letter of credit). PSMF, ¶ 29.

In short, Lehigh Defendants withheld nearly $1,000,000 of Plaintiffs' credit card proceeds, which far exceeded the contractual bargained-for security deposit of

10

$487,500 and far exceeded the approximate $50,000 in unpaid fuel invoices cited in the Termination Notice.

Further, to the extent that Lehigh Defendants attempt to rely on the cross-default provisions contained in the Supply Agreements as a basis to withhold Plaintiffs' credit card proceeds and likewise declare Plaintiffs in default under the Leases to justify the Termination Notice, this argument also fails in light of the clear and unambiguous language of the Supply Agreements.

Specifically, Section 7(f) of the Supply Agreements provides that *should Lehigh agree to extend credit to UPS*, then the following terms and conditions may apply:

> Credit. Nothing herein shall be construed as obligating Seller to extend any credit to Purchaser. Upon Seller's request, Purchaser shall provide Seller with information and documents relating to Purchaser's financial condition and creditworthiness. **If Seller, in its sole determination, elects to extend credit to Purchaser**, such extension of credit shall only be made in writing on such terms and conditions that Seller may require including, without limitation, the following:

> In order to secure payment of all Purchaser's present and future indebtedness owed by Purchaser to Seller at any time during the Term of this Contract, including renewal periods, or upon its termination or expiration, **Purchaser hereby grants to Seller a security interest and/or a purchase money security interest** in (i) all of Purchaser's inventory of petroleum products and tires, batteries and accessories ("TBA") purchased from Seller, regardless of when purchased, (ii) all accounts receivable owing to Purchaser regardless of when or how incurred, (iii) all of Purchaser's equipment at the Premises, whether or not purchased from Seller, and (iv) all proceeds of Purchaser's

11

inventory, accounts receivable and equipment. **Purchaser shall sign all agreements, financing statements, and renewals as necessary to perfect, memorialize and provide public record of this security interest.** In the event of insolvency of Purchaser, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against Purchaser, or failure of Purchaser to perform any of the obligations of payment in accordance with the terms of payment established by Seller from time to time, Seller shall have the option without notice or demand upon Purchaser to declare an event of default under the Uniform Commercial Code, and upon any such default, Seller may declare all of Purchaser's indebtedness to Seller immediately due and payable. Thereafter Seller may proceed to enforce payment and may exercise any and all rights available to it. If Seller refers Purchaser's account for collection, Purchaser agrees to pay all collection costs permitted by applicable law, including but not limited to any and all reasonable attorneys' fees, court costs, and allowable interest necessary to secure collection, in addition to the outstanding balance. **Seller reserves the right to require from Purchaser from time to time a security deposit, letter of credit, personal guaranty and/or other forms of security acceptable to Seller to secure Purchaser's obligations under this Contract or any other contract or agreement between Seller and Purchaser.**

PSMF, ¶ 5.

The foregoing language in the Supply Agreement in no way grants Lehigh Defendants the unfettered discretion to withhold UPS' credit card proceeds for all sales. Even setting aside the fact Section 7(f) above is inapplicable since Lehigh Defendants **failed to extend any credit to UPS**, it only grants Lehigh Supplier a **security interest** in UPS' "inventory, accounts receivable and equipment" and requires UPS to execute any agreements, financing statements, etc. to memorialize the security interest. There is no legal or factual support that could be presented by

12

Lehigh Defendants to justify withholding of credit card proceeds pursuant to the language above. There is no question that Lehigh Defendants' conduct was improper and unauthorized even under its own Supply Agreements. PSMF, ¶ 5.

Further, since Lehigh Defendants did not extend credit to UPS, Lehigh Supplier was required to treat the credit card proceeds as follows:

> If the Credit Card Proceeds exceed the balance on Purchaser's account with Seller for the sale of any goods as of the Payment Date, Seller shall at its option either (i) pay such excess amount to Purchaser within a commercially reasonable time, or (ii) treat such excess amount as a credit in favor of Purchaser.

*See* PSMF ¶ 4. Yet, Lehigh Defendants failed to either pay the excess credit card proceeds to UPS or treat the excess amount as a credit in favor of UPS. As such, it can hardly be said that Lehigh Defendants' actions were reasonable as contemplated under the PMPA.

C.     **Lehigh Defendants Breached the Supply Agreements When They Withheld Credit Card Proceeds and Refused to Apply The Monies Towards UPS' Balance for Fuel Invoices**

At the time Lehigh Defendants sent UPS the February 6, 2020 Termination Notice, they were withholding nearly $1,000,000 in credit card proceeds belonging to UPS while simultaneously citing the approximately $50,000 in allegedly unpaid fuel invoices as a basis for termination.

