**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**
Asaad K. Siddiqi, Esq.
290 W Mount Pleasant Ave
Building 3, Suite 2370
Livingston, NJ 07039
asiddiqi@tisslaw.com

-and-

**ZARCO EINHORN SALKOWSKI, P.A.**
Robert Zarco, Esq. (*pro hac vice*)
Robert F. Salkowski, Esq. (NJ Bar No. 049591992)
Brenda Phang, Esq. (*pro hac vice*)
One Biscayne Tower
2 South Biscayne Boulevard, 34th Floor
Miami, FL 33131
rzarco@zarcolaw.com
rsalkowski@zarcolaw.com
bphang@zarcolaw.com

*Attorneys for Plaintiffs/Counter-Defendants*
*Universal Property Services Inc. and Syed Kazmi*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES INC. and SYED KAZMI, <br><br> Plaintiffs, <br> vs. <br><br> LEHIGH GAS WHOLESALE SERVICES, INC, LEHIGH GAS WHOLESALE LLC, LGP REALTY HOLDINGS LP, CIRCLE K STORES INC., and TMC FRANCHISE CORP., <br><br> Defendants. | Civil Action No. 3:20-cv-03315-FLW-TJB <br><br> **PLAINTIFFS' RESPONSE TO LEHIGH DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' SUPPLEMENTAL STATEMENT OF MATERIAL FACTS** |

Plaintiffs UNIVERSAL PROPERTY SERVICES, INC. ("UPS") and SYED KAZMI ("Kazmi") (collectively "Plaintiffs"), by and through undersigned counsel, hereby submit this Response to Defendants, Lehigh Gas Wholesale Services, Inc. ("Lehigh Landlord"), Lehigh Gas Wholesale LLC ("Lehigh Supplier") and LGP Realty Holdings LP's ("LGP") (collectively "Lehigh Defendants") Statement of Material Facts in Support of Their Motion For Summary Judgment [DE 161-6], as follows:[1]

1.    Undisputed.

2.    Undisputed.

3.    Disputed. UPS did not agree to pay rent "without setoff" unequivocally and under any circumstance, namely, Lehigh Defendants' decision to withhold nearly $1 million in credit card proceeds belonging to UPS, which is not authorized or contemplated under the Leases. *See generally* Lease [DE 161-4].

4.    Disputed. Section 4 of the Supply Agreements goes on to detail exactly how payment will be collected from the purchaser (i.e. UPS), the form of payment, the specific amounts to be collected, among other payment details. Section 4(a) also provides:

> If the Credit Card Proceeds exceed the balance on Purchaser's account with Seller for the sale of any goods as of the Payment Date, Seller shall at its option either (i) pay such excess amount to Purchaser within a

---

[1] Plaintiffs' citation to this Counter-Statement of Material Facts shall be referenced as "PSMF" followed by the corresponding paragraph number.

commercially reasonable time, or (ii) treat such excess amount as a credit in favor of Purchaser.

Supply Agreement, § 4(a) [DE 161-5].

5.      Disputed. The language referenced is incomplete and is only applicable in the event Lehigh Supplier extended credit to UPS, which did not occur here. Section 7 of the Supply Agreements first provides as follows:

> Credit. Nothing herein shall be construed as obligating Seller to extend any credit to Purchaser. Upon Seller's request, Purchaser shall provide Seller with information and documents relating to Purchaser's financial condition and creditworthiness. If Seller, in its sole determination, elects to extend credit to Purchaser, such extension of credit shall only be made in writing on such terms and conditions that Seller may require including, without limitation, the following:

> (f) Seller reserves the right to require from Purchaser from time to time a security deposit, letter of credit, personal guaranty and/or other forms of security acceptable to Seller to secure Purchaser's obligations under this Contract or any other contract or agreement between Seller and Purchaser.

Section 3(b) of the Leases only allows Lehigh Landlord to request a letter of credit as security at the time of execution of the Leases. As for future rent payments, Lehigh Landlord is only entitled to security in the form of a security deposit after the Leases were executed. Section 3(b) provides as follows:

> To secure timely payment of rent, and other sums due under this Lease or any accompanying contract, Lessee shall, upon execution of this Lease, provide Lessor with a security deposit and other security interest acceptable to Lessor, at Lessor's sole option, including without limitation a letter of credit and personal guaranty, as more fully set forth in the accompanying Security Agreement between the parties hereto (the "Security Agreement"). Lessor reserves the right to require a

3

security deposit at any time in the future to secure timely payment of rent and other sums due under this Lease or any accompanying contract.

