**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNIVERSAL PROPERTY SERVICES, INC., and SYED KAZMI,  Plaintiffs/Counterclaim Defendants,  v.  LEHIGH GAS WHOLESALE SERVICES, INC., LEHIGH GAS WHOLESALE LLC, LGP REALTY HOLDINGS LP, CIRCLE K STORES, INC. and TMC FRANCHISE CORP.,  Defendants/Counterclaim Plaintiffs. | Civil Action No. 20-03315 (GC) (TJB)  **OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendants/Counterclaim Plaintiffs Lehigh Gas Wholesale Services, Inc., Lehigh Gas Wholesale LLC, and LGP Realty Holdings LP (collectively, "Lehigh Gas")'s Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56. (ECF No. 161.) Plaintiffs Universal Property Services, Inc. (UPS) and Syed Kazmi opposed, and Lehigh Gas replied. (ECF Nos. 163, 164.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part.**

I.    **BACKGROUND**

A.    **Factual Background[1]**

Circle K Stores Inc. (Circle K) is a franchisor of gas stations and convenience stores.  UPS sought to become a franchisee.  Syed Kazmi was the sole owner of UPS, and his brother Shamikh Kazmi managed the day-to-day operations.  (ECF No. 161-25 at 10-11; ECF No. 161-26 at 27.) [2] Between April and July 2019, UPS and Circle K executed a series of franchise agreements for 17 gas stations in Florida.  (ECF No. 161-3 ¶ 1; ECF No. 163-1 ¶ 1.)  The franchise agreements each consisted of two sub-agreements—a lease and a fuel supply contract.  Thus, Circle K and UPS executed 17 leases and 17 fuel supply contracts.  (ECF No. 161-3 ¶ 1; ECF No. 163-1 ¶ 1.)  Each pair—*i.e.*, each of the 17 franchise agreements—was identical but for their addresses and rent amounts.  (ECF No. 161-3 ¶ 1; ECF No. 161-3 ¶ 1.)  In August 2019, Circle K sold and assigned the gas stations and franchise agreements to Lehigh Gas.  (ECF No. 161-3 ¶ 2; ECF No. 163-1 ¶ 2.)  The assignment went into effect in September 2019.  (*See* ECF No. 161-26 at 84.)  Thus, Lehigh Gas became the franchisor and UPS the franchisee.

On February 6, 2020, Lehigh Gas notified UPS that it would be terminating the franchise, effective February 27, 2020.  (ECF No. 161-11 at 4 (citing 15 U.S.C §§ 2802(b)(2)(A),

---

[1]    On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).  The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1.  Lehigh Gas's Statement of Undisputed Material Facts is at ECF No. 161-3, Plaintiffs' Responsive Statement of Material Facts and Supplemental Statement of Disputed Material Facts are at 163-1, and Lehigh Gas's Response to Plaintiffs' Supplemental Statement of Disputed Material Facts is at ECF No. 164-1.  Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

[2]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

2802(b)(2)(C), 2802(c)(8)).)  The notification letter cited two main reasons.  First, Lehigh Gas stated that UPS failed to supply an acceptable letter of credit as is required under the fuel contracts. (*Id.*)  Second, Lehigh Gas stated that UPS failed to pay upwards of $700,000 in rent and associated fees from November 2019 to February 2020 in violation of the leases, and upwards of $50,000 in fuel in violation of the fuel contracts.  (*Id.* at 2-3.)  The instant Motion concerns whether termination was lawful under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (PMPA).

### 1. *Letters of Credit*

As part of the agreements between Circle K (later Lehigh Gas) and UPS, UPS was obligated to provide security for its payment obligations.  (ECF No. 161-3 ¶ 6; ECF No. 163-1 ¶ 6; *see also* ECF No. 161-15 at 14.)  The leases state: "To secure timely payment of rent, and other sums due under this Lease or any accompanying contract, [UPS] shall, upon execution of this Lease, provide [Lehigh Gas] with a security deposit and other security interest acceptable to [Lehigh Gas], at [Lehigh Gas]'s sole option, including without limitation a letter of credit and personal guaranty . . . ."  (ECF No. 161-4 at 3.)  Under the fuel supply contracts, "[Lehigh Gas] reserves the right to require from [UPS] from time to time a security deposit, letter of credit, personal guaranty and/or other forms of security acceptable to [Lehigh Gas] to secure [UPS's] obligations under this Contract or any other contract or agreement between" Lehigh Gas and UPS. (ECF No. 161-5 at 5-6.)  The total security requested by Circle K and Lehigh Gas (as the assignee) to cover all of UPS's financial obligations under the lease and supply agreements was $487,500. (ECF No. 163-1 ¶ 53; ECF No. 164-1 ¶ 53.)

Syed Kazmi signed the personal guaranties, (ECF No. 161-3 ¶ 8; ECF No. 163-1 ¶ 8), and Soleil Chartered Bank (Soleil) supplied the letters of credit.  (ECF No. 161-13 at 12.)[3]  Govind Srivastava, a nominated managing director at Soleil with authority to sign Soleil's letters of credit, testified at his June 23, 2022 deposition that UPS contacted Soleil to obtain letters of credit.  (*Id.* at 10, 13.)[4]  The letters of credit were issued to UPS when Circle K was the franchisor, and Lehigh Gas became the beneficiary once Circle K assigned its rights to Lehigh Gas.  (*Id.* at 17.)  Srivastava testified that there were four letters of credit between Circle K and UPS that were substantially similar to each other—one dated April 23, 2019 for $300,000, a second dated May 9, 2019 for $25,000, a third dated June 26, 2019 for $187,500, and a fourth dated July 3, 2019 for $2,000,000. (*Id.* at 18-19, 23-24; *see also* ECF No. 161-17; ECF No. 161-18; ECF No. 161-19; ECF No. 161-20.)

Each letter of credit was accompanied by a fee agreement and indemnity agreement.  (ECF No. 161-13 at 15; *see also* ECF No. 161-21; ECF No. 161-22; ECF No. 161-23; ECF No. 161-24.) In other words, Soleil received a fee from UPS for issuing a letter of credit, and if Soleil were required to pay the beneficiary, UPS would be required to pay Soleil.  Srivastava testified that while Circle K and later Lehigh Gas were parties to the letters of credit, he was not aware if those parties were ever shown the indemnity agreements—to which they were not parties—between UPS and Soleil.  (ECF No. 161-13 at 23; ECF No. 161-15 at 12.)  Shamikh Kazmi testified that

---

[3]    Soleil Bank's representative distinguishes between a "standby letter of credit" and "letter of credit," (ECF No. 161-13 at 12), but the Court finds the difference immaterial for the purposes of this Opinion and will use the term "letter of credit" for ease of reference.

[4]    Govind Srivastava is the Chief Executive Officer of the corporation Soleil Capitale and was nominated by the trustees of Soleil Chartered Bank to issue letters of credit on the bank's behalf. (ECF No. 161-13 at 7-8.)  The difference between Soleil Capitale and Soleil Chartered Bank is immaterial for the purposes of this Opinion, so the Court will refer to both as "Soleil."