As noted above, Lehigh Defendants were required to treat credit card proceeds belonging to UPS as follows:

13

> If the Credit Card Proceeds exceed the balance on Purchaser's account with Seller for the sale of any goods as of the Payment Date, Seller shall at its option either (i) pay such excess amount to Purchaser within a commercially reasonable time, or (ii) treat such excess amount as a credit in favor of Purchaser.

*See* PSMF ¶ 4.

The Supply Agreements further provided Lehigh Defendants with the following relief in the event UPS fell behind on fuel-related payments:

> If at any time the financial responsibility of Purchaser shall become impaired or unsatisfactory to Seller, or should Purchaser be in arrears in his accounts with Seller, Seller may require, as a condition of making further deliveries under this Contract, payment by Purchaser of all past due accounts and cash payment prior to, or upon, all such future deliveries.

*Id.*

Despite the foregoing, Lehigh Defendants failed to disburse the credit card proceeds to UPS and likewise failed to treat the credit card proceeds as a credit in UPS' favor. Lehigh Defendants also elected to not exercise the only right it had under the Supply Agreements (*i.e.*, demand that UPS satisfy the appx. $50,000 in fuel invoices) so that it could continue to rely on the alleged overdue invoices as a reason to withhold nearly $1,000,000 in credit card proceeds belonging to UPS. Not only did Lehigh Defendants' actions constitute a breach of the Supply Agreements, but likewise constitute a violation under the PMPA.

14

### D. Lehigh Defendants' February 6, 2020 Notice of Termination Was Defective

#### 1. Lehigh Defendants Never Requested that UPS Provide a New Letter of Credit Outside of Inadmissible Settlement Communications

Throughout this litigation and in their Brief, Lehigh Defendants have focused on a letter of credit that they allege UPS failed to provide to support their claim that their termination of the Agreements was reasonable. [DE 161-2 at p. 14].

All of the issues and arguments surrounding UPS's alleged failure to provide a letter of credit acceptable to Lehigh Defendants is inadmissible settlement communications that this Court should not consider in determining the propriety or reasonableness of the termination.

In discovery, Joseph Alfier was offered by Lehigh Defendants as their 30(b)(6) corporate representative to testify about the parties' communications regarding the letters of credit, among other topics. PSMF, ¶ 54. According to Mr. Alfier, all discussions between the parties concerning or regarding the letters of credit were made in the context of settlement negotiations. PSMF, ¶ 61. Furthermore, Mr. Alfier did not know whether Lehigh Defendants ever formally requested a new letter of credit from UPS once settlement discussions broke down or whether Lehigh Defendants requested a new letter of credit from UPS after January 2, 2020. PSMF, ¶¶ 62-63.

15

It is well established that settlement discussions are inadmissible and thus, any attempts by Lehigh Defendants to rely on any statements regarding the letters of credit within the context of settlement should not be considered by the Court. Fed. R. Civ. P 408; *Commodity Futures Trading Com'n v. Rosenberg,* 85 F. Supp. 2d 424, 434 (D.N.J. 2000) (explaining how letters advising plaintiff of possible compromise plan prior to institution of legal action were inadmissible under Rule 408 rationale).

> **2.    Concerns about the Validity of the Soleil Letters of Credit Cannot Establish the Reasonableness of the Lehigh Defendants' Termination because They First Arose After the February 6, 2020 Termination Notice.**

Even if this Court elects to consider the parties' settlement discussions surrounding the letters of credit to decide the Motion, Plaintiffs respectfully state that summary judgment in favor of Lehigh Defendants would nonetheless be improper.

Lehigh Defendants claim that they had concerns over the validity of the letters of credit issued by Soleil Chartered Bank ("Soleil"). Brief, pp. 9-10. However, the "reasonableness" of Lehigh Defendants' decision to terminate the Agreements based on these concerns remains a question of fact that cannot be decided on summary judgment, especially given that their own 30(b)(6) witness could not testify as to

16

why Lehigh Defendants determined that the Soleil letters of credit were not valid.[2]

Mr. Alfier, the territory manager for the wholesale markets in North Jersey for Cross America Partners LP who was offered as Lehigh Defendants' 30(b)(6) witness, was responsible in 2018 for determining the creditworthiness of UPS. PSMF, ¶¶ 55-56. Mr. Alfier could not testify about the due diligence undertaken by Circle K or TMC Franchise Corp. to determine the strength or validity of the Soleil letters of credit, nor could he recall when Lehigh Defendants first became concerned about their validity. PSMF, ¶¶ 57, 59. Nor was Mr. Alfier able to testify whether Lehigh Defendants ever actually determined that the Soleil letters of credit were valid or not, and was not able to testify as to why they were unacceptable to Lehigh Defendants:

> Q:    You mean a different letter of credit. Did you ever determine whether or not the letter of credit by Soleil Bank was valid or not?
> A:    I can't answer that. Again, in our eyes, office, I was there to communicate that we saw it as not valid.
> Q:    And what was the reason why Lehigh saw the Soleil letter of credit as not being valid?
> A:    I don't know. Again, I was there to just communicate that it was not and that we needed a different one.