*See* Supply Agreement at § 7(f) [DE 161-5] and Lease at § 3(b) [DE 161-4], respectively.

6. Undisputed.

7. Disputed. The response provided in paragraph 5 above is adopted and incorporated as if fully set forth herein.

8. Disputed as to the scope of the Guaranties, namely, the type of debt, the amount of such debts, and under which contractual agreements. Section 1(b) of the Guaranties specifically provide as follows:

In the event that Purchaser fails at any time to make any part or all of its payments or perform its obligations under the Contract or Lease, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.

*See* Guaranty at § 1(b) [DE 161-7].

9. Undisputed that Lehigh Defendants attempted to draw rent from UPS' accounts on November 4, 2019.

10. Disputed. Lehigh Defendants began withholding credit card proceeds beginning in September 2019. By September 30, 2019, Lehigh Defendants withheld a total of $279,794.48 in credit card proceeds for fuel purchases. *See* Lehigh Defendants' SMF, Ex. 9 [DE 161-12] ("AR Balance Chart").

4

11.     Disputed. The response provided in paragraph 10 above is adopted and incorporated as if fully set forth herein.

12.     Disputed. Lehigh Defendants began withholding credit card proceeds beginning in September 2019. *See supra* ¶ 10. Lehigh Defendants continued to withhold credit card proceeds even after the funds withheld by Lehigh Landlord exceeded the $487,000 security deposit required under the Leases. *Id.*

13.     Disputed. Lehigh Defendants never formally requested a new letter of credit from Plaintiffs and certainly did not indicate that it would continue withholding UPS' credit card proceeds until UPS provided such letter of credit. *See* Shamikh Tr. at 69:19 – 71:1; 101:3-23 [DE 161-26].

14.     Disputed. At all times beginning from November 2019 through February 2020, Lehigh Defendants withheld credit card payments belonging to UPS that far exceeded the amounts for rent and fuel that Lehigh Defendants claim it was owed by UPS. *See* AR Balance Chart [DE 161-12].

15.     Disputed. Lehigh Defendants began withholding credit card proceeds belonging to UPS before any issue regarding rent payments first arose in early-November 2019 and even after they collected the requisite $487,000 in security from UPS. *See* AR Balance Chart [DE 161-12].

16.     Disputed. Lehigh Defendants did not attempt to draw on the letter of credit to seek payment for "UPS's debts." At that time, on February 5, 2020, Lehigh

5

Defendants withheld approximately $996,366.59 in credit card proceeds belonging to UPS. *See* AR Balance Chart [DE 161-12]. On the very next day and before Soleil had responded to Lehigh Defendants' draw request, Lehigh Defendants terminated all of the Franchise Agreements for alleged non-payment of rent and fuel invoices by UPS. *See* Lehigh Defendants' SMF, Ex. 8 [DE 161-11].

17.    Undisputed.

18.    Disputed. In late-September 2019, Circle K submitted a request to draw on one of UPS' letters of credit in the approximate amount of $640,000. The request was acknowledged and approved by Soleil Chartered Bank and the amounts requested were ultimately paid to Circle K. *See* Lehigh Defendants' SMF, Ex. 13 [DE 161-16]; *see also* June 23, 2022 Soleil Tr. at 148:7-15 (confirming payment was made on one or more of the letters of credit issued to UPS by Soleil).

19.    Disputed as to the amounts demanded by Circle K. *See supra* ¶ 18.

20.    Disputed. Soleil did not reject or otherwise deny Circle K's draw request. *See supra* ¶ 18. The amounts requested by Circle K were ultimately satisfied by UPS. *See* June 23, 2022 Soleil Tr. at 148:7-15 (confirming payment was made on one or more of the letters of credit issued to UPS by Soleil).

21.    Disputed. *See supra* ¶ 18.

22.    Disputed that the letters of credit were to secure UPS' obligations under all of the Agreements. The letters of credit were for payment of gasoline and fuel

6

related invoices. *See* Lehigh Defendants' SMF, Exs. 14-17 [DE 161-17 – DE 161-20].