UPS never sent Lehigh Gas or Circle K the indemnity agreements but that they never asked for them. (ECF No. 161-26 at 131-137.) However, UPS was required to share them: the indemnity agreements between UPS and Soleil state that UPS "confirm[s] that we as [letter of credit] applicant have notified the project owners as to the contents of this indemnity agreement, and have provided the project owner with a signed copy of this indemnity agreement." (*See, e.g.*, ECF No. 161-24 at 3.)

The interaction between the indemnity agreements (between Soleil and UPS) and the letters of credit (between Soleil, UPS, and Lehigh Gas), was a central topic of Srivastava's deposition. Srivastava reviewed the June 26, 2019 letter of credit, (ECF No. 161-13 at 18; *see also* ECF No. 161-19 at 2-3), and confirmed that the letter meant that "in the event UPS doesn't pay for the petroleum or any other outstanding invoices, Soleil will pay" up to $187,500, (ECF No. 161-13 at 19-20.) He clarified that if there was "a problem in the claim by [Lehigh Gas]," then Soleil would not have to pay. (*Id.* at 20.) But if Lehigh Gas satisfied the conditions of the letter of credit—*i.e.*, if it "supplied the goods"—it "will be paid." (*Id.* at 21.)

However, the letter of credit also provided that "[c]laims, if any, will be settled upon completion of other credit terms by *applicant* to us." (ECF No. 161-19 at 3 (emphasis added).) Srivastava testified that this meant Soleil "would only pay [Lehigh Gas] in the instance of UPS making the payment to [Soleil] first," as stipulated in the indemnity agreement, even if Lehigh Gas "supplied the goods." (ECF No. 161-13 at 21.) Srivastava was asked what purpose the letter of credit served as a result: "why would [UPS] need to give the money to you if they could just have paid [Lehigh Gas]?" (*Id.* at 22.) Srivastava responded: "This is totally dependent on [Lehigh Gas] and UPS. It is their agreement." (*Id.*) When asked if Circle K, or Lehigh Gas, was aware of the effect of the indemnity provision, Srivastava responded that it was "very obvious" based on the

letter of credit and that neither Lehigh Gas nor "Circle K []ever asked us any question on that." (*Id.*)

Srivastava went back and forth on his understanding of the indemnity provision.  First, he clarified that in order for Soleil to pay Lehigh Gas, *UPS* would have had to pay the indemnity amount, not just sign an indemnity agreement.  (*Id.* at 23.)  But he later testified that so long as *Lehigh Gas* satisfied all of its conditions in the letter, "Soleil would be obliged to pay."  (*Id.* at 29.) This would be the case even if UPS had "not provided Soleil the money under the indemnity agreement . . . ."  (*Id.*)  Under such a scenario, Soleil would sue UPS to recover the indemnity amount.  (*Id.*)  To settle the discrepancy, Srivastava was asked "in order for Soleil to pay on any draw on any [letter of credit], does [UPS] have to have first paid Soleil the money in which [Lehigh Gas] is seeking to draw?"  (*Id.* at 34.)  Srivastava reverted to his original position: "[P]rovided [Lehigh Gas] has met all the conditions, yes."  (*Id.*)

Srivastava was questioned further about this discrepancy at his July 8, 2022 deposition. When asked whether the only way for the franchisor to receive payment from Soleil would be if UPS paid Soleil the requested amount first, Srivastava replied: "Correct."  (ECF No. 161-15 at 13.)  Srivastava agreed that Soleil "has no funds of its own to secure the . . . letter of credit."  (*Id.*) And when asked what value Soleil provided to Lehigh Gas given these facts, he replied: "both [UPS] and Lehigh [Gas] agreed [to the letter of credit], so there must be some value, what value, I don't know . . . ."  (*Id.*)  Srivastava also testified that he did not think Soleil had ever "written a check in response to a claim and a . . . letter of credit."  (*Id.* at 21.)  But in his previous deposition, when asked whether Soleil had ever paid a letter of credit, he replied that Soleil "must have paid." (*See* ECF No. 161-13 at 39.)

The parties agree that on October 24, 2019, Circle K sent a letter to Soleil in relation to the July 3, 2019 letter of credit, noting that Soleil failed to comply with Circle K's draw request and requesting immediate payment. (ECF No. 161-3 ¶¶ 18-19; ECF No. 161-16 at 2; ECF No. 163-1 ¶¶ 18-19.) The parties also agree that Soleil never paid Circle K. (ECF No. 161-3 ¶¶ 18-19; ECF No. 163-1 ¶¶ 18-19.) Plaintiffs contend Soleil did not pay because UPS satisfied its obligations to Circle K. (ECF No. 163-1 ¶ 20 (citing ECF No. 163-13 at 39).) The deposition transcript Plaintiffs cite, however, merely indicates that Srivastava believed Soleil "must have paid" a letter of credit before, but it makes no reference to the specific letter of credit concerning Circle K and UPS, nor does it indicate that UPS paid its obligation thereby eliminating Circle K's need to invoke the letter of credit. (*See* ECF No. 163-13 at 39.)

Joseph Alfier, a Lehigh Gas (and former Circle K) representative, testified that the letters of credit presented a "big[] issue." (ECF No. 161-10 at 4, 10.) When asked whether "the issue surrounding the letter of credit arose when Circle K [unsuccessfully] attempted to exercise its rights under the letter of credit," Alfier replied that he could not say "for sure that's when the alarms went off, but that was definitely one that I remember." (*Id.*) Alfier testified that concerns about the "validity of the letters of credit" arose "soon after the sites came over to Lehigh [Gas]" from Circle K. (*Id.* at 12.) Lehigh Gas's director of accounting, Thomas Caverly, testified that Lehigh Gas became aware of the "questionability of the letter of credit" in October or November of 2019 but did not terminate the contracts at that time because Lehigh Gas was "trying to work it out, work it out going forward." (ECF No. 161-6 at 18.)

Lehigh Gas and UPS representatives met in December 2019 to discuss the letters of credit and rent payment issues. (ECF No. 161-31 at 10-11.) At that or at another related meeting,[5] Lehigh Gas representatives stated they would agree to concessions such as rent abatements, but Lehigh Gas was not willing to negotiate on the letter of credit and requested that UPS supply a new letter. (ECF No. 161-10 at 14.) On January 2, 2020, UPS emailed a draft of a new letter of credit from, allegedly, Barclays Bank PLC (Barclays), but Lehigh Gas informed UPS that it would only accept a "signed original [letter] on bank letterhead" that was sent to Lehigh Gas's office rather than attached to an email. (*Id.* at 14-15.) Lehigh Gas never received a physical letter. (*Id.* at 15.)[6] The parties do not explain, nor does the record reveal, when Lehigh Gas understood that a letter from Barclays would not arrive. Discussions thereafter "broke down" because, according to Alfier, "everything was contingent on getting a letter of credit." (ECF No. 161-10 at 14.) After January 2, 2020, Alfier was not aware of any communications between Lehigh Gas and UPS about a new letter of credit or any formal requests to provide a letter of credit. (*Id.* at 14, 16.)

---

[5]    Shamikh Kazmi testified that the parties engaged in "[d]ozens" of meetings to attempt to resolve disputes, (ECF No. 161-26 at 56), though there does not appear to be evidence in the record providing clarity on the timeline or exact number of these meetings.