---

[2] Although the Lehigh Defendants claim that Soleil rejected a drawdown request in October 2019, that request was made by Circle K and not by the Lehigh Defendants. See Brief, p. 11. Moreover, Mr. Alfier testified that he did not know how much money Circle K sought to draw down from the Soliel letters of credit (*i.e.*, did the request exceed the guaranteed amount) or why Soleil did not recognize Circle K's right for the money and actually allow the drawdown. PSMF, ¶ 60. Further, a genuine dispute of material fact exists as to whether the draw request was approved and ultimately paid to Circle K. PSMF, ¶ 19.

PSMF, ¶ 61. Thus, the reasonableness of Lehigh Defendants' decision to terminate the Agreements cannot be decided here, where their own corporate representative was not able articulate why Lehigh Defendants questioned the validity of the letters of credit from Soleil.

Furthermore, Lehigh Defendants argue their decision to question the validity of the Soleil letters of credit is evidenced by the fact that Soleil "rejected Lehigh's draw" and because of an undisclosed agreement that Soleil would not pay on the letters of credit unless UPS paid Soleil first. Brief, pp. 9-13. These arguments are a red-hearing and cannot be used as a basis to determine the reasonableness of the Lehigh Defendants' decision to terminate the Agreements because Lehigh Defendants first became aware of these issues only after they issued the Termination Notices on February 6, 2020.

Specifically, it was not until February 5, 2020, one day before the February 6, 2020 Termination Notice, that Lehigh Defendants sent a letter to Soleil attempting to drawdown on the letter of credit. See Brief, pp. 10-11. Yet, it was not until February 14, 2020, some twelve days after the Termination Notice was issued, did Soleil reject Lehigh Defendants' attempted draw. *See* Brief, p. 11. Further, the basis for Soleil's rejection remains unclear and at issue.  PSMF, ¶ 24 (explaining that if a dispute existed between the parties as to the draw request, Soleil would not issue payment until such dispute was resolved) [DE 161-13].

18

Furthermore, Lehigh Defendants first learned of the "undisclosed agreement" that UPS was alleged to have with Soleil at the deposition of Soleil's corporate representative on June 23, 2022, more than 2 years after the February 2, 2020 Termination Notice. *See* Brief, pp. 12-13; fn. 8.

Thus, neither Soleil's February 14, 2020 refusal to pay on the drawdown request, nor the undisclosed agreement that was revealed in discovery can be a basis for Lehigh Defendants' decision to terminate the Agreements.

### 3. Lehigh Defendants Rejected Plaintiffs' Attempt to Provide a Replacement Letter of Credit.

Lehigh Defendants claim that they had discussed with Plaintiffs -again, in the context of settlement discussions- rent relief conditioned upon a new letter of credit from UPS. Brief, p. 14. According to Lehigh Defendants, although UPS sent a draft letter of credit allegedly from Barclay's Bank, discovery during the pendency of this action revealed that Barclay's Bank had no record of ever being contacted by UPS or its broker to request a letter of credit. *Id.*

However, the Barclay Bank letter of credit offered by Plaintiffs was rejected out of hand by Lehigh Defendants, even before UPS and Mr. Kazmi had the opportunity to present an original, signed agreement from that lender. According to Mr. Alfier:

> Q:   And do you recall whether Mr. Kazmi ever offered a second letter of credit beyond the letter of credit from Soleil Bank?
> A:   He did. One from Barclays in the United Kingdom.

19

> Q: And was that acceptable to Lehigh at the time?
> A: No.
>
> Q: And when was that offered made by Mr. Kazmi for a letter of credit regarding Barclays Bank?
> Q: And was that offered made to you directly or it was made to somebody else?
> A: It was made -- it was sent to me and then I sent it to our office who made the decision on the validity of the letter of credit.
>
> Q: Your testimony is you do not know the reason or reasons why Lehigh had rejected that second letter of credit that was being offered?
> A. Correct.

PSMF, ¶ 62. Thus, despite conceding that UPS attempted to secure a letter of credit from Barclay's Bank, Lehigh Defendants frustrated UPS's attempt to do so by rejecting it out of hand, without any ability to cite a reason why.