23.     Disputed as to Lehigh Defendants' characterization of the Indemnity Agreements and suggestion that UPS concealed information from Circle K or Lehigh Defendants, which was never requested by either of them. Syed Tr. at 30:9-15 [161-25]; Shamikh Tr. at 137:11-138:7 [DE 161-26]; June 23, 2022 Soleil Tr. at 125:2-4 ("Beneficiary had the SBLC. If they had any inquiries, Circle K never came back to us.").

24.     Disputed. *See supra* ¶ 23; *see also* June 23, 2022 Soleil Tr. at 144:8 – 145:23 (explaining that if a dispute existed between the parties (i.e. UPS and Lehigh Defendants) as to the draw request, Soleil would not issue payment until such dispute was resolved) [DE 161-13].

25.     Disputed as to Lehigh Defendants' characterization of Soleil's February 14, 2020 Letter.  *See* June 23, 2022 Soleil Tr. at 144:8 – 145:23 (explaining that if a dispute existed between the parties (i.e. UPS and Lehigh Defendants) as to the draw request, Soleil would not issue payment until such dispute was resolved) [DE 161-13]. Further, the Soleil letters of credit were procured by UPS as security for the payment of gasoline and fuel related invoices whereas Lehigh Defendants' alleged draw request was primarily for rent and other related payments under the Leases. *See* Lehigh Defendants' SMF, Exs. 14-17 [DE 161-17 – DE 161-20].

26.    Disputed. *See* June 23, 2022 Soleil Tr. at 144:8 – 145:23 (explaining that if a dispute existed between the parties (i.e. UPS and Lehigh Defendants) as to the draw request, Soleil would not issue payment until such dispute was resolved) [DE 161-13].

27.    Disputed. *See supra* ¶ 23.

28.    Disputed. Mr. Srivastava went on to testify that he was unsure since there were four or five letters of credit issued to UPS. *See* Soleil Tr. at 74:21-23 [DE 161-15].

29.    Disputed. The discussions between UPS and Lehigh Defendants regarding rent reduction made up only a portion of the extensive settlement discussions between the parties as part of a global resolution of the various outstanding issues. Lehigh Defendants never formally requested a new letter of credit to replace the letters of credit previously issued by Soleil Chartered Bank nor did Lehigh Defendants condition any offers for rent relief on a new letter of credit. *See* Shamikh Tr. at 69:19-22 [DE 161-26].

30.    Disputed. Lehigh Defendants never formally requested a new letter of credit to replace the letters of credit previously issued by Soleil Chartered Bank. *Id.* at 69:19-22. In late-September 2019, Circle K submitted a request to draw on one of UPS' letters of credit in the approximate amount of $640,000. The request was

acknowledged by Soleil Chartered Bank and the amounts requested were ultimately paid to Circle K. *See supra* ¶ 18.

31.    Undisputed.

32.    Disputed. The response to the subpoena speaks for itself. UPS did not interact directly with Barclays Bank and no formal request for a new letter of credit was ever made by Lehigh Defendants. *See* Shamikh Tr. at 69:19 – 71:1 [DE 161-26].

33.    Undisputed. *See supra* ¶ 32.

34.    Disputed. The breakdown in negotiations among the relevant parties did not occur solely due to issues surrounding the letter of credit, as represented by Lehigh Defendants. Lehigh Defendants did not even attempt to draw on the letter of credit at issue until one day prior to sending UPS the February 6, 2020 Termination Notice. *See* Lehigh Defendants' SMF, ¶ 16.

35.    Undisputed.

36.    Undisputed.

37.    Disputed. UPS testified that it had business relationships with Aqri Inc. and Diwan Petrol, namely, the sale of merchandise to UPS that UPS utilized in the 17 C-Stores. *See* Shamikh Tr. at 202:7-21 [DE 161-26].

38.    Disputed. *See supra* ¶ 37.

39.    Disputed. *See supra* ¶ 37.

40.     Disputed. As of January 31, 2020 and based on the information currently available to Plaintiffs, the rent balance was approximately $542,220.27 and a negative fuel balance or a credit of $712.158.12 in fuel-related credit card payments owed to UPS. *See* AR Balance Chart [DE 161-12]. As of February 29, 2020 and based on the information currently available to Plaintiffs, the rent balance was approximately $725,219.41 and there was a credit of $996.366.59 owed to UPS in fuel-related credit card payments. *Id.*

41.     Disputed. *See supra* ¶ 5.

42.     Disputed. During all relevant times, Lehigh Defendants withheld credit card proceeds belonging to UPS in an amount that far exceeded the amounts that Lehigh Defendants claimed they were owed by UPS. *See* AR Balance Chart [DE 161-12].