[6]    During discovery, Lehigh Gas subpoenaed Barclays for "[a]ll documents and electronically stored information relating to UPS's attempt to obtain a standby letter of credit, letter of undertaking or similar financial instrument from Barclays," (ECF No. 93-1 at 9), but Barclays stated that it found no responsive documents. (ECF No. 161-28 at 2.) Lehigh Gas submits that this evidence indicates that "Barclays has no record of ever being contacted by UPS or its broker." (ECF No. 161-3 ¶ 32.) UPS states that it "did not interact directly with Barclays Bank" but it disputes Lehigh Gas's position, though it is unclear on what grounds. (ECF No. 163-1 ¶ 32.) The parties agree that Shamikh Kazmi never asked Barclays to issue UPS a letter of credit. (ECF No. 161-3 ¶ 33; ECF No. 163-1 ¶ 33.) Shamikh Kazmi testified that he reached out to a broker or other similar intermediary to coordinate the draft letter of credit from Barclays and that the draft letter was provided to Lehigh Gas, but he could not recall any other information about this letter. (ECF No. 161-26 at 72-73.)

On February 5, 2020—after UPS had missed four months of payments—Lehigh Gas sent a letter to Soleil requesting payment in accordance with the April 23, 2019 letter of credit. (*See* ECF No. 161-14.) On February 6, 2020, Lehigh Gas issued its termination notice which stated it would go into effect in 21 days. (ECF No. 163-1 ¶ 60; ECF No. 164 ¶ 60; ECF No. 161-11 at 2.) Lehigh Gas representative David Hirnak testified that the company decided to terminate because "we were uncomfortable with the financial situation of the customer" which included the letters of credit issue: "after lots of back and forth . . . we were unable to get any acceptable security that was required under the contract." (ECF No. 161-31 at 14.) The termination letter stated that UPS "[f]ail[ed] to provide an acceptable letter of credit as required under Section 7 of the Supply Agreements." (ECF No. 161-11 at 3.)

On February 14, 2020, Soleil rejected Lehigh Gas's February 5, 2020 draw request "due to non-completion of credit terms" by UPS. (ECF No. 161-14.) Srivastava was asked what UPS would have needed to do in order for Soleil to pay Lehigh Gas, and Srivastava testified that "UPS should have paid and then we would have paid [Lehigh Gas]." (ECF No. 161-13 at 38.) The relationship between Lehigh Gas and UPS was officially terminated on February 27, 2020, though UPS did not vacate immediately. (*See* ECF No. 161-11 at 2; ECF No. 161-3 ¶ 45; ECF No. 163-1 ¶ 45.)

### 2.    *Rent and Fuel Payments*

The second issue that led Lehigh Gas to terminate was UPS's failure to pay for rent and fuel. Section 3 of the leases provide a rent schedule and state that on the first of each month, "[s]uch rent shall be payable, without setoff, deduction, notice, or demand." (ECF No. 161-4 at 2.) Under Section 4 of the fuel supply contracts, UPS must pay Lehigh Gas "at or before the time of delivery of the [fuel.]" (ECF No. 161-5 at 4.) The provision goes on to outline that UPS "hereby assigns to [Lehigh Gas] all of [UPS's] right, title and interest in the proceeds from the sale [of fuel]

by [Lehigh Gas] that are effectuated through credit card transactions." (*Id.*)  In other words, the credit card proceeds belonged to Lehigh Gas.  And "[i]f the Credit Card Proceeds exceed the balance on [UPS's] account with Lehigh Gas" for the sale of fuel "as of the Payment Date, [Lehigh Gas] shall at its option either (i) pay such excess amount to [UPS] within a commercially reasonable time, or (ii) treat such excess amount as a credit in favor of [UPS]." (*Id.*)

Thus, if Lehigh Gas made more money off credit card proceeds than Lehigh Gas was entitled to receive from UPS, then Lehigh Gas could either pay the difference to UPS— *i.e.*, "sweep" the proceeds into UPS's account—or treat the difference as a credit in UPS's favor. Lehigh Gas's standard practice under this scenario was to retain the credit card proceeds until a "territory manager"—an intermediary between UPS and Lehigh Gas—specifically requested them to be swept into UPS's account, at which point the proceeds would be transferred so long as UPS was in good standing.  (*See* ECF No. 161-6 at 6-7.)  If the credit card proceeds were less than what it was entitled to from UPS, Lehigh Gas would charge UPS for the difference.  (*See id.* at 6.)

The payment issues began in the fall of 2019.  Caverly testified that during this time, Lehigh Gas began retaining the credit card proceeds.  (*Id.* at 7.)  Lehigh Gas argues it began withholding credit card proceeds on November 8, 2019.  (ECF No. 161-3 ¶ 12.)  Plaintiffs argue Lehigh Gas began withholding credit card proceeds in September 2019.  (ECF No. 161-3 ¶ 12.)  The record reveals that Lehigh Gas retained $279,794.48 by the end of September across the 17 gas stations. (ECF No. 161-12 at 2.)  Caverly testified that the amount Lehigh Gas retained at any one time could vary considerably in the normal course of business because some gas stations request sweeps once a week or twice a month whereas others "don't ask for sweeps often."  (ECF No. 161-6 at 19.)  It was not until November 2019 when the withholding pattern changed considerably because Lehigh Gas stopped sweeping new proceeds back to UPS regardless of whether UPS requested

10

those proceeds.  Caverly reviewed the credit card transaction data and confirmed that the last time Lehigh Gas swept proceeds was on November 8, 2019.  (*Id.* at 9.)  When asked why Lehigh Gas stopped paying the proceeds after this date, Caverly responded: "I think the decision was made because [UPS] returned November's rent draft and at that point, we also were pretty sure that [the] Soleil Bank letter of [] credit that was provided was not . . . actually secured."  (*Id.* at 10.)

As of November 22, 2019, UPS was still paying for fuel (though not rent).  (*Id.* at 19.)  At some point after this, UPS stopped paying for fuel, but the record is not clear on precisely when the payments stopped.  (*See* ECF No. ECF No. 161-11 at 2-3, 31-38.)  In January 2020, Lehigh Gas stopped supplying fuel to UPS because UPS missed November, December, and January rent payments.  (ECF No. 161-6 at 13.)

On the same day that Lehigh Gas tried to draw the November 2019 rent that bounced, UPS paid One Ten Retail Services Corp II Inc. (One Ten) $620,000.  (ECF No. 161-3 ¶ 35; ECF No. 163-1 ¶ 35.)  Syed Kazmi was the president of One Ten and his father was the owner.  (ECF No. 161-3 ¶ 36; ECF No. 163-1 ¶ 36.)  Syed Kazmi was also the president of Aqri Incorporated and Diwan Patrol, companies that operated gas stations until they ceased operations in 2020.  (ECF No. 161-25 at 19, 22-23.)  UPS paid these three companies a total of $890,876 from November 2019 through February 2020, and Lehigh Gas notes that this amount was greater than the rent ($721,058.78) and fuel ($54,446.88) debt that UPS failed to pay to Lehigh Gas by the February 6, 2020 termination notice date.  (ECF No. 161-3 ¶¶ 40-42 (citing ECF No. 161-29); ECF No. 163-1 ¶ 40 (not disputing the amount sent to the three companies).)