Unlike the facts presented in the case law relied upon by Lehigh Defendants, the alleged failures proffered by these defendants do not constitute legitimate failures or serve as proper basis to terminate the franchise relationship under the PMPA. Indeed, "any failure for a cause beyond the reasonable control of the franchisee" and "any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State" are expressly excluded from the definition of "failure" under the PMPA. 15 U.S.C. § 2801(13). *Cf. Joseph v. Sasafrasnet, LLC*, 689 F.3d 683, 692–93 (7th Cir. 2012) (finding that the franchisee's issues with non-

payment and NSFs were due to the franchisee's failure to transfer credit card revenues into the proper account and thus, within the franchisee's control).

> **4.    Lehigh Defendants Improperly Rely on New Events That Were Only First Revealed During the Course of Discovery in This Litigation as a Basis for Their Notice of Termination**

Finally, Lehigh Defendants argue that payments made by UPS to family members of Syed Kazmi or to companies owned by him or members of his family between November 2019 and February 2020 provide further support that they acted reasonably under the PMPA when they terminated the Agreements. Specifically, Lehigh Defendants claim that from November 2019 through February 2020, UPS paid companies owned by family members of Syed Kazmi a total of $890,876, an amount that exceed the rent and fuel debt that UPS owed Lehigh during that same period of time. *See* Brief, §II.F. According to Lehigh Defendants, UPS could have, but chose not to, fulfill its obligations to Lehigh. *Id.*, § I. While Lehigh Defendants' post-discovery narrative may seem appealing, it cannot be used to retroactively support whether they acted reasonably when they terminated the Agreements.

Before terminating the Agreements, the PMPA required Lehigh Defendants to provide UPS with a written notice of termination, sent by certified mail or personally delivered, that contains "a statement of intention to terminate the franchise or not to renew the franchise relationship, *together with the reasons therefor…*" 15 U.S.C. § 2804(c)(3) (emphasis added).  In the event a franchisor was

later forced to defend the propriety of its termination, the propriety of the termination must be established "based on the reasons that it gave to the franchisee in the notice of termination" and cannot "assert new reasons for the termination…" *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 597-598 (3d Cir. 1989)("In order for the notice requirement to be meaningful, it must be the case that the franchisor, defending a PMPA action, not assert new reasons for the termination in court; the defendant must establish that the termination was proper under the PMPA based on the reasons that it gave to the franchisee in the notice of termination.").

Here, the February 6, 2020 Termination Notice issued by Lehigh Defendants offered four reasons why Lehigh Defendants sought to terminate the Agreements. Importantly however, none of those reasons stated in the Termination Notice included payments UPS or Mr. Kazmi made to family members or related companies or affiliates. PSMF, ¶ 43. Furthermore, because these payments were discovered by Lehigh Defendants during the course of this litigation, well after the February 6, 2020 Termination Notice, the nature of these payments cannot serve to support the reasons why Lehigh Defendants chose to terminate the Agreements.

Thus, because Lehigh Defendants cannot assert new reasons as a basis for termination that were not originally stated in the Termination Notice, and because those new reasons were first uncovered in discovery, Lehigh Defendants cannot rely

on payments UPS made to family members or related companies as a basis for the reasonableness of the termination under the PMPA or as grounds for its Motion.

Further, Mr. Kazmi made clear through this deposition testimony that the payments in question were made to Aqri Inc. and Diwan Petrol, for the purchase of merchandise that UPS utilized in the 17 C-Stores.  PSMF, ¶ 37.

> **E.      Lehigh Defendants Are Not Entitled to Summary Judgment on Their Counterclaim**

Lehigh Defendants have failed to present sufficient evidence that would justify summary judgment on Count V of Plaintiffs' Second Amended Complaint. As such, Lehigh Defendants are not entitled to judgment as a matter of law on their Counterclaim, which seeks monies allegedly owned by Plaintiffs under the Agreements and related guarantees.

## III.   CONCLUSION

Based on the foregoing, Plaintiffs UNIVERSAL PROPERTY SERVICES, INC. and SYED KAZMI, respectfully request that the Honorable Court enter an Order: (i) summarily denying Defendants Lehigh Gas Wholesale Services, Inc., Lehigh Gas Wholesale LLC, and LGP Realty Holdings LP's Motion For Summary Judgment and (ii) granting such further relief that the Court deems just and proper.

Respectfully Submitted,

/s/ Asaad K. Siddiqi
Asaad K. Siddiqi, Esq.
**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**

/s/ Robert F. Salkowski
Robert F. Salkowski, Esq.
**ZARCO EINHORN SALKOWSKI, P.A.**

*Co-Counsel for Plaintiffs/Counter-Defendants Universal Property Services Inc. and Syed Kazmi*

Dated: July 25, 2025

24