43.     Disputed. The termination as described in the February 6, 2020 Termination Notice was improper because during all relevant times, Lehigh Defendants withheld credit card proceeds belonging to UPS in an amount that far exceeded the amounts that Lehigh Defendants claimed they were owed by UPS. *See* AR Balance Chart [DE 161-12].

44.     Undisputed.

45.     Undisputed that UPS did not vacate the gas stations immediately upon receipt of the February 6, 2020 Termination Notice.

46. Undisputed to the extent "settlements" refers to UPS' agreement to vacate the remaining 17 C-Store locations that were still accessible to UPS.

47. Disputed. UPS vacated the gas stations at various times and at the very latest, by June 1, 2020. Beginning in late-February 2020, Lehigh Defendants improperly exercised self-help remedies and constructively evicted UPS from at east one of the 17 C-Stores. SAC, ¶¶ 128-129.

48. Disputed. *See supra* ¶ 47.

49. Disputed. Lehigh Defendants selectively applied credit card proceeds to UPS' outstanding balance in a manner that best suited Lehigh Defendants for purposes of justifying their decision to improperly terminate UPS' franchise agreements. *See generally* AR Transaction Report [DE 161-9]; *see also* February 6, 2020 Termination Notice [161-11] (reflecting that a portion of UPS' credit card proceeds were selectively applied to fuel invoices at random).

50. Disputed. *See supra* ¶ 49. Further, the Yardi Open AR Spreadsheet reflects amounts that were incurred and billed to UPS after UPS vacated the leased premises for the 17 C-Stores. Specifically, the "Base Rent Open AR" tab on the Yardi Open AR Spreadsheet reflects a total number of $246,076.51, which is primarily made up of amounts that were incurred following UPS' departure from the leased premises for the 17 C-Stores. *See generally* Lehigh Defendants' SMF, Ex. 27 [DE 161-27].

11

51.    Disputed. UPS paid rent and provided sufficient security for fuel and real estate as requested by Circle K and Lehigh Defendants. *See* AR Balance Chart [DE 161-12]; *see also supra* ¶¶ 5, 50.

## **PLAINTIFFS' SUPPLEMENTAL STATEMENT OF MATERIAL FACTS**

52.    On or around August 20, 2019, UPS received a Notice of Assignment, which covered the 17 C-Stores at issue. SAC, ¶ 81 [DE 70].

53.    The total security requested by Circle K and Lehigh Defendants (as the assignee) to cover all of UPS' financial obligations under the Leases was approximately $487,500. *See* Caverly Tr. at 19:9-15 [DE 161-6]; *see also* AR Balance Chart.

54.    Joseph Alfier was offered by Lehigh Defendants as their 30(b)(6) corporate representative to testify as to: (i) all communications between the Lehigh Parties and the Defendants, either written or oral, regarding the financial performance of the 17 C-Stores from August 2019 to the present; (ii) all communications between the Lehigh Parties and any third-party, either written or oral, regarding letters of credit in connection with the 17 C-Stores from August 2019 to the present; (iii) all communications between the Lehigh Parties and Plaintiffs, either written or oral, regarding the 17 C-Stores from August 2019 to the present; and (iv) any letters of credit that were requested by the Lehigh Parties from Plaintiffs

in connection with the 17 C-Stores. *See* Alfier Tr. at 4:24-25; 5:1-6; 19:20 – 20:1; and 21:1-18 [DE 161-10].

55.     Mr. Alfier is the territory manager for the wholesale markets in North Jersey for Cross America Partners LP. *Id*. at 5:11-19.

56.     Mr. Alfier was responsible in 2018 for due diligence to determine the creditworthiness of UPS:

> The biggest thing was going to through the credit process, making sure they had the credit to go into the amount of locations that we were soliciting for them, reviewing a business plan that Shamikh and Syed had put together as part of the review process to select them to go into these locations so the business plan was a huge part of that, the credit, and then they also had one set with us in New Jersey because they were in network, but outside of that there were really no more responsibilities for me.