The parties agree that by February 29, 2020, UPS owed $725,219.41 in rent.  (ECF No. 161-2 at 15; ECF No. 161-3 ¶ 40.)  Plaintiffs contend, however, that UPS was entitled to credit card proceeds amounting to $996,336.59.  (ECF No. 161-3 ¶ 40.)

The parties disagree about how much Lehigh Gas held in credit card proceeds as compared to the amount UPS owed to Lehigh Gas.  Lehigh Gas states that from November 2019 through February 2020 "the credit card proceeds withheld by Lehigh [Gas] trailed UPS's obligations." (ECF No. 161-3 ¶ 15.)  UPS, by contrast, states that "[a]t all times beginning from November 2019 through February 2020, Lehigh [Gas] Defendants withheld credit card payments belonging to UPS that far exceeded the amounts for rent and fuel that Lehigh [Gas] Defendants claim it was owed by UPS."  (ECF No. 163-1 ¶ 14.)  The difference stems from the fact that Lehigh Gas includes the $487,500 security obligation, whereas UPS just accounts for fuel and rent.  The record reveals that by the end of January—a few days before Lehigh Gas's decision to terminate—Lehigh Gas was withholding $712,158.12 in credit card proceeds, UPS owed $542,220.27 in rent and (as always) had a security obligation of $487,500.  (ECF No. 161-12 at 2; *see also* ECF No. 161-6 at 21.)  By the end of February 2020—when the missed February rent was included—Lehigh Gas was withholding $996,366.59 in credit card proceeds and UPS owed $725,219.41 in rent.  (*Id.*)  In other words, Lehigh Gas could have covered UPS's rental obligations, but if it did, the remainder ($271,147.18) would be insufficient to cover the security Lehigh Gas was owed by UPS ($487,500).[7]

After the termination went into effect on February 27, 2020, UPS did not leave the gas stations because it believed the terminations were improper.  (ECF No. 161-3 ¶ 45; ECF No. 163-1 ¶ 45.)  Lehigh Gas commenced 17 eviction cases in Florida state court in March 2020, and UPS agreed to vacate.  (ECF No. 161-3 ¶ 46; ECF No. 163-1 ¶ 46.)  UPS vacated all of the gas stations

---

[7]    The spreadsheet cited by the parties, (ECF No. 161-12 at 2), does not account for fuel payment obligations owed by UPS to Lehigh Gas.  Based on the termination notice, it appears that UPS owed nearly $55,000 by February 2020.  (*See* ECF No. 161-11 at 3.)  Therefore, the remainder would be even smaller if Lehigh Gas covered UPS's rental and fuel obligations.

by June 1, 2020. (ECF No. 161-3 ¶ 47; ECF No. 163-1 ¶ 47.) During this time period, Lehigh Gas charged UPS rent as a holdover tenant under Section 17(e) of the leases. (ECF No. 161-3 ¶ 48; ECF No. 163-1 ¶ 48.) Lehigh Gas states it then applied the credit card proceeds to satisfy a portion of UPS's debt, with fuel being fully satisfied but $273,235.35 remaining in unpaid rent. (ECF No. 161-3 ¶¶ 49-50.) Plaintiffs contend that Lehigh Gas "selectively applied credit card proceeds to UPS'[s] outstanding balance in a manner that best suited Lehigh [Gas] Defendants for purposes of justifying their decision to improperly terminate UPS's franchise agreements" and that, in any event, the remaining balance on rent is inaccurate because it is "primarily . . . made up of amounts that were incurred following UPS's departure from the leased premises" on June 1, 2020. (ECF No. 163-1 ¶¶ 49-50.) UPS does not offer its own calculation for how much rent remains unpaid.

## B.    Procedural Background

On March 26, 2020, Plaintiffs filed their Complaint in this Court, followed by an Amended Complaint (FAC) on April 10, 2020. (ECF Nos. 1, 5.) The FAC added Circle K and TMC Franchise Corp. (TMC) as Defendants. (ECF No. 5.) After the Honorable Freda L. Wolfson, U.S.D.J, denied Lehigh Gas's Motion to Dismiss, Plaintiffs filed a Second Amended Complaint (SAC) on May 21, 2021. (ECF No. 70.) The SAC asserts eight causes of action, including three claims against Lehigh Gas: violation of the PMPA (Count V) and breaches of the leases and fuel supply agreements (Counts VI and VII). (*See id.*)[8] On July 19, 2021, Lehigh Gas filed an Answer to the SAC

---

[8]    On July 23, 2024, Plaintiffs stipulated to dismissal of all claims against the non-Lehigh Gas defendants. (*See* ECF No. 152.)

and asserted three counterclaims: UPS breached the lease and fuel supply agreements, (ECF No. 78 at 31-32), and Syed Kazmi breached his guaranty agreements, (*id.* at 33.)[9]

On January 28, 2022, Lehigh Gas filed a Motion for Judgment on the Pleadings with respect to Plaintiffs' claims. (ECF No. 97). On August 8, 2022, Judge Wolfson granted Lehigh Gas's Motion with respect to the two breach of contract claims (Counts VI and VII) and granted in part the PMPA claim (Count V). (ECF No. 116.) The Court summarizes Judge Wolfson's decision to the extent it is relevant to the instant Motion for Summary Judgment.

Plaintiffs alleged that beginning in September 2019, Lehigh Gas withheld fuel and non-fuel credit card proceeds from the 17 gas stations even though Lehigh Gas was only authorized to withhold credit card proceeds from fuel sales. (*Id.* at 3.) According to Plaintiffs, Lehigh Gas withheld these credit card proceeds because UPS owed Circle K—and therefore Lehigh Gas—payment in connection with a prior inventory audit. (*Id.*) In response, UPS advised Lehigh Gas that because it did not receive the credit card proceeds, it could not pay rent beginning in November 2019. (*Id.* at 4.) The parties discussed a path forward—Lehigh Gas would provide rent relief if UPS provided a new letter of credit. (*Id.*) UPS did not provide the letter, Lehigh Gas did not provide rent relief, and UPS failed to pay rent on November 1, 2019; December 1, 2019; January 1, 2020; and February 1, 2020. (*Id.*) Plaintiffs alleged that on January 15, 2020, Lehigh Gas stopped selling fuel to UPS and that on February 6, 2020, Lehigh Gas notified UPS that it would be terminating the lease and fuel supply agreements. (*Id.*) Lehigh Gas argued that withholding credit card proceeds, whether fuel or non-fuel, was authorized by the fuel and lease agreements. (*Id.* at 7.) Plaintiffs argued withholding non-fuel credit card proceeds (*i.e.*, convenience store

---

[9]    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

proceeds) was not authorized. (*Id.*) Analyzing the contracts under Pennsylvania law, which prohibits looking beyond the four corners of the documents if the writing is unambiguous, Judge Wolfson found Lehigh Gas did not breach the agreements and dismissed Counts VI and VII. (*Id.* at 7-13 (citing *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008).)