*Id*. at 9:6-18.

57.     Mr. Alfier did not know what actions were taken by Circle K or TMC Franchise Corp., if any, to determine the strength of the Soleil Letter of Credit. *Id*. at 10:22 – 11:12; 13:1-11.

58.     There were no issues with UPS bouncing checks prior to November 2019. *Id*. at 28:17-20.

59.     Mr. Alfier could not recall when Lehigh Defendants first became concerned about the validity of the Soleil Letters of Credit offered by UPS. *Id*. at 32:9-21.

13

60.     Mr. Alfier did not know how much money Circle K previously sought to draw down from the Soliel Letters of Credit. *Id.* at 34:15-24. While Lehigh Defendants (through the testimony of Thomas Caverly, another 30(b)(6) witness) believed Circle K previously sought to draw down on the letter of credit, it was not until February 2020 that Lehigh Defendants themselves actually sought to draw down on the Soleil letter of credit. Mr. Caverly could not recall whether the draw request was made by Lehigh Defendants before or after Lehigh Defendants issued the February 6, 2020 Termination Notice. *See* Caverly Tr. at 37:2 – 38:6 [DE 161-6]. In reality, the first time Lehigh Defendants actually sought to draw down on the Soleil Letters of Credit was on February 5, 2020, only one day prior to sending the Termination Notice to UPS and before Lehigh Defendants ever heard back from Soleil on the draw request. *See* Lehigh Defendants' SMF, ¶ 16.

61.     Mr. Alfier was not able to testify whether Lehigh ever determined that the Soleil Letters of Credit were valid or not, and was not able to testify why Lehigh Defendants viewed them as invalid or insufficient:

Q:      You mean a different letter of credit. Did you ever determine whether or not the letter of credit by Soleil Bank was valid or not?

A:      I can't answer that. Again, in our eyes, office, I was there to communicate that we saw it as not valid.

Q:      And what was the reason why Lehigh saw the Soleil letter of credit as not being valid?

14

> A:    I don't know. Again, I was there to just communicate that it was not and that we needed a different one.

*See* Alfier Tr. at 44:22 – 45:7; 54:17-20 [DE 161-10].

According to Mr. Alfier, all discussions between Lehigh Defendants and UPS regarding the letters of credit were made in the context of settlement negotiations. *Id.* at 46:18 – 47:11.

62.    Mr. Alfier testified that UPS and Mr. Kazmi offered Lehigh Defendants a second letter of credit from Barclays Bank but that it was not acceptable to Lehigh Defendants, although he was unable to explain why.

> Q:    And do you recall whether Mr. Kazmi ever offered a second letter of credit beyond the letter of credit from Soleil Bank?
> A:    He did. One from Barclays in the United Kingdom.
>
> Q:    And was that acceptable to Lehigh at the time?
> A:    No.
>
> Q:    And when was that offered made by Mr. Kazmi for a letter of credit regarding Barclays Bank?
> Q:    And was that offered made to you directly or it was made to somebody else?
> A:    It was made -- it was sent to me and then I sent it to our office who made the decision on the validity of the letter of credit.
>
> Q:    Your testimony is you do not know the reason or reasons why Lehigh had rejected that second letter of credit that was being offered?
> A.    Correct.

*Id.* at 45:20 – 46:16; 49:23 – 50:24.

Later, Mr. Alfier testified that the original letter of credit from Barclay was never received. *Id.* at 54:4-7.

63.  Mr. Alfier does not know whether Lehigh Defendants ever formally requested that  UPS provide a new letter of credit once settlement discussions broke down. *Id.* at 47:21-25. Mr. Alfier does not know if Lehigh requested from UPS a new letter of credit after January 2, 2020. *Id*. at 55:12-22.

Respectfully Submitted,

*/s/ Asaad K. Siddiqi*
Asaad K. Siddiqi, Esq.
**TRENK ISABEL SIDDIQI & SHAHDANIAN P.C.**

*/s/ Robert F. Salkowski*
Robert F. Salkowski, Esq.
**ZARCO EINHORN SALKOWSKI, P.A.**

*Co-Counsel for Plaintiffs/Counter-Defendants Universal Property Services Inc. and Syed Kazmi*

Dated: July 25, 2025