As for Count VI, Plaintiffs alleged that Lehigh Gas breached the fuel supply agreements because those agreements required Lehigh Gas to sell fuel to UPS. (*Id.* at 9.) Judge Wolfson dismissed UPS's claim, reasoning that "the contractual provisions governing [Lehigh Gas's] rights and remedies in the event of UPS's non-payment of rent are straightforward, clear, and unambiguous." (*Id.*) Section 4(c) of the fuel supply agreement provided that "[i]f at any time the financial responsibility of [UPS] shall become impaired or unsatisfactory to [Lehigh Gas], or should [UPS] be in arrears in [its] accounts with [Lehigh Gas], [Lehigh Gas] <u>may require as a condition of making further deliveries under this Contract</u>, payment by [UPS] of all past due accounts and cash payment prior to or upon, all such future deliveries." (*Id.* (quoting ECF No. 161-5 at 4) (emphasis added by Judge Wolfson).) Judge Wolfson therefore concluded that Lehigh Gas was permitted to cease providing fuel once UPS failed to remit rent payments and did not become current on past due amounts. (*Id.* at 10.) Judge Wolfson also noted Plaintiffs' argument—that Lehigh Gas prevented UPS from paying rent by withholding credit card proceeds therefore justifying non-payment under Section 4(c)—was unavailing because Section 3(a) of the lease agreements provide that rent is due "<u>without setoff</u> . . . on the 1st day of each and every calendar month. (*Id.* (quoting ECF No. 161-4 at 2) (emphasis added by Judge Wolfson).) UPS's argument that it should be excused from paying because Lehigh Gas owed them the credit card proceeds, Judge Wolfson explained, was a setoff argument. (*Id.*) The Court therefore granted Lehigh Gas's Motion with respect to Count VI. (*Id.* at 11.)

As for Count VII, Plaintiffs challenged Lehigh Gas's withholding of non-fuel credit card proceeds, in violation of both the leases and fuel supply agreements. Judge Wolfson again ruled for Lehigh Gas, finding the contractual provisions "straightforward." (*Id.* at 11.) Section 3(b) of the leases permit Lehigh Gas to require "a security deposit at any time in the future to secure timely payment of rent and other sums due." (*Id.* at 11 (quoting ECF No. 161-4 at 3).) And Section 7(f) of the fuel supply contracts allow Lehigh Gas to require a "security deposit [or] letter of credit . . . to secure [UPS's] obligations under" the fuel agreement "or any other contract or agreement between" Lehigh Gas and UPS. (*Id.* (quoting ECF No. 161-5 at 6) (emphasis added by Judge Wolfson).) That provision also outlines that "[i]n order to secure payment of all [UPS's] present and future indebtedness owed by [UPS] to [Lehigh Gas] at any time during the Term of this Contract . . . [UPS] hereby grants to [Lehigh Gas] a security interest . . . in . . . **all proceeds of [UPS's] inventory, accounts receivable and equipment**." (*Id.* (quoting ECF No. 161-5 at 6) (emphasis added by Judge Wolfson).) Relying on dictionary definitions of "accounts receivable" and the inclusion of the term "all proceeds," Judge Wolfson concluded that the language in these provisions entitled Lehigh Gas to a security interest in credit card proceeds "from both fuel sales and non-fuel sales," so withholding non-fuel credit card proceeds was authorized. (*Id.* at 11-12 (emphasis added by Judge Wolfson).) The Court therefore granted Lehigh Gas's Motion with respect to Count VII. (*Id.* at 13.)

Finally, the Court considered Plaintiffs' claim in Count V that terminating the contracts violated the PMPA. The Court found Lehigh Gas complied with the procedural requirements for termination, namely the issue of adequate notice, and proceeded to consider the substantive requirements. (*Id.* at 14-17.) The Court explained that termination is prohibited under the PMPA unless there is an "event which is relevant to the franchise relationship and as a result of which

termination of the franchise or nonrenewel of the franchise relationship is reasonable . . . ." (*Id.* at 18 (quoting 15 U.S.C. § 2802(b)(2)(C)).) The PMPA provides a non-exhaustive list of events which may permit termination including "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled." 15 U.S.C. § 2802(c)(8).

The Court found factual disputes "permeat[ed]" this claim. (*Id.* at 19.) The Court reasoned that Lehigh Gas had to show termination was objectively reasonable but noted that occurrence of an enumerated ground for termination, such as 15 U.S.C. § 2802(c)(8), does not make termination *per se* reasonable under Third Circuit precedent. (*Id.* at 19-20 (quoting *Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670, 673 (3d Cir. 1984)).) The Court concluded that neither side provided caselaw on whether the reasonable determination under the PMPA is for a court or factfinder, but if even it were for a court, factual disputes still existed. (*Id.* at 20.) The Court noted that, for example, while Lehigh Gas was permitted to withhold the credit card proceeds under the contracts, "withholding this large sum of money on one hand, and demanding payment on the other, certainly bears on the reasonableness of [Lehigh Gas's] conduct that ultimately led to the termination of the franchise agreements." (*Id.*) And Plaintiffs alleged that Lehigh Gas had not requested that UPS provide an additional letter of credit prior to the termination notice, so factual disputes existed surrounding Lehigh Gas's argument that it terminated because Lehigh Gas did not provide a letter of credit. (*Id.*) Thus, the Court denied Lehigh Gas's Motion with respect to the substantive grounds for termination alleged in Plaintiff's PMPA claim. (*Id.* at 21.)

The parties then moved forward with discovery, and Lehigh Gas filed the instant Motion for Summary Judgment on June 13, 2025, (ECF No. 161), which Plaintiffs opposed, (ECF No. 163). Lehigh Gas requests the Court grant summary judgment in its favor with respect to Plaintiffs'

PMPA claim (because termination was lawful) and Lehigh Gas's three counterclaims (because UPS did not pay for its rent or fuel and Syed Kazmi did not pay in UPS's absence).  (ECF No. 161.)

## II.    LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))).  "[I]nferences, doubts, and issues of credibility should be resolved against the moving party."  *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

## III.    <u>DISCUSSION</u>

### A.    **Violation of the PMPA**

The PMPA regulates the relationship between petroleum franchisors and franchisees. "Congress passed this legislation . . . because it was concerned that franchisors had been using their superior bargaining power to compel compliance with certain marketing policies and to gain an unfair advantage in contract disputes" and "wanted to protect franchisees from arbitrary or discriminatory terminations and non-renewals." *Patel v. Sun Co.*, 141 F.3d 447, 451 (3d Cir. 1998) (internal quotation marks and citations omitted). Accordingly, the "PMPA prohibits franchisors from terminating or nonrenewing franchises except under certain prescribed situations." *Id.* at 451-52 (citing 15 U.S.C. § 2802(a)). Lehigh Gas argues that two of those statutory circumstances apply. (ECF No. 161-2 at 29-39 (citing 15 U.S.C. § 2802(b)(2)(A) and 15 U.S.C. § 2802(b)(2)(C).)

First, termination is permitted upon "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship[.]" 15 U.S.C. § 2802(b)(2)(A). "Analyzing a termination under this section requires the court to examine the provision of the contract to determine if it is both reasonable and material," and this "determination is made by the court from an objective viewpoint." *Lombardi v. Kimber Petro. Corp.*, Civ. No. 91-3341, 1992 WL 88075, at *3 (D.N.J. Apr. 6, 1992). "Section 2802(b)(2)(A) requires only that the disputed provision of the contract be 'reasonable and material'" and "does not require that the termination itself be reasonable." *Id.* (citation omitted). Courts have interpreted "reasonable" in "keeping with [its] common and ordinary use and meaning[]" and have analyzed whether provisions are "conscionable." *Hillmen, Inc. v. Lukoil N. Am., LLC*, Civ. No. 13-4239, 2015 WL 3947960, at *7 (E.D. Pa. June 26, 2015) (citations omitted). "The Third Circuit Court of Appeal's 'materiality' test inquires whether the franchise agreement provision is a non-technical requirement and is a 'significant substantive requirement relating to

19

the way the franchisee must run his business.'" *Id.* (citing *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 595 n. 11 (3d Cir. 1989)). If the provision is both reasonable and material, "[t]ermination under this subsection does not require that the franchisor provide the franchisee the opportunity to cure." *Id.* (citing *O'Shea*, 886 F.2d at 595).

Second, termination is also permitted upon "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C). The PMPA provides a non-exhaustive list of qualifying events, 15 U.S.C. § 2802(c), such as "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," *id.* § 2802(c)(8). However, 15 U.S.C. § 2802(b)(2)(C) is not a "per se termination rule favoring franchisors." *Rago*, 741 F.2d at 673 ("[W]e cannot agree with the district court that no reason can justify a franchisee's failure to make timely payments."). When termination pursuant to 15 U.S.C. § 2802(b)(2)(C) is based on franchisee misconduct, as is the case under 15 U.S.C. § 2802(c)(8), the PMPA "generally contemplates an objective reasonableness inquiry" which requires viewing the facts "from the perspective of a reasonable business person charged with making" the termination decision. *Patel*, 141 F.3d at 456 n.5, 459.

15 U.S.C. § 2802(b)(2)(A) and 15 U.S.C. § 2802(b)(2)(C) have overlap. First, the same conduct can justify termination under both statutory provisions. *See, e.g.*, *Zipper v. Sun Co., Inc.*, 947 F. Supp 62, 67-68 (E.D.N.Y. 1996) (finding franchisee's "failure to pay amounts due for rent, gasoline and other products, provide adequate justification" for termination under both and 15 U.S.C. § 2802(b)(2)(C) (through 15 U.S.C. § 2802(c)(8)) and 15 U.S.C. § 2802(b)(2)(A)).

Second, termination is not permitted if the franchisee's "failure"—a term used in 15 U.S.C. § 2802(b)(2)(A) and 15 U.S.C. § 2802(c)(8)—was "beyond the reasonable control of the

franchisee." 15 U.S.C. § 2801(13). "This exclusion has been considered as 'merely a legislated excuse for nonperformance' which reflects a judgment that 'unforeseen circumstance may impede compliance' with certain, otherwise reasonable, franchise requirements." *Hillmen,* 2015 WL 3947960, at *8 (quoting *Rago*, 741 F.2d at 673). "Courts that have addressed this 'legislative excuse for nonperformance' issue have held that a franchisee's lack of funds to pay invoices, for whatever reason, cannot be characterized as a cause beyond the franchisee's reasonable control." *Id.* (collecting cases). In *Hillmen*, the court found that the defendant's rent increases did not justify the plaintiff's failure to pay for fuel because the plaintiff presented no evidence that the rent increases were "unlawful or outside the scope of [the d]efendant's allowable business discretion" and plaintiff entered into contracts agreeing to those rent increases. *Id.* at *9.

Third, regardless of the grounds for termination, "[t]he franchisee shall have the burden of proving the termination of the franchise." 15 U.S.C. § 2805(c). If a franchisee satisfies this burden, the "franchisor shall bear the burden going forward with evidence to establish as an affirmative defense that such termination . . . was permitted under section 2802(b)[.]" *Id.*

### 1.      *15 U.S.C. § 2802(b)(2)(A)*

Lehigh Gas argues that "payment of rent and provision of security are reasonable and material provisions of the" leases and fuel supply contracts, so breaches of both "serve as grounds for [termination] under [15 U.S.C. § 2802(b)(2)(A)]." (ECF No. 161-2 at 32.) Plaintiffs nowhere address this argument or even cite to 15 U.S.C. § 2802(b)(2)(A) in their brief, instead focusing on 15 U.S.C. §§ 2802(b)(2)(C), 2802(c)(8). (*See generally* ECF 163.) The Court agrees that termination was permitted because UPS "fail[ed] to comply with a provision of the franchise" that was material and reasonable—namely Section 3 of the leases, which cover rent payment obligations.

21

Under Section 3 of each of the lease agreements, "rent shall be payable, without setoff . . . on the 1st day of each and every calendar month during the effective life of this Lease[.]"  (ECF No. 161-4 at 2-3.)  It is undisputed that Lehigh Gas was unable to collect rent from UPS in November 2019 and that by February 29, 2020, the rent balance was $725,291.41.  (ECF No. 161-3 ¶¶ 9, 40; ECF No. 163-1 ¶¶ 9, 40.)  UPS did not submit rent payments in November 2019, December 2019, January 2020, or February 2020.  (ECF No. 116 at 17; ECF No. 161-6 at 11; ECF No. 161-11 at 2.)  Plaintiffs argue UPS did not submit rent payments because Lehigh Gas was holding, by February 2020, nearly $1,000,000 in credit card proceeds that belonged to UPS.  (*See* ECF No. 163 at 12.)  Judge Wolfson, analyzing the four corners of the document as is required under Pennsylvania law when a contract is unambiguous, found that this argument was "unpersuasive" in the breach of contract context because it was "belied by the express terms of the Lease, which provide that rent is due 'without setoff[.]'"  (ECF No. 116 at 10 (emphasis by Judge Wolfson).)  Therefore, UPS failed to comply with a provision of the franchise.

Because UPS failed to comply with a provision of the franchise, termination is proper if that provision is material and reasonable and the ability to comply with it was within UPS's reasonable control.  UPS does not brief the first two issues and only briefs the third in the context of 15 U.S.C. § 2802(c).  (*See* ECF No. 163 at 24-25.)  There is no doubt that the provision to pay rent is material.  *See, e.g., Zipper*, 947 F. Supp. at 67 (finding termination justified when, in part, neither party disputed whether payment obligations were material); *cf. 3 N Holding Corp. v. LUKOIL N. Am. LLC*, Civ. No. 24-05102, 2024 WL 3355612, at *6 (D.N.J. July 9, 2024) ("[T]his Court finds that a franchisor has a materially significant interest in ensuring that its franchisees' gas stations are maintained in a good, clean, and orderly condition.")

The next question is whether the "without setoff" provision is reasonable in light of the fact that, as Judge Wolfson found, the leases and fuel supply contracts allowed Lehigh Gas to retain credit card proceeds—both fuel and non-fuel—as security.  (ECF No. 116 at 12.)  In other words, the Court must determine whether it is reasonable for Lehigh Gas to require UPS to pay rent without setoff while at the same time retaining the ability to withhold funds that UPS could use to pay that rent.  The Court finds it is a reasonable contractual provision.  As Judge Wolfson stated, Lehigh Gas "contracted for a tenant with the financial wherewithal and security to pay rent without relying on [UPS's] revenue [from the 17 gas stations] to cover the expense."  (ECF No. 116 at 10 (internal quotation marks omitted).)  "That, indeed, was the purpose of the setoff provision agreed to by UPS."  (*Id.*)  Further, the parties explicitly agreed that the provision was reasonable: Section 5 states that the parties "agree that in all respects the provisions are reasonable and of material significance to the relationship."  (ECF No. 161-4 at 4.)  And UPS has not presented the Court with any authority indicating such a provision is unreasonable.  *Cf. Hillmen*, 2015 WL 3947960, at *7 (noting courts have analyzed whether provisions were "conscionable" to determine whether they were reasonable); *Zipper*, 947 F. Supp. at 67 (finding provision reasonable when the "parties do not dispute that the payment obligations at issue here are [] reasonable").

Thus, the only issue that remains is whether UPS's inability to pay was outside of UPS's reasonable control or was a "failure" within the meaning of the PMPA.  The Court finds it was within UPS's reasonable control.  While unforeseen events such as a flood would make a subsequent termination unlawful, *Rago*, 741 F.2d at 673, courts have continually "held that a franchisee's lack of funds to pay invoices, for whatever reason, cannot be characterized as a cause beyond the franchisee's reasonable control."  *Hillmen,* 985 F. Supp. 2d at 667.  And, like in *Hillmen*, where the franchisee unpersuasively argued that the franchisor caused the missed

payments, Lehigh Gas did not engage in conduct that was "unlawful or outside the scope of [its] allowable business discretion." *Id.* Indeed, Judge Wolfson previously held that "the Lease and Fuel Supply Agreement authorized the withholding of non-fuel [and fuel-based] credit card proceeds as security based on UPS's failure to pay rent." (ECF No. 116 at 12.) And, just as in *Hillmen*, UPS willingly entered into contracts with the setoff provisions, so it cannot rely on withheld funds as a valid justification.[10] Therefore, because UPS violated a reasonable and material setoff provision by failing to pay rent for four months and amassing over $700,000 in debt, and because that failure to pay was not outside of UPS's reasonable control within the meaning of the PMPA,[11] Lehigh Gas lawfully terminated the franchise under 15 U.S.C. § 2802(b)(2)(A).[12]

### 2.    *15 U.S.C. § 2802(b)(2)(C)*

Even if termination were unlawful under 15 U.S.C. § 2802(b)(2)(A), the Court finds the 15 U.S.C. § 2802(c)(8) termination was reasonable, and therefore permitted, under 15 U.S.C. § 2802(b)(2)(C).

---

[10]    Indeed, the evidence in the record demonstrates that regardless of Lehigh Gas's actions, the ability to pay was still within UPS's control given that UPS sent money to other companies owned by Syed Kazmi from November 2019 to February 2020 that was beyond what UPS owed to Lehigh Gas during that same timeframe. (*See* ECF No. 161-3 ¶¶ 40-42; ECF No. 161-29; ECF No. 163-1 ¶¶ 40-42.)

[11]    Plaintiffs state that "Circle K supplied them with false and misleading historical financial data" when executing the initial agreements. (ECF No. 163 at 5.) To the extent Plaintiffs imply that the contracts between Lehigh Gas and UPS should be deemed unenforceable or that UPS's failure to pay rent was out of its reasonable control as a result, the Court rejects these conclusory, unsubstantiated arguments.

[12]    Because the Court finds termination permissible due to breach of Section 3(a) of the leases, the Court need not consider Lehigh Gas's other arguments under 15 U.S.C. § 2802(b)(2)(A). Further, a breach of the lease allows Lehigh Gas to terminate the corresponding fuel supply agreement. (*See* ECF No. 161-5 at 16-17 ("This [fuel supply agreement] may be terminated by [Lehigh Gas]" upon "[UPS's] material breach of the accompanying [lease].").)

Judge Wolfson denied Lehigh Gas's Motion for Judgment on the Pleadings with respect to the reasonableness of 15 U.S.C. § 2802(c)(8) termination for three reasons.  First, Judge Wolfson was not presented with caselaw indicating that the Court, rather than a jury, should decide such a question.  (ECF No. 116 at 20.)  Second, Judge Wolfson found factual disputes existed surrounding whether Lehigh Gas "requested UPS to provide an additional letter of credit prior to the February 6, 2020 Termination Notice."  (*Id.*)  Third, factual disputes existed surrounding why Lehigh Gas withheld credit card proceeds when "presumably the $1 million in credit card proceeds allegedly withheld from UPS could have been sufficient to satisfy the missed rental payments."  (*Id.*)  Each of these disputes is now resolved.

First, courts in this Circuit routinely find terminations reasonable on motions for summary judgment.  *See, e.g.*, *Rago*, 741 F.2d at 672, 674 ("[W]e conclude that under the circumstances Rago's failure to operate the station was a sufficient ground for terminating his franchise under § 2802(c)(9)(A) of the PMPA."); *Hillmen*, 2015 WL 3947960, at *1, *7-9 (finding "a franchisee's failure to sell gas for seven (7) consecutive days" reasonable grounds for termination); *Wynn v. Lukoil N. Am.*, LLC, Civ. No 15-166, 2015 WL 5093051, at *1, *4 (E.D. Pa. Aug. 28, 2015) ("[Plaintiff]s's admitted failure to purchase or sell motor fuel . . . is reasonable grounds for [defendant]'s termination under the facts of this case."); *Atlantis Petrol., LLC v. Getty Petrol. Mktg., Inc.*, Civ. No. 11-2517, 2011 WL 4348285, *1, *6 (E.D. Pa. Sept. 16, 2011) ("Defendant's decision to finally terminate the Distributor Agreement was reasonable in light of all the circumstances.")

Second, discovery has shed light on the letter of credit issue.  Lehigh Gas became suspicious of the Soleil letters of credit months before termination, at least in part because Circle K was not able to draw on the letters.  (ECF No. 161-10 at 10-12; ECF No. 161-16 at 2.)  Following

the onset of these suspicions, Lehigh Gas met with UPS several times to discuss the letter of credit issue and requested that UPS provide a new letter of credit. (ECF No. 161-6 at 18; ECF No. 161-10 at 14; ECF No. 161-26 at 56.; ECF No. 161-31 at 10-11, 13-14.) And the record demonstrates that when Lehigh Gas requested that a physical, signed, original version of the letter be sent to Lehigh Gas's office, Lehigh never received such a letter. (ECF No. 161-10 at 14-15.) Thus, Lehigh Gas was wary, and reasonably so, of UPS's ability to supply reliable credit.[13]

The factual circumstances surrounding the letter of credit also add critical context to Lehigh Gas's decision to withhold nearly $1 million in credit card proceeds—Judge Wolfson's third concern. The undisputed facts reveal that after UPS missed its first rental payments in November 2019 and Lehigh Gas became suspicious of the Soleil letters of credit, Lehigh Gas stopped sweeping credit card proceeds to UPS. (ECF No. 161-6 at 9-10.) Judge Wolfson has already held it was entitled to withhold these proceeds—whether fuel or non-fuel—under the franchise agreements. (ECF No. 116 at 11-13.) But the decision to withhold these proceeds was not just lawful with respect to the contracts—it was also reasonable given that Lehigh Gas rightfully believed it needed a new valid letter of credit for the $487,500 in security it was promised from UPS. (*See* ECF No. 163-1 ¶ 53; ECF No. 164-1 ¶ 53.) Thus, Lehigh Gas withheld proceeds as a form of security. (*See* ECF No. 161-10 at 12; ECF No. 161-31 at 22-23.) And—even though it had no contractual obligation to release the proceeds in the first place—it did not hold an unreasonable amount of those proceeds. The record reveals that at no point in time did Lehigh

---

[13]    Lehigh Gas's reasonable suspicions were substantiated by the discovery process which revealed that (1) UPS never sent Lehigh Gas the indemnity agreement between UPS and Soleil despite its contractual obligation to do so, (ECF No. 161-24 at 3; ECF No. 161-26 at 131-137), (2) Soleil would not pay Lehigh Gas unless UPS sent the money to Soleil first, (ECF No. 161-15 at 13), and (3) Barclays had no record of being contacted by UPS about supplying a letter of credit to Lehigh Gas, (ECF No. 93-1 at 9; ECF No. 161-28 at 2.)

Gas withhold enough credit card proceeds to cover both UPS's promised security amount and its rental obligations.  (*See* ECF No. 161-6 at 21; ECF No. 161-3 ¶ 15; ECF No. 163-1 ¶¶ 14-15; ECF No. 161-12 at 2.)  In other words, when factoring in UPS's security obligations, the presumption from the pleadings that "the $1 million in credit card proceeds allegedly withheld from UPS could have been sufficient to satisfy the missed rental payments," (ECF No. 116 at 20), has been rebutted.

At bottom, UPS did not pay its rent and Lehigh Gas did not provide UPS the proceeds to pay that rent because it needed the proceeds as security that UPS did not otherwise supply.  But Lehigh Gas contracted with UPS with the expectation that UPS would provide adequate security and pay its rental obligations without setoff.  When Lehigh Gas learned that UPS would do neither, it made the decision to terminate the franchise.  Absent any evidence of bad faith or pretext by Lehigh Gas, and analyzing the termination decision from "from the perspective of a reasonable business person charged with making such decision[]," *Patel*, 141 F.3d at 456 n.5,  the Court finds the 15 U.S.C. § 2802(c)(8) termination was reasonable and therefore permitted under 15 U.S.C. § 2802(b)(2)(C).[14]

### B.    Breach of Contract Counterclaims

Lehigh Gas seeks summary judgment on its counterclaims, which assert that (1) UPS failed to pay rent under the leases; (2) UPS failed to pay for fuel under the fuel supply agreements; and (3) Syed Kazmi failed to satisfy these debts in violation of his guaranties.  (ECF No. 161-2 at 40.) UPS's only response is that because Lehigh Gas has "failed to present sufficient evidence that would justify summary judgment under Count V," then Lehigh Gas is "not entitled to judgment as a matter of law on their Counterclaim[s]."  (ECF No. 163 at 27.)

---

[14]    UPS's failure to pay rent was not out of its reasonable control in the context of 15 U.S.C. § 2802(c)(8) for the same reasons that it was not out of its reasonable control in the context of 15 U.S.C. § 2802(b)(2)(A).  *See supra* Section III.A.1.

A breach of contract claim under Pennsylvania law requires the claimant to show three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (internal quotation marks and citation omitted). As an initial matter, the Court denies Lehigh Gas's counterclaim with respect to fuel payments under the fuel contracts. Lehigh Gas's only argument as to damages—for both rent and fuel—is that "the breaches resulted in hundreds of thousands of dollars' worth of damages sustained by Lehigh [Gas] which still have not been paid to this day." (ECF No. 161-2 at 41 (citing ECF No. 161-30 at 12 (listing "Grand Total" as $273,235.35)).) However, Lehigh Gas concedes that after UPS vacated the gas stations, Lehigh Gas "applied all the credit card proceeds to satisfy a portion of UPS's debt" and the application of those proceeds "satisfied UPS's outstanding debt for fuel" even if not for rent. (*Id.* at 22-23.) Indeed, Lehigh Gas states that the $273,235.35 amount refers to solely "unpaid rent." (*Id.* at 23.) Therefore, because any resultant damages from an alleged breach of the *fuel supply contract* have been paid off, the claim is moot.

As for the other two agreements, both are valid contracts. (*See* ECF No. 116 at 7-8 ("[I]t is undisputed that the agreements are governed by Pennsylvania law and that the Leases . . . and Security Agreements are valid and enforceable contracts.").) UPS breached the leases by failing to pay rent. *See supra* Section III.A.I. Under the guaranty agreements, Syed Kazmi "unconditionally and irrevocably guarantees the full and prompt payment when due of . . . [t]he payments to be made by [UPS] under the terms of [the leases] between [UPS] and [Lehigh Gas]." (ECF No. 161-7 at 2.) UPS disputes "the scope of the [g]uaranties" but the language relied on by UPS outlines that if UPS "fails at any time to make any part or all of its payments . . . under the . . . Lease . . . the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if

they constituted the direct and primary obligation of the Guarantor." (ECF No. 163-1 ¶ 8 (citing ECF No. 161-7 at 2).) Thus, Syed Kazmi was required to pay missed rental payments under the leases on UPS's behalf. The parties do not dispute that there is at least still some amount of unpaid rent from the period in which UPS occupied the gas stations. (ECF No. 161-3 ¶¶ 49-50; ECF No. 163-1 ¶¶ 49-50.)[15] Therefore, because Syed Kazmi was required to pay this unpaid amount given that UPS did not, he is in breach of the guaranties and there are at least some resultant damages stemming from his (and UPS's) breach.

As for damages, factual disputes remain. Lehigh Gas argues there is an outstanding rent balance of $273,235.35. (ECF No. 161-3 ¶ 50 (citing ECF No. 161-30 at 12).) The only citation Lehigh Gas provides is to a row of a spreadsheet labeled "Grand Total." (ECF No. 161-30 at 12.) Lehigh Gas provides no further elaboration on how to interpret the spreadsheet. UPS responds that the spreadsheet erroneously includes rental fees after June 1, 2020, when UPS had already vacated all of the gas stations. (ECF No. 163-1 ¶ 50.) Indeed, the spreadsheet consists of entries dated after UPS vacated all the gas stations. (*See, e.g.*, ECF No. 161-30 at 12-13.) Because Lehigh Gas has not provided an explanation of what entries should or should not be factored into a damages calculation to resolve this factual dispute, the Court is unable to award damages for UPS's and Syed Kazmi's breaches at this time.

---

[15]   The leases provide Lehigh Gas the right to charge rent to a holdover tenant. (*See* ECF No. 161-4 at 8 ("[F]or each day or fraction thereof after termination . . . of this Lease that Lessee fails or refuses to vacate the Premises, Lessee shall pay Lessor upon demand as minimum damages (i) a sum equal to one hundred twenty five percent (125%) of the monthly installment rental . . . computed on a daily basis, or (ii) a sum equal to the maximum amount of damages recoverable under the law for Lessee's holding over, whichever sum is greater.").) Therefore, because termination was lawful, the rent charged between Lehigh Gas's termination of the franchise and UPS's vacating of the gas stations factors into this unpaid amount.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, and other good cause shown, Lehigh Gas's Motion for Summary Judgment (ECF No. 161) is **GRANTED** with respect to Count V, **DENIED as moot** with respect to the fuel supply contract counterclaim, and **GRANTED** with respect to the lease and guaranty counterclaims as to liability, with damages to be determined at a later proceeding.  An appropriate Order follows.

Dated: January /5, 2026

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**